· 530

*FILED*

JUN 2 9 2007

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF
(In...) CALIFORNIA

PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

Name __**BOATMAN**__                    __**CHRISTOPHER**__
         (Last)                              (First)

Prisoner Number __**D-65055**__

Institutional Address __**CSP-SAN QUENTIN**__

E-filing

**SAN QUENTIN, CA 94964**

UNITED STATES DISTRICT COURT                    **SI**

NORTHERN DISTRICT OF CALIFORNIA

**C 07 3412**

__**CHRISTOPHER BOATMAN**__
Full Name of Petitioner                         Case No (To be provided by the
                                                clerk of court)

                                                (PR)

vs.

__**ROBERT AYERS, Warden**__          PETITION FOR A WRIT OF HABEAS CORPUS
   Name of Respondent
   (Warden or jailer)

Read Comments Carefully Before Filling In

When and Where to File

You should file in the Northern District if you were convicted and sentenced in one of these counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa, San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in this district if you are challenging the manner in which your sentence is being executed, such as loss of good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

If you are challenging your conviction or sentence and you were not convicted and sentenced in one of the above-named fifteen counties, your petition will likely be transferred to the United States District Court for the district in which the state court that convicted and sentenced you is located. If you are challenging the execution of your sentence and you are not in prison in one of these counties, your

1

petition will likely be transferred to the district court for the district that includes the institution where you are confined. Habeas L.R. 2254-3(b).

## Who to Name as Respondent

You must name the person in whose actual custody you are. This usually means the Warden or jailer. Do not name the State of California, a city, a county or the superior court of the county in which you are imprisoned or by whom you were convicted and sentenced. These are not proper respondents.

If you are not presently in custody pursuant to the state judgment against which you seek relief but may be subject to such custody in the future (e.g., detainers), you must name the person in whose custody you are now and the Attorney General of the state in which the judgment you seek to attack was entered.

## A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

1.  What sentence are you challenging in this petition?

    (a) Name and location of court that imposed sentence (for example; Alameda County Superior Court, Oakland):

__SUPERIOR  COURT__                          __FRESNO  COUNTY__
       Court                                      Location

    (b)  Case number, if known ___ **3510310**
    (c)  Date and terms of sentence  **MAY/1986--16YEARS TO LIFE**
    (d)  Are you now in custody serving this term? (Custody means being in jail, on parole or probation, etc.) Yes **X**  No

Where? __CSP-SAN QUENTIN, SAN QUENTIN, CA 94964__
       (Name of Institution)                    (Address)

2.  For what crime were you given this sentence? (If your petition challenges a sentence for more than one crime, list each crime separately using Penal Code numbers if known. If you are challenging more than one sentence, you should file a different petition for each sentence.)

__SECOND  DEGREE  MURDER  WITH  USE  OF  FIREARM.__

3.  Did you have any of the following?

Arraignment: Yes **X** No ___  Preliminary Hearing: Yes **X** No ___Motion to Suppress: Yes ___ No **X**

4.    How did you plead?

Guilty __**X**__    Not Guilty _____    Nolo Contendere _____

Any other plea (specify) ___**N/A**_____

5.    If you went to trial, what kind of trial did you have?

Jury _____    Judge alone _____    Judge alone on a transcript _____

6.    Did you testify at your trial?  Yes __ No __

7.    Did you have an attorney at the following proceedings:

(a)    Arraignment   Yes **X**         No __
(b)    Preliminary hearing         Yes **X**         No __
(c)    Time of plea   Yes **X**         No __
(d)    Trial   Yes __   No __
(e)    Sentencing   Yes **X**         No __
(f)    Appeal       Yes __         No
(g)    Other post-conviction proceeding   Yes __         No __

8.    Did you appeal your conviction?   Yes __ No **X**

(a)    If you did, to what court(s) did you appeal?

Court of Appeal         Yes __    No __    _____
                                            (Year)                    (Result)

Supreme Court of
California               Yes __    No __    _____
                                            (Year)                    (Result)

Any other court          Yes __    No __    _____
                                            (Year)                    (Result)

(b)    If you appealed, were the grounds the same as those that you are raising in this
petition?                                    Yes __ No __

(c)    Was there an opinion?       Yes __   No __

(d)    Did you seek permission to file a late appeal under Rule 31(a)?
                                             Yes __       No __

4

If you did, give the name of the court and the result:

9.      Other than appeals, have you previously filed any petitions, applications or motions with respect to this conviction in any court, state or federal?      Yes **X**      No __

Note: If you previously filed a petition for a writ of habeas corpus in federal court that challenged the same conviction you are challenging now and if that petition was denied or dismissed with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit for an order authorizing the district court to consider this petition. You may not file a second or subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28 U.S.C. § 2244(b).

     (a)   If you sought relief in any proceeding other than an appeal, answer the following questions for each proceeding. Attach extra paper if you need more space.

I.    Name of Court  **FRESNO COUNTY SUPERIOR COURT**

    Type of Proceeding  **PETITION FOR WRIT OF HABEAS CORPUS**

    Grounds raised (Be brief but specific):

    a.   **PLEASE SEE ATTACHED PETITION INSERT A**

    b.   **PLEASE SEE ATTACHED PETITION INSERT B**

    c.   **PLEASE SEE ATTACHED PETITION INSERT C**

    d.

    Result  **DENIED**            Date of Result **JANUARY/2007**

II.   Name of Court  **CALIFORNIA COURT OF APPEAL/FIFTH DISTRICT**

    Type of Proceeding  **PETITION FOR WRIT OF HABEAS CORPUS**

    Grounds raised (Be brief but specific):

    a.   **SAME AS ABOVE**

    b.

    c.

    d.

    Result  **DENIED**            Date of Result **FEBRUARY/2007**

III.  Name of Court  **CALIFORNIA SUPREME COURT**

Type of Proceeding ___ **PETITION FOR REVIEW** _____

Grounds raised (Be brief but specific):

a. ___ **SAME AS ABOVE** _____

b. _____

c. _____

d. _____

Result ___ **DENIED** _____ Date of Result __ **MAY/2007** ___

    (b)    Is any petition, appeal or other post-conviction proceeding now pending in any

court?    Yes **X** No __

## #1 DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA C 06-5234 SI
## #2 NINTH CIRCUIT COURT OF APPEALS, No. 05-16199 _____

(Name and location of court)

B. GROUNDS FOR RELIEF

    State briefly every reason that you believe you are being confined unlawfully. Give facts to

support each claim. For example, what legal right or privilege were you denied? What happened? Who

made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you need

more space. Answer the same questions for each claim.

    Note: You must present ALL your claims in your first federal habeas petition. Subsequent

petitions may be dismissed without review on the merits. 28 U.S.C. § 2244(b); McCleskey v. Zant, 499

U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).

    Claim One: __ **PLEASE SEE ATTACHED PETITION INSERT A** _____

7

Supporting Facts: __**PLEASE SEE ATTACHED PETITION  INSERT A**__

Claim Two: __**PLEASE SEE ATTACHED PETITION  INSERT B**__

Supporting Facts: __**PLEASE SEE ATTACHED PETITION  INSERT B**__

Claim Three: __**PLEASE SEE ATTACHED PETITION  INSERT C**__

Supporting Facts: __**PLEASE SEE ATTACHED PETITION  INSERT C**__

If any of these grounds was not previously presented to any other court, state briefly which grounds were not presented and why:

__**ALL CLAIMS TIMELY RAISED**__

List, by name and citation only, any cases that you think are close factually to yours so that they are an example of the error you believe occurred in your case. Do not discuss the holding or reasoning of these cases:

**PLEASE SEE ATTACHED PETITION**

Do you have an attorney for this petition?    Yes __ No **X**

If you do, give the name and address of your attorney:

**N/A**

WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in this proceeding. I verify under penalty of perjury that the foregoing is true and correct.

Executed on __**JUNE 25, 2007**__     _Christopher Bootman_
                    Date                           Signature of Petitioner

( rev 5/96)

9

CONTENTION

I

**THE BOARD OF PAROLE HEARINGS VIOLATED PETITIONER'S RIGHT TO STATE AND FEDERAL DUE PROCESS WHEN IT DENIED PETITIONER PAROLE UNDER THE PRESSURE OF THE GOVERNOR. THE ONLY DIFFERENCE BETWEEN THE APRIL 6, 2005 HEARING AND THE JUNE 29, 2006 HEARING WAS THE GOVERNOR'S REVERSAL OF THE GRANT OF PAROLE, AND OTHERWISE, ONLY POSITIVE CHANCES OCCURRED CONCERNING PETITIONER'S SUITABILITY.**

On June 29, 2006, Christopher Boatman ("Petitioner") appeared before the Board of

Parole Hearings ("Board") for his subsequent hearing after having his April 6, 2005, parole grant

reversed from the Governor. Petitioner challenges the Board's decision on the grounds that it was

based on pressure by the Governor, and therefore he did not receive a fair and impartial hearing.

The specific factors applicable to the Board and also the Governor's parole decisions, are set

forth in Penal Code section 3041 and the Board's regulations (promulgated pursuant to

subdivision (a) of section 3041) established criteria for determining suitability for release on

parole. (Cal. Code Regs., Tit. 15 ("CCR-15") section 2402.) The factor statutorily required to be

considered, and of most importance, is public safety. As stated in subdivision (b) of Penal Code

section 3041, the Board "shall set a release date unless it determines that the gravity of the

current convicted offense or offenses, or the timing and gravity of current or past convicted

offense or offenses, is such that consideration of the public safety requires a more lengthy period

of incarceration for this individual...." The factors required to be considered by the Board

regulations are for the most part specified in section 2402.

At the June 29, 2006 hearing, the Board found petitioner unsuitable for parole for two

years. Just a few months earlier, the Board setting En Banc found petitioner suitable for parole,

after a panel found that "the prisoner would not pose an unreasonable risk of danger to society or

a threat to the public safety if released from prison." (See Exhibit A, April 6, 2005 "Decision" from Board.) On August 24, 2005, Governor Arnold Schwarzenegger ("Governor") reversed the April 6, 2005 decision on the grounds that "the gravity of the murder committed by [Petitioner] presently outweighs any positive factors tending to support his parole suitability. Accordingly, because [I] believe his release from prison would pose an unreasonable risk of danger to society at this time, [I] REVERSE the Board's 2005 decision to grant parole to [Petitioner]." (See exhibit B, Governor's decision to reverse the grant of parole.)

On June 29, 2006, Petitioner appeared before the Board. The Board denied Petitioner parole for the following reasons: "The crime was very cruel. The crime was done or planned without feeling bad about hurting others. The inmate did not care people suffered. The reason for the crime was small compared to the hurt it caused. The inmate has sexually assaulted [inaudible] very much." (Exhibit C, June 29, 2006 Hearing Transcripts ("HT") p. 64.) Petitioner has never been found guilty of sexually assaulting anyone. The only negative difference between April 6, 2005 and June 29, 2006 was the Governor's reversal of the grant of parole, and otherwise, only positive changes occurred concerning Petitioner's suitability for parole. Therefore it was arbitrary and capricious to deny Petitioner parole based on the Governor's decision. The commitment offense did not change. Petitioner had matured after spending yet another year in prison. Petitioner continued to take personal responsibility for his crime. Petitioner continued to participate in self-help programs. The Psychological assessment for the Board, which was prepared on January 4, 2005, did not change. "[Petitioner] would pose a low risk if he were to be released to the community at this time." (HT 26.) Parole plans remain the same. (HT 27-30.) The 2006 decision to deny parole was based on the same factors that were considered by the 2005

2.

hearing panel, and Board "Decision Processing and Scheduling Unit," (See Exhibit D, Board Decision Processing and Scheduling Unit Letter affirming the decision to grant parole.)

The Due Process Clause of the Fourteenth Amendment prohibits state action that deprives a person of life, liberty, or property without due process law. A person alleging a due process violation must first demonstrate that he or she was deprived of a liberty or property interest protected by the Due Process Clause, and then show that the procedures that led to the deprivation were not constitutionally sufficient. Kentucky Dep't of Corrections v. Thompson, 490 U.S. 454, 459-460 (1989); McQuillion v. Duncan, 306 F.3d 895, 900 (9th Cir. 2002). In the parole context, a prisoner alleging a due process claim must demonstrate the existence of a protected liberty interest in parole, and the denial of one or more of the procedural protections that must be afforded when a prisoner has liberty interest in parole. In Sass v. California Board of Prison Terms, F.3d, No. 05-16455, 2006 WL 2506393, at * 3 (9th Cir. Aug. 31, 2006), the Ninth Circuit Court of Appeals concluded that under clearly established Supreme Court authority, "California's parole scheme gives rise to a cognizable liberty interest in release on parole." Id. at *3 (quoting McQuillion v. Duncan, 306 F.3d 895, 902 (9th Cir. 2002)). The liberty interest exists even for prisoners who have not already been granted a parole date. Id. (citing Biggs v. Terhune, 334 F.3d 910, 915 (9th Cir. 2003)).

Having concluded that California state prisoners have a protected liberty interest in parole under the United States Constitution, the courts should apply something more than the "some evidence" standard, the narrowest review standard, and instead apply the "preponderance of the evidence" standard used in civil cases. First, the "some evidence" standard of judicial review evolved from the Superintendent v. Hill (1985) 472 U>S. 445, 455 ["Hill"]. See In re Powell, 45 Cal.3d at 904. The United States Supreme Court prescribed the "some evidence"

3.

standard in Hill to apply to a hearing at which disciplinary charges were based on a confidential source causing the prisoner's due process right to be diminished by the prison's need for security and confidentiality.

A California term-to-life prisoner's due process right is not diminished because neither the parole determination process used by the Board nor adjudication of habeas corpus claims require disclosure of a confidential source or involve any security concerns. Second, the State's court's that adopted Hill's "some evidence" standard to review parole decisions expressively held that California's term-to-life prisoners did not have a due process liberty interest in a parole grant. In re Powell, supra, 45 Cal.3d at 911. The contrary has now been established. Sass v. Cal. Bd. of Prison Terms, 461 F.3d 1123 (9th Cir. 2006); McQuillion, 306 F.3d at 902; Rosenkrantz, 29 Cal.4th at 621. Due Process demands a finding what is now defined as a vested liberty interest protected by the Due Process Clause. Third, Hill excluded claims that allege that **procedure** used by the agency did not comply with state law, (472 U.S. at 457 ["respondents relied only upon the Federal Constitution and did not claim that the disciplinary board's findings failed to meet evidentiary standards imposed by the state law"].) Although the California Courts have not yet ruled on the matter, a decision by the Supreme Court of Minnesota, however, authenticated the reasoning above. (In Carrillo v. Fabian, 701 N.W.2d 763; 2005 Minn. LEXIS 424.)

The Carrillo court held that "The 'some evidence' standard sends the message to prison inmates as well as society at large that once an individual is convicted of a crime, he is presumed guilty of every subsequent allegation. This message runs contrary to fundamental principles of criminal law in the United States. ... Taking the Supreme Court's three factors into consideration, we conclude that the 'some evidence' standard is inappropriate for use by the DOC at the fact-finding level. We conclude that the 'preponderance of the evidence' standard better protects

4.

against an erroneous deprivation of an inmate's liberty interest in his supervised release date and does not impose an unacceptable burden on the DOC." The Court should have apply the above reasoning to require a preponderance of the evidence in the record to uphold a board's panel's or governor's parole decision. The Board's decisions are suppose to be based on a preponderance of the evidence of parole suitability in the record. "**Good cause**" is the standard (In re Powell, supra, 45 Cal.3d at 901; In re Brown (1967) 67 Cal.2d 339, 342; In re McClain (1960) 55 Cal.2d 78, 87; In re Caswell (2001) 92 Cal.app.4th 1017, 1024, 1026; In re Clutchette (1974) 39 Cal.App.3d 561; In re Monzo (1973) 33 Cal.App.3d 144, 147; and Cal. Code of Regs. tit. 15 ("CCR-15") section 2450) "Good cause" is defined by the Board as "**a preponderance of the evidence** that there is a factual basis and good reason for the decision made." CCR Title 15 § 2000(b)(48) (emphasis added.) However, even if the "some evidence" standard is used in this case, not even that standard has been met. Furthermore, in addition, due process requires that the evidence must have "some indicia of reliability." (Biggs v. Terhune, 334 F.3d at 915.) "California's parole scheme gives rise to a cognizable liberty interest in release on parole." Id. at *3 (quoting McQuillion v. Duncan, 306 F.3d 895, 902 (9th Cir. 2002)). The liberty interest exists even for prisoners who have not already been granted a parole date. Id. (citing Biggs v. Terhune, 334 F.3d 910, 915 (9th Cir. 2003)). (In re Jeffery Elkins, (2006) Cal.App.4th (First Appellate District, filed 10/30/06.) The Elkins Court further stated that "[t]he commitment offense is one of only two factors indicative of unsuitability a prisoner cannot change (the other being his 'Previous Record of Violence'). Reliance on such an immutable factor 'without regard to or consideration of subsequent circumstances' may be unfair [citation] and 'runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation.' [Citation] The commitment offense can negate suitability only if circumstances of the crime

5.

reliably established by the evidence in the record rationally indicate that the offender will present an unreasonable public safety risk if released from prison." In comparison with that of Jeffery Elkins' case, Petitioner's commitment offense and prison behavior is far less serious. Elkins was found guilty of first-degree murder when he beat his 19 year old high school classmate to death with a baseball bat while he slept in order to rob him. Elkins later put the body in the trunk of his car and went to sleep. He throw the body over a cliff, then stole numerous items from the victim's storage unit and victim's girlfriend's residence. Yet, in that case the court found it arbitrary to rely on the commitment offense to deny parole. The court, citing Rosenkrantz v. Marshall (C.D. Cal. 2006) 444 F.Supp.2d 1063, 1065, 1070, stated that "While relying upon petitioner's crime as an indicator of his dangerousness may be reasonable for some period of time, in this case, continued reliance on such unchanging circumstances - after nearly two decades of incarceration and half a dozen parole suitability hearings - violates due process because petitioner's commitment offense has become such an unreliable predictor of his present and future dangerousness that it does not satisfy the 'some evidence' standard. After nearly twenty years of rehabilitation, the ability to predict a prisoner's future dangerousness based simply on the circumstances of his or her crime is nil. [Citation.]" Same holds true in the instant case. Petitioner has not been afforded federal and state constitutional due process guaranties in the course of the Board's refusal to follow the Legislative intent to "normally grant" parole and give him a fair and meaningful review of his suitability.. (See Hicks v. Oklahoma (1980) 447 U.S. 343 [arbitrary deprivation of a state statute affecting life or liberty constitutes a violation of federal due process.].) The Court should grant the petition and order his immediate release.

