MENTAL HEALTH EVALUATION
FOR THE BOARD OF PRISON TERMS
JANUARY 2005 LIFER HEARING
SAN QUENTIN STATE PRISON

This report is based on a review of the inmate's central and medical files, a life history questionnaire completed by the inmate, and a personal interview of one hour on 1/14/05.

The report focuses on the issue of the inmate's dangerousness as a result of the Board 's concern that the report of 9/04 was not specific enough in this area. Additional information which is relevant to the inmate's potential for danger-ousness will also be included. The Board is respectfully directed to previous evaluations for information concerning other domains.

**Identifying information**: Mr. Boatman, who goes by the nickname of Bert, is a 39 year-old single male who self-identifies as African-American. He is a first termer who was received into CDC on 9/3/87 and is serving a sentence of 15 years to Life for Murder in the Second Degree with Use of a Firearm. He is of slightly less than medium height, with athletic build and shaved head. He presented as very well groomed, friendly, polite, and open.

**Family History**: Mr. Boatman indicated that his parents' separation when he was 15 years old was an important factor in his development. He stated that, looking back, he realizes he felt empty and anxious and did not know how to ask for help. However, the inmate did not appear to be blaming his parents or shifting his responsibility in any way. In fact, he added that he felt his use of drugs played a more important part in his subsequent behavior.

**Substance Abuse History**: Mr. Boatman stated that he began using drugs at the age of 15. He indicated that he used alcohol and marijuana from the age of 15 to 20 and used cocaine from the age of 18 to 20. He stated that he "didn't care about anything" when he was using and feels it was "a major factor" in his subsequent behavior. Mr. Boatman stated that he has not used any substances, however, for the past 18 years.

**Plans if Granted Release**: Mr. Boatman's statements during this interview were consistent with those of the 9/04 report. Aside from living arrangements and vocational plans, he stated that he plans to participate in Narcotics Anonymous and to continue with his current program by giving to his community. He would like to share his story, based on his experience with drugs and crime, and to become a mentor. He stated that he would also like to marry and have children.

**Diagnostic impression:**

| Axis I:   | V71.09 | No Diagnosis on Axis I  |
|-----------|--------|-------------------------|
| Axis II:  | V71.09 | No Diagnosis on Axis II |
| Axis III: |        | None                    |
| Axis IV:  |        | Incarceration           |
| Axis V:   |        | GAF=81                  |

**Review of Life Crime:** Mr. Boatman's account of the instant offense and his statements concerning his responsibility and his sense of remorse were consistent with previous reports. Mr. Boatman stated quite clearly that he feels responsible for what happened and that he is sorry for what happened. He stated that he pleaded guilty to the crime "so that the victim's family would not be dragged through the pain [of a jury trial]."

**Assessment of Dangerousness:** A number of factors were considered in assessing Mr. Boatman's current level of dangerousness. Factors that are favorable for the inmate are, first, that he did not actually commit the murder himself. Second, he does not have a history of violent criminal behavior. He has a minimal criminal history and no juvenile record. Third, he has not received any 115's in his 18 years of incarceration. Fourth, he does not have a history of serious mental health problems. While he does have a history of substance abuse, it appears that he has been clean and sober for the past 18 years, and he has participated in NA as well as other self-help programs to aid his recovery. In addition, he appears to have strong support from a stable family and friends. Other factors in his favor are that he has earned his GED and has worked at a variety of jobs since his incarceration with laudatory performance evaluations.

This examiner does not believe that there are any factors that are unfavorable at this point in time. Mr. Boatman was convicted twice for theft prior to the instant offense and served six months in jail for the second offense. The inmate was quite forthcoming about his history and self-reflective about the changes that he feels he has made over the years. Mr. Boatman stated he feels he has matured. He feels that he has come to trust people and indicated that this is because he now chooses his friends carefully. He added that he chooses people who are positive and successful. In turn, he feels grateful for the support he has received.

Mr. Boatmen appears eager to work and to involve himself in the community. He appears to understand the importance of his continued participation in 12 step programs and wants to give to his community, particularly to those affected by drugs and crime.

It is this examiner's professional opinion that Mr. Boatman would pose a low risk if he were to be released into the community at this time.

BOATMAN, CHRISTOPHER D65055

**Clinician Observations/Comments/Recommendations**: it is recommended that Mr. Boatman participate in AA or NA and that he participate in weekly counseling to transition successfully into the outside community if he is granted parole.

Elizabeth Wantuch, Psy.D.
Clinical Psychologist
San Quentin State Prison

BOATMAN. CHRISTOPHER  D-65055
September 7, 2004

# MENTAL HEALTH EVALUATION
# FOR THE BOARD OF PRISON TERMS
# SEPTEMBER 2004 LIFER HEARING
# SAN QUENTIN PRISON

Mr. Boatman was interviewed by the undersigned on September 3. 2004 for two and one-quarter hours for the purpose of his Board of Prison Terms Lifer Hearing. Available records in his central file were reviewed. Please see prior counselor reports (most recently conducted in September 2004) and psychological assessments (most recently conducted in the year 2000) for additional details. The author reserves the right to modify any findings, should any more recent reports or any additional records become available in the future.

Before starting the evaluation. I explained to Mr. Boatman that, although I am a physician, I am not his treating physician, he is not my patient, we do not share a physician/patient relationship. and I would, therefore, not be able to observe the usual confidentiality. I also informed him of the voluntary nature of this evaluation and that he is not required to reply to any questions he does not wish to answer. I explained to Mr. Boatman I am required to convey to the board of prison terms all of my findings. Having been thus informed. Mr. Boatman agreed to proceed. In my opinion. he appeared competent to agree to this evaluation.

Prior to concluding the evaluation. all quotations in this evaluation and the context within which they were spoken by Mr. Boatman were verified by him.

Finally. an observing student physician was present during this evaluation. Mr. Boatman was informed of the circumstances regarding his presence and he allowed the presence of this student physician. when given a choice to refuse his presence without any repercussions.

