INITIAL PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PRISON TERMS

| | |
|---|---|
| In the matter of the Life ) Term Parole Consideration ) Hearing of: ) CHRISTOPHER BOATMAN ) ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯) | CDC Number D-65055 |

CALIFORNIA STATE PRISON, SAN QUENTIN

SAN QUENTIN, CALIFORNIA

JUNE 18, 1996

11:22 A.M.

PANEL PRESENT:

Mr. Steven Baker, Presiding Commissioner
Mr. John Gillis, Commissioner
Mr. Mike Douglas, Deputy Commissioner

OTHERS PRESENT:

Mr. Christopher Boatman, Inmate
Mr. Mark Raineri, Attorney for Inmate
Mr. Rodriguez, Correctional Officer

CORRECTIONS TO THE DECISION HAVE BEEN MADE
⎯⎯⎯⎯  No
⎯⎯√⎯⎯  Yes          See Errata Sheet

M. Madison, Transcriber          Peters Shorthand Reporting

INMATE COPY

ii

## INDEX

| | PAGE |
|---|---|
| Proceedings...................................... | 1 |
| Case Factors.................................... | 5 |
| Pre-Commitment Factors.......................... | 10 |
| Post-Commitment Factors......................... | 15 |
| Parole Plans.................................... | 25 |
| Closing Statements.............................. | 33 |
| Recess.......................................... | 36 |
| Decision........................................ | 37 |
| Adjournment..................................... | 41 |
| Transcriber Certification....................... | 42 |

--oOo--

| INMATE _Freeman, Christopher_ | CDC NUMBER _D-65055_ |
|---|---|
| TYPE OF HEARING _Initial_ | DATE OF HEARING _6/18/96_ |

A review of the hearing transcript and parole decision by the Decision Review Unit (DRU) has revealed the following error(s):

_Page #1 Line #5 "with use of a Firearm" is incorrect._

Recommendation: To correct the error(s) set forth above in the hearing transcript, read the following language into the record at the next scheduled parole consideration hearing:

_Page #1 Line #5 change "with use of a Firearm" to read "armed with Firearm"._

APPROVED BY: _H. Smith_ Commissioner/Deputy Commissioner   Date: _8/26/96_

[9/93]   PERMANENT ADDENDA

INMATE COPY

1

1    P R O C E E D I N G S

2    **PRESIDING COMMISSIONER BAKER:**    All right.

3    This will be an Initial Parole Consideration Hearing

4    for Christopher Boatman, ID-number D-65055.  9/3 of

5    '87, the Prisoner was received into CDC pursuant to

6    Penal Code Section 1168 for violation of Penal Code

7    Section 187 and 12022.5.  That's a second-degree

8    murder with the use of a firearm, Fresno County case

9    number 351031-0, Count One.  The controlling minimum

10   eligible parole date is 1/31 of '97 on a 16 to Life

11   sentence.  Today's date is June 18th, 1996.  We're

12   located at San Quentin Prison.  The time is

13   approximately 11:22.  We're going to establish voice

14   identification be each of us stating our first name

15   and last name and spelling our last name.

16   Mr. Boatman, when we get around the table to you, if

17   after you spell your last name, you'd give me your

18   CDC-number.  We'll start with me and go to my right.

19   My name is Steve Baker, B-a-k-e-r, Commissioner with

20   the Board of Prison Terms.

21   **COMMISSIONER GILLIS:**    John Gillis,

22   G-i-l-l-i-s, Commissioner, Board of Prison Terms.

23   **DEPUTY COMMISSIONER DOUGLAS:**    Mike Douglas,

24   D-o-u-g-l-a-s, Deputy Commissioner, Board of Prison

25   Terms.

26   **ATTORNEY RAINERI:**    Mark Raineri,

27   R-a-i-n-e-r-i, counsel for Mr. Boatman.

2

1       **INMATE BOATMAN:**   Christopher Boatman,

2    B-o-a-t-m-a-n, D-number 65055.

3       **CORRECTIONAL OFFICER RODRIGUEZ:**   Officer

4    Rodriguez, R-o-d-r-i-g-u-e-z.

5       **PRESIDING COMMISSIONER BAKER:**   All right.

6    Thank you, everyone.  Mr. Boatman, the purpose of

7    today's hearing is to consider your suitability for

8    parole.  In arriving at a decision, we'll consider the

9    commitment offense, prior criminality and social

10   history, as well as your behavior since your

11   commitment.  And we have reviewed your central file

12   and will give you an opportunity to make any

13   corrections or clarifications to the record.  And then

14   go directly to your progress since your incarceration,

15   the psychiatric reports and any other information

16   which has a bearing on parole suitability.  And before

17   we recess for deliberation, the Prisoner's attorney

18   and the Prisoner will be given an opportunity to make

19   a short presentation regarding parole suitability and

20   length of confinement.  And there's certain rights

21   that you have for this hearing.  You have a right of a

22   timely notice of the hearing and your file was made

23   available to you for review.  You have the right to

24   present any relevant documents.  Do you have any

25   documents that we don't already have?

26       **INMATE BOATMAN:**   I probably do.

27       **PRESIDING COMMISSIONER BAKER:**   Do you have

3

1     them with you?

2         INMATE BOATMAN:   Yes, I do.

3         PRESIDING COMMISSIONER BAKER:    What kind of

4     documents?

5         INMATE BOATMAN:   They are support letters.

6         PRESIDING COMMISSIONER BAKER:    Okay.  If you'd

7     hand those support letters over to Mr. Gillis, please.

8         ATTORNEY RAINERI:   Thank you.  We also have

9     some other documents pertaining to his job search and

10    things like that.  Would you like them at this time?

11        PRESIDING COMMISSIONER BAKER:    Those should

12    also go to Mr. Gillis.  Is that part of his parole

13    plans?

14        ATTORNEY RAINERI:   Yes, they are.

15        PRESIDING COMMISSIONER BAKER:    Yeah, they go

16    to Mr. Gillis also.

17        PRESIDING COMMISSIONER BAKER:    Okay, thank

18    you.  You also have a right to an impartial panel.  Do

19    you have any problems with the panel members seated

20    before you today?

21        INMATE BOATMAN:   No, I do not.

22        PRESIDING COMMISSIONER BAKER:    Okay.  You're

23    going to get a copy of the tentative written decision

24    today.  That decision will be effective in 90 days

25    after review.  A transcript and a copy of the decision

26    will automatically be sent to you.  You have a right

27    to appeal within 90 days of the effective date of the

4

1     decision.  You're not required to discuss the matter

2     with the panel.  You're not required to admit to the

3     offense.  However, the panel does accept as true the

4     court findings.  In other words, we're not going to

5     retry your case.

6               INMATE BOATMAN:   Okay.

7               PRESIDING COMMISSIONER BAKER:   Mr. Douglas,

8     any confidential information being used?

9               INMATE BOATMAN:   No, Mr. Chair.

10              PRESIDING COMMISSIONER BAKER:   Okay.  I'm

11    going to pass to your attorney a copy of the checklist

12    and make sure that he's got the same set of paperwork

13    that we do.

14              ATTORNEY RAINERI:   I have the same documents,

15    save the confidential folder.