**CONTENTION II.**

## A CONTINUOUS DENIAL OF PAROLE BASED ON THE COMMITMENT OFFENSE IS A VIOLATION OF THE PLEA AGREEMENT AND THEREFORE VIOLATES PETITIONER'S STATE AND FEDERAL DUE PROCESS AND EQUAL PROTECTION OF THE LAW UNDER THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION

Pursuant to a negotiated plea, Petitioner pled guilty to second degree murder. Plea agreements are contractual in nature and are measured by contractual law standards. In California, "[a]ll contracts, whether public or private are to be interpreted by the same rules ..." CAL. CIV. CODE § 1635 (See also, Shelton, 4th at 344. A court must first look to the plain meaning of the agreement's language. United States v. Keller, (9th Cir. 1990) 902 F.2d 1391, 1393. As with other contracts, provisions of the plea agreements are occasionally ambiguous and the government must bear responsibility for any lack of clarity. U.S. v. De La Fuente, (9th Cir. 1993) 8 F.3d 1333. 1337-1338. The Court noted that a plea agreement is governed by the laws of contracts. Furthermore, in Shelton, 37 Cal.4th at 344, a court must first look to the plain meaning of the agreement's language, if the language in the contract is ambiguous, "it must be interpreted in the sense in which the promisor believed at the time of making it, that the promisee understood it" (Cal. CIV CODE § 1649.) The inquiry considers not the subjective belief of the promisor but, rather, the "objectively reasonable" expectation of the promisee. Bank of the West v. Superior Court, 2 Cal.4th 1245. 1265 (1982); Badie v. Bank of Am., 67 Cal.App.4th 779, 802 n. 9 (1998) ("Although the intent of the parties determines the meaning of the contract, the relevant evidenced by the words of the instrument, not a party's intent..." Shelton, 37 Cal.4th at 767. If after the second inquiry the ambiguity remains, "the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist." 345 (ambiguities [in a plea agreement] are construed in favor of the defendant") received consideration of value.

7.

The mere opportunity to appear before a second punishment tribunal that historically maximizes the punishment for the majority of those under its jurisdiction is not actual consideration. It is not the less sever punishment system leniency [or] lessened punishment" owed by the state to Petitioner. (See Victoria v. Supreme Court, (1985) 40 Cal.3d 634, 639, 645; see also, Brown v. Poole (9th Cir. 2003) 337 F.3d 1155.

The State, through the District Attorney's Office, offered Petitioner a plea bargain wherein he would receive the promise of the possibility of parole. The Board's decision to use the District Attorney's opposition for parole as some evidence to deny parole is a breach of the plea agreement Petitioner and the State entered when Petitioner plead guilty. See Santobello v. New York, 404 U.S. 257, 262 (1971); Buckley v. Terhune, 441 F.3d 688 (9th Cir. 2006) (enbanc). "As recognized by the [Board], the inhumanity of the murder will never change, it will not minimize in its shockingness over time. A later decision that the murder 'wasn't so bad' will never be made, and if it were, such a decision would be clearly arbitrary. Therefore, if the [Board's] decision to deny parole based on the nature of the offense is permitted to stand, contrary to the parole statutes which logically measures parole eligibility on the information of the prisoner after the proscribed period of punishment, parole eligibility is an impossibility, not possibility. The parole statutes do not vest the [Board] with the power to resentence petitioner." Johnson 2006 WL 195159 at *8. The impossibility of parole is a breach of the agreement made by the State and Petitioner. Furthermore there is nothing in the law that allows the Board use the District Attorney's opposition as some evidence to deny parole. Such a law would be unconstitutional because it gives the District Attorney power to retry the case, resentence prisoners, and violate plea bargain agreements.

INSERT B (cont.)

The statutory rules require the parties of Petitioner's plea agreement to consider his commitment offense solely as a second degree murder, one that is lacking the element of premeditation and deliberation, and not to it as a the greater offense of a first degree murder. Facts allegedly showing a higher degree, therefore, may not properly be considered in evaluating the circumstances of Petitioner's plea based on commitment offense, which is stipulated to be a lower degree. A contrary rule would negate the very terms of the plea bargain, which unless otherwise stated is based on the understanding that no adverse sentencing consequences will be suffered by reason of facts underlying and solely pertaining to a higher degree or dismissed or unchanged count. (People v. Harvey (1979) 25 Cal.3d 754, 758.) A guilty plea in not voluntary if induced by unfulfilled promise. (Brady v. United States (1970) 397 U.S. 742, 745., As the California Sixth Appellate Court recently held: " .... [I]t should be self evident that after an inmate has served the equivalent of 25 years, whether his actions were more than minimally necessary for a second degree conviction ... is no longer the appropriate question. [The Board's] position, that inmates who were only convicted of second degree may forever be denied parole based on some modicum of evidence that their acts rose to the level of a first, without acknowledging the fact that they have already served the time for a first, should be seen as so ridiculous that simply to state it is to refute it." (In re Bernard John Weider, 2006 DJDAR 15795, 15798.)

The Superior Court's reliance on Petitioner's commitment offense, and dismissed charges, is unreasonable and contrary to the reasoning of the United States Supreme Court in Thompson v. Oklahoma, 487 U.S. 815, 835 (1988); see also, Stanford v. Kentucky, 492 U.S. 361, 395 (1989); cited in Rosenkrantz v. Marshall, CV-05-3836-GAF (AJW), p. 42, filed June 26, 2006.

To the extent, the Superior Court's decision can be read to indicate reliance on the fact that Petitioner's crime was first degree felony murder, yet Petitioner was only convicted and sentenced for a second degree murder. The length of time Petitioner has already served, combined with his custody credits, makes him eligible for parole had he committed the most egregious type of first degree murder described by the Board's own Matrix guidelines. (Torture/murder of a public official CCR-15 § 2403(c).) Once a petitioner convicted of second degree "reaches that point" in time such that he would be "eligible for parole if he had been convicted of first degree" it is necessary to "consider whether his offense would still be considered especially egregious for first degree murder." In re Rosenkrantz (2002, 29 Cal.4th 616, 690, J. Moreno concurring. Original emphasis.) The States dismissal of charges and plea agreement cannot now operate to put Petitioner in a worse position. As there is no evidence whatsoever supporting the Board's action. See In re Smith (2003) 109 Cal.App.4th 489, 507.

This is a classic case where, putting aside the commitment offense, "all other factors clearly indicate [Petitioner] is suitable for release on parole." Scott II, supra, 133 Cal.App.4th at 594.) As the Northern District Court of California cautioned about a Governor [therefore Board] sole reliance on "the circumstance of the offense and conduct prior to the offense," [citation] constitutes a due process violation." Martin v. Marshall, F.Supp.2d___, 2006 WL 1344584 (N.D. Cal.).

For the foregoing reasons the Court should enforce the plea agreement and order that Petitioner be released on parole immediately.

INSERT C

## CONTENTION III.

## THE BOARD OF PAROLE HEARINGS VIOLATED PETITIONER'S STATE AND FEDERAL DUE PROCESS WHEN THEY IGNORED THE DOCTRINES OF RES JUDICATA AND COLLATERAL ESTOPPEL WHEN THE BOARD RELITIGATED FACTORS AND REVERSED THEIR FINDINGS THAT HAD BEEN LITIGATED AND DECIDED AT HIS 2005 PAROLE HEARING

On June 29, 2006 Petitioner appeared before a parole and was denied two year (Exhibit "A") Petitioner was denied parole by the same Board that found him suitable just over thirteen months earlier on April 6, 2005.[1] (Exhibit "C") Prior to being found suitable [1] for parole, Petitioner had appeared before the Board six times and was denied parole. Under the doctrines of Res Judicata and Collateral Estoppel, the Board is barred from relitigating a claim previously tried and decided.

Collateral Estoppel precludes relitigation of issues argued and decided in prior proceedings. (Teitelbaum Furs, Inc. v. Dominiom Inc. Co., Ltd,. (1962) 58 Cal.3d 601, 604 25 Cal.Rptr. 559, 375 P.2d 439.) Co., Ltd. (1962) 58 Cal.3d 601, 604 25 Cal.Rptr. 559, 375 P.2d 439.) In order to establish collateral estoppel, several threshold requirements must be met; "First, the issue was decided a former proceeding. Second, this issue must have been actually litigated in a former proceeding. Third, it must have been necessarily decided in a former proceeding. Fourth, it must be final and on the merits. Finally, the party against whom preclusion is sought must be the same as, or in privity with the party to the former proceeding. (Lucido v. Superior Court, (1990) 51 Cal.3d 335, 341, 272 Cal.Rptr. 7667, 795 P.2d 1223; See also People v. Simms, (1982) 32 Cal. 3d 468, 484, 186 Cal.Rptr. 77 651 P.2d 321.) Also, See, Greenblatt v. Drexel Burnham Lambert, Inc., 763 F.2d 1352, 1360 (11th Cir. 1985). The issue previously presented in

---

[1] Petitioner was found suitable for parole once before in 2002 and his parole date was rescinded by Governor Davis in 2002

INSERT C (cont.)

the 2005 parole consideration hearing is identical to the issue Petitioner presented in the instant action. The issue presented was final upon its merits, and confirmed by the full Board members. All the parole consideration hearing panels that Petitioner has appeared before, are all of the same entity. The Relationship is sufficient to establish privity. "Collateral Estoppel may be applied to decisions made by administrative agencies [W]hen an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it, of which the parties have had an adequate opportunity to litigate." (People v. Simms, 32 Cal.3d 468.) The Supreme Court in Simms found that an administrative agency (DSS) acted in a judicial capacity when it required a hearing to be an impartial hearing and that "[a]ll testimony . be submitted under oath of affirmation." It also required that a verbatim record of the testimony and exhibits introduced at the hearing be maintained. In addition, the parties received written statement of outcome of the hearing. The Supreme Court found that the decisions are adjudicatory in nature and that parties had the right to petition for review in superior court. People v. Simms, 32 Cal.3d at p. 479- 480. See Also, Clark v. Bear Stearns & Co., Inc., 966 F.2d 1318. L In addition, like Simms, the parole consideration hearing was administrative in nature and was heard by a officer (Board Commisioner, an officer of the State) who conducted the hearing pursuant to a statutory mandate. Petitioner's June 29, 2006 parole consideration hearing falls under the doctrine of Res Judicata and Collateral Estoppel. Petitioner had appeared before the Board six times prior to being found suitable for parole. Petitioner's confirmation parole date was rescinded by Governor Davis in 2002 before the full Board further made the parole consideration hearing final. The Governor's review should not make the Board's parole suitability finding invalid, and automatically subject Petitioner to another parole consideration hearing.

Furthermore, public policy consideration precludes application herein. The policy

12.

consideration includes the preservation of the integrity of the judicial economy, and protection of the litigant from harassment by vexatious litigation. Lucido, supra, 51 Cal.3d at 43, 272 Cal.Rptr. 767, 795 P.2d 622. To continue to subject Petitioner to reappear before a parole consideration panel, does not promote judicial economy, as can clearly be seen by the numerous parole denials being litigated by similarly situated prisoners. Petitioner was found suitable for parole at his sixth hearing, which was affirmed by the full Board.

If an individual commissioner of the Board of Parole hearings can find an inmate suitable for parole one year, but not the next, when nothing but positive programming has occurred during the interim period, commissioners are not requiring the evidence considered to have some indicia of reliability. It is more apparent then ever that parole decisions are arbitrary and capricious as demonstrated by this case.

It is obvious Governor Schwarzenegger's power over parole hearings has forced the commissioners he appoints to abandon their independent roles. No case can illustrate that better than this case where the same commissioners who found facts that cannot change, to have somehow changed. Because the facts assessing the commitment offense are the most routine of reasons for denials of parole suitability, and this case demonstrates that assessment is influenced by the Governor's power of appointment and not the underlying facts, and that Petitioner was denied due process at his 2006 parole hearing. For that reason, coupled with the holding of approximately 5,000 parole hearings a year, this case will shed invaluable light on the arbitrary and capricious manner these hearings are held and where due process is routinely denied to prospective parolees who have recognized their responsibility for going prison, but have made incredible efforts to address their own deficiencies.

13.

The Superior Court's denial of this claim is unreasonable and contrary to clearly established federal law. The Double Jeopardy Clause embodies the corollary doctrine of collateral estoppel and res judicata. Ashe v. Swenson, 397 U.S. 436, 444-45 (1970). Collateral estoppel "means simply that when an issue of ultimate fact has once been determined by a valid and final judgment that issue cannot again be litigated between the same parties in any future lawsuit." (Id. at 443.) Since the Board's decision became final for the Board after 90 days of the hearing, it lost jurisdiction over the matters that had already been determined to show that Petitioner is suitable for parole. The doctrine bars the introduction in a subsequent hearing of evidence that was used against Petitioner in previous hearings if the Board attempts to use this evidence to prove a fact previously found against it. U.S. v. Gonzalez-Sanchez, 823 F.2d 572, 583-84 (1st Cir.); U.S. v. Johnson, 697 F.2d 735, 739-40 (6th Cir. 1983); U.S. v. Weems, 49 F.3d 528, 531-33 (9th Cir. 1995); and U.S. v. Corley, 824 F.2d 931, 933 (11th Cir. 1987). Collateral estoppel has its most sweeping effect when every issue in a case has necessarily been determined in the defendant's favor in a previous proceeding, because it precludes the government from prosecuting the case. Ashe, 397 U.S. at 466; De La Rosa v. Lynaugh, 817 F.2d 259, 268 (5th Cir. 1987); U.S. v. Barragan-Cepeda, 29 F.3d 1378, 1380-82 (9th Cir. 1994); and U.S. v. Garcia, 78 F.3d 1517, 1520-22 (11th Cir. 1996).

Since being granted parole, the only new evidence that is negative for Petitioner is the Governor's denial. All other evidence is positive and demonstrates Petitioner's continued efforts to do well in what has now been determined to be an overcrowded and extremely dangerous prison system for both inmates and prison staff. (Governor's Schwarzenegger's State of the State address of January 9, 2007.)

14.

INSERT C (cont.)

## CONCLUSION

After fulfilling and exceeding all the requirements placed on him by the Board and being found suitable by the full Board, then having to appear before an additional review by the Governor without any of the due process required - e.g., to be present and heard - and have his grant of parole rescinded, should not automatically subject Petitioner to reappear before a parole consideration panel to again have elements that had already been found in his favor be used against him violates the Doctrine of Res Judicata and Collateral Estoppel. For the above mentioned reasons, this Court should grant the petition and order Petitioner released.

DATED: June 25, 2007                    Respectfully submitted;

                                        Christopher Boatman
                                        Christopher Boatman
                                        Petitioner in Pro Se

15.

EXHIBIT A

47

1          **CALIFORNIA BOARD OF PRISON TERMS**

2                    **D E C I S I O N**

3          **DEPUTY COMMISSIONER MAY:**  We're on record.