<u>Psychosocial Assessment</u>

I.    Identifying Information: Mr. Boatman is a 39 year-old African-American male, born in Covington. Louisiana, who is serving a life sentence for murder in the second degree. He reports his date of birth as July 25. 1965 and states he is single, never married. He describes himself as Catholic since childhood

BOATMAN   CHRISTOPHER                    San Quentin
9/7/04

BOATMAN, CHRISTOPHER  D-65055
September 7, 2004

and states he continues to practice this faith. He does not demonstrate and he
does not report any unusual physical characteristics. except for being born
severely "pigeon toed." (Please see medical history for additional details.) He
denies any aliases. but states he has gone by the nick-name "Bert" since
childhood.

II.  **Developmental History:** Mr. Boatman reports he was born via a normal
spontaneous vaginal delivery one month premature. he but denies any other
known prenatal or perinatal complications or concerns. He reports no birth
defects and denies any known prenatal exposures to alcohol, tobacco.
nicotine, prescriptions medications. or illicit substances. He reports achieving
normal developmental milestones with regard to speech. language, and motor
development, as well as normal peer interaction with family and friends from
infancy through adulthood. He denies any idiosyncratic habits. He also denies
any history of cruelty to animals. fire-setting behaviors. theft, or tendency to
engage in physical altercations prior to age 15. He reports he experienced
nocturnal enuresis up until age 4, but that this disappeared when his father
began giving him a small amount of honey prior to bedtime.

He reports a childhood medical history significant for wearing leg braces from
his ankles to below his knees to correct the aforementioned "pigeon-toes" (He
describes walking with severely inverted toes prior to this treatment.) He
reports no sequelae subsequent to treatment. He also reports another series of
injuries at age 12 years resulting from being hit by a truck while sitting on the
back of a motorcycle. From this event, Mr. Boat reports sustaining a fractured
right ankle and humerus—resulting in being hospitalized for a few days and
rehabilitation for weeks afterward. He states he recovered completely from
these injuries. He denies any other additional childhood medical or surgical
concerns.

Mr. Boatman denies any history of being a victim or perpetrator of either
physical or sexual abuse.

III.  **Education:** Mr. Boatman reports he dropped out during the 12th grade. He
states the factors which contributed to his dropping out consisted of his

BOATMAN  CHRISTOPHER                    San Quentin
9/7/04

BOATMAN. CHRISTOPHER  D-65055
September 7. 2004

deciding to work during the day for his father—however, he states his drug
use also substantially contributed to his dropping out. He states he started
continuation courses soon after dropping out. but discontinued these classes
10 units short of the necessary requirements to obtain a high school diploma.

He reports he later obtained a GED while in custody at Solano State Prison in
March. 1993, before completing requirements for his high school diploma in
May. 1993.

Mr. Boatman describes his academic strengths as follows. "I do better in math
than in English and reading. When I was a kid. I couldn't keep up with the
other students because I couldn't read as fast, but that's better, now." He
denies any history of dyslexia, and reports only mild difficulties with
concentration and focus with reading, only. He denies any history of
disciplinary problems during childhood.

IV:     **Family History:** Mr. Boatman reports he is the third of six offspring born to
his biological mother. He reports his older sister (age 42), older brother (age
40), and next youngest brother (age 37) are also fathered by his biological
father. He states his two youngest siblings, a brother (age 29) and a sister (age
27) are biologically-related to his step-father. He states his family moved from
Louisiana to a suburb of Fresno soon after his mother married his step-father
during his early childhood. Mr. Boatman reports no memory of his biological
father. who separated from his mother when Mr. Boatman was three years-
old. He reports his relationship with his mother, step-father and all of his
siblings as "...Very good...still good today. We was all close......We were
taught that a family stays together." He reports being closest with his youngest
brother with whom he plans to work upon his being paroled and he states they
speak via telephone weekly. He reports no history of violence or friction in his
family. until his mother and step-father separated a year before the life
offense. then later divorced. However, he states they re-connected about 10
years ago and have been living together ever since.

He reports no known medical problems which run in his family—stating his
mother and siblings are all in good health. He states his grandparents lived
well into old-age. He states he was told by his older brother that his biological

BOATMAN   CHRISTOPHER                San Quentin
9/7/04

BOATMAN, CHRISTOPHER  D-65055
September 7, 2004

father developed a problem with alcohol, but he reports no personal contact
with his biological father. He also reports his younger half-brother was once
addicted to heroin, but has been sober for "many years" and now works as a
sponsor for narcotics anonymous and runs a successful well-drilling business
in Lemoore, California. He reports no other history of substance misuse and
he denies any known history of mental illness among his biological relatives
or in his step-father.

V.    **Psychosexual Development and Sexual Orientation:**  Mr. Boatman reports
he entered puberty at age 14 and became sexually active at age 17. He states
his first partner was his "on-again, off-again girlfriend" with who he had a 3
year relationship up to life offense.

He reports having consensual sex with a teenage female who was a friend of
someone he knew, but that she became upset with him when she saw him
kissing another friend of hers, which led her to report their sexual activity to
her mother. However, Mr. Boatman was arrested and charged with 2 counts of
rape with force and fear, but later these charges were reduced and dismissed.

Mr. Boatman reports his sexual orientation as being exclusively heterosexual
during his life. He reports no sexual activity while being in custody and denies
any sexual fantasies, but reports occasional nocturnal orgasms which occur
every few months. since he does not masturbate. He denies any other history
of sexual dysfunction, aggression. or fantasies.

VI.    **Marital History:** Mr. Boatman reports he has been single, never married. He
reports he has not fathered any children and states no woman has become
pregnant from him to his knowledge.