16              PRESIDING COMMISSIONER BAKER:   All right,

17    thank you.  Counselor, any preliminary objections

18    before we get started?

19              ATTORNEY RAINERI:   No objections.

20              PRESIDING COMMISSIONER BAKER:   Will your

21    client be speaking with us today?

22              INMATE BOATMAN:   Yes, he will.

23              PRESIDING COMMISSIONER BAKER:   Okay.

24    Mr. Boathart -- or Boatman, I mean, all of our

25    testimony is taken under oath.  So if you'd raise your

26    right hand, please.  Do you swear or affirm the

27    testimony you're about to give today will be the

5

1     truth, the whole truth and nothing but the truth?

2            INMATE BOATMAN:    I do.

3            PRESIDING COMMISSIONER BAKER:    All right,

4     thank you.  All right, description of the crime says

5     "At approximately 12:00 noon on 5/29 of '86, Inmate

6     Boatman was driving his car with his co-defendants,

7     Harold Jones and Roland Montgomery.  The three of them

8     had been free-basing cocaine and decided they needed

9     more money to buy drugs.  Boatman drove past a small

10    store in Lanare, L-a-n-a-r-e, which they decided not

11    to rob because there was too many cars there.  At

12    approximately 12:30 p.m., they stopped at the home of

13    Chris Besel, B-e-s-e-l, and found Mr. Besel working on

14    a motorcycle.  The four of them were talking when

15    Jones went to the car to retrieve a .22 caliber

16    handgun which belonged to Boatman's stepmother.

17    Mrs. Boatman did not know that they had her weapon.

18    Jones shot a can and told Mr. Besel how they planned

19    to rob the store in Lanare, but instead were going to

20    rob the 41 Market (phonetic).  Mr. Besel warned that

21    they were known, would be identified and caught.

22    Jones said that they would not need to worry about

23    that.  The three confederates left Mr. Besel and drove

24    to the 41 Market in Riverdale.  Jones and Boatman

25    entered the store.  Boatman stood by the door and

26    acted as a lookout for outside interference.  Jones

27    confronted the 19-year-old store clerk, John Sousa,

6

1    S-o-u-s-a, pointed the gun at him and ordered him not
2    to move.  Jones then ordered Mr. Sousa to give him the
3    money.  Mr. Sousa opened the cash register and gave
4    Jones a hundred dollars, then turned away.  Jones shot
5    Mr. Sousa in the back of the neck and then fled to
6    Boatman's vehicle.  Mr. Sousa was discovered by
7    another customer at approximately 1:50 p.m.  The cash
8    drawer was on the counter and the safe was open.  The
9    customer called for help.  Mr. Sousa was taken to the
10   hospital where he later died from a single .22 caliber
11   wound to the back of the neck.  On 5/30 of '86, an
12   anonymous caller identified the perpetrators.  On 6/2
13   of '86, a search of Boatman's house revealed the
14   murder weapon and Boatman and Montgomery were
15   arrested.  Jones fled to Texas where he was arrested
16   on 8/7 of '86."  Is that what happened?
17        **INMATE BOATMAN:**  Yes, that's what happened.
18   But prior to that, we had decided to -- there was two
19   more stores that we stopped at before them other two.
20        **PRESIDING COMMISSIONER BAKER:**  Okay.  Did you
21   rob those other two stores?
22        **INMATE BOATMAN:**  No, we did not.
23        **PRESIDING COMMISSIONER BAKER:**  How come?
24        **INMATE BOATMAN:**  There was a lookout also --
25   there was -- there was too many customers and we
26   decided to go to another one.
27        **PRESIDING COMMISSIONER BAKER:**  Okay.  So you

7

1    finally end up at this 41 one?

2        INMATE BOATMAN:   Yes.

3        PRESIDING COMMISSIONER BAKER:   And you know

4    your crime partner's got the gun, because it's your

5    stepmother's gun?

6        INMATE BOATMAN:   Yes.

7        PRESIDING COMMISSIONER BAKER:   Yeah.  How come

8    you took her gun in the first place?

9        INMATE BOATMAN:   The gun was needed because we

10   had -- Jones had a sawed-off shotgun and it was·too

11   big.  So he said that he needed a handgun, would be

12   easier to hide, to go in the store.

13       PRESIDING COMMISSIONER BAKER:   All right.

14       INMATE BOATMAN:   And I told him that my

15   stepmother had one and I could sneak it out and that I

16   could put it back before she came home.

17       PRESIDING COMMISSIONER BAKER:   Did you know

18   that he was going to kill that guy?

19       INMATE BOATMAN:   What's that?

20       PRESIDING COMMISSIONER BAKER:   Did you know he

21   was going to kill?

22       INMATE BOATMAN:   No, I did not.

23       PRESIDING COMMISSIONER BAKER:   What did you

24   say to him after he did it?

25       INMATE BOATMAN:   I asked him why he shot him?

26       PRESIDING COMMISSIONER BAKER:   What'd he say?

27       INMATE BOATMAN:   He said because he was

8

1    reaching for a gun.

2           PRESIDING COMMISSIONER BAKER:    Did it appear

3    to you that the guy was reaching for a gun?

4           INMATE BOATMAN:    No, it didn't.

5           PRESIDING COMMISSIONER BAKER:    Did you argue

6    with him then?

7           INMATE BOATMAN:    I did not argue.  I didn't

8    see him reaching.  I was at the door at the time.

9           PRESIDING COMMISSIONER BAKER:    Yeah.

10         INMATE BOATMAN:    But what I heard was the

11    shot.

12         PRESIDING COMMISSIONER BAKER:    Okay.

13         INMATE BOATMAN:    And I knew he shot him.

14         PRESIDING COMMISSIONER BAKER:    Yeah?

15         INMATE BOATMAN:    But I did not see him -- John

16    reaching for anything.

17         PRESIDING COMMISSIONER BAKER:    Okay.  Are you

18    responsible for the death of this victim?

19         INMATE BOATMAN:    Yes, I am.

20         PRESIDING COMMISSIONER BAKER:    How so?

21         INMATE BOATMAN:    Very much so.

22         PRESIDING COMMISSIONER BAKER:    Tell me how.

23         INMATE BOATMAN:    Well, if I didn't agree to do

24    this, I know that John would be still living today.