4          **PRESIDING COMMISSIONER LEE:**  All right.  In

5    the Subsequent Parole Consideration of Christopher

6    Boatman.  The Panel has had a great difficulty in

7    making this determination.  The reason being is

8    that there are factors in mitigation in regards to

9    Mr. Boatman's offense: first of all, that he was

10   young, he was taking drugs, that he was not the

11   shooter.  The aspects that negate that, however,

12   are the fact that he was clearly out of control at

13   the time.  He was already on probation.  He was

14   apparently involved in a lifestyle which led him to

15   voluntarily be a part of this robbery to the extent

16   that he actually furnished the firearm, which led

17   to the death of a young man that had no reason to

18   die whatsoever.  But again, I am bound by the law

19   and the law is that this is a sentence of 16 years

20   to life.  Because it's 16 years to life, the

21   anticipated plea bargain would be that the Board of

22   Prison Terms would determine whether or not this

23   man is a threat to society. And I'd like to make

24   my statements up front, just in case you decide to

25   change your mind and try to tell me that I'm wrong,

26   then I can change my mind.  I cannot conceive of a

27   **CHRISTOPHER BOATMAN   D-65055 DECISION PAGE 1 4/6/05**

48

1   situation where a person did not know the
2   ramifications of either what he was going to do or
3   what he pled to.  And when you indicate to me that
4   you didn't know someone was going to get hurt or
5   possibly get hurt or that if you pled guilty, you
6   thought you were only going to do 10 years, that's
7   naïveté to the highest degree.  But I can't hold
8   that against you, because unfortunately, I mean, if
9   everybody was brilliant, they wouldn't be in this
10  institution.  And I'm hoping that if you are true
11  to what you've indicated in regards to your faith,
12  then you've matured enough to know that wisdom
13  comes from experience and that the experience that
14  you've had from sitting in jail for close to 19
15  years has taught you something.  So the Panel
16  reviewed all information received from the Public
17  and relied upon the following circumstances in
18  concluding that the prisoner is suitable for parole
19  and would not pose an unreasonable risk of danger
20  to society or a threat to the public safety if
21  released from prison.  Number one, the inmate has
22  no juvenile record of assaulting others.  Number
23  two, he has a stable social history, as exhibited
24  by the reasonably stable relationship with others.
25  I'm going to tell you, sir, that very unlikely that
26  I'm ever going to have a situation that occurs as
27  **CHRISTOPHER BOATMAN  D-65055 DECISION PAGE 2 4/6/05**

49

1   today occurred.  And one of the big reasons that
2   I've noticed is that both situations that I was
3   involved in today had very stable relationships and
4   you're very fortunate that you have a family that's
5   willing to support you.  While in prison, he has
6   enhanced his ability to function within the law
7   through educational programs, self-help programs,
8   vocational programs, and his job assignments.  I am
9   not taking into account significant stress in your
10  life.  The reason why I'm not taking that into
11  account is because I don't believe your stress is
12  any greater than anybody else's stress.  However, I
13  will take into account that you did not -- you lack
14  a significant criminal history of a violent nature.
15  You did in fact do some things that you were placed
16  on probation for.  That whole sexual thing, I just
17  let it go because that was something that
18  (inaudible), though Governor obviously was
19  concerned about it, the previous Governor.  I'm
20  going to tell you right now, there's a distinct
21  possibility that everything that Commissioner, as
22  well as myself, is saying is going to be reversed.
23  I'm going to tell you, this is a very serious
24  crime.  You have realistic plans, which include job
25  offers as well as family support, to live with your
26  family, as well as continue to go back to digging
27  **CHRISTOPHER BOATMAN  D-65055 DECISION PAGE 3 4/6/05**

50

1   wells, I guess.  You've maintained close family
2   ties while in prison.  You've maintained positive
3   institutional behavior, which indicates significant
4   improvement in self-control.  You show signs of
5   remorse.  You have indicated that you understand
6   the nature and the magnitude of the offense and
7   accepted responsibility for the criminal behavior
8   and desire to change toward good citizenship.  I
9   will commend you in this one area.  Not once did
10  you point the finger at the codefendant, saying he
11  did the shooting.  What you said for the record was
12  that you didn't know he was going to do that.  I
13  think if you had shifted the blame, maybe the
14  decision might have been different.  Psychological
15  factors.  As of January 2005, Dr. Wantuch indicated
16  that you were a low risk, that in her impression,
17  the report, that you are favorable for a grant of
18  parole.  In regards to the September 7th, year 2004
19  authored by Cornberg, that report also was
20  favorable.  In regards to the base term, base life
21  offense which the prisoner has been convicted of is
22  murder in the second degree, pursuant to Penal Code
23  section 187.  Date of the offense was May 29th,
24  1986.  Term is derived from the matrix located at
25  CCR Title XV at 2403-C, second degree murder.  The
26  Panel finds that category 3-C is appropriate in
27  **CHRISTOPHER BOATMAN   D-65055 DECISION PAGE 4 4/6/05**

51

1    that you had no relationships with the victim and

2    death was not immediate.  The Panel assesses 240

3    months as the base term and notes this is the

4    midterm.  There are no aggravating or mitigating

5    circumstances to change from the midterm --

6    sufficiently change from the midterm.  This point

7    in time, we're not going to aggravate this offense.

8    Parole is granted.  This decision is -- If this

9    decision is final, you will get a date of parole.

10   We'll send a copy of this decision.  However, the

11   decision is subject to the Governor's exercising

12   his review authority.  In case number 3510310, in

13   regards to count one, murder in the second degree,

14   you are getting 240 months.  You will receive also

15   six months pursuant to the weapons charge.  Total

16   term, 246 months.  Time credit from September 3,

17   1987 to today's date, April 6th, year 2005, is 71

18   months, giving you a total of 175 months.  You are

19   beyond that period of time.  I will now inform you

20   in regards to what the procedure will be.  At this

21   time, once documentation has been reviewed, what

22   will happen is that the investigative unit of the

23   BPT will investigate all documentation.  They will

24   basically check to see whether or not your job

25   references, as well as your home references, are

26   valid.  I would strongly suggest that you pray that

27   **CHRISTOPHER BOATMAN   D-65055 DECISION PAGE 5 4/6/05**

52

1    nothing falls through, because that is a simple
2    reversal and it's my understanding that if anything
3    is faulty --

4         **INMATE BOATMAN:**  No, it's not.

5         **PRESIDING COMMISSIONER LEE:**  -- that that is
6    an automatic reversal.  At that point in time, it
7    goes to the Governor, at which time the Governor
8    will decide whether to allow this grant or reverse
9    the grant.  He can also send it (inaudible) back to
10   the Commission, at which time the set of
11   Commissioners will make a decision as to whether or
12   not Deputy Commissioner and I made a mistake.  Mr.
13   Boatman, I'm going to tell you that I feel that I'm
14   taking a chance with you.  I believe that even
15   though you have done everything conceivable that
16   the institution can give, that I conceivably, well,
17   could have denied you based upon the offense.  I
18   felt that your handing your gun over was beyond
19   (inaudible) in regards to felony murder.  But
20   again, having 115s seems to be more -- not having
21   115s impressed us.  I think also the remarks by the
22   psychiatrist, who oftentimes we disagree with,
23   seemed to be consistent.  The other thing that I
24   will congratulate you in, sir, or commend you, is
25   that oftentimes we have people come in here and
26   attempt to tell us that they are Christians or they
27   **CHRISTOPHER BOATMAN   D-65055 DECISION PAGE 6 4/6/05**

53

1    are Buddhists or they are American Indian

2    spiritualists and they changed their lives in this

3    or that nature.  You did not attempt to persuade us

4    in such a fashion.  Obviously, your faith is that

5    strong and will keep you out of trouble.  So having

6    said that, Commissioner?

7        **DEPUTY COMMISSIONER MAY:**  Yeah, I wanted to

8    -- I want to add something, since we mentioned

9    about the psychiatric report.  Another psychiatric

10   report that I think should be on record for your

11   favor, we should also include the one by --

12   September the 29th, 2000 by Dr. Buchan, B-U-C-H-A-

13   N.  Dr. Buchan concluded,

14        "This man is not a criminal.  I

15        believe that it is very unlikely that

16        Mr. Boatman would behave violently if

17        released, that his violence potential

18        is actually less than that of an

19        average person.  Should he be

20        released, he will be a solid citizen,

21        son, brother, and hopefully someday a

22        husband and father.  There is no

23        psychological reason to deny him

24        immediate parole.  This decision to

25        grant him parole should be based on

26        other than psychological factors."

27   **CHRISTOPHER BOATMAN  D-65055 DECISION PAGE 7 4/6/05**

54

1   With that, I'll conclude.  Good luck to you.

2           **INMATE BOATMAN:**  Thank you.

3           **PRESIDING COMMISSIONER LEE:**  It is 6:00 P.M.

4   This hearing is (inaudible).

5           **INMATE BOATMAN:**  Thank you, Commissioner Lee

6   and Commissioner May.  I won't disappoint you.  You

7   have my word on that.

8                           --oOo--

9

10

11

12

13

14

15

16

17

18

19

20

21

22                                  PENDING REVIEW

23  **PAROLE GRANTED**                 AND APPROVAL

24  **THIS DECISION WILL BE FINAL ON:** _____

25  **YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT**

26  **DATE, THE DECISION IS MODIFIED.**

27  **CHRISTOPHER BOATMAN  D-65055 DECISION PAGE 8 4/6/05**

55

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, MATTHEW YATES, a duly designated
transcriber, CAPITOL ELECTRONIC REPORTING, do
hereby declare and certify under penalty of perjury
that I have transcribed tape(s) which total one in
number and cover a total of pages numbered 1
through 54, and which recording was duly recorded
at CALIFORNIA STATE PRISON, SAN QUENTIN at SAN
QUENTIN, CALIFORNIA, in the matter of the
SUBSEQUENT PAROLE CONSIDERATION HEARING of
CHRISTOPHER BOATMAN, CDC No. D-65055, on APRIL 6,
2005 and that the foregoing pages constitute a
true, complete, and accurate transcription of the
aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested
party in the above-captioned matter and have no
interest in the outcome of the hearing.

Dated April 27, 2005 at El Dorado County,
California.

Matthew Yates
Transcriber
**CAPITOL ELECTRONIC REPORTING**

EXHIBIT B

# INDETERMINATE SENTENCE PAROLE RELEASE REVIEW
(Penal Code Section 3041.2)

## CHRISTOPHER BOATMAN, D-65055
## SECOND-DEGREE MURDER

AFFIRM:

MODIFY:

REVERSE:                                    X

On May 29, 1986, Christopher Boatman and crime partners Harold Jones and Roland Montgomery decided to rob a store to obtain money for drugs. Mr. Boatman retrieved a .22-caliber revolver from his home and the three got into his car. After driving around, they stopped at the home of Chris Besel who, after hearing of the robbery plan, questioned the group about how they planned to get away with the crime since they had no masks and could easily be identified. Mr. Jones responded, "We're not going to worry about that."

Mr. Boatman and his partners left Mr. Besel's home and went to the 41 Market as planned. Mr. Montgomery remained in the car while Mr. Boatman and Mr. Jones entered the store. The store was empty except for one clerk, 19-year-old John Sousa. As Mr. Boatman stood watch at the doorway, Mr. Jones confronted Mr. Sousa with the gun and demanded money. Without resisting, Mr. Sousa emptied the contents of the cash register and gave the money to Mr. Jones. Then, when Mr. Sousa turned away, Mr. Jones shot him once in the back of the neck. Mr. Boatman and his partners fled in the car. Mr. Sousa was later discovered by a customer and emergency personnel were called. He was transported to a local hospital where he later died.

Mr. Boatman was arrested a few days later. He was 21 years old at the time. He pled guilty to second-degree murder and was sentenced to 15 years to life in prison, plus a one-year enhancement for the use of a firearm.

This was not Mr. Boatman's first conviction. He was previously convicted of grand theft and petty theft as an adult—and was on both felony and misdemeanor probation when he committed the murder of Mr. Sousa. He also was arrested at age 18 for two counts of rape with force or fear, but the charge was later reduced to unlawful sex with a minor and ultimately dismissed. Although not convicted, Mr. Boatman has consistently admitted to having sexual intercourse with the 14-year-old girl in this case.

Since his incarceration for Mr. Sousa's murder, Mr. Boatman has remained discipline-free and has worked to enhance his ability to function within the law upon release by regularly participating in self-help and therapy programs, including Narcotics Anonymous, KAIROS, Alcoholics Anonymous, spirituality classes, and Alternatives to Violence. He also has upgraded himself educationally and vocationally by earning his GED and training in welding, plumbing, and machine-tool technology. Likewise, Mr. Boatman has received favorable evaluations in

Christopher Boatman, D-65055
Second-Degree Murder
Page 2

recent years from various correctional and mental-health professionals, has maintained
seemingly positive relationships with family and friends, and has made realistic, confirmed plans
to live with his parents and work for their well-drilling business upon parole. These are all
positive factors supportive of Mr. Boatman's release from prison to parole.

Although he claims to have remorse and accept responsibility for Mr. Sousa's murder, Mr.
Boatman has maintained throughout his incarceration, and as recently as during his 2005 parole
hearing, that he did not know anyone would get hurt during the robbery despite his crime
partner's remarks beforehand that there would be no concern about being identified by witnesses.
This to me is some evidence that Mr. Boatman may not fully grasp the consequences of his
actions or the magnitude of his role in this murder. Regardless of Mr. Boatman's claimed belief
as to what would happen, it was he who brought along the gun—and he was an active, willing,
and major participant in a planned armed robbery that resulted in the shooting death of
Mr. Sousa. Mr. Boatman's actions therefore exceeded the minimum necessary to sustain a
conviction for second-degree murder, and make the murder for which he was convicted
especially heinous. This factor alone is enough for me to conclude at this time that
Mr. Boatman's release from prison would pose an unreasonable public-safety risk. Moreover,
the manner in which Mr. Sousa was murdered was particularly cruel and senseless. Mr. Sousa
fully cooperated with his assailants and then was shot in the neck after he turned away.

The Fresno County District Attorney's Office sent a letter to the Board earlier this year opposing
Mr. Boatman's parole based on the gravity of the murder he committed and his criminal history.

Mr. Boatman is now 40 years old and has made some creditable gains in prison over the years.
But based on the current record before me and after carefully considering the very same factors
the Board is required to consider, I find the gravity of the murder committed by Mr. Boatman
presently outweighs any positive factors tending to support his parole suitability. Accordingly,
because I believe his release from prison would pose an unreasonable risk of danger to society at
this time, I REVERSE the Board's 2005 decision to grant parole to Mr. Boatman.

Decision Date: 8|24|05

ARNOLD SCHWARZENEGGER
Governor, State of California

EXHIBIT C

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )        CDC Number D-65055
Hearing of:               )
                          )
CHRISTOPHER BOATMAN       )
_____)

SAN QUENTIN STATE PRISON

SAN QUENTIN, CALIFORNIA

JUNE 29, 2006

1:51 P.M.

PANEL PRESENT:

Michael Porter, Presiding Commissioner
Chuck Wolk, Deputy Commissioner

OTHERS PRESENT:

Christopher Boatman, Inmate
Candace Christensen, Attorney for Inmate
James Sanderson, Deputy District Attorney
Two Correctional Officers, Unidentified

INMATE
COPY

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____  No        See Review of Hearing
_____  Yes       Transcript Memorandum

Ted Rivera      Vine, McKinnon & Hall

ii

INDEX

Page

Proceedings....................................... 1

Case Factors..................................... 1

Pre-Commitment Factors............................16

Post-Commitment Factors...........................22

Parole Plans......................................27

Closing Statements................................58

Recess............................................63

Decision..........................................64

Adjournment.......................................66

Transcriber Certification.........................67

--oOo--

1

1          **P R O C E E D I N G S**

2          **PRESIDING COMMISSIONER PORTER:** Okay, we're on

3     record. Okay, the time is 1:51. This is a Subsequent

4     Parole Consideration Hearing for Mr. Christopher Boatman.

5     Back on record. Okay, we're back on record. This is a

6     Subsequent Parole Consideration Hearing for

7     Mr. Christopher Boatman, CDC number D as in David, 65055.

8     Today's date is 6/29/06. We are located at San Quentin

9     State Prison. The inmate was received on 9/3/87, from

10    Fresno County. The life term began on 9/3/87. From a

11    minimum eligible parole date, is 1/31/97. The

12    controlling offense for which the inmate has been

13    committed is murder. Second degree, use of firearm.

14    Case number FRE351031-0. Count One, Penal Code section

15    187 PC 12022A. The inmate received a term of 16 years to

16    life with a minimum eligible parole date of 1/31/97.

17    This hearing is being tape recorded. And for the purpose

18    of voice identification, each of us will say our first

19    name, and say and spell our last name. And when it comes

20    to you, Mr. Boatman, please give us your CDC number after

21    you spell your last name.

22         **INMATE BOATMAN:** Okay.

23         **PRESIDING COMMISSIONER PORTER:** All right, we'll

24    start with me and go to my right. Michael Porter,

25    P-O-R-T-E-R, Commissioner.

26         **DEPUTY COMMISSIONER WOLK:** Chuck Wolk, W-O-L-K,

27         **DEPUTY DISTRICT ATTORNEY SANDERSON:** James

2

1    Sanderson, S-A-N-D-E-R-S-O-N, District Attorneys office

2    Fresno County.

3        **INMATE BOATMAN:**  Christopher Boatman, B-O-A-T-M-A-N,

4    D number 65055.

5        **ATTORNEY CHRISTENSEN:**  Candace Christensen,

6    C-H-R-I-S-T-E-N-S-E-N, attorney for Mr. Boatman.

7        **PRESIDING COMMISSIONER PORTER:**  Okay, and for the

8    record we do have two correction officers present.  And

9    they will not be participating in the hearing.  They are

10   here for security purposes only.  And before we begin,

11   Mr. Boatman, can you please read the ADA statement for

12   me?

13       **INMATE BOATMAN:**  Yes, The Americans With

14   Disabilities act, ADA is a law to help people with

15   disabilities.  Disabilities are problems to make it

16   harder for some people to see, hear, read, talk, walk,

17   learn, think, work or take care of themselves than it is

18   for others.  Nobody can be kept out of public places or

19   activities because of their disability, because of a

20   disability.  If you have a disability, you have the right

21   to ask for help to get ready for your BPT hearing.  Get

22   to the hearing, talk, read forms and papers, and

23   understand the hearing process.  BPT will look at what

24   you ask for, to make sure that you have a disability that

25   is covered by the ADA.  And that you have asked for the

26   right kind of help.  If you do not get help, or if you

27   think -- or -- or if you don't think you got the kind of

3

1    help you need, ask the BP -- ask for a BPT 1074 Grievance

2    form.  You can also get help to fill it out.

3        **PRESIDING COMMISSIONER PORTER:**  Thank you sir.

4        **INMATE BOATMAN:**  Yes.

5        **PRESIDING COMMISSIONER PORTER:**  The record reflects

6    that you signed a BPT 1073 form on 3/21/06.  Indicating

7    that you do not have a disability as defined under the

8    American's with disabilities act.  Is that true?

9        **INMATE BOATMAN:**  Yes, it is.

10       **PRESIDING COMMISSIONER PORTER:**  Is that information

11   still current?

12       **INMATE BOATMAN:**  Yes, it is.

13       **PRESIDING COMMISSIONER PORTER:**  Okay.  Let's see did

14   you have any problems walking up the steps or anything to

15   get here?

16       **INMATE BOATMAN:**  No problems.

17       **PRESIDING COMMISSIONER PORTER:**  Okay.  Did you see

18   pretty good or do you need glasses or magnifying glasses?

19       **INMATE BOATMAN:**  No, I don't -- I see pretty good,

20   sir.

21       **PRESIDING COMMISSIONER PORTER:**  Okay, do you have

22   any hearing impairments?

23       **INMATE BOATMAN:**  No hearing impairments.

24       **PRESIDING COMMISSIONER PORTER:**  Okay, have you been,

25   ever been included in the triple CMS or EOP programs?

26       **INMATE BOATMAN:**  Triple CMS, no, I haven't.

27       **PRESIDING COMMISSIONER PORTER:**  Okay, and do you

4

1    know what those terms mean?