VII.    **Military History:** Mr. Boatman reports no history of military service.

VIII.    **Employment/Income History:** Mr. Boatman reports his first job consisted of
working for his step-father at age 10 assisting with milking cows. He reports

BOATMAN   CHRISTOPHER                    San Quentin
9/7/04

BOATMAN, CHRISTOPHER  D-65055
September 7, 2004

his next job occurred at age 12 and also entailed working with his step-father and consisted of helping drill wells. He states his first job outside of his family occurred at age 17 and entailed milking cows at a local dairy 5-6 hours per day. He reports quitting this job after 6 months, but soon began stocking shelves at his step-father's liquor store a few hours per day from age 18-19.

Since being in custody, Mr. Boatman reports he obtained his welding certificate in 1994, then became a journeyman in machine shop in 2002. He states he also decided to work in vocational plumbing since 2002, in order to better prepare himself for his future employment plans of working with his brother's drilling company. He reports he still utilizes his welding expertise on an intermittent basis, when asked to help with a job. "But I knew back in 2002 after things fell through with my parole date that if I'm going to work with my brother after I get my date, I needed to know a little more about plumbing. I can find water for drilling. I now know enough to right now make him happy with the work I will provide him with. There are tests (to be certified), and I'm considering doing it." Mr. Boatman reportedly received laudatory chronos for Welding. Journeyman machinist documented July 1998, per 2003 counselor's report. (Please see this report for a list of certificates documenting occupational skills and participation in various self-help programs.)

IX.   **Substance Abuse History:** Mr. Boatman reports his initial exposure to drugs occurred at age 15, when a friend of his began using cannabis. Mr. Boatman states he initially began smoking a single joint of cannabis 1-2 times per week. He states he began purchasing his own cannabis a year later and was soon smoking daily, at a rate of "a dime-bag a week." He states he continued to smoke cannabis at this rate while starting to use cocaine via snorting monthly at age 18. He reports not liking cocaine all that much. "It was an expensive high and I really didn't like it." However, he reports his substance use changed dramatically after being introduced to rock cocaine 3-4 months prior to the life offense. "I was instantly addicted. I stopped smoking marijuana at that point and I was using the rock everyday from the beginning. I'd use at least a quarter (gram) a day…maybe half-a-gram sometimes." Mr. Boatman reports his daily activities revolved around obtaining and using rock cocaine by the time of the life offense. He also reports using alcohol on weekends— consisting of a six-pack of beer at one time during his latter teen years.

BOATMAN   CHRISTOPHER                    San Quentin
9/7/04

BOATMAN. CHRISTOPHER D-65055
September 7. 2004

However. he reports this use did not affect his functioning other than his feeling drunk the night he would use. He denies any occupational. legal. or personal effects from his use of alcohol compared to cocaine.

He reports he recognized he had developed an addiction to cocaine, which led to maladaptive pattern of behavior and he planned to obtain treatment at the time of the life offense. but he reports not receiving any such treatment prior to this occurrence. Mr. Boatman reports attending narcotics anonymous meetings since 1993 and states he has gone weekly since then—only missing a handful of groups over the past decade. He reports plans for his brother to be his sponsor once he is released from custody and he plans to assist his brother in his activities with the narcotics anonymous community in Lemoore. California. Mr. Boatman states the concerns raised by the governor who denied him parole inspired him to attend and complete a spirituality class which included a 12-step program geared toward preventing alcohol relapse earlier this year. He reports he is "ready and willing" to undergo random drug and alcohol testing as part of his parole.

X.  **Psychiatric and Medical History:** Mr. Boatman reports he has never experienced symptoms consistent with any major mental illness. (aside from substance misuse.) He confirms this history during a thorough review of mental health symptoms (mood. anxiety. psychotic. eating disorder symptoms) conducted by author during this evaluation. He denies any history of thoughts. plans. or intent to harm self or others. He denies having ever seen a mental health professional of any kind. except for possibly during a routine screening evaluation at some point during his incarceration.

Regarding his medical history. Mr. Boatman reports being diagnosed with elevated cholesterol a year ago, and he states he currently receives Lipitor, after experiencing renal side-effects from Zocor. He reports a history of left shoulder dislocations which are sports-related injuries. and he states he underwent arthroscopic surgery a few years ago. He reports he has fully recovered from this operation and continues to play sports and work without impairment. He reports he wears a goatee, due to his propensity to develop "skin bumps" after shaving around his lip and chin region. He denies any other current or prior medical or surgical concerns. aside from those covered

BOATMAN  CHRISTOPHER                San Quentin
9/7/04

BOATMAN, CHRISTOPHER D-65055
September 7, 2004

in his childhood history. He denies history of head injury, seizures, or loss of
consciousness.

XI.     **Plans if Granted Release:** Mr. Boatman reports he plans to live with his
mother and step-father and work with his brother—all of whom live close to
each other in Lemoore, California. He reports his parents have prepared to
supply him with clothing and transportation, in order to minimize his expenses
during his transition. He has received numerous letters of support regarding
his parole, which were read from the central file by the undersigned. These
include a letter from Tanney Machine and Manufacturing Fresno, California
Dated July 19, 2004 "...there would be a very good chance he could be hired
very soon after his release." Rutter Armery Incorporated in Fresno, California
inmate "...would be very qualified for the type of work we are presently
doing at our shop." Job filled, but inmate offered an interview and referral to
other potential opportunities. Supportive letters within the past few months
from San Quentin Correctional Officers J. Robinson, L Casner, J.C. Gladson,
and from Recreational Coach Don Denevi, Kairos contact John Kelly. Other
correspondence supporting Mr. Boatman's parole include letters from Darryl
Hildreth who is a contact from observing Mr. Boatman work in vocational
programs and from David Peironnet and Clarence Campbell who report being
acquainted with Mr. Boatman for the past few years through their work in the
Christian community. Mr. Boatman also reports he has an additional 15 more
recent letters from family regarding support for his plans if granted release.
(He reports they have not been placed in the central file, since he has yet to
have been able to give them to his counselor.) A prior letter of support from
his mother documents her willingness to house Mr. Boatman and support him
with clothing.