25    And because of my participation in this, if I didn't

26    get the gun and agree to do this, I know he would

27    still be living.  And I'm very much to blame, just as

9

1   Harold Jones is.  The one that did the actual
2   shooting.
3           PRESIDING COMMISSIONER BAKER:   Okay.  Why did
4   you guys try to go do some robberies in the first
5   place?
6           INMATE BOATMAN:   To get more money for some
7   crack cocaine.
8           PRESIDING COMMISSIONER BAKER:   Okay.  Were you
9   addicted to crack at that time?
10          INMATE BOATMAN:   Yes, I was.
11          PRESIDING COMMISSIONER BAKER:   And you were
12  doing a lot of it, were you?
13          INMATE BOATMAN:   I was doing it two to three
14  times, maybe, a day.
15          PRESIDING COMMISSIONER BAKER:   Okay.  And you
16  were under the influence when you did this crime?
17          INMATE BOATMAN:   At the time I wasn't under
18  the influence.  It was maybe two hours or three hours
19  that we had smoked it.  And by the time of the crime I
20  wasn't under the influence.  I was -- I was addicted,
21  but I wasn't, you know, I wasn't high at that time.
22          PRESIDING COMMISSIONER BAKER:   Okay.  What do
23  you think about all this?
24          INMATE BOATMAN:   I'm very saddened that it
25  happened.  I know I hurt a lot of people, hurt my
26  family.  And I hurt -- I destroyed a lot of lives.
27  I'm very saddened for John and I just wish I could

1    have seeked the help that I needed.  I was sick and I
2    needed help.
3              PRESIDING COMMISSIONER BAKER:   Okay.  You
4    might get some questions from some of the other panel
5    members about it.  In the meantime, I'm going to go
6    on.
7              INMATE BOATMAN:   Okay.
8              PRESIDING COMMISSIONER BAKER:   Your -- no
9    juvenile record.  Is that correct?
10             INMATE BOATMAN:   Yes.
11             PRESIDING COMMISSIONER BAKER:   Never arrested
12   as a juvenile?
13             INMATE BOATMAN:   No.
14             PRESIDING COMMISSIONER BAKER:   Okay.  But then
15   as an adult in 1984, you started getting arrested by
16   the Fresno County Sheriff.  You were picked up for two
17   counts of rape with force and fear.  Later on that was
18   put down to what?  Statutory rape or something, was
19   it?
20             INMATE BOATMAN:   Yes, it was.  It was sexual
21   intercourse with a minor.
22             PRESIDING COMMISSIONER BAKER:   And how old
23   were you at the time?
24             INMATE BOATMAN:   I was 18 years old.
25             PRESIDING COMMISSIONER BAKER:   And how old was
26   the girl?
27             INMATE BOATMAN:   She was 14 years old.

11

1    PRESIDING COMMISSIONER BAKER:    Fourteen years

2    old?

3    INMATE BOATMAN:    Yes.

4    PRESIDING COMMISSIONER BAKER:    Okay.  And you

5    were arrested by San Luis Obispo Police Department for

6    grand theft, possession of a weapon.  Committed a

7    purse snatch and was in possession of a tire iron.

8    Sentenced on 12/19 of '84, six months in jail, three

9    years probation with a condition that you not be in

10   possession of a weapon.  Also ordered to pay a $75

11   fine.  Charged and transported in custody to face the

12   rape charges in Fresno.  That was later on reduced to

13   release in the Fresno County Jail.  Arrested for it.

14   This talks about the 14-year-old girl.  Okay.

15   Probation was accepted by the authorities in Fresno.

16   Apparently, you reported regularly on your probation.

17   '85, arrested by the Fresno Police Department for

18   petty theft and sentenced to 60 days in jail, 58 days

19   suspended and one year probation.  Any other arrests

20   that we should know about?

21   INMATE BOATMAN:    There's no other arrests.

22   That's all my arrests.

23   PRESIDING COMMISSIONER BAKER:    Okay.  That

24   pretty well --

25   INMATE BOATMAN:    Yes.

26   PRESIDING COMMISSIONER BAKER:    -- works it

27   out, huh?

12

1          **INMATE BOATMAN:**  Yes.

2          **PRESIDING COMMISSIONER BAKER:**  Okay.  It says

3    you were born in Louisiana.  What was your date of

4    birth?

5          **INMATE BOATMAN:**  7/25/65.

6          **PRESIDING COMMISSIONER BAKER:**  '65?

7          **INMATE BOATMAN:**  Yes.

8          **PRESIDING COMMISSIONER BAKER:**  And you're the

9    forth of six children.

10          **INMATE BOATMAN:**  I'm the third.

11          **PRESIDING COMMISSIONER BAKER:**  Third of six

12    children?

13          **INMATE BOATMAN:**  Yes.

14          **PRESIDING COMMISSIONER BAKER:**  Okay.  Third of

15    six children.  Any of your brothers and sisters in

16    trouble with the law?

17          **INMATE BOATMAN:**  I have a younger brother that

18    was arrested for -- he stole some tapes out the store,

19    the same thing I done.

20          **PRESIDING COMMISSIONER BAKER:**  What a

21    shoplift?

22          **INMATE BOATMAN:**  Yeah, shoplift, yes.  And the

23    other ones have never been in trouble with the law.

24          **PRESIDING COMMISSIONER BAKER:**  Okay.  So

25    pretty much, you're the only one that's done any

26    serious time?

27          **INMATE BOATMAN:**  Yes.

13

1     **PRESIDING COMMISSIONER BAKER:**     Okay.  Dropped

2     out a high school after completing the eleventh grade.

3     Moved to Fresno to live with your mother.  Started

4     smoking marijuana and drinking alcohol at the age of

5     14.  Started getting into all kinds of different kinds

6     of drugs.  Is that correct?

7         **INMATE BOATMAN:**     Marijuana and cocaine was the

8     choices at that -- that was --

9         **PRESIDING COMMISSIONER BAKER:**     That was the

10    (inaudible)

11        **INMATE BOATMAN:**     Yes, that was the drug

12    (inaudible)

13        **PRESIDING COMMISSIONER BAKER:**     Okay.  You

14    testified for the prosecution?

15        **INMATE BOATMAN:**     Yes.

16        **PRESIDING COMMISSIONER BAKER:**     You still

17    having -- are you having any problems because of that?

18        **INMATE BOATMAN:**     As far as what?

19        **PRESIDING COMMISSIONER BAKER:**     In the prison

20    system?

21        **INMATE BOATMAN:**     No, I haven't, no.

22        **PRESIDING COMMISSIONER BAKER:**     But you did

23    have some enemies?

24        **INMATE BOATMAN:**     Yes.

25        **PRESIDING COMMISSIONER BAKER:**     Okay.  What

26    happened to the guy that pulled the trigger in this

27    thing?  Do you know?

14

1        **INMATE BOATMAN:**   The last report that's in the
2    report, it's he's at Pelican Bay State Prison in Ad.
3    Seg. for something.   I'm not sure.   They didn't
4    explain it, but they said he was in --
5        **PRESIDING COMMISSIONER BAKER:**   Okay.   So
6    there's no chance of you going up there, right?
7        **INMATE BOATMAN:**   No, there's no chance of me
8    going up there.
9        **PRESIDING COMMISSIONER BAKER:**   Okay.   Anything
10   else I should know about in your history before you
11   came into the institution?   Anything I've left out?
12   Anything you want on the record?   Any marriages?
13       **INMATE BOATMAN:**   No.
14       **PRESIDING COMMISSIONER BAKER:**   Any military?
15       **INMATE BOATMAN:**   No.
16       **PRESIDING COMMISSIONER BAKER:**   Any children?
17       **INMATE BOATMAN:**   No.
18       **PRESIDING COMMISSIONER BAKER:**   Anything else?
19       **INMATE BOATMAN:**   Not that I can thing of right
20   now.
21       **PRESIDING COMMISSIONER BAKER:**   Okay.   I'd like
22   you to give your attention, then, to Mr. Douglas.
23   He's going to talk to you about what you've done since
24   you've been in the institution.
25       **DEPUTY COMMISSIONER DOUGLAS:**   Good morning,
26   Mr. Boatman.
27       **INMATE BOATMAN:**   Good morning.