2        **INMATE BOATMAN:** Yeah, that's [inaudible] and stuff.

3        **PRESIDING COMMISSIONER PORTER:** Yes.

4        **INMATE BOATMAN:** Triple -- no.

5        **PRESIDING COMMISSIONER PORTER:** Okay, have you ever

6    taken any medication for mental health?

7        **INMATE BOATMAN:** No, I haven't.

8        **PRESIDING COMMISSIONER PORTER:** Either on the street

9    or in prison?

10       **INMATE BOATMAN:** No.

11       **PRESIDING COMMISSIONER PORTER:** Okay. And finally,

12   do you suffer from any disability that would prevent you

13   from participating in today's hearing?

14       **ATTORNEY FALLMAN:** No disabilities.

15       **PRESIDING COMMISSIONER PORTER:** Okay. Counsel are

16   there and ADA issues that you believe that need further

17   discussion regarding your clients ability to fully

18   participate in today's hearing?

19       **ATTORNEY CHRISTENSEN:** No.

20       **PRESIDING COMMISSIONER PORTER:** Okay. This hearing

21   is being conducted pursuant to the Penal Code and the

22   rules and regulations of the Board of Parole Hearings

23   governing parole consideration hearings for life inmates.

24   The purpose of today's hearing is to once again consider

25   your suitability for parole. And then [inaudible] we

26   will consider the number and each of the crimes for which

27   you are committed. Your prior criminal and social

5

1    history, your behavior in programming since your
2    commitment, and your plans if released.  We have had the
3    opportunity to review your Central File and you will be
4    given an opportunity to correct and clarify the record.
5    We will consider your progress since your commitment,
6    your counselor's report and your mental health
7    evaluations.

8         **INMATE BOATMAN:**  Yes.

9         **PRESIDING COMMISSIONER PORTER:**  We will focus on
10   your progress and any new reports since our last hearing.
11   Any change in parole plans should be brought to our
12   attention.  Before we recess for deliberation, the
13   District Attorney's representative, your attorney and you
14   will be given opportunity to make a final statement
15   regarding your parole suitability.  Your statements
16   shall be limited to why you feel you are suitable
17   for parole.  We will then recess, clear the room and
18   deliberate.  Once we have completed our
19   deliberations, we will resume the hearing and
20   announce our decision.  The California Code of
21   Regulations states that regardless of time served, a
22   life inmate shall be found unsuitable for and denied
23   parole if in the judgment of the panel, the inmate
24   would pose an unreasonable risk of danger to society
25   if released from prison.  You have certain rights,
26   those rights include the right to a timely notice of
27   this hearing.  The right to review your Central

6

1  file, and the right to present any relevant

2  documents. All right, counsel, have the rights of

3  your client been met?

4  **ATTORNEY CHRISTENSEN:** Yes, they have.

5  **PRESIDING COMMISSIONER PORTER:** Okay. You have an

6  additional right to be heard by an impartial panel. We

7  are your panel. Do you have any objection to us?

8  **INMATE BOATMAN:** No, I don't.

9  **PRESIDING COMMISSIONER PORTER:** Okay. You will

10 receive a copy of our written tentative decision today.

11 That decision becomes final within a hundred and twenty

12 days. A copy of the decision and a copy of the

13 transcript will be sent to you. On May 1st, 2004 the

14 regulations regarding your right to appeal a decision

15 made at this hearing were appealed. The current policy

16 is entitled Administrative Appeals, correspondence and

17 grievances concerning board of prison term decisions.

18 That means if you object to any decision we -- they made

19 here, you have to go to the court to file an appeal. You

20 can discuss it with your attorney, or you could review

21 information within the prison law library. Mr. Boatman,

22 you are not required to admit or discuss your offense.

23 However this panel does accept as true, the findings of

24 the court. Do you understand that?

25 **INMATE BOATMAN:** Yes.

26 **PRESIDING COMMISSIONER PORTER:** Okay. Deputy

27 Commissioner Wolk, do we have any confidential

7

1  information?

2  **DEPUTY COMMISSIONER WOLK:**  No, sir.

3  **PRESIDING COMMISSIONER PORTER:**  Okay, I have passed

4  a hearing check list marked Exhibit One to your attorney.

5  And to ensure that we are operating off the same set of

6  documents.  Counsel, do we all -- are we all operating on

7  the same set of documents?

8  **ATTORNEY CHRISTENSEN:**  Yes, we are.

9  **PRESIDING COMMISSIONER PORTER:**  Okay.  District

10  Attorney, do we have--

11  **DEPUTY DISTRICT ATTORNEY SANDERSON:**  I reviewed

12  those, so I know.

13  **PRESIDING COMMISSIONER PORTER:**  Okay, excellent. All

14  right, Counsel, do you have any additional documents that

15  need to be submitted?

16  **ATTORNEY CHRISTENSEN:**  Other than what I brought

17  with me when I came [inaudible] no.

18  **PRESIDING COMMISSIONER PORTER:**  Okay, the letters of

19  support.

20  **DEPUTY DISTRICT ATTORNEY SANDERSON:**  [Inaudible]

21  getting those.

22  **ATTORNEY CHRISTENSEN:**  Well it sent in the mail, it

23  would be in the C file, if they are, I apologize.  Those

24  would be duplicates then.

25  **PRESIDING COMMISSIONER PORTER:**  Okay.

26  **ATTORNEY CHRISTENSEN:**  But some of them are recent

27  from June.

8

1       **PRESIDING COMMISSIONER PORTER:**  All right.  Counsel,

2     are there any preliminary objections?

3       **ATTORNEY CHRISTENSEN:**  No.

4       **PRESIDING COMMISSIONER PORTER:**  Will your client be

5     speaking with the panel today?

6       **ATTORNEY CHRISTENSEN:**  Yes, he will.

7       **PRESIDING COMMISSIONER PORTER:**  Okay, sir, since

8     you'll be speaking with us today, we need to swear you

9     in.

10       **INMATE BOATMAN:**  Okay.

11       **PRESIDING COMMISSIONER PORTER:**  Okay.  Raise your

12     right hand please.  Do you solemnly swear or affirm that

13     the testimony you give at this hearing will be the truth,

14     the whole truth and nothing but the truth?

15       **INMATE BOATMAN:**  I do.

16       **PRESIDING COMMISSIONER PORTER:**  Okay.  Thank you.

17     Let's get started.  For the statement of facts, I'm going

18     to incorporate by reference the June 2006 board report,

19     pages one and two if there are no objections, counselor.

20       **ATTORNEY CHRISTENSEN:**  No objection.

21       **PRESIDING COMMISSIONER PORTER:**  Okay, basically

22     Mr. Boatman, can you tell us what happened on 5/29/86?

23       **INMATE BOATMAN:**  Yes, I can.  That day I moved my

24     [inaudible] Harrold Jones [inaudible] we were smoking

25     crack cocaine.  And it came up that we ran out of the --

26     the drugs.  And Harrold Jones stated that we can get some

27     more.  He says that if you are willing to do this, that

9

1    you can just get the gun and he'd be the driver.  I've

2    done this before, I'll just run in the store and I'll run

3    right back out.  And he stated at that time -- I stated

4    that I'll go along with it, if nobody would get hurt.

5    And I agreed to do this.  I went back to the house and --

6    and I snuck my step mother's gun.  And one of the reasons

7    I done that, 'cause I wasn't thinking.  'Cause I had a

8    shotgun and he said this would be too big to -- to hide.

9         **PRESIDING COMMISSIONER PORTER:**  How old were you at

10   this time?

11        **INMATE BOATMAN:**  I was 20 years old.

12        **PRESIDING COMMISSIONER PORTER:**  Okay.

13        **INMATE BOATMAN:**  When this crime had happened.  Not

14   thinking right at that time -- my thoughts were confused

15   and indecisive.  I deceived myself in believing that

16   nobody was going to get hurt.  And then -- and I didn't

17   think of nobody but myself at the time of the crime I

18   found myself getting more involved.  I -- I became very

19   selfish.  I took more of a leadership role and when we

20   drove to the store -- when I drove to the store my plans

21   changed.  I felt that if I didn't play a bigger part in

22   this crime, that I wasn't going to get anything.  So, I

23   had asked Butch Montgomery if he wanted to drive, and I

24   would be the lookout, and he said yes.  So, that's what I

25   did.  I got immediately out the car, and I was the

26   lookout at that time.  It's really sad that -- the things

27   that I've done -- you know, I hurt so many people.  And

10

1    this wasn't supposed to happen.  The plans were --

2        **PRESIDING COMMISSIONER PORTER:**  All right, finish

3    telling us -- tell us just what happened.  Okay you are

4    the look -- supposed to be the lookout what happened?

5        **INMATE BOATMAN:**  I was the lookout.  I went to the

6    door.  Trans [phonetic] ran in the store.  I guess, I

7    didn't hear him, but obviously he said hold it up.  And

8    John held his hands up -- and as I was looking in -- and

9    a minute I guess went by as I was looking for traffic,

10   and then I heard the shot.  Immediately hearing the shot,

11   I turned and I seen John fall into -- to the counter and

12   I ran to the car.  And when I was leaving we -- when --

13   when we took off -- I had asked, I didn't know if he had

14   shot him or not at that time.  And I had asked did you

15   shoot him, and he said yes.  There were so many questions

16   that -- and I said why.  He said he was reaching for a

17   gun, I remember.  But I also asked, do you think he's

18   gonna die.  And he said he don't know.  When I got back

19   home, what I did is I parked my car and I flattened the

20   tire.  Out of fear, I wiped off which I thought was the

21   prints when I handled the gun and I put it back.  I went

22   to the house where we tried to get some more drugs and

23   none was available at that time.  From then I stayed at

24   my -- my house and prior after that -- and after hearing

25   on the news that John had died, I became very depressed.

26   I didn't know what to do.  I stayed in my room until I

27   was arrested.  My plans were to leave town.  Everybody

11

1    had plans, and I didn't ask.  I should have asked why.  I
2    should have asked myself the questions of why.  What do
3    you mean by these statements that he made?  But I didn't.
4    Not worried about being caught and identified -- it
5    should have striked a trigger in me to say what do you
6    mean.  But I didn't.  At that time I was powerless.  And
7    the plans were to go, and everybody was going to leave
8    town after the robbery to lay low for a little while
9    after we got the drugs.  And that's what I thought.  But
10   I know I -- I think differently today.  Or I know that if
11   a person is going to commit a crime -- whether it's
12   stealing bubble gum out of a bubble gum machine or
13   something, somebody's going to get hurt.  Whether it's
14   physically or mentally.  These things I didn't take into
15   consideration at that time I was committing this crime.
16       **PRESIDING COMMISSIONER PORTER:**  Okay.  Did you know
17   -- you keep calling him John, did you know him
18   personally?
19       **INMATE BOATMAN:**  No, I did not.
20       **PRESIDING COMMISSIONER PORTER:**  Okay, all right.
21   Keep saying his name John, I thought maybe you knew him
22   personally.
23       **INMATE BOATMAN:**  No, it's -- no I do not know him
24   personally.
25       **PRESIDING COMMISSIONER PORTER:**  Souzza.
26       **INMATE BOATMAN:**  Yes, John Souzza.
27       **PRESIDING COMMISSIONER PORTER:**  Okay, so basically

1   you were supposed to be the lookout man and things turned

2   the way that you didn't think they would turn.

3       **INMATE BOATMAN:**  Yes.

4       **PRESIDING COMMISSIONER PORTER:**  Okay, all right.  I

5   think you covered that pretty good.  Before -- before you

6   did this crime, you look like you had -- let's talk about

7   -- you didn't have a juvenile record.

8       **INMATE BOATMAN:**  No.

9       **PRESIDING COMMISSIONER PORTER:**  But let's talk about

10   some of the other -- crimes, looks like you had two rapes

11   from -- two forced rapes.  What happened with that?

12       **INMATE BOATMAN:**  Them charges were me and a friend

13   picked up these girls that we knew in the school.

14       **PRESIDING COMMISSIONER PORTER:**  At what school?

15       **INMATE BOATMAN:**  From Riverdale School, high school.

16       **PRESIDING COMMISSIONER PORTER:**  Okay.  Hpw old were

17   you at this time?

18       **INMATE BOATMAN:**  I was 18 years old at the time.

19       **PRESIDING COMMISSIONER PORTER:**  Okay.

20       **INMATE BOATMAN:**  She was 14, turning on 15 I'm

21   pretty sure.

22       **PRESIDING COMMISSIONER PORTER:**  Uh-huh.

23       **INMATE BOATMAN:**  What happened is that we hung out

24   all day.  We had sex.  This is why it's two -- I think it

25   was three -- three charges at that time.  The next day

26   come by, we did the same thing.  It was consensual sex.

27   The third day came around and she got mad at me for

13

1    kissing her friend and they both ran out the house.  And

2    they got caught by a truant officer of the school, and

3    what they did is that they lied.  And I was arrested and

4    after no cooperation from the victims they eventually

5    dropped it to sexual intercourse with a minor.  And then

6    it was dropped on altogether when I came back to facing

7    charges from the -- the grand theft.

8         **PRESIDING COMMISSIONER PORTER:**  Okay.  14 and 18 are

9    pretty big difference.

10        **INMATE BOATMAN:**  It is.

11        **PRESIDING COMMISSIONER PORTER:**  How'd you come

12   across a 14 year old?  I mean what -- what led you to

13   them when you were 18 years old?

14        **INMATE BOATMAN:**  When I was 18 years old, what I was

15   doing was I was hanging out a lot.  I was working part

16   time, and like when lunch break comes around from the

17   lunch time, I sat around at the school.  Like the parking

18   lots and stuff.  And that's how I came across them and

19   met them.  That's how I came into contact with them.

20        **PRESIDING COMMISSIONER PORTER:**  Tell us about the

21   grand theft.

22        **INMATE BOATMAN:**  The grand theft.  I was in San Luis

23   Obispo and -- and in a town that I didn't know anybody.

24   And what I did is I snatched a woman's purse, and I ran

25   and I got caught.  And that day it was stupidity and --

26   and I didn't have to do that.  And --

27        **PRESIDING COMMISSIONER PORTER:**  Did you have a gun

14

1  with you?

2      **INMATE BOATMAN:**  No.  I didn't have nothing with me
3  at the time I snatched the purse.  I did plead guilty to,
4  um -- with the crowbar.

5      **PRESIDING COMMISSIONER PORTER:**  You had a crowbar?

6      **INMATE BOATMAN:**  No.  I didn't have it, but I plead
7  guilty to it at the time.  While I didn't have that when
8  I snatched the purse, I had it when I went back and ran
9  to my car.  And acted like, when I seen the police, I was
10  going to change my tire.

11      **PRESIDING COMMISSIONER PORTER:**  Okay.

12      **INMATE BOATMAN:**  So --

13      **PRESIDING COMMISSIONER PORTER:**  All right, well what
14  happened after that?  What's the next crime you committed
15  after that?

16      **INMATE BOATMAN:**  The next crime I committed was
17  stealing tapes out of, um -- uh -- a music store
18  something.  Like a, um -- like I said a lot of tapes and
19  videos and things like that.  I ran in the store.  I
20  grabbed a few, and I came out and the buzzer beeped on
21  me.  And that's what I did.  It was in '85 I think.

22      **PRESIDING COMMISSIONER PORTER:**  All right.  So, what
23  -- the time you got for okay -- that was part of your
24  probation but you had a weapon again?

25      **INMATE BOATMAN:**  Yes, it was.

26      **PRESIDING COMMISSIONER PORTER:**  Did you get -- what
27  kind of probation did you get for the rape?

15

1       **INMATE BOATMAN:** I didn't, uh --

2       **PRESIDING COMMISSIONER PORTER:** You do six months in
3       jail, or --

4       **INMATE BOATMAN:** I did six months for the, um -- I
5       did six months for the purse snatch -- the grand theft.
6       What happened after that, when I got in trouble with the
7       rape. A month went by I think, and I got in trouble
8       again with this grand theft and when I, uh -- did my six
9       months in the county jail, what happened is they
10      transported me back to Fresno County, to stand trial for
11      the rape. And after that it was dismissed. So the
12      probation was for the -- for the grand theft.

13      **PRESIDING COMMISSIONER PORTER:** Okay. And also
14      during the rape it says that you shared marijuana with
15      her. How much marijuana did you guys smoke together?

16      **INMATE BOATMAN:** We smoked like a dime bag in the
17      course of them three days. So it was a joint here and a
18      joint there.

19      **PRESIDING COMMISSIONER PORTER:** In two days or three
20      days?

21      **INMATE BOATMAN:** It was three days.

22      **PRESIDING COMMISSIONER PORTER:** Three days.

23      **INMATE BOATMAN:** Yes.

24      **PRESIDING COMMISSIONER PORTER:** Okay, all right.
25      Let's get to some of your personal factors here. You
26      were born in Louisiana.

27      **INMATE BOATMAN:** Yes.

16

1    **PRESIDING COMMISSIONER PORTER:** Okay, how long did
2    you live there?

3    **INMATE BOATMAN:** We lived there, I was three years
4    old and my mother decided to move us to, um -- to Fresno
5    county where she thought -- where she met my dad. She
6    met my dad, and they thought they could give us a better
7    life. So, uh -- I was raised in California since then.
8    Since three.

9    **PRESIDING COMMISSIONER PORTER:** Okay.

10   **INMATE BOATMAN:** So --

11   **PRESIDING COMMISSIONER PORTER:** All right. And you
12   were the third of six children.

13   **INMATE BOATMAN:** Yes, I am.

14   **PRESIDING COMMISSIONER PORTER:** What kind of
15   relationship did you have with your brothers --

16   **INMATE BOATMAN:** My siblings.

17   **PRESIDING COMMISSIONER PORTER:** -- and sisters?

18   **INMATE BOATMAN:** Oh we had a wonderful relationship.
19   Our family household --

20   **PRESIDING COMMISSIONER PORTER:** Did you have older
21   brothers or older sisters?

22   **INMATE BOATMAN:** Yes, I had an older sister, Arlene.