## Clinical Assessment

XII.    **Current Mental Status/Treatment Needs:** Mr. Boatman presented on time
for this evaluation. He presents as an alert, friendly, appropriately-groomed
male of his stated age. He displayed no unusual mannerisms, psychomotor
abnormalities, facial expressions, or hand gestures. His gait appeared normal.
He displayed appropriate eye-contact throughout the evaluation. He

BOATMAN   CHRISTOPHER                    San Quentin
9/7/04

BOATMAN. CHRISTOPHER D-65055
September 7. 2004

demonstrated full orientation to the day. date. year. location of the interview,
and was able to name various current events accurately. Although his IQ was
not measured, he appeared to demonstrate average intelligence (based upon
his vocabulary and his ability to reason through events) and he displayed no
evidence of any cognitive deficits.

His speech was normal in rate. rhythm, volume, and tone. His thought process
was consistently rational and linear throughout the entire evaluation. He
described his mood as "upbeat, more focused, positive" and he appeared
euthymic with normal range of affect. aside from appropriate tearfulness when
describing the life offense consistent with his demonstrating remorse for his
involvement with the death of the victim. He denied any auditory or visual
hallucinations or other sensory concerns or paranoid ideation at the time of the
evaluation. He did not report or exhibit any behaviors which would suggest
any psychotic or delusional processes during the evaluation. He denied any
thoughts or plans of harming self or others. Mr. Boatman demonstrated insight
into the factors leading up to his incarceration and reports he understands how
he must maintain sobriety in order for any success to occur in his life. He
demonstrated insight into how his actions during the life offense affected the
lives of those who care about the victim. as well as those who care about him.
He demonstrated future-orientation toward his upcoming Parole Consideration
Hearing. Thus, there is no evidence of psychosis. cognitive impairment. mood
or anxiety symptoms. or any other significant psychological impairment
which would warrant psychological or psychiatric treatment at present time.

Axis I:     -No evidence of any current Axis I disorder at present time
            -Cocaine Dependence, in Institutional Remission
            -Cannabis Dependence, in Institutional Remission
            -Alcohol Abuse. in Institutional Remission

Axis II:    deferred

Axis III:   hyperlipidemia

Axis IV: Legal problems

Axis V: 75-80

BOATMAN   CHRISTOPHER            San Quentin
9/7/04

BOATMAN, CHRISTOPHER  D-65055
September 7, 2004

XIII.  **Review of Life Crime:**
Please see the central file for prior reviews by the inmate and others regarding
the life crime. During this evaluation, Mr. Boatman reported, "It's just very
sad what happened (tearfully, with his upper lip trembling)...and I'm
responsible. I affected a lot of people...they didn't deserve that. We went
there and I didn't want to do it, but I didn't have the guts. My part was a very
big part: If we didn't have my car, if we didn't have my step-mother's gun,
John (the victim) would still be alive today." He continues to discuss the
events of the day of the life offense as follows: "That day, I went over to a
friend's house...I knew it was a drug house...and they were smoking crack. I
had no money and they gave me some (crack.) My partner Harold Jones said
he had robbed a place before to get money for drugs. He said, 'All you have to
do is drive the car. No one will get hurt.' He asked if I had a pistol. I said,
'Yes. I could get my step-mother's gun.' So my friend Butch and him and me
went to get it...The first place we went to rob had too many people, so we
went to this other place. When we got there, I was worried if I didn't get more
involved, I would get any of the money, so I asked Butch if he would drive
and I'd be the lookout instead of him," he reports, shaking his head, becoming
increasingly teary-eyed. "Then I heard a shot and began to run away back to
the car and I could see John (the victim) fall as I turned my head to look at
what happened. Butch drove us away, but we switched half-way back to their
house and I dropped them off then drove to my Dad and step-mother's house
around the block. That's where I was arrested three days later. I wish I could
change the way I was thinking...I just wish it never happened."

As stated above, Mr. Boatman does not suffer from any non-substance related
mental condition which bear any relevance to the life offense. His level of
insight, remorse, and empathy appears significant during this evaluation.

XIV.  **Assessment of Dangerousness:**
A.  <u>Within a Controlled Setting</u>: Per his report and based upon a review of available
records in the central file, Mr. Boatman has not accrued any disciplinary actions,
except for two 128's during his incarceration. Per his report, these actions
consisted of sleeping through count and for sending his mother a pair of earrings.

BOATMAN   CHRISTOPHER              San Quentin
9/7/04

BOATMAN. CHRISTOPHER  D-65055
September 7, 2004

He reports no history of violent behavior prior to the life offense and denies any altercations with inmates since this incarceration. He attributes the success of his programming to his faith, as well as toward his determination to continue to strive to become a better person. He states, "You can either succeed or give up. The last ten years at San Quentin has changed me…it's the support, the network. and the community. I chose my friends very carefully since I've been here because it's like choosing fruit. You want to be careful with what you choose. I now have a courage and a strength to stop myself from doing what is wrong. which I didn't have before I got arrested."

B.  If released into the community: There is not enough data to allow one to predict the future behavior of anyone who is to be released from custody to the community with absolute accuracy. His history of increasing seriousness of criminal behavior prior to his arrest all concurred with the increasing seriousness of his reported substance misuse. He reports complete sobriety since his incarceration and he reports a willingness to take every measure possible to insure his sobriety. He reports he has taken significant measures to prevent relapse—as noted by his participation in narcotics anonymous and the spirituality class. as well as his plans to have his brother be his sponsor upon release from custody. Please refer to the letters of support and other documents in the central file regarding the many letters of support regarding his future employment, residence, and other supports upon release from custody.

C.  Significant Risk Factors/Precursors to Violence:

1.)  Previous history of violence: As noted in Mr. Boatman's life crime. he has a history of escalating seriousness of criminal behavior prior to the life offense; however, he denies any history of direct violent or aggressive behavior prior to. during. or since the life offense. Please see prior documents in the central file for further details.