15

1       **DEPUTY COMMISSIONER DOUGLAS:**  We're going to

2    talk about your post-conviction factors.  You know,

3    this is an initial hearing, so we're going to kind of

4    get a birds-eye view of how you've been doing since

5    you were admitted into CDC, okay?

6       **INMATE BOATMAN:**  Okay.

7       **DEPUTY COMMISSIONER DOUGLAS:**  You were

8    received on 9/3/87.  Your classification score is

9    currently 11.  And I reviewed your C-file and I notice

10   that you have a number of chronos for excellent

11   attendance in Narcotics Anonymous.

12      **INMATE BOATMAN:**  Yes.

13      **DEPUTY COMMISSIONER DOUGLAS:**  Starting in '93

14   and going all the way up to -- or starting on '94 and

15   going up to '96.  You also have a chrono for

16   participating in a walk-a-thon?

17      **INMATE BOATMAN:**  Yes.

18      **DEPUTY COMMISSIONER DOUGLAS:**  And you have a

19   chrono for -- did you complete an Alternatives to

20   Violence program?

21      **INMATE BOATMAN:**  Yes.

22      **DEPUTY COMMISSIONER DOUGLAS:**  Yeah, you

23   completed that?  You got your GED in '93?

24      **INMATE BOATMAN:**  Um-hum.

25      **DEPUTY COMMISSIONER DOUGLAS:**  And where were

26   you at when you got that?

27      **INMATE BOATMAN:**  I got in Solano.

16

1     **DEPUTY COMMISSIONER DOUGLAS:**   And then did you
2     take some more -- didn't you take some more classes or
3     something beyond that?
4           **INMATE BOATMAN:**   Classes?
5           **DEPUTY COMMISSIONER DOUGLAS:**   Yeah, units.
6     Didn't you get some more units at all in education?
7           **INMATE BOATMAN:**   Oh, yes.  I completed a -- I
8     also went back to high school.  The GED --
9           **DEPUTY COMMISSIONER DOUGLAS:**   Right.
10          **INMATE BOATMAN:**   I completed the GED, but I
11    had to complete the GED before I completed because it
12    was some kind of policy where you couldn't -- if I --
13    you know, it was some kind of policy where I couldn't
14    complete the high school diploma and then get a GED,
15    so I thought I'd get a GED first and then complete
16    high school.
17          **DEPUTY COMMISSIONER DOUGLAS:**   Yeah, I wanted
18    that on the record, you see.
19          **INMATE BOATMAN:**   Oh.
20          **DEPUTY COMMISSIONER DOUGLAS:**   Because this is
21    your hearing and it's your --
22          **INMATE BOATMAN:**   Yes.
23          **DEPUTY COMMISSIONER DOUGLAS:**   -- opportunity
24    where you can shine to shine and where you can't
25    shine, we'll talk about it anyway.  So I --
26          **INMATE BOATMAN:**   Okay, yes, I completed high
27    school.  I went back and got my transcripts and

17

1    everything from high school from Stockton.

2        **DEPUTY COMMISSIONER DOUGLAS:**    That's very

3    good.    In the way of certificates I see that you

4    completed -- you got a certificate in '96 in May for

5    completing a substance abuse program.

6        **INMATE BOATMAN:**    Yes.

7        **DEPUTY COMMISSIONER DOUGLAS:**    And you also got

8    your certificate for welding.

9        **INMATE BOATMAN:**    Yes.

10        **DEPUTY COMMISSIONER DOUGLAS:**    And then you

11    have about 10 or 11 other certificates, I believe,

12    related to welding and machine shop --

13        **INMATE BOATMAN:**    Yes.

14        **DEPUTY COMMISSIONER DOUGLAS:**    -- and so on.

15        **INMATE BOATMAN:**    Yes.

16        **DEPUTY COMMISSIONER DOUGLAS:**    And they were

17    too numerous to -- starting with tools and --

18        **INMATE BOATMAN:**    Um-hum, yes.

19        **DEPUTY COMMISSIONEP DOUGLAS:**    -- going on and

20    on and on.    You're currently working in the machine

21    shop now?

22        **INMATE BOATMAN:**    Yes, I am.

23        **DEPUTY COMMISSIONER DOUGLAS:**    What do you make

24    in a day?

25        **INMATE BOATMAN:**    What I make?

26        **DEPUTY COMMISSIONER DOUGLAS:**    What do you make

27    a month?    Are you making any money?

18

1          INMATE BOATMAN:  Financially?

2          DEPUTY COMMISSIONER DOUGLAS:  Yeah.

3          INMATE BOATMAN:  Yes, I make approximately

4     $20.  If I make $20, I'm lucky.

5          DEPUTY COMMISSIONER DOUGLAS:  Do you?

6          INMATE BOATMAN:  Yes.

7          DEPUTY COMMISSIONER DOUGLAS:  Okay.  If I ask

8     you if you've had a chance to save any of that, have

9     you had a chance to save anything --

10         INMATE BOATMAN:  No, I haven't.

11         DEPUTY COMMISSIONER DOUGLAS:  -- at $20 a

12    month?

13         INMATE BOATMAN:  No, I haven't.

14         DEPUTY COMMISSIONER DOUGLAS:  I'm not shocked

15    to hearing that, frankly.  Okay.  Is there anything

16    else relative to what you've accomplished?  You've

17    gotten your welding certificate.  You've gotten about

18    10 or 12 other certificates relating to welding and

19    machine shop.  You've done the Alternatives to

20    Violence, you participated in a walk-a-thon and you

21    have consistently been a part of NA.

22         INMATE BOATMAN:  Yes.

23         DEPUTY COMMISSIONER DOUGLAS:  Is there

24    anything else that you've done that I should note here

25    or should be noted here?

26         INMATE BOATMAN:  Personal Responsibility

27    course.

19

1    DEPUTY COMMISSIONER DOUGLAS:   Okay.

2        INMATE BOATMAN:   It's designed to help reduce

3    recidivism.  It's a course taken in the vocational

4    shop, which our instructor gives.

5        DEPUTY COMMISSIONER DOUGLAS:   Okay.

6        INMATE BOATMAN:   And I can't think of nothing

7    else.

8        DEPUTY COMMISSIONER DOUGLAS:   Is it in your

9    C-file?  I didn't see anything at all related to that

10   personal responsibility.  But that's okay.

11       INMATE BOATMAN:   I don't know if it's in the

12   C-file, but I have --

13       DEPUTY COMMISSIONER DOUGLAS:   How long ago did

14   you -- how long have you been participating in that?

15       INMATE BOATMAN:   What's that?  The --

16       DEPUTY COMMISSIONER DOUGLAS:   That Personal

17   Responsibility.

18       INMATE BOATMAN:   Oh, it's just a course.  It's

19   just a course of -- like a thirty-something, not 30 --

20   thirty-something weeks.

21       DEPUTY COMMISSIONER DOUGLAS:   That's tied to

22   your vocation?  It's tied to your vocation?

23       INMATE BOATMAN:   Yes.  It's -- yes.

24       DEPUTY COMMISSIONER DOUGLAS:   Okay.  And are

25   you currently doing that?