23   **PRESIDING COMMISSIONER PORTER:** Okay.

24   **INMATE BOATMAN:** And I had an older brother, Melvin.

25   **PRESIDING COMMISSIONER PORTER:** Okay.

26   **INMATE BOATMAN:** And the relationship with them --

27   **PRESIDING COMMISSIONER PORTER:** And two other --

17

1    **INMATE BOATMAN:**  Yes, two under me.  There's three
2    under -- there's three under me.

3    **PRESIDING COMMISSIONER PORTER:**  How many brothers
4    and sisters under you?

5    **INMATE BOATMAN:**  Under me there's three.  There's
6    two brothers and one sister under me.

7    **PRESIDING COMMISSIONER PORTER:**  Okay.  And back to
8    your relationship with your family, go ahead.

9    **INMATE BOATMAN:**  The relationship with my family was
10   very strong as it is today.  We did everything together.
11   We were taught that family sticks together no matter what
12   and that the, uh -- a bond with them, um -- is something
13   that I'm very grateful for.  To have this -- that the
14   love is still there.

15   **PRESIDING COMMISSIONER PORTER:**  Okay.  How was your
16   relationship with your mom and dad?  Were they both in
17   the home up until when -- or?  [Inaudible] you committed
18   the commitment offense?

19   **INMATE BOATMAN:**  My mom and dad, yes they divorced
20   when I was 14 years old. The separation split us apart.
21   We had to choose what parent, we had to -- you know went
22   to court and who you wanted to stay with.  And, uh -- I
23   chose to stay with my dad all for the first six months.
24   And then I would periodically switch to my mother, and
25   stay with her in Fresno.

26   **PRESIDING COMMISSIONER PORTER:**  And where'd your dad
27   live?

18

1    **INMATE BOATMAN:** He lived in Riverdale.

2    **PRESIDING COMMISSIONER PORTER:** Okay.

3    **INMATE BOATMAN:** My mom lived in Fresno.

4    **PRESIDING COMMISSIONER PORTER:** Okay. Why'd you

5    choose to leave from your dad after six months? Or go

6    back and forth. Why didn't you just stay with him the

7    whole time?

8    **INMATE BOATMAN:** I didn't like the -- he uh --

9    **PRESIDING COMMISSIONER PORTER:** Who were the other

10   kids with you at this point? Who else went to live with

11   dad?

12   **INMATE BOATMAN:** My youngest brother Andre. My

13   younger one and then me. Andre, he stayed with my dad

14   also.

15   **PRESIDING COMMISSIONER PORTER:** Okay.

16   **INMATE BOATMAN:** And everybody else all stayed with

17   my mom.

18   **PRESIDING COMMISSIONER PORTER:** Okay.

19   **INMATE BOATMAN:** And I chose between the both of

20   them because I wanted to, uh -- stay with both of them.

21   **PRESIDING COMMISSIONER PORTER:** Right.

22   **INMATE BOATMAN:** And --

23   **PRESIDING COMMISSIONER PORTER:** So, you wanted a

24   relationship with both. All right, so what happened with

25   -- it looks like you started getting in trouble as you

26   became a teenager. What happened?

27   **INMATE BOATMAN:** Yes, I did. It just didn't work

19

1   out the way I planned.  I started hanging out a lot more
2   on the streets.  I started running into people that were
3   using drugs and doing -- just hanging out all day.

4        **PRESIDING COMMISSIONER PORTER:**  What'd your dad say
5   to you?  Or were you with your mom when you were hanging
6   out?

7        **INMATE BOATMAN:**  I was -- I was with my dad.  But I
8   kept it from him -- hidden.

9        **PRESIDING COMMISSIONER PORTER:**  Uh-huh.

10       **INMATE BOATMAN:**  I had -- I told -- I was working
11  also.  I was working [inaudible].  So he never knew, at
12  least I think he didn't, when I was going out.  Because
13  he had a job himself and he was working and staying busy.
14  So when he'd come home he was tired.  He'd go to sleep.
15  You know.  And I'd sneak out the house.

16       **PRESIDING COMMISSIONER PORTER:**  Uh-huh.

17       **INMATE BOATMAN:**  And, just hang on the streets.

18       **PRESIDING COMMISSIONER PORTER:**  Okay.

19       **INMATE BOATMAN:**  But when the six months came, I was
20  missing my mom.  Although she visited every now and then
21  to drop the kids off for -- my brothers and sisters for
22  the weekend -- the littler ones.  And what I'd do is I,
23  uh -- I'd move.  I'd say, dad I'll be back.

24       **PRESIDING COMMISSIONER PORTER:**  Uh-huh.

25       **INMATE BOATMAN:**  I'll be back in a few months.  I
26  got to go spend time with mom.  And I did that, uh --
27  until, uh -- I committed this crime.

20

1     **PRESIDING COMMISSIONER PORTER:** You lived with your
2 dad until you committed the crime?

3     **INMATE BOATMAN:** Yes, it was like I moved back with
4 him like -- I just had got there like six or seven months
5 before I did what I did.

6     **PRESIDING COMMISSIONER PORTER:** Okay. When did you
7 see -- when did you start using drugs? Tell us how that
8 escalated, with the crack cocaine.

9     **INMATE BOATMAN:** Okay. I started first just buying
10 a little marijuana. Drinking a little bit every now and
11 then, and hanging on the streets. This guy owed me some
12 money. I sold him like a quarter of a bag of marijuana.

13     **PRESIDING COMMISSIONER PORTER:** Uh-huh.

14     **INMATE BOATMAN:** He owed me like twenty five bucks -
15 - twenty bucks. Something like that, and I wanted my
16 money so I can buy some cocaine.

17     **PRESIDING COMMISSIONER PORTER:** Uh-huh.

18     **INMATE BOATMAN:** So he says I have some crack. And
19 I said crack -- I said what is crack? And he says if you
20 -- if you come over to my house I'll show you. If you
21 want your money in crack, I'll give it to you in crack.
22 So we went over to his house, and he put a little bit in
23 the pipe. And then -- and then I hit it. And what
24 happened is that I remember me almost passing out holding
25 my hit in. And I told him what is this stuff, and he
26 said it's crack cocaine. And I said I can't hardly see.
27 'Cause my vision was impaired. And I told him, I want my

21

1    money in that stuff right there.  That's some good stuff.
2    And it's -- and it's crazy.  Anybody that uses a drug or
3    anything -- thinks about using a drug -- especially when
4    it makes a person go almost blind, will say no.  I
5    wouldn't want none of this stuff.  But no me, that is
6    what I want.  And that's where I started.

7        **PRESIDING COMMISSIONER PORTER:**  How old were you at
8    the time?

9        **INMATE BOATMAN:**  I was 20 years old.  I started
10   using crack cocaine in January of '86.

11       **PRESIDING COMMISSIONER PORTER:**  Okay.  And before
12   then how -- how much were you drinking?

13       **INMATE BOATMAN:**  It wasn't a lot.  It was occasion,
14   and the, uh -- like on the weekend or something.  Friends
15   got together and I'd drink maybe a six pack or something.
16   Or a beer here and there.  But my main choice was for
17   marijuana.  And when I got introduced to crack it was the
18   crack.

19       **PRESIDING COMMISSIONER PORTER:**  How much marijuana
20   did you smoke?

21       **INMATE BOATMAN:**  I smoked -- myself, I would go
22   through a quarter of weed a month myself.  But if I was
23   sharing, it would go a lot quicker.  But me -- but me
24   personally, I'd smoke a joint when I woke up.  And I'd
25   smoke a joint in afternoons.  And possibly when I went --
26   before I went to bed.

27       **PRESIDING COMMISSIONER PORTER:**  Okay.

22

1      **INMATE BOATMAN:**  So --.

2      **PRESIDING COMMISSIONER PORTER:**  All right.  We

3   better go to Deputy Commissioner Wolk and go into summary

4   your post conviction factors.

5      **INMATE BOATMAN:**  Yes.  Can I -- can I say a little

6   bit about my criminal history, or --

7      **PRESIDING COMMISSIONER PORTER:**  We'll -- we'll --

8   we'll get back to that.

9      **INMATE BOATMAN:**  Oh.

10      **DEPUTY COMMISSIONER WOLK:**  Okay.  We're going to

11   talk about your programming since you came to prison, and

12   I'm going to start out with your vocational programming.

13   And I see that you worked as a housing [inaudible], a

14   Boxing Trainer and [inaudible].

15      **INMATE BOATMAN:**  Yes.

16      **DEPUTY COMMISSIONER WOLK:**  [Inaudible] and you have

17   your Voc Welding certificate of completion?

18      **INMATE BOATMAN:**  Yes.

19      **DEPUTY COMMISSIONER WOLK:**  And your Voc Machine

20   Shop?

21      **INMATE BOATMAN:**  Yes.

22      **DEPUTY COMMISSIONER WOLK:**  And you're currently

23   working in Voc Plumbing.

24      **INMATE BOATMAN:**  Yes.

25      **DEPUTY COMMISSIONER WOLK:**  How much longer do you

26   have before you get that certificate?

27      **INMATE BOATMAN:**  I have two more tests to take.

23

1   Which will take approximately five months to complete.

2   I'm almost done.  And, uh --

3       **DEPUTY COMMISSIONER WOLK:**  I was going through the

4   file and I see numerous laudatory chronos as well as

5   letters commending you for your job.  All the -- your

6   supervisors and staff have written out commending you for

7   the good job that you've done.  As far as your therapy

8   and self help, I know that you've been active in

9   Narcotics Anonymous since 1994. You're still active. You

10  took a seminar called An Alternative to Violence in '94.

11  Then you took the Advanced Alternative to Violence in

12  2000.  You took part in the San Quentin walk-a-thon in

13  1995.  You also are a member of Kairos or were a member

14  or Kairos from 2000 until 2004.  You took Centering

15  Prayer in 2001, and you've been involved in a

16  spirituality class since 2003.  And you're still involved

17  in it.  You've received laudatory chronos, about 15 of

18  them for your participation in various therapy and self

19  help endeavors.  You also took the Responsibility

20  Rehabilitation and Restoration Ecumenical [inaudible]

21  table in 2005.  And from Violence to Homeless in June of

22  2005.  You have certificates in it says, Core Curriculum,

23  what is that?

24      **INMATE BOATMAN:**  Core Curriculum is the new

25  curriculum that was just implemented for our vocational

26  Plumbing.  And that they also have, I don't know if you

27  have the certificates there, sir.  I should have gave

24

1   them to you.  But it's --

2       **DEPUTY COMMISSIONER WOLK:**  What [inaudible].

3       **INMATE BOATMAN:**  It's the [inaudible].

4       **DEPUTY COMMISSIONER WOLK:**  It's okay, I don't need

5   it.

6       **INMATE BOATMAN:**  All right.

7       **DEPUTY COMMISSIONER WOLK:**  You also took the

8   [inaudible] Cutting Tools, these are all machine tool

9   technology programs.  The Engine Wave, the Katargio

10  (phonetic) you participated in that in 1996.  Making a

11  Change in '95.  Um, you have numerous certificates of

12  completion regarding your well being in your machine

13  shop.  And you have your [inaudible] for Machinist?

14      **INMATE BOATMAN:**  Yes, I completed that.  I'm now a

15  Journeyman.

16      **DEPUTY COMMISSIONER WOLK:**  That's like thousands of

17  dollars a week.

18      **INMATE BOATMAN:**  Yeah, it's like eight thousand

19  dollars, I think of training.

20      **DEPUTY COMMISSIONER WOLK:**  You got your [inaudible]

21  card?

22      **INMATE BOATMAN:**  Yeah, I wanted to show you.  There's

23  a lot of this stuff in -- that's the [inaudible].

24      **DEPUTY COMMISSIONER WOLK:**  Wow, so you'd be readily

25  employable.

26      **INMATE BOATMAN:**  Sure, I have the --

27      **DEPUTY COMMISSIONER WOLK:**  Thank you.  You wanna see

25

1   that?

2       **PRESIDING COMMISSIONER PORTER:**   Yeah.   That's very
3   good Mr. Boatman.

4       **INMATE BOATMAN:**   Thank you.

5       **DEPUTY COMMISSIONER WOLK:**   You have what I would
6   consider to be a fairly minimal disciplinary history. You
7   have no 115s throughout your incarceration.   You have a
8   128A for not standing for count in April of '99.   And a
9   being in possession of a contraband earring in 1993.   And
10  that's all.   That's the extent of your disciplinary
11  history.   I have a psychology, or psychological
12  evaluation counsel, dated January 4th, of '05.   Is there
13  anything later than that?

14      **ATTORNEY CHRISTENSEN:**   No, that's what I have.

15      **DEPUTY COMMISSIONER WOLK:**   Okay.   This was conducted
16  by Dr. Elizabeth Wontuck (phonetic), doctor of
17  psychology, clinical psychologist. It's about a three,
18  two and a half page assessment.   Under AXIS I of the DSM,
19  you have no diagnosis.   Under AXIS II, no diagnosis.   As
20  she goes into what she -- what they call the assessment
21  of dangerousness, she says a number of factors were
22  considered in assessing Mr. Boatman's current level of
23  dangerousness.   Factors that are favorable for the inmate
24  are, first, he did not actually commit the murder
25  himself.   Second, he does not have a history of violent
26  criminal behavior.   He has a minimal criminal history and
27  no juvenile record.   And third, he has not received any

1    115 -- any 115s in approximately 19 years of

2    incarceration.  Fourth, he does not have a history of

3    serious mental health problems.  But then she goes on to

4    state while he does have a history of substance abuse, it

5    appears that he has been clean and sober for the past 18

6    years.  And he has participated in NA as well as other

7    self help programs to date, as we covered.  In addition,

8    he appears to have a strong support.  To have strong

9    support from a stable family and friends.  Other factors

10   in his favor are that he has earned his GED, and has

11   worked at a variety of jobs since his incarceration with

12   laudatory performance evaluations.  This examiner does

13   not believe that there are any factors that are

14   unfavorable at this point in time.  Mr. Boatman was

15   convicted twice for theft prior to the incident offense.

16   Served six months in jail.  Mr. Boatman states he feels

17   he has matured.  He feels he has come to trust people and

18   indicated this is because he now chooses his friends

19   carefully.  He chooses people who are positive and

20   successful.  In this examiner's professional opinion, it

21   is Miss -- this examiner's professional opinion that

22   Mr. Boatman would pose a low risk if he were to be

23   released to the community at this time.  And that's

24   pretty much all, what her report says or --  Now, this

25   concludes what I'm going to cover today.  And so, I will

26   give you the opportunity, if I've left anything out you

27   can go ahead and add it now.

27

1     **INMATE BOATMAN:**  Not that I know of, you left
2     anything out.

3     **DEPUTY COMMISSIONER WOLK:**  Okay.  Then I'll turn it
4     back over to Mr. Porter.

5     **PRESIDING COMMISSIONER PORTER:**  Okay.  Thank you,
6     sir, we're going to start with your future plans
7     Mr. Boatman.  Where do you plan on living after you get
8     paroled?

9     **INMATE BOATMAN:**  I plan on staying with my older
10    sister, Arlene in Fresno California.  I will be working
11    as a Well Driller.  I have a couple job offers that are -
12    - that I have in there.  But one is for West Harmon.

13    **PRESIDING COMMISSIONER PORTER:**  Uh-huh.

14    **INMATE BOATMAN:**  He's offered to employ me with 25
15    dollars an hour.  And there's also one for Jonathan
16    Figueroa, with Mount Whitney Collision and Classic Cars.
17    Would you -- I would like to also if it's okay with -- I
18    have to talk to both of them if it's okay if I work part
19    time in his shop.  That's doing a lot of welding and just
20    -- I just restorate -- restoring and that's right up my
21    alley.  And I would like to -- like to do that for part
22    time.  And there's also, um -- uh -- Zach Tanny, from
23    Machine Shop in here, in Fresno, California.  Who has
24    written a letter that they, uh -- it's also another job
25    option that I have.  And also from, uh -- [inaudible].
26    He said that he would give me some -- if he couldn't hire
27    me at that -- at this time, he'd give me some positive

28

1    leads for other machine shops in the immediate area.  And
2    I also -- I had the support of my family, and all the
3    financial leads and resources. My brother also has
4    written a letter there.  We also have another -- a family
5    owned business.  It's [inaudible] that we deliver.  He's
6    graduated -- his MBA and that, uh -- his website is there
7    on his letter.  And he wants me to deliver these
8    throughout the county of Fresno and stuff like that.  So,
9    um -- what I, um -- I also like to, uh -- uh -- attend,
10   um -- this 90 meetings in 90 days with my [inaudible]
11   representative, but also my sponsor.  That we all made
12   that a personal commitment with him to attend these, uh -
13   - these meetings which I think is very important to this
14   for -- for my transition back into the community.
15   Considering I'm an ex -- I'll always be a recovering
16   addict.  And when these things work out, I -- I switched
17   my parole plans from my parents.  Because they have
18   separated again.  They are the best of friends right now.
19   But for differences, they thought it would be best to
20   split apart.  So this way that I could support both of
21   them -- I felt I didn't want to -- I wanted to stay with
22   my dad and I want to stay with my mom again.  But I love
23   them both, um -- and I know this is -- this is hurting
24   them a lot for me being in this situation.  So, I'll be
25   able to be there for both of them if I stay with my
26   sister.  In the city -- it gives me a lot of job avenues
27   in the city too.  And that's one of the reasons why I

1    switched my parole plans to stay with her.

2        **PRESIDING COMMISSIONER PORTER:** Will you be pretty
3    close to an AA and NA?

4        **INMATE BOATMAN:** Oh, yes. Without a doubt. My
5    sponsor had made the schedule and I will be very close to
6    AA and NA, the meetings. So that's something that I'm
7    really looking forward to.

8        **PRESIDING COMMISSIONER PORTER:** Okay.

9        **INMATE BOATMAN:** Spending time with --

10       **PRESIDING COMMISSIONER PORTER:** All right. Well you
11   know crack is still out there.