2.)  Previous history of substance misuse: If Mr. Boatman were to relapse. this would significantly increase his predisposition toward future dangerousness. Mr. Boatman extensively explained how substance use affected his propensity toward "being involved with the wrong crowd"

BOATMAN   CHRISTOPHER                    San Quentin
9/7/04

BOATMAN, CHRISTOPHER D-65055
September 7, 2004

both prior to and with regard to his life crime. The measures Mr. Boatman
reports he is willing to take upon parole can minimize his risks of relapse.

3.) <u>Economic stressors:</u> Mr. Boatman reports having set occupational plans,
as well as plans for housing, which can minimize these risk factors upon
release from custody. Please see the aforementioned letters and any new
documentation (which has yet to be placed in the central file, according to
Mr. Boatman) regarding these plans.

4.) <u>Lack of structured activity:</u> He reports plans to work full time and spend
his spare time involved with the narcotics anonymous community upon
release from custody, aside from spending time with his family. Should
these plans come to fruition, this should minimize his risk of recidivism,
as well.

## XV.    Clinician Observation/Comments/Recommendations:

As noted earlier in this report, Mr. Boatman was cooperative with the evaluation. His
history, as described above, includes only distant risk factors which may predispose him
toward future dangerousness. Again, as reported above, as with any assessment where one
is asked to predict someone's future behavior, it is impossible to predict someone's future
dangerousness or risk of recidivism with absolute accuracy. However, he has no
documented violent behavior during his incarceration, no documented substance misuse,
and he has participated in substance misuse treatment consistently (as documented in the
central file,) in addition to participating in other educational and self-help activities, per
the prior reports in the central file. In addition, he does not demonstrate any evidence of a
severe mental disorder per past reports or at present time. Thus, it is recommended that
factors in his case, other than psychopathology, (i.e., moral, legal, ethical, medical or other
criteria) be considered in determining his eligibility for parole.

J. KORNBERG, M.D.
Psychiatry Fellow

BOATMAN   CHRISTOPHER                    San Quentin
9/7/04

Boatman, Christopher                                                September 28. 2000
D65055

# PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
## September 2000 SUBSEQUENT LIFER HEARING
## SAN QUENTIN STATE PRISON

### PSYCHOSOCIAL ASSESSMENT

The report was based on an interview with the subject lasting approximately three hours and a thorough review of his C-file and medical file.

I.  Identifying Information:
Bertran Christopher Boatman was born July 25, 1965 in Louisiana. He is a single, 35 year old African American male who identifies as Christian. He goes by the nickname of "Bert." He has no aliases. He reports four scars: on his right shoulder, right ankle. and right and left wrists. He is the 3rd child of Aieda and Melvin Phillips. He has 3 full siblings and 2 half siblings, both from his mother's second marriage to Jim Boatman. the man he considers to be his father.

He was first committed to CDC in 1987 for murder, second-degree.

II.  Developmental History:
Mr. Boatman came to California when he was an infant, to a small farming community in the Southwest corner of Fresno County. He was born "one or two months" prematurely. He is unaware of birth complications or vulnerability resulting from his early arrival.  As an infant he needed to "have braces for a time to keep my feet kinda straight, all the way up to my ankles, so I couldn't walk." This condition did not require surgery. He met developmental milestones. He was "an animated kid" and apparently a bit of a risk-taker. "I'd do things the other kids wouldn't do. I'd be the first one to dive in and do something." He described family life and peer relations as normal. He was close to his stepfather and tried to emulate his industrious habits.

> I was a good kid. I always did my chores. I'd get up while everyone
> else was sleeping I'd knock my chores out. I loved to go to work
> with my Dad with the cows. When I was 5 years old I was already
> driving the tractor, so he could take care of the cows.

He wet the bed until he was about 4 years old, recalling that his Dad would give him honey as a remedy to prevent bedwetting. He denies fire setting or cruelty to animals. He recalls "we had dogs, cats, horses. I had a show pig in Future Farmers of America when 12 or 13--I came in 2nd place." He was in 4H. He denies predatory behavior but

Boatman, Christopher                                    September 29, 2000
D65055

says he was bullied allot by some of the older kids but does not recall why. He denies
physical or sexual abuse as victim or perpetrator.

He denies serious illness as a child but did have several accidents. He "almost went
blind" when he was about 12, from infrared rays when welding his bike without a mask.
He says he had seen his father welding and wanted to be like him. At 12, he was hit by a
truck while riding his bike. breaking his right shoulder, wrist and ankle. He fell off a
motorcycle as he descended a hill when he was 14 years old breaking teeth and cutting
his right wrist.

Referring to the three years prior to the instant offense as a "bad time in his life...because
I was doing things out of character." He had two convictions during this period. He did
6 months at San Luis Obispo County Jail for Grand Theft (a purse snatching). He did
some jail time for, "stealing cassette tapes out of a store." He denies other shoplifting
incidents except for taking candy several times.

III. Education:
He completed the 11th grade at Riverdale High School dropping out in the 12th grade.
Until that year he denies school problems. "I loved school," he says. He was held back in
kindergarten. "I think it had to do with not paying attention." He took no medication for
attention problems or for any other condition. He did not receive special education
services and denies truancy until 12th grade. "In high school I began getting in trouble
allot...missing allot of classes." Despite this he played sports, particularly basketball. He
began to butt heads with a "strict" teacher. "He wanted me to do things I really should
have been doing like shave, report to class on time. I started to rebel." He quit school and
began Continuation High School, quitting to begin a job at a dairy.

He passed his GED exam 2/25/93

IV. Family History:

Biological parents:
Until recently he believed his birth father had died when he was approximately 2 years
old. Recently his siblings have found and met their father. now 54, who is living in
Alabama. Married, with 2 children, he works as an air craft mechanic. Mr. Boatman does
not know if his father has a criminal, medical, drug or psychiatric history.