26       INMATE BOATMAN:   No, I'm not.  I finished it.

27       DEPUTY COMMISSIONER DOUGLAS:   Oh, okay.  You

20

1   finished it?

2       **INMATE BOATMAN:**    Yes.

3       **DEPUTY COMMISSIONER DOUGLAS:**    Okay.  Now, what

4   I'm going to do is I'm going to go to that portion of

5   the hearing where I just touch on areas that were

6   prepared for this hearing relative to your activity

7   since your coming on board and talk about

8   post-conviction factors.  And needless to say because

9   this is an initial hearing, they have several pages on

10  all the things you've -- where you've been and what

11  you've done and I'm not going to read all that.

12      **INMATE BOATMAN:**    Okay.

13      **DEPUTY COMMISSIONER DOUGLAS:**    I'm just going

14  to touch on highlights of it.  It starts out here in

15  2/89, it says "Boatman transferred to Folsom State

16  Prison as part of the large-scale exodus of all

17  Level IV general population inmates from San Quentin.

18  At Folsom, Boatman was given Close A-R Custody and

19  assigned to work for the recreation department as a

20  boxing trainer.  Boatman states that his duties

21  consisted of monitoring workouts.  His supervisor

22  reported that he was a good worker.  He was respected

23  by others.  By the end of 1989, Boatman's custody was

24  returned to Close B and he continued to avoid coming

25  to the attention of both staff and inmates."  And it

26  goes on "1890 [sic] Boatman attended his first BPT

27  documentation hearing."  And of course, at that time

21

1    they talked to you about taking part in self-help
2    groups and upgrading vocationally and so on.  Says "A
3    mental health evaluation prior to the hearing noted
4    his polysubstance abuse and adult antisocial
5    personality disorder.  The clinician suggested that
6    Boatman had little self-understanding, that he had --
7    and that he participated in a Twelve Step group.
8    Following the BPT hearing, Boatman was transferred to
9    Corcoran State Prison noting that his positive
10   programming and falling classification score.  At
11   Corcoran Boatman was given a Close B Custody and
12   assigned to the yard crew.  Less than three months
13   later, Boatman was placed in Segregated Housing Unit
14   after he was recognized by a staff member who was
15   close to the victim."  It goes on.  "He arrived at
16   Solano State Prison 11/92 where his custody remained
17   Medium A-R.  He was again assigned to general workers
18   and school waiting list.  He was assigned as a housing
19   unit porter for a short time and he transferred.  He
20   would remain -- he transferred to school unit where he
21   would remain for several months.  2/93 he took and
22   passed the GED exam, however, he remained in school
23   and by 6/93 Boatman had completed 165 hours in school
24   and had a grade point level of 9.2."  11/22/93, once
25   again, you had a BPT hearing and they recommended you
26   remain disciplinary free and so on.  It said you were
27   transferred to San Quentin in 12/93 and that that's

22

1    when you got involved in vocational welding program.
2    "His instructor reported that he has good problem
3    solving skills and study habits.  Noting his progress
4    in the course, Boatman was recommended to be evaluated
5    by the Joint Apprenticeship Committee."  That's the
6    JAC.  "In 1995, Boatman's grades had risen to B's and
7    his falling classification score required that he get
8    endorsed to remain at San Quentin on Level II override
9    status noting that he was indentured in apprenticeship
10   and a lifer.  His vocational instructor, Mr. Orland
11   (phonetic), reported that Boatman had completed 2500
12   hours of 8,000 hours of apprenticeship program,
13   approximately 1500 hours per year.  Mr. Orland stated
14   that upon completion Boatman will become a journeyman
15   machinist and welder.  Boatman had been a regular
16   participant in Narcotics Anonymous since his arrival
17   at San Quentin in 1993.  Boatman reports that he
18   spends most of his evening studying, napping, watching
19   T.V. and on the weekends he plays basketball and
20   chess."  Boatman said that you read the Bible and
21   attend church occasionally.  They summarize that
22   report by saying "Considering the commitment offense,
23   prior record and prison adjustment, this writer
24   believes the Prisoner would probably pose a lower than
25   average inmate degree of threat to the public if
26   released from prison at this time.  Although Boatman
27   did not pull the trigger and was not the" -- I don't

23

1    know -- well, I guess they're starting again.

2    "Although Boatman did not pull the trigger and was not

3    the dominant party during the commission of the crime,

4    Boatman accepts that he was equally responsible for

5    the tragic loss of a young, promising life of the

6    victim."  And then they go on to recommend that "Prior

7    to release Boatman could benefit from remaining

8    disciplinary free, completing his vocational training

9    and continuing to participate in self-help groups."

10   Then we'll go right to your psychiatric report.  And

11   once again, I won't read all that either.

12           INMATE BOATMAN:   Okay.

13           DEPUTY COMMISSIONER DOUGLAS:   I'll just touch

14   on it.  This was prepared by Dr. Tenkova, Ph.D.,

15   Clinical Psychologist.  It talks about the mental

16   status at the time of the examination.  Said you were

17   "well-groomed, average height, weight, prompt for his

18   appointment, pleasant cooperative.  His answers were

19   honest and sincere.  Mr. Boatman was oriented to the

20   time, place and person and his speech was abundant.

21   His thought coherent and goal-directed.  Talking about

22   the offense, the victim and the victim's family was

23   clearly painful for him.  His speech became

24   increasingly more sad and tearful.  He took full

25   responsibility for the crime and at one point became

26   overwhelmed by tears and sadness."  In the discussion

27   portion of that, it says "Mr. Boatman has had a stable

24

1     and favorable institutional course.  He received a

2     disciplinary 128 in 1993."  That had to do with

3     earrings, didn't it, or something?

4           INMATE BOATMAN:  Yes, it did.

5           DEPUTY COMMISSIONER DOUGLAS:  Yeah.  I

6     didn't -- I noted that, but I didn't mention it.

7           INMATE BOATMAN:  Yes.

8           DEPUTY COMMISSIONER DOUGLAS:  Contraband

9     earrings or something.

10          INMATE BOATMAN:  Um-hum.

11          DEPUTY COMMISSIONER DOUGLAS:  Okay.  It says

12    he was employed as a porter, a kitchen worker and a

13    welder.  Let's see, it said that you completed courses

14    in workshop, self-help programs such as Alternatives

15    to Violence and, what's this?  Marines Aid --

16          INMATE BOATMAN:  Aids Marin Project.

17          DEPUTY COMMISSIONER DOUGLAS:  Is that -- it's

18    M-a-r-i-n-s.  It can't be -- it's supposed to be

19    Marine?

20          INMATE BOATMAN:  Marin.

21          DEPUTY COMMISSIONER DOUGLAS:  Oh, Marin's

22    Aid -- oh.

23          INMATE BOATMAN:  Yes.

24          DEPUTY COMMISSIONER DOUGLAS:  Oh, Aids, the

25    disease?  Is that what it is?  Aids, the disease?  Are

26    they talking about Aids the disease?