12       **INMATE BOATMAN:** Yeah, it's --

13       **PRESIDING COMMISSIONER PORTER:** So, it -- you're
14   walking down the street and you run into your old buddies
15   -- somebody offers you crack. What are you going to do?

16       **INMATE BOATMAN:** I'm going to call the police.
17   Crack, I'm not going to do no crack. 'Cause one of the
18   things that I realized in my recovery that even if I were
19   to say, make a drug transaction -- right with no -- with
20   no, uh -- uh -- um -- how would you say, with no
21   repercussions, right. Would I do that? No, I wouldn't.
22   Because I know that if I'm going to make a transaction,
23   it's my -- I might as well be using the drugs. And the
24   thing is -- is that you know -- I know -- there's crack
25   in here too. And I know that they, uh -- if I were to do
26   it, I'd go back to the same place where I left off. And
27   I don't want to go back there. So, that's what

30

1    definitely what I would do.

2        **PRESIDING COMMISSIONER PORTER:**  Okay.  I found some
3    of your letters of employment.

4        **INMATE BOATMAN:**  Oh, okay.

5        **PRESIDING COMMISSIONER PORTER:**  It's looking pretty
6    solid. This Zach Tanny, who's that?

7        **INMATE BOATMAN:**  That's the machine shop in Fresno.
8    I've been writing him resumes and sending them.  I
9    haven't met him but he's willing to offer me this
10   interview.  And I'm sure that once he sees what I know
11   that I will be getting paid some good money.  'Cause I'll
12   be able to, uh -- I think help his business prosper.  You
13   know with -- with the skills that I've learned -- that
14   I've learned in the machine shop.  So --

15       **PRESIDING COMMISSIONER PORTER:**  Yeah, he's -- that -
16   -

17       **INMATE BOATMAN:**  He's also --

18       **PRESIDING COMMISSIONER PORTER:**  He employs 45 to 50
19   people.  That's pretty good.

20       **INMATE BOATMAN:**  Yeah.  And he's also said -- in the
21   bottom there that he even has some ex -- he has -- he has
22   ex -- seven -- was it seven people that he employed from
23   a prison system?

24       **PRESIDING COMMISSIONER PORTER:**  Uh-huh.

25       **INMATE BOATMAN:**  And I'm happy with the results.
26   So, that's a positive factor, yeah.

27       **PRESIDING COMMISSIONER PORTER:**  Okay, he's a

31

1    [inaudible] individual he didn't give a --

2         **INMATE BOATMAN:**  Okay.

3         **PRESIDING COMMISSIONER PORTER:**  -- give a number.

4    But he said he'll be very happy to see you.  And he's

5    looking forward to hiring you.  And we got a letter from

6    Jonathan Figueroa, who's that?

7         **INMATE BOATMAN:**  That's a -- that's a family friend.

8    Jonathan Figueroa, and he has a business in which is --

9    which is getting pretty big right now. It just started

10   like a few years ago.

11        **PRESIDING COMMISSIONER PORTER:**  Uh-huh.

12        **INMATE BOATMAN:**  And that they -- he's willing to, -

13   - give me that employment.

14        **PRESIDING COMMISSIONER PORTER:**  He said he'll start

15   you at 20 dollars an hour.

16        **INMATE BOATMAN:**  Yeah.

17        **PRESIDING COMMISSIONER PORTER:**  And it's commission

18   based and will be paid on a weekly basis. Okay, that's a

19   good offer.

20        **INMATE BOATMAN:**  Yes.

21        **PRESIDING COMMISSIONER PORTER:**  Got another one from

22   West Harmon, who is that?

23        **INMATE BOATMAN:**  West Harmon is a well drilling

24   business that my family is, uh -- well drillers are like,

25   um -- what they do is if my -- my family or my brother

26   couldn't get to a well, what happens is that well

27   drillers call well drillers.  Okay, so they kind of --

32

1    they kind of in the same group.  And that -- they, um --
2    he is also willing to give me that employment knowing my
3    family.

4         **PRESIDING COMMISSIONER PORTER:**  Okay, very good.
5    Turn the tape over next.

6    [Thereupon, tape was turned over.]

7         **PRESIDING COMMISSIONER PORTER:**  Okay -- okay we're
8    back on record.  We were talking about the [inaudible]
9    drilling.

10        **INMATE BOATMAN:**  Yeah.

11        **PRESIDING COMMISSIONER PORTER:**  And you say your
12   starting salary would -- would be 25 dollars an hour.
13   Okay, that is a good offer.  And that Robert Army, who is
14   that?

15        **INMATE BOATMAN:**  I don't know.  That's a guy that
16   I've sent resumes and cover letters to.  Also in Fresno,
17   California.

18        **PRESIDING COMMISSIONER PORTER:**  Okay.

19        **INMATE BOATMAN:**  And so --

20        **PRESIDING COMMISSIONER PORTER:**  He said that we're
21   not currently looking for a machinist, however things
22   could change.  So he said keep on contacting, in case a
23   position opens.  And we're going to get into some of your
24   letters.

25        **DEPUTY COMMISSIONER WOLK:**  How many letters is it?
26        **INMATE BOATMAN:**  It's only like 20, 21, I think.
27   Right now it's like --

33

1    **PRESIDING COMMISSIONER PORTER:**   Yeah, this is more

2    than 21.

3    **INMATE BOATMAN:**   Is it?

4    **PRESIDING COMMISSIONER PORTER:**   Looks like it, feels

5    like it.

6    **INMATE BOATMAN:**   Oh it's -- it's -- some of them are

7    like double.

8    **PRESIDING COMMISSIONER PORTER:**   Well, let's go over

9    some.   Thomas Witt, who is that?

10   **INMATE BOATMAN:**   That's a friend that I've met

11   through this institution, through the Kairos ministry.

12   **PRESIDING COMMISSIONER PORTER:**   Okay, all right.

13   Said, uh -- that he thinks you should be found suitable

14   for parole.   And you're a very cheerful man with a smile

15   on his face and a song his heart. So they're very

16   supportive of you.   And we've got Arlene Boatman, who is

17   that?

18   **INMATE BOATMAN:**   That's my older sister who I would

19   be -- will be staying with.

20   **PRESIDING COMMISSIONER PORTER:**   Okay.

21   **INMATE BOATMAN:**   Given the opportunity.

22   **PRESIDING COMMISSIONER PORTER:**   Okay.   She's very

23   supportive of you. She said that her home is equipped

24   with everything you'll need to translate, to transition

25   and pursue your goals.

26   **INMATE BOATMAN:**   Uh-huh.

27   **PRESIDING COMMISSIONER PORTER:**   She's currently

34

1   working for the IRS, she's been there for 18 years so --

2       **INMATE BOATMAN:**  Yes.

3       **PRESIDING COMMISSIONER PORTER:**  --okay, will be

4   happy to have you live with her.

5       **INMATE BOATMAN:**  Yes, she wrote another one too.

6       **PRESIDING COMMISSIONER PORTER:**  Okay.  This is

7   Ms. Arlene again.  I guess more support and that you're

8   in her prayers.  She's waiting for you.  Let's see, this

9   is from --

10      **INMATE BOATMAN:**  Andre --

11      **PRESIDING COMMISSIONER PORTER:**  Andre Boatman, who

12  is that?

13      **INMATE BOATMAN:**  That's my younger brother under me

14  who lives in San Antonio, Texas.  And the one that has

15  the, a, uh -- the business with the cocoa.  So he's --

16      **PRESIDING COMMISSIONER PORTER:**  Okay.  Well he's in

17  -- he's very supportive of you.

18      **INMATE BOATMAN:**  He's very successful.

19      **PRESIDING COMMISSIONER PORTER:**  He's been trying for

20  you, and he knows you got a lot of job offers.  And he

21  knows you've got several opportunities to -- to get a

22  good business going with yourself.  Landmark and Business

23  Factory, that's his current company.  Okay.

24      **INMATE BOATMAN:**  That's --

25      **PRESIDING COMMISSIONER PORTER:**  Then we have Jim

26  Boatman.

27      **INMATE BOATMAN:**  Yes.

35

1      **PRESIDING COMMISSIONER PORTER:**  Who is Jim?

2      **INMATE BOATMAN:**  That's my dad.

3      **PRESIDING COMMISSIONER PORTER:**  Okay.  And he's in

4   support of you -- you're his son.  And he says you have

5   not only made him -- you accomplished a lot.  And your

6   father's proud of you and he still -- he still has a

7   bedroom full of clothes for you.

8      **INMATE BOATMAN:**  I know.

9      **PRESIDING COMMISSIONER PORTER:**  He's waiting for

10   you.  And he's looking forward to you getting out.  We

11   have a Brandy Boatman, who is that?

12      **INMATE BOATMAN:**  That's my little sister.

13      **PRESIDING COMMISSIONER PORTER:**  Okay.

14      **INMATE BOATMAN:**  That's the youngest one.

15      **PRESIDING COMMISSIONER PORTER:**  Little sister is,

16   wow -- she's full of excitement waiting for you to get

17   out.  She says it put a heavy toll on her by you being

18   away.  And -- but her love is strong and she's got

19   assurance, that you know -- her love is going to stay

20   strong for you.  One day, you'll be a tight family again.

21   Christopher and Kimberly Peyton, who is that?

22      **INMATE BOATMAN:**  That's friends that I met through

23   the -- also the um -- the Kairos program.

24      **PRESIDING COMMISSIONER PORTER:**  Okay, all right.

25      **INMATE BOATMAN:**  I have like seven or eight of them

26   letters.

27      **PRESIDING COMMISSIONER PORTER:**  They've known you

36

1   for over three years and him and his family are very

2   supportive of you.  And they're behind you getting --

3   getting out of here.  And we have a letter from Liz Ram.

4       **INMATE BOATMAN:**  She's another one who I met through

5   the Kairos program.

6       **PRESIDING COMMISSIONER PORTER:**  Okay.

7       **INMATE BOATMAN:**  She's a good family friend.

8       **PRESIDING COMMISSIONER PORTER:**  She's a retired

9   professional woman.  And she's known you for six years.

10  And you've always been respectful towards her and she

11  believes you've made a lot of positive strides.  And she

12  sees you almost every Sunday in mass and [inaudible], and

13  a member of the choir.  So, she says you're a good

14  lecturer, she says you are a man full of compassion,

15  loving and understanding.  And there's a Marx (phonetic)

16  help me out with the last name.

17      **INMATE BOATMAN:**  Marx, I couldn't -- I couldn't.

18      **PRESIDING COMMISSIONER PORTER:**  C-A-Z-E-N-A-D-E.

19      **INMATE BOATMAN:**  I don't know, I couldn't pronounce

20  it myself.

21      **PRESIDING COMMISSIONER PORTER:**  Cazenade.

22      **INMATE BOATMAN:**  Yeah, I always get it wrong.  I

23  just call him Brother Marx.

24      **PRESIDING COMMISSIONER PORTER:**  Where do you know

25  him from?

26      **INMATE BOATMAN:**  Well Marx, I met through -- also

27  the, a, uh -- the also the, uh -- the programs that we

37

1   were -- the a, um -- he used to come to our Spirituality
2   Class.

3       **PRESIDING COMMISSIONER PORTER:**  Uh-huh.

4       **INMATE BOATMAN:**  Which is a 12 step, like for drug
5   and alcohol rehabilitation program.  And I -- that's
6   where I got to know him a lot better. He came through the
7   -- also the Kairos Ministry.  And that we have grown to
8   become close friends.  He's an ex addict on -- he's been
9   clean and sober for over 30 years.

10      **PRESIDING COMMISSIONER PORTER:**  Yeah, since '87.

11      **INMATE BOATMAN:**  Yes, since '87 and that they -- I
12  felt that he would be the best friend that I could ever
13  have when I'm -- when I get released.

14      **PRESIDING COMMISSIONER PORTER:**  Okay.

15      **INMATE BOATMAN:**  Probably 'cause of his background
16  and his understanding of addiction.  And that they --
17  he's agreed to be my sponsor.

18      **PRESIDING COMMISSIONER PORTER:**  Okay.

19      **INMATE BOATMAN:**  So he's taking me -- taking me to
20  the meetings and everything.

21      **PRESIDING COMMISSIONER PORTER:**  He said that you've
22  demonstrated that you are committed to your recovery and,
23  uh -- that you've taken all the necessary steps to be
24  successful upon your release.  So, he's very supportive.

25      **INMATE BOATMAN:**  Yes.

26      **PRESIDING COMMISSIONER PORTER:**  And there's another
27  letter from him.  We got a letter from Tina Olivero

38

1    (phonetic).

2         **INMATE BOATMAN:**  Yes.

3         **PRESIDING COMMISSIONER PORTER:**  Okay, who is she?

4         **INMATE BOATMAN:**  She's a friend that -- that comes

5    up for [inaudible] from, back down south to visit.  I've

6    known her for like eight years.

7         **PRESIDING COMMISSIONER PORTER:**  Okay.

8         **INMATE BOATMAN:**  The, uh -- a real close friend of

9    the -- my family.  In fact she's like a little sister to

10   me.

11        **PRESIDING COMMISSIONER PORTER:**  Okay.  She says she

12   lovingly calls you Bert.

13        **INMATE BOATMAN:**  Yeah.

14        **PRESIDING COMMISSIONER PORTER:**  And it's easy to

15   love Bert.  'Cause you're so amazingly humble and a

16   compassionate person.  So she's very supportive of you

17   getting out soon.  All right, we got John Kelly, did we

18   go over his?

19        **INMATE BOATMAN:**  No.

20        **PRESIDING COMMISSIONER PORTER:**  Okay.  Who is John?

21        **INMATE BOATMAN:**  John Kelly is -- he's been a

22   volunteer at this prison over, uh -- 13 years.

23        **PRESIDING COMMISSIONER PORTER:**  Okay.

24        **INMATE BOATMAN:**  He does a lot of work in the Kairos

25   program and also the spirituality class he is involved

26   in.  And that, uh -- I've come to known him as an -- and

27   uh -- I feel grateful to have him as one of my friends

39

1    also.

2        **PRESIDING COMMISSIONER PORTER:**  Okay.  Well he's --
3    he's in support of you.  And he said there's no doubt in
4    his mind that you're on the right track.  And you've made
5    up for your mistakes in the past and he's supportive of
6    you.  Let's see, Victor Feralla (phonetic).

7        **INMATE BOATMAN:**  Feralla.

8        **PRESIDING COMMISSIONER PORTER:**  Okay, who is that?
9        **INMATE BOATMAN:**  He's another one from Kairos.  He's
10   very supportive when I come to -- to [inaudible].

11       **PRESIDING COMMISSIONER PORTER:**  All right.  So, he
12   says you're -- he's happy and wants you to get out.  And
13   he said you were found suitable for parole [inaudible] so
14   he can't figure out why you're still here.  Okay, we got
15   Laurie W. Gayle, who is she?

16       **INMATE BOATMAN:**  She's a volunteer from the catholic
17   chapel.  She does, um -- a lot of the -- she's a part of
18   our -- a band.  She sings and worships in there.  And a
19   real good friend who's come to -- we've come to share
20   with one another and, um -- just a loving experience.

21       **PRESIDING COMMISSIONER PORTER:**  She's been knowing
22   you for about four years and she's spent many hours with
23   you and she says you're a deeply spiritual man with very
24   strong and sheer sense of who he is and has learned with
25   Christ in his life.  So she's very supportive of you.
26   And we've got Thomas E. Whit, who is that?

27       **INMATE BOATMAN:**  Thomas E. Whit is, [inaudible], I

40

1  think you read that the first time.

2      **PRESIDING COMMISSIONER PORTER:**  Okay, is he someone-

3      -

4      **INMATE BOATMAN:**  Yeah, you read that one.

5      **PRESIDING COMMISSIONER PORTER:**  Okay, we've got

6  Patricia Putnam.

7      **INMATE BOATMAN:**  She's another friend who, uh --

8  from the Kairos ministry that I've come to know over

9  several years.  It's a real good friend [inaudible].

10      **PRESIDING COMMISSIONER PORTER:**  Okay.  She's been

11  knowing you for about six years and she's always

12  supportive of you and she -- she meets with you like

13  regularly and attends the meetings, I think it's twice a

14  month.  Sharing with your Kairos.

15      **INMATE BOATMAN:**  Yes.

16      **PRESIDING COMMISSIONER PORTER:**  We've got Sister

17  Karen Conover.

18      **INMATE BOATMAN:**  Yes.

19      **PRESIDING COMMISSIONER PORTER:**  Okay.  She's

20  supportive of you.  She's been knowing you for seven

21  years as a community volunteer with music and with the

22  catholic chapel and everything.  She wants you to get

23  out.  Brother David Corona.

24      **INMATE BOATMAN:**  Yes.

25      **PRESIDING COMMISSIONER PORTER:**  Who's he?

26      **INMATE BOATMAN:**  He's another from the, the Kairos

27  that I know.

41

1      **PRESIDING COMMISSIONER PORTER:**  He's -- he's
2   definitely supportive of you and he wants you to get out.
3   You've got a Robert Puente.

4      **INMATE BOATMAN:**  Yes, he's a -- he's a -- Robert
5   Puente has been a volunteer here at the prison for -- I
6   can't recall.  It's like ten years or so.  And that they,
7   uh -- he used to teach this course at the, uh -- Personal
8   Responsibility Course, Making a Change. And he does a lot
9   of, um -- um educational as far as writing and helping us
10   [inaudible] GED's and things like that, and better in the
11   trade.  So --

12      **PRESIDING COMMISSIONER PORTER:**  He said that he's
13   known you for six years and you've made -- you've made
14   great strides and he believes that you've shown remorse
15   for what you've done and -- and [inaudible].  He says you
16   understand the suffering that you've caused for others,
17   and he believes that you whole heartedly have changed and
18   just want to -- just go further and do good things. So
19   he's supportive of you.  We've got a Laura Bowman, okay
20   who's she?