His parents' relationship had ended after his father went to Vietnam during the war where
he was a helicopter pilot. His wife. the subject's mother, apparently met another man and
began a new family. Mr. Boatman is unsure of whether his parents had legally married.
Returning from Vietnam after the war, unable to find his family. he became an alcoholic.
Following the war, his father became an alcoholic, now recovering.

Thus far Mr. Boatman and his birth father have not had direct contact. He has written his
father a letter, expressing a desire to communicate.

Boatman. Christopher                                        September 29, 2000
D65055

The subject's mother, now 55, has had two marriages. She married Jim Boatman who raised her 4 children as his own and they had 2 more children together. They divorced when Mr. Boatman was 14 or 15 years old. He does not recall any arguing or trouble with the couple until the time of their divorce. "My mother wanted to go back and get her education. My dad is the old type and he wanted her to stay at home."

The two youngest children went with their mother. The subject and a younger brother stayed with their step-father, Jim Boatman. Two older children were in college.

Following her divorce, Aieda Boatman completed a degree at Fresno State University. For 8 years she had a common-law relationship with Thomas Tripp, a man 10 years older than she, who owned a liquor store. After he died, Aieda and Jim Boatman resumed their relationship. She has made a career of selling real estate. She has no history of alcohol or drug use, criminal activity or mental or physical illness.

Stepfather: Jim and Aieda Boatman married after the subject's birth father went to Vietnam. The couple divorced when he was 14 or 15 years old. Mr. Boatman has always worked as a rancher. He has no history of drug or alcohol abuse or a history of criminal behavior. He has not had serious illnesses or injuries. He has been re-united with the subject's mother again for the past 9 or 10 years.

Siblings: Mr. Boatman has 4 full-siblings and 2 half-siblings.   There is no history criminal behavior, serious medical or mental illness among his siblings. Arlene Boatman, 38 years, works for social security and is married with 3 children. She has had some college education. Melvin Boatman, 37 years old, an air force veteran, sells hospital equipment. He completed college. He is married with 2 children. Ontre Boatman, 33, a personal trainer, was in the Air Force, and is now married with 2 children. He completed college. This is the sibling with whom Mr. Boatman feels the closest. Sail Boatman, 27, who "has worked a little here and there" sometimes as a computer programmer. He is now in drug treatment program. Mr. Boatman is unsure which drug he was using but he thinks it was heroin. This is the only family member, besides the subject, who has a history of drug use. Brandy Boatman, 26, is married with 2 children.

Grandparents:
Mr. Boatman was closest to his step-father's parents. 'They lived in Lemoore and we visited them allot. They had a big farm and grew alfalfa and cotton on their land... a big old ranch with horses and almost all the animals you can name." His maternal grandmother lives in Louisiana. He does not know her medical, criminal or substance use history. "We went down there allot to stay. She does not know that I am incarcerated. My Mom tells me it would break her heart if she knew. So when I write I do not mention I'm in prison." He never knew his maternal grandfather or his paternal grandparents. "I don't know nothing about them."

3

Boatman, Christopher                                        September 29, 2000
D65055

Mr. Boatman describes his childhood as satisfying. He felt loved and supported--"I wouldn't change my upbringing for nothing in the world.". He reports uniformly good relationship with all family members. Throughout the years he has had the support and backing of a large and loving family. He is appreciative of their support and returns it generously.

> My family has been really loyal, from day one. They show their love
> each time I call, through their letters. My mother drove by herself on
> many occasions to see me. My brother comes up from Texas. Their
> love hasn't diminished none since I been incarcerated.

### V. Psychosexual Development and Sexual Orientation:
Mr. Boatman recalls onset of puberty at "around 13 or 14. I had a girl-friend at that time." He had intercourse for the first time at age 16 in a relationship which was "off and on" but "really never serious." He did have a serious and steady relationship for the two years before his incarceration. He denies homosexual relationships and denies high-risk sexual behavior, aggressive sexual behavior or perversions.

### VI. Marital History:
There have been no marriages and he has not fathered children. He says he "would love to marry and have children."

### VII. Military History:
He was not in the military.

### VIII. Employment or Income History:
Mr. Boatman's employment history outside of prison is minimal. He worked along side his dad as a child, in the fields, driving tractor and doing farm chores. On weekends he worked with his dad drilling water wells. After dropping out of high school he was employed on and off at a liquor store owned by Thomas Tripp, his mother's companion. He worked at a dairy when he was 18 and 19.

While incarcerated he has worked as a porter, kitchen worker, boxing trainer and as a machinist and welder. In December, 1994, he completed welding training. In 1997 he completed an apprenticeship in "Machine Tool Trades" and was inducted as a member in the American Welding Society that same year. He is currently working as a Machinist in San Quentin's Vocational Machine Shop. His supervisor requested that he be inducted to Journeyman status early, because of his superior skill level. In January, 1999, he completed further components of the Machine Tool Technology trade.

Chronos and attendance records were reviewed: A chrono from the Machine Tool Technology program notes that Boatman possesses machinist skills commensurate with receiving between $15.00 and $20.40 per hour based on wages set by the Board of Apprenticeship Standards (7/98). His "mature behavior and high work standards" (9/96) have been acknowledged. He was cited for "A" grades in Machine Shop. His instructor

4

Boatman, Christopher                                        September 29, 2000
D65055

would "love to have him in his crew if he had a shop in the community" (4/96). It has
been noted that "his social skills are effective and appreciated" (4/96). Time cards show
an excellent attendance record.

Mr. Boatman describe his hobbies and social pursuits as follows: "I like making things.
I'm good with my hands. I like movies. I play chess. I've won every chess tournament
I've entered. I play softball, basketball. I got some real nice friends, that care."

IX.  Substance Abuse History:
Mr. Boatman began smoking marijuana at 14 and drinking occasionally at age 18. In
1986 he used cocaine, "a couple of times but I didn't like it." This changed. For
approximately 6 months prior to the instant offense, he free-based crack cocaine about
twice a day. He had not received drug treatment prior to incarceration. Since 1993 he
has been a committed and active participant in Narcotics Anonymous. He also attended
Alcohol Anonymous for a short period in 1997. He completed the Katargeo program in
April 1996. He was noted to be "a thoughtful and reflective" group participant.