27          INMATE BOATMAN:  Yes, Aids, yes.

25

1    DEPUTY COMMISSIONER DOUGLAS:    All right.    That
2    you participated in that project and it said you'd
3    been attending NA regularly.    His diagnostic
4    impressions are -- they use five axes.    On Axis I,
5    cocaine dependence in institutional remission.
6    Axis II, they give no diagnosis, unknown.    Axis IV,
7    incarceration.    Axis V, you got a GAF score of 65.
8    Recommendations, drug monitoring and regular
9    attendance to NA should be mandatory conditions of
10    parole.    And with the reading of that report, I'll
11    return it to you, Mr. Chair.
12    PRESIDING COMMISSIONER BAKER:    Thank you.
13    Mr. Gillis?
14    COMMISSIONER GILLIS:    Thank you.    I notice
15    that you've been sending out resumes for employment.
16    What kind of employment are you seeking?
17    INMATE BOATMAN:    A welder or a machinist.
18    COMMISSIONER GILLIS:    Okay.    And you're
19    certified in both?
20    INMATE BOATMAN:    No, I'm not certified in the
21    machinist, but as a welder, I am.
22    COMMISSIONER GILLIS:    Okay.    Have you had
23    training as a machinist?
24    INMATE BOATMAN:    Yes, I am.    I'm in that
25    trade.
26    COMMISSIONER GILLIS:    Oh, you're in that now?
27    INMATE BOATMAN:    Right now.

26

1    COMMISSIONER GILLIS:   When will you finish

2    that?

3    INMATE BOATMAN:   I have 2500 -- a little over

4    2500 hours, with 8,000 that I'll need.  Well, 800 --

5    8,000 I'll need to complete the program.  So it'll be

6    another three years, maybe.  It depends, if, you know.

7    COMMISSIONER GILLIS:   Three years to complete

8    the program?

9    INMATE BOATMAN:   Yes.  Three more years to

10   complete that program.

11   COMMISSIONER GILLIS:   Now, which one is it

12   you're most interested in?  The welding or --

13   INMATE BOATMAN:   Welding is my interest.  I

14   love to weld.  But machinist and a welder are under

15   the same union, so my apprenticeship agreement keeps

16   on going.  So --

17   COMMISSIONER GILLIS:   Um-hum, okay.  All

18   right.  And you also -- let's see, you didn't get a

19   response from any of those.  Well --

20   INMATE BOATMAN:   Yes.

21   COMMISSIONER GILLIS:   IBM sent a response; is

22   that correct?  And you got a response from --

23   INMATE BOATMAN:   Yes.

24   COMMISSIONER GILLIS:   -- Westinghouse.

25   INMATE BOATMAN:   I sent a lot of them out.  I

26   sent a lot of them out.  I'm surprised I only had a

27   few responses.

27

1       **COMMISSIONER GILLIS:**  Well, that's good.
2   We're glad to see that you're taking the initiative in
3   that area.

4       **INMATE BOATMAN:**  Yes.

5       **COMMISSIONER GILLIS:**  And that you didn't wait
6   until you got here for us to tell you that you had to
7   do that.  Some of these letters are dated back in
8   1995.  And just for the record, they are -- you've got
9   a form letter here dated August 23rd of '95 and it's
10  where you are sending out, I guess, a resume?

11      **INMATE BOATMAN:**  Yes.

12      **COMMISSIONER GILLIS:**  Okay.  And there's
13  another one, a copy of a resume and a letter from
14  Electronic Systems, Westinghouse.  And a letter from
15  IBM, September the 18th of 1995.  So keep that -- keep
16  it up, moving forward in the right direction in that
17  area.  There's a letter here dated -- there's no date
18  on it.  From your mother.

19      **INMATE BOATMAN:**  Yes.

20      **COMMISSIONER GILLIS:**  When did she send this?

21      **INMATE BOATMAN:**  She sent that a while ago.  I
22  don't know if you received a copy of it.  Because she
23  has told me that she has written.  And that was my
24  copy of it.  She didn't sign it or nothing like that.

25      **COMMISSIONER GILLIS:**  Okay.  There was no copy
26  in the --

27      **INMATE BOATMAN:**  Okay.

28

1    **COMMISSIONER GILLIS:**    -- in the packet that
2    came out and I didn't look for letters in the C-file.
3    **INMATE BOATMAN:**    Okay.
4    **COMMISSIONER GILLIS:**    But it's a very
5    supportive letter.  She indicates that she believes
6    you will be a model citizen and that she's going to
7    spend some time seeing that you do that.  She also
8    says she has a place for you to live.
9    **INMATE BOATMAN:**    Yes.
10   **COMMISSIONER GILLIS:**    And planning to move to
11   a bigger home.  So it's a very supportive letter.
12   There's another letter here from your brother dated
13   June 17th of 1996.  And it's also a very supportive
14   letter and he's talking about how much you've changed,
15   both morally and spiritually, and how you've pursued
16   your education and those kinds of things.  So these
17   are very supportive letters.  We sent out notices to
18   the criminal -- folks in the criminal justice system
19   who were involved in your arrest, your prosecution,
20   your defense.  And we ask them if they have any
21   comments.  There is a -- we don't have any.
22   **INMATE BOATMAN:**    No responses?
23   **COMMISSIONER GILLIS:**    No responses from any of
24   those.  And I'm surprised that there's not a letter
25   here from Fresno.  That's where the crime occurred.
26   **INMATE BOATMAN:**    Yes.
27   **COMMISSIONER GILLIS:**    Didn't you say that

1    you testified?

2         INMATE BOATMAN:  Yes.  I didn't actually get

3    on the witness stand and testify, but in cooperation

4    I've made a statement.

5         COMMISSIONER GILLIS:  You made a statement

6    that was used --

7         INMATE BOATMAN:  Yes.

8         COMMISSIONER GILLIS:  -- against your

9    co-defendants?

10        INMATE BOATMAN:  Yes.

11        COMMISSIONER GILLIS:  Yeah.  Okay.  Unless

12   they are -- did they say they were going to support

13   your release or where there any promises --

14        INMATE BOATMAN:  No.

15        COMMISSIONER GILLIS:  -- made by the

16   department?

17        INMATE BOATMAN:  At the time it wasn't.  There

18   wasn't no promises.  The only promise it was is to YA

19   'til I was 25.

20        COMMISSIONER GILLIS:  Um-hum.

21        INMATE BOATMAN:  And that didn't go through

22   because they didn't accept me.  So --

23        COMMISSIONER GILLIS:  Okay.  The YA didn't

24   accept you?

25        INMATE BOATMAN:  No, they didn't accept me.

26        COMMISSIONER GILLIS:  I noticed that that was

27   in the sentencing transcript, the recommendation

1    for YA --

2              INMATE BOATMAN:   Yes.

3              COMMISSIONER GILLIS:   -- and I was going to

4    ask you about that.  What about your substance abuse

5    problem?

6              INMATE BOATMAN:   My substance abuse problem?

7              COMMISSIONER GILLIS:   Um-hum.

8              INMATE BOATMAN:   It's very much under control.

9    But it's like a foundation I've built, going to

10   Narcotics Anonymous.  And when I started going to NA

11   meetings, it was recommended that I go.  And I was

12   clean a long time before I started attending these

13   meetings, before I joined the fellowship.  And I like

14   it.  It's a (inaudible)

15             COMMISSIONER GILLIS:   How's it going for you?

16             INMATE BOATMAN:   It's going very well.

17             COMMISSIONER GILLIS:   What is it doing for

18   you?