21      **INMATE BOATMAN:**  She's an academic teacher here who
22   works for the prison and she, what she did is she
23   resubmitted the letter that she wrote to Governor
24   Schwarzenegger earlier, so --

25      **PRESIDING COMMISSIONER PORTER:**  Okay.  So by all
26   accounts, you've always been a good person.  You know,
27   you got strayed away a little bit in your youth, but

42

1    however you've been transformed in prison.  And you've
2    been maintaining a very good prison record and she's a
3    hundred percent behind you.  We have D.D. Lavi PhD.

4        **INMATE BOATMAN:**  Oh, that's Denevey (phonetic),
5    that's Dawn Denevey.

6        **PRESIDING COMMISSIONER PORTER:**  Okay.

7        **INMATE BOATMAN:**  He's the coach that works in this
8    institution and that they, uh -- I've been a part of the
9    tennis team over a few years.  [Inaudible] what I do, is
10   I take a lot of the volunteers up and I give them tours
11   around the institution.  All that kind of and they visit
12   us and play with us and that they, uh -- it's been
13   something that I really enjoy.

14       **PRESIDING COMMISSIONER PORTER:**  Okay, yeah.  He's a
15   -- I guess with the tennis team.

16       **INMATE BOATMAN:**  Yeah, with the tennis team.

17       **PRESIDING COMMISSIONER PORTER:**  Yeah.  He's feeling
18   like you're definitely worthy and he's definitely
19   supportive of you and he wants you to get out.  And we
20   have one from --

21       **INMATE BOATMAN:**  Ayita (phonetic).

22       **PRESIDING COMMISSIONER PORTER:**  Ayita, okay who is
23   she?

24       **INMATE BOATMAN:**  Ayita DeLatega (phonetic) she's
25   been with the [inaudible] corrections back in '94-5, I
26   met her and we're -- she was doing things with my old
27   supervisor, Paul Earn, and she has become the -- our

43

1    college for Death Row now that she does and that I have

2    come to know her and work with her on a lot of projects.

3    And that they, uh -- I thought it was one of the reasons

4    why a lot of the letters are from the Kairos and the

5    people that, um -- that are within this prison is because

6    I thought it would be better for you to get a better

7    understanding of who I was.  'Cause you know family's

8    pretty much going to you know, -- uh --

9         **PRESIDING COMMISSIONER PORTER:**  Right, okay --

10        **INMATE BOATMAN:**  Okay so --

11        **PRESIDING COMMISSIONER PORTER:**  -- so she's observed

12   your professional work habits and you've always acted in

13   a respectful way, work hard and has always been diligent

14   about completing your assignments.  Okay, I think we've

15   got all the letters covered, and do we have any letters

16   of opposition?

17        **DEPUTY COMMISSIONER WOLK:**  No, sir, we do not.

18        **PRESIDING COMMISSIONER PORTER:**  Okay, but we have

19   our District Attorney here and, sir, we're going to open

20   the panel up for you to ask questions of the, Mr. Boatman

21   here.

22        **DEPUTY DISTRICT ATTORNEY SANDERSON:**  You've done a

23   pretty good job according to background, Commissioner, so

24   I just have a few questions.  The purse snatching on

25   September 21st, of '84.  [Inaudible].

26        **INMATE BOATMAN:**  Yes -- yes I did.

27        **DEPUTY DISTRICT ATTORNEY SANDERSON:**  And then you

44

1    were, you jogged by this young woman and turned around
2    and came up behind her and grabbed her purse.

3        **INMATE BOATMAN:**   I came right be--, behind her, yes.
4        **DEPUTY DISTRICT ATTORNEY SANDERSON:**   Why did you
5    pick her out?

6        **INMATE BOATMAN:**   She was around -- there was nobody
7    around -- and I thought that was an easy time.

8        **DEPUTY DISTRICT ATTORNEY SANDERSON:**   Why did you do
9    a purse snatch to begin with?

10       **INMATE BOATMAN:**   Why.   There isn't a valid excuse
11   that I can give you of why I done it.   I know at that
12   time in my life I was dealing with a lot of issues.   My
13   heart was empty and full of anxiety.   I thought that you
14   know -- it was crazy.   But if I used drugs it would
15   dampen the depression at the moment that was adding to me
16   to [inaudible] to doing this thing.   And it's sad because
17   I was a good kid and at that time I just needed a little
18   help.

19       **DEPUTY DISTRICT ATTORNEY SANDERSON:**   Did you do the
20   purse snatch because you needed money?

21       **INMATE BOATMAN:**   No, I didn't need no money.   It was
22   stupidity.   If I needed money, the only thing I had to do
23   was just call my parents or something.

24       **DEPUTY DISTRICT ATTORNEY SANDERSON:**   So, you didn't
25   need the money --

26       **INMATE BOATMAN:**   No.

27       **DEPUTY DISTRICT ATTORNEY SANDERSON:**   -- or a mean

45

1   spirit in this, or, or what?

2       **INMATE BOATMAN:**  You can say it was mean spirited.
3   I was smoking marijuana at that time.  And I felt if I
4   could get a little money I can buy me some more.  But
5   that's still not excusing.  I'm not going to make an
6   excuse for that.

7       **DEPUTY DISTRICT ATTORNEY SANDERSON:**  Okay.  So, I'm
8   confused.  I thought you said you didn't do it because of
9   the money.

10      **INMATE BOATMAN:**  No, I didn't but -- not for the
11  money, for the drugs.  This is what I stole it for.

12      **DEPUTY DISTRICT ATTORNEY SANDERSON:**  How were you
13  buying your drugs before that time?

14      **INMATE BOATMAN:**  I had, um -- I had some money in my
15  wallet.  And when I -- when I, um -- did the crime, um --
16  I felt like I can buy more -- more drugs.  So --

17      **DEPUTY DISTRICT ATTORNEY SANDERSON:**  Now, let me go
18  back to [inaudible], um -- you didn't need the money when
19  you did the purse snatch.  I think that's what you said.

20      **INMATE BOATMAN:**  Yes.

21      **DEPUTY DISTRICT ATTORNEY SANDERSON:**  Okay.  And I
22  think you said that you could get money from -- from your
23  folks.

24      **INMATE BOATMAN:**  Uh-huh.

25      **DEPUTY DISTRICT ATTORNEY SANDERSON:**  And had you
26  gotten money from your folks before so you could get
27  marijuana?

46

1       **INMATE BOATMAN:**  Yes, I did.  Before I took the trip
2    up there, I had just got money from them.

3       **DEPUTY DISTRICT ATTORNEY SANDERSON:**  So why did you
4    have to -- why did you feel you had to do the purse
5    snatching?

6       **INMATE BOATMAN:**  That's a good question.  And -- and
7    because I didn't -- and, uh -- I wasn't thinking at that
8    time when I did it.  I thought since I was in a town,
9    it'd be easy target.  You know, and that day, uh -- I
10   just wasn't thinking of nobody.  I didn't even care.

11      **DEPUTY DISTRICT ATTORNEY SANDERSON:**  What about your
12   friend that you were with, [inaudible]?

13      **INMATE BOATMAN:**  Yes.

14      **DEPUTY DISTRICT ATTORNEY SANDERSON:**  Did you plan on
15   doing it with him?

16      **INMATE BOATMAN:**  Yes.

17      **DEPUTY DISTRICT ATTORNEY SANDERSON:**  Were you
18   looking for an easy target [inaudible]?

19      **INMATE BOATMAN:**  Yes.

20      **DEPUTY DISTRICT ATTORNEY SANDERSON:**  Both of you
21   were together.

22      **INMATE BOATMAN:**  Yes.

23      **DEPUTY DISTRICT ATTORNEY SANDERSON:**  And why were
24   you carrying a crowbar?

25      **INMATE BOATMAN:**  I wasn't carrying the crowbar.  Um
26   -- at the time I was arrested, um -- I didn't have the
27   crowbar.  Um -- I did plead to that, and, um -- so all I

47

1   did was snatch the purse and run.

2       **DEPUTY DISTRICT ATTORNEY SANDERSON:**  Why did you

3   plead to carrying a crowbar?

4       **INMATE BOATMAN:**  'Cause I gotta get out of jail.

5   When I told them, they told me that I would just do six

6   months.  And it was close to doing throughout that time.

7       **DEPUTY DISTRICT ATTORNEY SANDERSON:**  All right, in

8   looking at this document, it's a probation report

9   [inaudible] on page five it references the purse

10  snatching in [inaudible].

11      **INMATE BOATMAN:**  Okay.

12      **PRESIDING COMMISSIONER PORTER:**  The last line, it

13  says it was also determined that at the time the offense

14  occurred Boatman was carrying a pry iron.

15      **INMATE BOATMAN:**  Uh-huh.

16      **DEPUTY DISTRICT ATTORNEY SANDERSON:**  Do you know how

17  they arrived at that?

18      **INMATE BOATMAN:**  I do not know, but I wasn't.  All I

19  can say -- I was not carrying no crowbar.  I did go to my

20  car and act like I was going to change the tire when the

21  police had arrived out there.  But my assumption is that

22  it was taken from my trunk.  'Cause they popped the trunk

23  open, and I remembered the officer stating I got it --

24  here it is.

25      **DEPUTY DISTRICT ATTORNEY SANDERSON:**  Julie had said

26  something about you having a [inaudible].

27      **INMATE BOATMAN:**  Who?

48

1    **DEPUTY DISTRICT ATTORNEY SANDERSON:**  Julie

2    [inaudible].

3        **INMATE BOATMAN:**  I don't know who --

4    **DEPUTY DISTRICT ATTORNEY SANDERSON:**  She was one on

5    the -- it's not important.

6        **INMATE BOATMAN:**  Okay, it's a possibility that she

7    said that but--

8    **DEPUTY DISTRICT ATTORNEY SANDERSON:**  All right.

9        **INMATE BOATMAN:**  Or witnesses or whatever you have -

10   - but -- but I didn't have one, again, sir.

11   **DEPUTY DISTRICT ATTORNEY SANDERSON:**  So you just

12   pleaded to it to get out.

13       **INMATE BOATMAN:**  Yes, I did.

14   **DEPUTY DISTRICT ATTORNEY SANDERSON:**  [Inaudible] few

15   months later, so you did the petty theft.  What was that

16   about?

17       **INMATE BOATMAN:**  Stealing some cassette tapes.

18   **DEPUTY DISTRICT ATTORNEY SANDERSON:**  And the reason

19   you stole that, on that occasion was?

20       **INMATE BOATMAN:**  Um -- no excuse again sir.  Um -- I

21   stole it 'cause I thought I can get away with it.  And I

22   had the money to buy -- buy the tapes in my pocket.

23   **DEPUTY DISTRICT ATTORNEY SANDERSON:**  So, it wasn't

24   the money?

25       **INMATE BOATMAN:**  Wasn't for money.

26   **DEPUTY DISTRICT ATTORNEY SANDERSON:**  Wasn't for

27   drugs?

49

1      **INMATE BOATMAN:**  No it was not.  It was my criminal

2   behavior.  In a way I thought, that's what it was.  I

3   thought like a criminal would think.  And acted

4   [inaudible].

5      **DEPUTY DISTRICT ATTORNEY SANDERSON:**  Now murder

6   itself, back in May of '86, what was the reason you

7   committed that theft?  [Inaudible].

8      **INMATE BOATMAN:**  The theft.

9      **DEPUTY DISTRICT ATTORNEY SANDERSON:**  Yeah, basically

10   the robbery -- the theft.

11      **INMATE BOATMAN:**  Yes.

12      **DEPUTY DISTRICT ATTORNEY SANDERSON:**  Because

13   somebody ended up getting killed.

14      **INMATE BOATMAN:**  Yes.

15      **DEPUTY DISTRICT ATTORNEY SANDERSON:**  Yeah.  Why did

16   you commit that?

17      **INMATE BOATMAN:**  Um -- the main reason was for the

18   drugs.  It's what I was searching for.  It's an

19   addiction.  Uh -- that's why I agreed to do this -- is

20   for myself, being selfish.

21      **DEPUTY DISTRICT ATTORNEY SANDERSON:**  You were

22   convicted in September of '84, in the purse snatching.

23      **INMATE BOATMAN:**  No I was -- I was smoking then but

24   I wasn't addicted --

25      **DEPUTY DISTRICT ATTORNEY SANDERSON:**  You weren't

26   addicted in --

27      **INMATE BOATMAN:**  Well let me clarify that up.  Okay,

50

1    'cause I was addicted.  Because I was using everyday.  I

2    was smoking marijuana everyday.  Okay, so -- so I just

3    want to clarify that.

4         **DEPUTY DISTRICT ATTORNEY SANDERSON:**  Okay, so you

5    commit the -- the purse snatch in September of '84,

6    because you're addicted.

7         **INMATE BOATMAN:**  Yes, I was addicted.

8         **DEPUTY DISTRICT ATTORNEY SANDERSON:**  And that would

9    be the same for petty theft in '85?

10        **INMATE BOATMAN:**  Yes, it would be the same for the

11   petty theft in '85.  Not making decisions of my addiction

12   but -- but, uh -- the reaction of -- of thinking that I

13   can get away in -- in doing in a criminal state of mind.

14   You know 'cause -- 'cause that there wasn't for no drugs

15   or nothing.  That there was simply for, um -- for my

16   personal use.  To listen to me some free cassette tapes

17   out of the store.

18        **DEPUTY DISTRICT ATTORNEY SANDERSON:**  Now going back

19   to the robbery and murder.  Right now you've been using

20   crack cocaine, is that right?

21        **INMATE BOATMAN:**  Yes, it is.

22        **DEPUTY DISTRICT ATTORNEY SANDERSON:**  And you've run

23   out.  Is that right?

24        **INMATE BOATMAN:**  Yes.

25        **DEPUTY DISTRICT ATTORNEY SANDERSON:**  Now besides

26   doing crack cocaine, were you working at that time?

27        **INMATE BOATMAN:**  Uh -- I just recently had quit a

51

1    job a couple months prior to, um -- a couple months prior

2    to, um -- being addicted to that.  So I was working as a

3    [inaudible] in a -- in my step father's liquor store --

4    [inaudible] step -- step father's liquor store.

5        **DEPUTY DISTRICT ATTORNEY SANDERSON:**  Were you still

6    getting money from your folks?

7        **INMATE BOATMAN:**  Yes, but they were getting tired of

8    it.  Continuing to give me money and wondering what would

9    it -- what -- what it's for.

10       **DEPUTY DISTRICT ATTORNEY SANDERSON:**  Okay.  Maybe

11   part of the reason you did the robbery wasn't only

12   because you were addicted to the drugs, it was because

13   maybe a harder a lifestyle for you.

14       **INMATE BOATMAN:**  It was.  A part of it was a

15   lifestyle.  Yes, I agree with you.

16       **DEPUTY DISTRICT ATTORNEY SANDERSON:**  Now this

17   person, he was the shooter.  The guy that actually shot

18   the victim -- you did not know him personally.

19       **INMATE BOATMAN:**  No, I'd met him though.

20       **DEPUTY DISTRICT ATTORNEY SANDERSON:**  Oh.

21       **INMATE BOATMAN:**  One prior time.  And I knew the

22   house that I went to, uh -- that they smoked crack.  And,

23   uh -- when I went over, I jumped a couple fences and he

24   was there.

25       **DEPUTY DISTRICT ATTORNEY SANDERSON:**  How long had

26   you been up, [inaudible] that night?

27       **INMATE BOATMAN:**  After that -- after --

52

1    **DEPUTY DISTRICT ATTORNEY SANDERSON:**  Before it
2    happened.

3    **INMATE BOATMAN:**  Before it happened?

4    **DEPUTY DISTRICT ATTORNEY SANDERSON:**  Yeah.

5    **INMATE BOATMAN:**  Um -- a couple hours.

6    **DEPUTY DISTRICT ATTORNEY SANDERSON:**  Well was it
7    easy to trust this guy?

8    **INMATE BOATMAN:**  Um -- I knew he was kind of -- you
9    know, a little wild.  A little crazy but, um -- there was
10   no reason to trust him and -- but -- but I did.

11   **DEPUTY DISTRICT ATTORNEY SANDERSON:**  You decided to
12   believe that he wouldn't hurt anybody?

13   **INMATE BOATMAN:**  I did.

14   **DEPUTY DISTRICT ATTORNEY SANDERSON:**  [Inaudible]
15   being able to -- somebody else's thoughts and -- think it
16   was he that made the comment that there wasn't going to
17   be any witnesses.  Do you recall that?

18   **INMATE BOATMAN:**  I recall that.

19   **DEPUTY DISTRICT ATTORNEY SANDERSON:**  Said that after
20   you got the gun?

21   **INMATE BOATMAN:**  No -- yes, it was after the gun was
22   in the car at that time.

23   **DEPUTY DISTRICT ATTORNEY SANDERSON:**  How long did
24   you plan on doing this robbery?  How long did it take you
25   to -- were you able to get the people [inaudible]?

26   **INMATE BOATMAN:**  Um -- soon after smoking it took
27   approximately -- I'm making an assumption now 'cause I

53

1    really don't know.

2         **DEPUTY DISTRICT ATTORNEY SANDERSON:**  Okay.

3         **INMATE BOATMAN:**  But, um -- it wasn't about maybe an

4    hour or so afterwards.  After we went out -- after we had

5    used the crack.

6         **DEPUTY DISTRICT ATTORNEY SANDERSON:**  Okay, you

7    already left your house or you're -- I'm just asking

8    about the firearm.

9         **INMATE BOATMAN:**  Yes, I did.

10        **DEPUTY DISTRICT ATTORNEY SANDERSON:**  Okay, and you

11   came back with the firearm?

12        **INMATE BOATMAN:**  Yes.

13        **DEPUTY DISTRICT ATTORNEY SANDERSON:**  And

14   [inaudible].

15        **INMATE BOATMAN:**  Yes.

16        **DEPUTY DISTRICT ATTORNEY SANDERSON:**  And where did

17   you go from there?