X.  Psychiatric and Medical History:
Mr. Boatman denies a history of serious medical illness and has not been hospitalized. A
review of Mr. Bettencourt's file revealed no history of psychological treatment or
impairment. He has not been prescribed psychotropic medication. He has shown no
evidence of any mental impairment.

He has had prior psychiatric diagnoses:

Axis I: Polysubstance Dependence, in institutional remission (7/95); Cocaine
Dependence, in institutional remission (3/96); and no diagnosis (3/98)

Axis II: Adult Antisocial Behavior (7/95); and no diagnosis (3/96)

In addition to the Katargeo program he has completed other self-help programs.
He completed the Alternatives to Violence Program twice (11/94) and  (4/00).
In September nof 1995 he commmpleted "Making a Change Responsibility Course."

XI.  Plans if Granted Release:

If released on parole Mr. Boatman plans to stay with his parents in Lemoore, 30 miles
southwest of Fresno, until he saves enough money to get his own apartment and car. He
plans to work as a journeyman machinist and welder. He specializes in stainless steel/tig
welding. He has two job promises from machine shops in Fresno. Eventually, he wants
to marry and have children.

Mr. Boatman's plans for parole seem viable and realistic, mature and thoughtful. He
feels secure that he has significant support from his family. He has very saleable job
skills and really likes to work hard. He has many facets of his life that satisfy him and

Boatman, Christopher
D65055

September 29, 2000

give him meaning--his friendships and hobbies, his relationships with family, his love of farm life and animals to look forward to.

He plans to remain in the Lemoore area and live out his life there. "There's so many fishin' spots there. We still have some acres there--we've got 20 acres in Riverdale--5 miles from where my parents stay. Right now its just gras (but) anything can grow there. corn, hay--it's real good land--I'd like to farm it on my off time."

Boatman articulates a need to influence and support others in his community to make better choices than did he:

> My life goal is to give back from what I have taken-- to give back--to make sure others don't make the same mistake that I made in my life. I think I've got a lot of influence on people, in my character. Here I am, if I tell others what I've done, and how I ended up. They see the honesty I portray.

## CLINICAL ASSESSMENT

### XII. Current Mental Status/Treatment Needs

A. Summary Mental Status Evaluation:

Mr. Boatman presented as alert, oriented and cooperative. He was pleasant and responsive. Grooming was neat and clean. He maintained good eye contact. He spoke openly throughout the interview. He was at times somewhat tense. When probed, he admitted it was because of the nature of the interview. He was at all times respectful. His stream of conversation was appropriate. His ability to concentrate and focus were unimpaired. His thinking was goal directed and logical. His cognitive functioning was well developed. His conceptual thinking, reasoning, awareness and ability to comprehend were adequate for the formation of good judgement. There was no evidence of a psychosis. organic brain damage, serious psychological impairment or suicidal ideation. He has no suicidal history. His affect was stable and his mood was euthymic. He did not present any evidence of a mood disorder. He has good insight into the dynamics of his commitment offense and takes full responsibility for his actions. His judgement, at present. is well above average.

B. Clinical Diagnoses and Level of Functioning:

| | | |
|---|---|---|
| Axis I: | V799.90 | No diagnosis |
| Axis II: | V799.90 | No diagnosis |
| Axis III: | None reported. | |
| Axis IV: | Incarceration | |

D. Treatment activities: He is receiving no mental health treatment.

Boatman, Christopher                                    September 29, 2000
D65055

E.  Medications:  He receives no psychotropic medication.

F.  Prognosis:  The prognosis for him is very favorable.

XIII.  Review of Life Crime:

The instant offense occurred in 1986 when Mr. Boatman was 21. Mr. Boatman recalls
May 29. 1986, the day of the murder:

> I knew I needed help. I kept it (drug use) from parents. My mother never
> knew. I think my Dad knew at the last minute. I thought I was going to
> disappoint them if I asked for their help. I could have gone to my
> stepfather and told him (about my drug problem) but I was ashamed. I
> remember asking a friend for help. My friend was going to help me go
> 'cold turkey.' He was going to take me to Yosemite for a few days. But
> the car broke down so we came back. We were going to go the next day.
> He dropped me off at my parents. I was going through withdrawal.
>
> As soon as he dropped me off, I went to get some crack cocaine, knocking
> at a couple houses where people sold it. I went to a person's house. He
> didn't give me none. He said Bert. are you hooked on this stuff? I told
> him I wasn't hooked. Then I went to another persons house. They had
> some. There were three of us. We smoked what we had (free-basing).
> Harold Jones, he was discussing that it would be easy to go get some
> more. that he had robbed this place before and the only thing I had to do
> was drive the car and he would run in and run out. I was leery. But after
> discussing it I conformed saying that as long as no one got hurt I'd go
> along. I got in my car. Harold Jones said he needed a handgun because
> the gun that he had was too big to take in the store. I got my stepmother's
> gun out of her drawer and I gave it to him. We proceeded to go rob the
> store: Me, Harold Jones and Butch Montgomery..
>
> We drove to the store but there were too many customers. It was about
> 12:00pm. So we decided to do another store. We went to three stores in
> Riverdale. First to one, than another and we end up robbing the third one.
> A friend stayed 100 yards from the store we decided to rob and told him
> we were going to rob the store. He said 'you guys are crazy.' At first the
> plan was for me to be the driver and Butch and Harold to go in the store.
> This is how crazy I was. I started to think if he goes into the store, and I
> stay outside, he'll get all the money. So we switch. Butch was the driver
> and I went into the store with Harold. When we went in he had the gun
> stuck in his pants, not visible. The clerk didn't see me. I was at the door.
> Harold Jones went up behind the counter and behind the clerk. The clerk
> was our age, about 20 years old. I didn't hear anything. And then I heard a