19             INMATE BOATMAN:   In my life?

20             COMMISSIONER GILLIS:   Um-hum.

21             INMATE BOATMAN:   It's keeping me clean.

22             COMMISSIONER GILLIS:   Okay.  Twelve Step

23   program?

24             INMATE BOATMAN:   Yes.

25             COMMISSIONER GILLIS:   Do you know the Twelve

26   Steps?

27             INMATE BOATMAN:   Yes, I do.

31

1          COMMISSIONER GILLIS:   All of them?

2          INMATE BOATMAN:   All of them.

3          COMMISSIONER GILLIS:   What about number six?

4          INMATE BOATMAN:   Number six is we're entirely

5     ready to have God remove all these defects of

6     character.  Step Six and Step Seven -- Step Seven is

7     we humbly ask Him to remove our shortcomings.  And

8     it's willingness.  You have -- it's a step that gets

9     you to move in a spiritual direction.  And that's what

10    is required.  And the character defects or

11    shortcomings are things that, you know, that cause

12    pain and misery all our lives.

13         COMMISSIONER GILLIS:   Do you have any?

14         INMATE BOATMAN:   Yes, I do.  I go through some

15    pain and misery sometimes.  And --

16         COMMISSIONER GILLIS:   What are your character

17    defects?

18         INMATE BOATMAN:   Character defects are, as far

19    as one thing, I'll always be an addict.  And I know

20    that.  And you have to, how should I say -- the

21    defects, if you're not aware of them, it's easier to

22    go back and use again, you see, as far as being

23    powerless over my addiction.  And that's my defects.

24         COMMISSIONER GILLIS:   Okay.

25         INMATE BOATMAN:   Is that I like to use.  I

26    liked to use when I was on the streets.

27         COMMISSIONER GILLIS:   Who visits you while

32

1    you're here in prison?

2        **INMATE BOATMAN:** My mother and my brother.

3    They haven't -- my family haven't seen me in a long

4    time. I write them constantly and we keep in touch.

5    As a matter of fact, I had a phone call yesterday. I

6    called my brother up. But visiting, they don't come

7    up. They used to come up a lot. But maybe once a

8    year now they make a trip.

9        **COMMISSIONER GILLIS:** Okay. Anything else

10   about your parole plans that I didn't cover?

11       **INMATE BOATMAN:** No, my mother, I will parole

12   to. My brother is an alternative. He's my second.

13       **COMMISSIONER GILLIS:** I'll return it to the

14   Chair.

15       **PRESIDING COMMISSIONER BAKER:** Thank you.

16   Mr. Douglas, any questions?

17       **DEPUTY COMMISSIONER DOUGLAS:** No, I have no

18   questions, Mr. Chair.

19       **PRESIDING COMMISSIONER BAKER:** Mr. Gillis?

20       **COMMISSIONER GILLIS:** No.

21       **PRESIDING COMMISSIONER BAKER:** You said

22   that -- or you didn't say it, but actually the chronos

23   say that you were, you know, some kind of a boxing

24   coach? You were a boxer?

25       **INMATE BOATMAN:** Oh, that was in New Folsom.

26   I was just a monitor in the work-outs and stuff like

27   that.

33

1    **PRESIDING COMMISSIONER BAKER:**    Okay.  So
2    you're not a boxer yourself?
3        **INMATE BOATMAN:**    No, I'm not.
4        **PRESIDING COMMISSIONER BAKER:**    Okay.  All
5    right.  Any questions of your client, Counsel?
6        **ATTORNEY RAINERI:**    No questions.
7        **PRESIDING COMMISSIONER BAKER:**    Closing
8    statement?
9        **ATTORNEY RAINERI:**    Thank you.  What I'm going
10   to address the Board on is my client's motivation.
11   First of all, his motivation to commit this crime,
12   which was ill-founded, obviously, and tragic, as an
13   addict to drugs.  But I think as soon as he heard the
14   shot inside the convenience store, I think that sound
15   was the turning point to change his motivation, to
16   change his life.  I think at that point he -- it's
17   clear he made a decision to do everything he could to
18   turn himself around.  I think he -- I think his
19   record, his post-conviction record, his cooperation
20   with the investigating officers is all indicative of
21   that.  I think his, in starting back with his desire
22   to get his high school diploma, not just his GED, but
23   going beyond that.  His desire to finish up, to get a
24   vocational certificate in welding and then his
25   motivation to go beyond that and to get a second
26   certificate in machine shop shows his desire to
27   improve himself and give himself a marketable skill

34

1    when he gets to the streets.  His motivation to get

2    his drug problem under control and find out more

3    insight into himself as to why he had the problem and

4    what he can do to create it I think shows a desire on

5    his part to turn the corner, turn his life around.

6    And I think, like I said in the beginning, as soon as

7    this crime occurred.  His support and his commitment

8    by his family to give him a place to stay for his

9    plans indicates what the Board is looking for in terms

10   of a network on the streets.  I also think that his

11   commitment and motivation to demonstrate his

12   achievements in terms of looking for a job is

13   evidenced by the fact that he's sending resumes out.

14   I mean, he's doing everything he can to take advantage

15   of his time of incarceration not -- not to say that he

16   wasn't guilty or to mitigate his responsibility, but

17   to take as much responsibility as he can and through

18   his insight and to make sure it never happens again.

19   I think that his presentation today was a very open in

20   candor.  I think he's a very honest person and I think

21   his involvement in therapy is, not just Narcotics

22   Anonymous, but in the other therapy he's taken,

23   Alternatives to Violence and the other programs.  One,

24   in fact, I think you forgot to mention was Making

25   Changes.  That was another program?

26        INMATE BOATMAN:   That's the Personal

27   Responsibility portion, making a change.

35

1    **ATTORNEY RAINERI:**  Thank you.  Sorry about
2    that.

3        **INMATE BOATMAN:**  That's all right.
4        **ATTORNEY RAINERI:**  Indicates his desire to not
5    only improve himself, but to show the Board and
6    document to prove that he's able to do that.  His
7    involvement in the walk-a-thon and in the Marin Aids
8    Project is obviously an attempt to give back to
9    society something that he's taken from.  And I think
10   he also has remorse for a very tragic, tragic crime
11   that he was involved in.  With that, I would submit.
12   Thank you.

13       **PRESIDING COMMISSIONER BAKER:**  Thank you.  Do
14   you have anything, Mr. Boatman, to tell us regarding
15   your suitability for parole?

16       **INMATE BOATMAN:**  Yes, sir.  I've done a lot of
17   things in my life that I'm not proud of.  And the
18   family, the victims, I'm very sorry.  I wish I could
19   tell them that.  And I hope that you can see who I am
20   today.  And when and if I ever parole, I'm going to
21   show you that I won't disappoint none of you in here.
22   My family needs me and I need them.  I just want to
23   say thank you for your time and consideration.

24       **PRESIDING COMMISSIONER BAKER:**  All right,
25   thank you.  It's 12:00 noon.  We're going to recess at
26   this time.  We'll call you back in a few minutes with
27   our decision.

36

1          **INMATE BOATMAN:**    Okay.