18        **INMATE BOATMAN:**  We went to the first store which

19   was in [inaudible], but he say, but, uh -- James said

20   that he had robbed this particular store before and that

21   store was too many people.  Too many customers.  'Cause

22   he was going to run in the back, and then, um -- so we

23   decided to go and, uh -- to another.  And the same thing,

24   this one had too many customers.  So the plan had changed

25   from that point.

26        **DEPUTY DISTRICT ATTORNEY SANDERSON:**  When did you

27   take on this, uh -- what you called this leadership role?

54

1   More of a leadership role.

2       **INMATE BOATMAN:** I took that, uh -- I'd say right

3   after I got in the car and I drove to where John was

4   working. I took --

5       **DEPUTY DISTRICT ATTORNEY SANDERSON:** [Inaudible].

6       **INMATE BOATMAN:** After I picked up the gun, when I

7   decided I was going to go and be a part of this and I got

8   the gun and I drove my car, that's when I, uh -- I took

9   that leadership position. And it escalated. As we

10  continued I, uh -- it's like we had [inaudible]. That's

11  when I told -- when I asked Butch if he wanted to be the

12  driver.

13      **DEPUTY DISTRICT ATTORNEY SANDERSON:** Okay, I think

14  that's all I have.

15      **PRESIDING COMMISSIONER PORTER:** Thank you, sir.

16  Counsel, do you have any questions of your client?

17      **ATTORNEY CHRISTENSEN:** A couple yeah. Just one

18  thing, when you were talking about the rape with the 14

19  year old, you said that it was consensual. Do you

20  understand that you can not -- that a 14 year old can not

21  consent to sex?

22      **INMATE BOATMAN:** I do -- I do understand now. At

23  that time, I did not understand that it was what I --

24  what mine was it was consensual. But I didn't do

25  anything you know.

26      **ATTORNEY CHRISTENSEN:** At the time.

27      **INMATE BOATMAN:** At the time -- at the past it was.

55

1    But now I understand that.  That no minor can consent to

2    sex [inaudible] adult.

3        **ATTORNEY CHRISTENSEN:**  Okay.  All right.  Well, at

4    the time this crime occurred you were already on

5    probation.  So obviously you were not successful on

6    probation.  So what can you tell this board to convince

7    them that you would be successful on parole?

8        **INMATE BOATMAN:**  Uh -- I'd be successful on parole

9    because of how much I've matured.  I care about people

10   today as well as myself.  I have faith in myself.  The

11   things that I choose are different today than the things

12   I choose then.  Everybody that I choose in my life today

13   are successful.  They are clean, they are sober and I

14   thought at that time they were my friends.  But they were

15   associates.  So it's just like I choose my friends like

16   anybody would choose their groceries out of the store you

17   know.  The fruits, if a fruit is all spoiled or rotten

18   you're not going to throw it in your bag.  You know, and

19   that there.  And to me it's like if you choose somebody

20   · in your life to hang around with, an associate that is

21   successful, most likely you're going to be successful.

22   If you choose somebody that's using drugs, I don't care

23   how strong you are, eventually you're going to start

24   using drugs.

25       **ATTORNEY CHRISTENSEN:**  Are you the only one in your

26   family with any type of criminal history?

27       **INMATE BOATMAN:**  Yes, I'm the only one with any type

56

1    of criminal history.  Although my brother is, um -- my
2    younger brother Sal, is, uh -- he's had a drug problem
3    with crystal meth.  Uh -- and, but criminal, I'm the only
4    one that I know of in this family.

5        **ATTORNEY CHRISTENSEN:**  Okay.  And then finally I
6    would just like you to address this.  Governor
7    Schwarzenegger in his decision dated 8/24/05 says
8    quote:

9                "Although he claims to have remorse and
10               accept responsibility for Mr. Souzza's
11               murder, Mr. Boatman has maintained
12               throughout his incarceration and as recently
13               as during his 2005 parole hearing that he
14               did not know anyone would get hurt during
15               the robbery.  Despite the crime partners
16               remarks before hand that there would be no
17               concern about being identified by witnesses.
18               This to me is some evidence that Mr. Boatman
19               may not fully grasp the consequences of his
20               actions or the magnitude of his role in this
21               murder."

22   End quote.  Could you address that concern for us?

23       **INMATE BOATMAN:**  Yes, it's really unfortunate that I
24   know that they -- if he was to know me I think that
25   opinion would be different.  And it's -- it's my fault.
26   I kind of take the responsibility for that because I did
27   not clarify this up when Commissioner Lee had asked me to

57

1    clarify this statement up. That's -- my pride got in the
2    way a little bit of that. And the past and the present.
3    I know that now today. As I stated earlier that the
4    person -- it doesn't matter what type of crime that you
5    commit in your life, I know that today -- that somebody's
6    going to be affected. They're going to get hurt. Okay,
7    then it is true, I was very naïve. I didn't know the
8    difference -- I didn't care. But today, through this
9    learning, and through the programs that I've been a part
10   of, and through the changes and the transformation that I
11   made in myself -- in my heart. That they -- that was me
12   then -- but it's not me today. I think totally
13   different. I don't think -- and as I stated earlier -- as
14   a criminal we think and act. And that day of -- and I
15   can see where he drew up this conclusion. Where yes, I
16   should have asked a question. I should have said what do
17   you mean by that. By that state -- what do you mean that
18   I didn't? And my intentions were to go commit this
19   robbery and to get this money without nobody getting hurt
20   at that time. And I believed that.

21       **ATTORNEY CHRISTENSEN:** Were there bullets in the
22   gun?

23       **INMATE BOATMAN:** There were bullets already in the
24   gun, yes. Yes, they were and so -- and I didn't think
25   about it. I was powerless at that time. But I -- but I
26   lived with that and it hurts. Knowing that, what I know
27   today I wish I would have known then. If I could have

58

1    stayed two steps ahead -- I would have stopped it.

2        **ATTORNEY CHRISTENSEN:** Do you ever find yourself --
3    today Mr. Boatman, wanting to do things that are not
4    right just to get away with it?

5        **INMATE BOATMAN:** What do you mean -- can you?

6        **ATTORNEY CHRISTENSEN:** Well you said that back then
7    you would sometimes commit a crime to -- you would steal
8    for drugs.  But sometimes not drugs.  Sometimes just to
9    get away with tit.

10       **INMATE BOATMAN:** Yes, it was the adrenaline I guess.
11   It's like that first hit when you take -- you always
12   chase that first hit.  It's the adrenaline of let me see
13   if I can get away with this.  You know.  And, uh --

14       **ATTORNEY CHRISTENSEN:** And today?

15       **INMATE BOATMAN:** And today it's -- it's totally
16   different.  The adrenaline to me is the adrenaline to
17   make a difference.  To -- to give back.  To stop the pain
18   that the people go through.  The victim -- there are so
19   many victims that are left behind.  And that's not right.
20   Today I think as a mature and responsible person.  I'm
21   not 20 years old anymore.  I'm almost 41 years old.  Next
22   month I'll be 41.  Might be kind of young to some that
23   say that.  But I feel as though I'm going on 60 years
24   old.

25       **ATTORNEY CHRISTENSEN:** [Inaudible].  No further
26   questions.

27       **PRESIDING COMMISSIONER PORTER:** Thank you counsel.

59

1   Okay, we'll go back to the District Attorney for closing
2   statements.
3   **DEPUTY DISTRICT ATTORNEY SANDERSON:**   I'll be real
4   brief. I'm going to continue on, Governor
5   Schwarzenegger's comments. His release review and
6   counsel reference. Leaving off where she -- or picking
7   up where she left off. Regardless of Mr. Boatman's
8   claimed belief as to what would happen -- it was he who
9   brought along the gun. He was active, willing and a
10  major participant in a planned armed robbery that
11  resulted in the shooting death of Mr. Souzza.
12  Mr. Boatman's actions therefore exceed [inaudible]
13  necessary to sustain a conviction for second degree
14  murder. [Inaudible] however for which he was convicted
15  [inaudible]. This factor alone is enough for me to
16  conclude at this time Mr. Boatman's release from prison
17  would pose [inaudible] for public safety risk.
18  [Inaudible] the manner of which Mr. Souzza was murdered
19  was [inaudible] and senseless. Mr. Souzza fully
20  cooperated with the assailants and then was shot in the
21  [inaudible]. I tend to agree with the governor. I don't
22  think anything really changed from the last hearing.
23  There are a couple things that came out at this hearing
24  that I didn't see in the papers from the courts and the C
25  file. One of which was the time which the inmate took a
26  leadership role, and decided to take a leadership role in
27  the -- in the robbery. And that was when he was by

60

1    himself and he picked up the gun before he [inaudible]

2    co-conspirators.  It was he who decided to take this

3    leadership role when he was picking up a loaded hand gun.

4    [Inaudible] this basically an execution of the gentleman

5    that was behind the counter [inaudible] conspiratorially

6    involved with the others who did these -- the robbery.

7    Also, based on some of the statements that came out

8    today, with respect to the prior criminal record

9    including the nature and the thought process that went

10   into the [inaudible] in September of 1984, his

11   willingness to do crime, he was not addicted to crack

12   cocaine at that time.  Little petty theft -- shows the --

13   a willingness or a -- [inaudible].  At this point in

14   time, I didn't see any subject able change in

15   circumstances, and still think that he is an unreasonable

16   risk [inaudible] society.

17        **PRESIDING COMMISSIONER PORTER:**  Thank you very much,

18   sir.  All right, Counselor, do you have a closing

19   statement?

20        **ATTORNEY CHRISTENSEN:**  I do.  Mr. Boatman is not an

21   unreasonable risk at this time.  Two prior panels have

22   found him suitable for parole.  He's just as suitable

23   today, if not more so in that he's continued with classes

24   and programming.  He is very candid in thought today.  In

25   his presentation he certainly did not minimize his

26   [inaudible].  But frankly opposite.  He takes full

27   responsibility and he has deep remorse for the victim.

1    And he has shown that -- that he has done here in prison
2    -- that he wishes to better his life and he has turned
3    himself to god by all of his positive programming.  Which
4    is [inaudible] and will utilize what he has learned in
5    the outside in order to be a productive law abiding
6    member of society.  Everything's in place for him to have
7    a successful parole.  He's got a loving family, wonderful
8    friends.  He has a residence.  He has a multiple job
9    offers.  He's picked up great skills here in prison.
10   Extremely marketable skills.  He would be able to have a
11   pipe hanging job if he were to be out there.  And he
12   would attend AA out on the streets.  That's one thing
13   that he realizes. He needs to have as a life long
14   commitment.  And he is a very good candidate, once again
15   for consideration for parole.  So, I hope the board goes
16   to find his [inaudible] this time.  [Inaudible], thank
17   you.

18   **PRESIDING COMMISSIONER PORTER:**  Thank you very much,
19   Counselor.  Mr. Boatman would you like to make a closing
20   statement?

21   **INMATE BOATMAN:**  Yes, I would.

22   **PRESIDING COMMISSIONER PORTER:**  Okay.

23   **INMATE BOATMAN:**  Thank you, Mr. Chrsistensen.  John
24   lost his life because of what I've done.  And knowing
25   that I could have stopped it -- it hurts a lot.  I didn't
26   do anything to prevent it.  I did everything to make it
27   happen.  I gave the gun, I drove my car.  And he was

62

1   killed because of what I've done.  It hurts me, because
2   the victims.  It's senseless, and they didn't do anything
3   do deserve that.  I -- I wish I could change it.  I wish
4   I can go back and prevent this tragedy from happening but
5   I can't.  I didn't want this to happen, but it did.  It
6   wasn't my intentions to commit a murder.  And, uh -- what
7   I do is I just ask for forgiveness.  And I'm sorry for
8   what I done.  You have seen a lot of things that I
9   achieved since my incarceration.  The certificates and
10  the positive laudatory chronos.  Completed vocational
11  trades.  With numerous self-help and therapy programs
12  I've taken in.  Favorable psychological evaluations and
13  counselor reports.  And many other factors supporting my
14  release.  Staying disciplinary free.  But it will never
15  clean the slate -- or bring John back.  Even if I was to
16  serve another 20 years in this institution -- it still
17  wouldn't be enough time for John's life.  All I can say
18  is that I agree with the District Attorney, that yes,
19  it's crazy.  But I disagree with you, sir, on the fact
20  that I'm not that person anymore.  I've been trying to do
21  my best and what I do.  All I can say is that I'm a good
22  person with a good heart, and I'm trying my best to good
23  for others in my family.  And most important, is that I
24  seek forgiveness for my taking of John's life and the
25  pain I have caused to his family.  I just thank you.
26      **PRESIDING COMMISSIONER PORTER:**  Okay.  Thank you
27  very much, sir.  We appreciate your comments.  We will

63

1     now recess for deliberations.

2                          R E C E S S

3                            --o0o--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

64

1      **CALIFORNIA BOARD OF PAROLE HEARINGS**

2                    **D E C I S I O N**

3      **PRESIDING COMMISSIONER PORTER:**  Okay.  We're back on

4      record.  Okay, the time is 3:37, and basically in the

5      matter regarding Christopher Boatman, CDC number D as in

6      David, 65055, we've reached a decision.  And the board

7      reviewed all information received from the public  and

8      relied on the following circumstances.  In concluding

9      that the person is not suitable for parole and would pose

10     an unreasonable risk of danger to society or a threat to

11     public safety if released from prison.  The crime was

12     very cruel.  The crime was done or planned without

13     feeling bad about hurting others.  The inmate did not

14     care people suffered.  The reason for the crime was small

15     compared to the hurt it caused.  The inmate has sexually

16     assaulted [inaudible] very much.  In a separate decision,

17     the hearing panel finds that it is not reasonable to

18     expect that parole would be granted at a hearing in the

19     following two years.  The specific reason for the

20     findings are, that this was carried out in an especially

21     cruel and callous moment.  The offense was carried out in

22     a dispassionate and [inaudible] manner. Such as an

23     execution style murder.  The offense was carried out in a

24     manner which demonstrates an exceptionally callous

25     disregard for human suffering.  The motive for the crime

26     was inexplicable in the relationship to the offense.  I

27     **C. BOATMAN      D-65055        DECISION PAGE 1    6/29/06**

1   mean this was a crime where he had given you the money.
2   You had went and got the gun, put bullets in it, and
3   drove down there.  So you knew that somebody had a good -
4   - somebody's going to get killed.  Especially when the
5   guy made the statement, there will be no witnesses.  When
6   someone asked you -- hey, who's going to -- what about
7   witnesses -- I'm going to take care of that.  And so this
8   man, even though he cooperated, he still lost his life.
9   You have no record of violence or assaultive behavior.
10   And it became an escalating pattern of criminal conduct.
11   Basically, you failed to profit from society's previous
12   attempt to correct your criminal, criminality.  Such as,
13   you were on probation at the time this -- this crime
14   occurred.  On probation.  A young lady had been raped
15   prior to that.  Somebody else had -- had had their purse
16   snatched prior to that.  And then at some point this --
17   it was just going to far.  It's like you were a one man
18   crime spree.  And, but don't let them take away from the
19   fact that you know -- you've been programming well.  And
20   you've been doing a lot of things that are very, very
21   commendable.  And you just keep going because you're on
22   the right track.  Do you have any comments Deputy
23   Commissioner?
24       **DEPUTY COMMISSIONER WOLK:**  Not at this time.
25       **PRESIDING COMMISSIONER PORTER:**  Okay.  That
26   concludes this hearing, the time is 3:41.  I wish you the
27   **C. BOATMAN      D-65055      DECISION PAGE 2      6/29/06**

66

1  best of luck, sir.

2        **INMATE BOATMAN:**  Thank you.

3        **PRESIDING COMMISSIONER PORTER:**  Good luck.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23  **PAROLE DENIED TWO YEARS**

24  **THIS DECISION WILL BE FINAL ON:** OCT 2 7 2006 _____

25  **YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT**

26  **DATE, THE DECISION IS MODIFIED.**

27  **C. BOATMAN      D-65055      DECISION PAGE 3    6/29/06**

67

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, TED RIVERA, a duly designated
transcriber, VINE, MCKINNON & HALL, do hereby
declare and certify under penalty of perjury that
I have transcribed tape(s) which total two in
number and cover a total of pages numbered 1 - 67,
and which recording was duly recorded at SAN
QUENTIN STATE PRISON, at SAN QUENTIN, CALIFORNIA,
in the matter of the SUBSEQUENT PAROLE
CONSIDERATION HEARING of CHRISTOPHER BOATMAN, CDC
No. D-65055, on JUNE 29, 2006, and that the
foregoing pages constitute a true, complete, and
accurate transcription of the aforementioned
tape(s) to the best of my ability.

I hereby certify that I am a disinterested
party in the above-mentioned matter and have no
interest in the outcome of the hearing.

Dated OCTOBER 1, 2006, at Sacramento County,
California.

T. Rivera
_____
TED RIVERA
Transcriber
**VINE, MCKINNON & HALL**

EXHIBIT D

STATE OF CALIFORNIA — DEPARTMENT OF CORRECTIONS AND REHABILITATION

ARNOLD SCHWARZENEGGER, GOVERNOR



**BOARD OF PAROLE HEARINGS**
**DECISION PROCESSING AND SCHEDULING UNIT**

1515 K Street, Suite 600
Sacramento, CA 95814

August 10, 2005

Christopher Boatman  D-65055
California State Prison – San Quentin
San Quentin, CA 94964

Dear Mr. Boatman:

Your parole consideration hearing was conducted on April 6, 2005. Decision Review is completed and the final decision date of your hearing is August 4, 2005. The decision has been approved by the California Department of Corrections and Rehabilitation, Board of Parole Hearings.

The decision finding you suitable for parole may be subject to review by the Governor.

Attached is the last "Decision Page" with the stamped final date and a front cover sheet to your transcript.  Please incorporate these pages in your copy of the hearing transcript.

Sincerely,

SANDRA D. MACIEL
Chief, Decision Processing
and Scheduling Unit

cc:    Institution Records Office

Enclosure