7

Boatman, Christopher                                    September 29, 2000
D65055

> shot. I said. 'Did you shoot him? Why?" Harold Jones said the clerk had
> reached for a gun. But there wasn't any.
>
> I know there wasn't any gun. I believe he had it in his mind to kill him so
> there wouldn't be any witnesses. After all these years I feel positive that
> the clerk didn't have no weapon and that it was planned to kill the clerk
> before the crime happened. I don't think Butch really knew or planned it.
> I think that it was in Harold's Jones mind to kill the clerk and eliminate
> witnesses before we even set foot in the store. If we (Butch and Mr.
> Boatman) had known he planned to take a life we wouldn't have been
> involved in anything like that. Harold Jones received life without parole.
> Butch Montgomery turned 'states evidence' and 'did two or three years.'
>
> Even today. I wake up in the morning and I think what I could have
> done different. The day he got shot I went in my bedroom, went down
> on my knees and cried. I knew I should go to the police. Not knowin'
> he was dead--I was hopin' he would be all right and prayin' he would
> be allright. If I had acted on my initial thought, I could easily have
> called for help. I didn't have enough balls to stop it. I was hopin' my
> car would break down, so we wouldn't have to go through this. I didn't
> stand up and say I don't want to do this. After this, I didn't want
> nothin'. I didn't even want drugs. All I could think about was the guy
> that got shot. The next day my friend Clifford came over to get me to
> go camping. 'Bert. get ready to go camping.' I said, 'I'm alright.'
> 'You sure you gonna be alright?' I didn't want him to be around me. I
> just stayed in my bedroom for three or four days until the police came
> to the house.

Mr. Boatman pled guilty to 2nd degree murder, receiving a sentence of 15 years to life.
He had no prior YA or CDC commitments. He initially went to Vacaville and then came
to San Quentin. After periods at New Folsom. Corcoran, Soledad, and then Solano, he
returned to San Quentin in 1993.

Boatman clearly sees that his immaturity and susceptibility to peer pressure directly
determined his involvement in murder. As he puts it: "I was conforming to be accepted.
They used drugs, so I used drugs."

Without clear direction and lacking adequate ego strength to withstand external influence,
he made a series of wrong choices. gradually becoming someone different than he had
been--a good boy, raised by good parents. He sees this.

> I was a young kid with so many goals in life. The goals were there. (I
> was) a good-hearted person that was willing to give and help
> others...Never in my life had I done anything like this. I knew what I was
> doing wasn't right...I knew what I was doing when I was using. We all

8

Boatman. Christopher                                    September 29, 2000
D65055

> talked about drugs with my family. We discussed drugs as a family. They
> said, 'don't do this. don't do that. And I did it anyway.

Boatman struggles to see how he fell beyond this family safety net:

> During my parents divorce was the only time I felt any negativity.
> Everybody went their separate ways and went on with their lives. It
> wasn't too good for me....I wanted to stay with my Dad and to stay with
> my mother. I was caught between them. When they were together I
> did good in school. After they split. school began to suffer. I was
> moving back and forth between them. It was like two different lives.
> I'd stay with my mom for a year.... Then I went back (to my Dad). At
> my Dad's house. everybody I knew was using. The people I knew from
> my Mother's side in Fresno, none of them were. My character was way
> different then when I stayed with my Father.

Mr. Boatman has deep remorse for his crime and accepts full responsibility for his
participation. He accepts his sentence as a just one:

> Now, I think I am fortunate for not getting more time than I did because
> I played a major factor in a man's death. It was my car. I got the gun.
> I went in the store. A human life has way more value than any time you
> can put on it.

XIV.  Assessment of Dangerousness:

A.  Within controlled setting:  Mr. Boatman's classification score has been zero for the
past 4 years. He has not received any 115's during his entire incarceration. He is viewed
as a programming, conforming inmate (9/90).  Boatman's behavior has been described as
"well above average" (4/96). Unit staff report Boatman causes no problems and is
considered a conforming inmate (4/96). Custody staff currently see Boatman as follows:
"He is very respected by other inmates. Younger inmates really respect him. They go to
him for advice. He is a role model for good behavior. He is widely respected among
staff. He programs really well, and as long as I have known him, which is many. many
years he has never caused a problem. In fact. when there is an inmate fight. he steps in to
help us" (10/00).

B.  If released to the outside community:
Potential for danger in the community, if released, appears to be quite minimal. He had
no history of violence prior to the instant offense. He has had no difficulty relating to
others and conforming to institutional demands in a very stressful institutional setting.
He is focused, and knows himself and his needs. He has strong family support. His
choices are very constructive. Others respect him. He has clear-cut goals and a means to
earn a good living.

9

Boatman, Christopher                                    September 29, 2000
D65055

C.  Significant risk factors/precursors to violence:
There are no risk factors or precursors to violence.

XV.    Clinician Observation/Comments/Recommendation:

Even during the "bad period" Mr. Boatman had positive friendships, worked, and
maintained strong family ties. He was raised by loving parents. I do not believe he was
ever "anti-social." Rather, he had ill-advised friendships and became a drug addict. Had
his life taken a different turn, he would have gone to Yosemite, kicked cocaine, and lived
a positive, goal oriented life much like the kind of life he is living in prison now, with
close friendships, hobbies, and hard work.

Although he did not actually do the murder, he torments himself for participating in a
crime that became murder and for making this murder possible, by supplying the car and
the gun. This is as it should be.

Yet, this man is not a criminal. I believe that it is very unlikely that Mr. Boatman would
behave violently if released--that his violence potential is actually less than that of an
average person. Should he be released, he will be a solid citizen, son, brother, and
hopefully, some day, a husband and father. There is no psychological reason to deny him
immediate parole. The decision to grant him parole should be based on other than
psychological factors.

S. Buchan, Ph.D.
Clinical Psychologist
San Quentin State Prison

10