2                          R  E  C  E  S  S

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

37

1    CALIFORNIA BOARD OF PRISON TERMS

2    D E C I S I O N

3    **PRESIDING COMMISSIONER BAKER:**    All right.

4    We're back on the record in the matter of Christopher

5    Boatman, ID-number D-65055.  The panel reviewed all

6    the information received from the public and relied on

7    the following circumstances in concluding that the .

8    Prisoner is not suitable for parole and would pose an

9    unreasonable risk of danger to society and a threat to

10   public safety if released from prison.  The offense

11   itself was carried out in a dispassionate and

12   calculated manner.  The Prisoner has an escalating

13   pattern of criminal conduct and an unstable social

14   history, including getting involved in drugs.  The

15   Prisoner has failed to develop a marketable skill to

16   be put to use upon release.  However, he is in

17   vocational welding and apparently doing very well.

18   The psychiatric report dated 3/19/96 by Dr. Tenkova,

19   T-e-n-k-o-v-a, is not totally supportive of release.

20   And the panel makes the following findings.  That the

21   Prisoner does need more therapy in order to face,

22   discuss, understand and cope with stress in a

23   non-destructive manner and until more progress is

24   made, the Prisoner continues to be unpredictable and a

25   threat to others.  The Prisoner should be commended

26   for his disciplinary free behavior and his excellent

27   **CHRISTOPHER BOATMAN D-65055   DECISION PAGE 1 (6/18/96)**

38

1    programming.  However, these positive aspects of his
2    behavior do not outweigh the factors of unsuitability.
3    This is a two-year denial, Mr. Boatman.  The hearing
4    panel finds it is not reasonable to expect that parole
5    would be granted at a hearing during the following two
6    years and the specific reason for that finding are as
7    follows.  First of all is the crime itself, that
8    during a robbery he and his crime partner shot and
9    killed a victim for no apparent reason.  And as a
10   result, a longer period of observation and evaluation
11   is required before the Board should set a date.  Also,
12   the Prisoner has not completed necessary programming
13   which is essential to his adjustment and needs
14   additional time to gain such programming.
15   Specifically, he has failed to complete his vocational
16   trade or participated in sufficient self-help and
17   therapy programming.  During the next two years, the
18   panel recommends that the Prisoner remain disciplinary
19   free.  That's the most important thing you can do.  It
20   took one 115 to wipe out all your good programming.
21           INMATE BOATMAN:   Yes.
22           PRESIDING COMMISSIONER BAKER:   And I think
23   you're already aware of that.
24           INMATE BOATMAN:   Yes, sir.
25           PRESIDING COMMISSIONER BAKER:   And you've done
26   very good.  I don't think you're going to have any
27   CHRISTOPHER BOATMAN D-65055  DECISION PAGE 2 (6/18/96)

39

1    problem with that.  Continue to upgrade vocationally.

2    Get your -- you know, go for that certificate.

3            INMATE BOATMAN:   Okay.

4            PRESIDING COMMISSIONER BAKER:   That's very

5    important.  You're doing an excellent job and we don't

6    want you to go backwards on us.

7            INMATE BOATMAN:   Yes, okay.

8            PRESIDING COMMISSIONER BAKER:   All right?

9            INMATE BOATMAN:   Okay.

10           PRESIDING COMMISSIONER BAKER:   And then

11   participate in self-help and therapy programming.

12   That means anything that comes up that you can get

13   into.  And stay in your AA and NA.  I want you to stay

14   in there if you can.

15           INMATE BOATMAN:   Okay.

16           PRESIDING COMMISSIONER BAKER:   But if you

17   can't, then keep studying that book yourself and be

18   prepared to answer questions about it, because we will

19   ask you.  But anything else that comes up that you can

20   get into in the self-help area, be sure and get into

21   it.  If there's nothing available, then there's

22   nothing available.  But, I mean, do the best you can

23   and try to get into something.  You're doing very

24   good.  I am very impressed.  And the rest of the panel

25   members, I believe, are too with your presentation

26   today.  I have -- I don't think I've ever seen anybody

27   CHRISTOPHER BOATMAN D-65055  DECISION PAGE 3 (6/18/96)

40

1    come in here on their initial hearing with as much

2    preparation as you've done and it's -- you're

3    definitely to be commended for that.

4        INMATE BOATMAN:    Thank you.

5        PRESIDING COMMISSIONER BAKER:    One of the

6    things that we do at your initial hearing, the chances

7    of getting a date at your initial hearing are

8    somewhere around real slim and probably none.  But at

9    least we want to tell you what it takes for you to get

10   out of prison one day.  And you're doing everything

11   that we're asking you to do.  I mean, you're doing a

12   good job.  Don't go backwards on me.

13       INMATE BOATMAN:    I won't.

14       PRESIDING COMMISSIONER BAKER:    Or I'm going to

15   get real upset.  Okay?

16       INMATE BOATMAN:    All right.

17       PRESIDING COMMISSIONER BAKER:    All right.

18   Mr. Douglas, any comments?

19       DEPUTY COMMISSIONER DOUGLAS:    Just keep up the

20   good work, Mr. Boatman.

21       INMATE BOATMAN:    I will.

22       PRESIDING COMMISSIONER BAKER:    Mr. Gillis?

23       COMMISSIONER GILLIS:    I was particularly

24   impressed with the way you're doing and how you're

25   progressing.  I thought if I went back through the

26   C-file, I'd find out where you had made some dramatic

27   CHRISTOPHER BOATMAN D-65055  DECISION PAGE 4 (6/18/96)

41

1   change along the way.  But when I looked at the

2   C-file, I see where you started from the outset --

3         INMATE BOATMAN:   Yes.

4         COMMISSIONER GILLIS:    -- and you expressed

5   remorse and it looks like that was your turnaround

6   point.  So you're doing good.  Keep it up.

7         PRESIDING COMMISSIONER BAKER:   Okay.  That

8   concludes the hearing.  The time is 12:15.  Good luck

9   to you, sir.

10        INMATE BOATMAN:   Okay.  Thanks a lot.

11                         --oOo--

12

13

14

15

16

17

18

19

20

21

22

23

24

25   PAROLE DENIED TWO YEARS                AUG 2 6 1996

26   EFFECTIVE DATE OF THIS DECISION _____

27   CHRISTOPHER BOATMAN D-65055  DECISION PAGE 5 (6/18/96)

42

CERTIFICATE AND

DECLARATION OF TRANSCRIBER

I, MICHELLE MADISON, a duly designated
transcriber, PETERS SHORTHAND REPORTING, do hereby
declare and certify under penalty of perjury that I
have transcribed tape(s) which total one in number and
cover a total of pages numbered 1 - 41, and which
recording was duly recorded at CALIFORNIA STATE
PRISON - SAN QUENTIN, SAN QUENTIN, CALIFORNIA, in the
matter of the INITIAL PAROLE CONSIDERATION HEARING OF
CHRISTOPHER BOATMAN, CDC No. D-65055, on JUNE 18,
1996, and that the foregoing pages constitute a true,
complete, and accurate transcription of the
aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested
party in the above-captioned matter and have no
interest in the outcome of the hearing.

Dated August 19, 1996, at Sacramento,
California.

_MichelleMadison_
MICHELLE MADISON
TRANSCRIBER