SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PRISON TERMS

In the matter of the Life )
Term Parole Consideration )          CDC Number D-65055
Hearing of:               )
                          )
CHRISTOPHER BOATMAN       )
_____  )



CALIFORNIA STATE PRISON, SAN QUENTIN

SAN QUENTIN, CALIFORNIA

JUNE 30, 1998

10:00 A.M.

PANEL PRESENT:

A. F. VAN COURT, Presiding Commissioner
JOHN GILLIS, Commissioner
PAT CASSADY, Deputy Commissioner

OTHERS PRESENT:

CHRISTOPHER BOATMAN, Inmate
CLAY LAUCELLA, Attorney for Inmate

CORRECTIONS/TO THE DECISION HAVE BEEN MADE

_____ No
_____ Yes          See Errata Sheet

Linda Rose, Transcriber          Capitol Electronic Reporting

INMATE COPY

ii

INDEX

Page

Proceedings................................ 1

Case Factors............................... 5

Pre-Commitment Factors..................... 8

Post-Commitment Factors.................... 13

Parole Plans............................... 24

Closing Statements......................... 33

Recess..................................... 35

Decision................................... 36

Adjournment................................ 41

Transcriber Certification.................. 42

--oOo--

1

1        P R O C E E D I N G S

2        DEPUTY COMMISSIONER CASSADY:  We're on record.

3        PRESIDING COMMISSIONER VAN COURT:  We're on the

4    air, okay.  This a Subsequent Parole Consideration

5    Hearing for Christopher Boatman, number D-65055.  On

6    9/3/87 the prisoner was received in CDC pursuant to

7    Penal Code section 1168 for violation of Penal Code

8    section 187, murder second with the enhancement

9    12022(a) use of a firearm.  It's Fresno County case

10   number 351031-0, count one.  The controlling minimum

11   eligible parole date is 1/31/97.  He also had -- The

12   count two was another robbery but that was dismissed.

13       INMATE BOATMAN:  Yes, it was.

14       PRESIDING COMMISSIONER VAN COURT:  Okay.  And

15   today's date is 6/30/98.  We're located at San Quentin

16   and the time now ten o'clock.  We will first establish

17   voice identification by each of us stating our first

18   and last name, spelling our last name, and when it

19   gets to the prisoner he'll also give his CDC number.

20   So we'll start off with you and go around the table

21   clockwise.

22       INMATE BOATMAN:  Christopher Boatman,

23   B-O-A-T-M-A-N.  D, number 65055.

24       PRESIDING COMMISSIONER VAN COURT:  And spell

25   your last name.

26       INMATE BOATMAN:  B-O-A-T-M-A-N.

27       PRESIDING COMMISSIONER VAN COURT:  Thank you.

2

1      INMATE BOATMAN:  Okay.

2      ATTORNEY LAUCELLA:  Clay Laucella,

3  L-A-U-C-E-L-L-A, attorney for Mr. Boatman.

4      DEPUTY COMMISSIONER CASSADY:  Pat Cassady,

5  C-A-S-S-A-D-Y, Deputy Commissioner, Board of Prison

6  Terms.

7      COMMISSIONER GILLIS:  John Gillis, G-I-L-L-I-S,

8  Commissioner.

9      PRESIDING COMMISSIONER VAN COURT:  A. F. Van

10  Court, V-A-N, capital C-O-U-R-T, Commissioner.

11  The purpose of today's hearing is to again consider

12  your suitability for parole.  In arriving at a

13  decision we will consider the commitment offense, your

14  other prior criminality, and social history, as well

15  as your behavior since your commitment.  We'll go

16  directly to your progress since the last hearing and

17  your psych reports and other information that has a

18  bearing on parole suitability.  Any change in parole

19  plans should also be brought to our attention.  Before

20  we recess for deliberation the prisoner's attorney and

21  the prisoner will be given the opportunity to make a

22  short presentation regarding parole suitability and

23  length of confinement.  The law and the Board of

24  Prison Terms rules state that you are to be denied a

25  parole date if your release would pose an unreasonable

26  risk of danger to others.  Now did you receive timely

27  notification that you were going to have this hearing?

3

1      INMATE BOATMAN:  Yes, I did.

2      PRESIDING COMMISSIONER VAN COURT:  You had an

3  opportunity to review your files?

4      INMATE BOATMAN:  Yes.

5      PRESIDING COMMISSIONER VAN COURT:  Okay.  And

6  then you have an additional right.  You have a right

7  to an impartial Panel.  Is the make-up of this Panel

8  satisfactory to you?

9      INMATE BOATMAN:  Yes, it is.

10      PRESIDING COMMISSIONER VAN COURT:  Okay.  Thank

11  you, sir.  Is the prisoner's attorney satisfied that

12  his rights have been met?

13      INMATE BOATMAN:  Yes, Sir.

14      PRESIDING COMMISSIONER VAN COURT:  You'll

15  receive a copy of the tentative written today.  The

16  decision is effective 90 days after review.  A

17  transcript and a copy of the decision will

18  automatically be sent.  You have a right to appeal

19  within 90 days of the effective date of the decision.

20  You are not required to discuss the matter with the

21  Panel.  You are not required to admit the offense.

22  But the Panel accepts as true the court findings.

23  Now, do we have any confidential information,

24  Commissioner Cassady?

25      DEPUTY COMMISSIONER CASSADY:  No, Sir.

26      PRESIDING COMMISSIONER VAN COURT:  And the

27  3042 notices were sent out, any responses will be

4

1   handled by Commissioner Gillis.  And let's see, do you

2   have any preliminary objections, Mr. Laucella?

3         ATTORNEY LAUCELLA:  No, Sir.

4         PRESIDING COMMISSIONER VAN COURT:  Okay.  Are

5   you going to respond to our questions that we put to

6   you today?

7         INMATE BOATMAN:  Yes, I will.

8         PRESIDING COMMISSIONER VAN COURT:  Okay.  We

9   take all of our testimony under oath, so would you

10  raise your right hand and be sworn.  Do you swear or

11  affirm the testimony you are about to give today will

12  be the truth, the whole truth, and nothing the truth?

13        INMATE BOATMAN:  Yes.

14        PRESIDING COMMISSIONER VAN COURT:  Okay, thank

15  you.  I have a list of documents here that I want to

16  give your Counsel, just to make sure that he has the

17  same source of information that we are using.

18        ATTORNEY LAUCELLA:  We have all these.

19        PRESIDING COMMISSIONER VAN COURT:  Okay, thank

20  you, sir.  Then at this point I am going to use the

21  information from the report from April 1996.  It seems

22  like that's the one that they refer back to.  And was

23  that your Initial Hearing?

24        INMATE BOATMAN:  Yes, in June.

25        PRESIDING COMMISSIONER VAN COURT:  Okay.  I

26  will try to make it a little briefer.

27        INMATE BOATMAN:  Okay.

5

1          **PRESIDING COMMISSIONER VAN COURT:**  Especially

2    the person that wrote this got pretty wordy

3    anyway.

4              "At approximately 12:00 noon on 5/29/86

5              Inmate Boatman was driving his car with

6              his codefendants, Harold Jones and Roy

7              Montgomery.  The three of them had been

8              free-basing cocaine and decided they

9              needed more money to buy more drugs.

10             Boatman drove past a small store in

11             Lanare where they decided not to rob

12             because there were too many cars.  At

13             approximately 12:30 p.m. they stopped at

14             the home of Chris Vassel and found

15             Mr. Vassel working on his motorcycle.

16             The four of them were talking when Jones

17             went to the car to retrieve a

18             .22-caliber handgun which belonged to

19             Boatman's stepmother.  Mrs. Boatman did

20             not know they had her weapon.  Jones

21             shot a can and told Mr. Vassel how they

22             had planned to rob the store in Lanare,

23             but instead they were going to rob the

24             Forty-One Market.  Mr. Vassel warned

25             they were known and would be identified

26             and caught.  Jones said that they didn't

27             need to worry about that.  The three

6

| | |
|---|---|
| 1 | (inaudible) left Mr. Vassel's and drove |
| 2 | to the Forty-One Market on Riverdale. |
| 3 | Jones and Boatman entered the market and |
| 4 | Boatman stood by the door and acted as a |
| 5 | lookout for outside interference.  Jones |
| 6 | confronted the 19 year old store clerk, |
| 7 | John Souza, pointed the gun at him and |
| 8 | ordered him not to move.  Jones then |
| 9 | ordered Mr. Souza to give him the money. |
| 10 | Mr. Souza opened the cash register and |
| 11 | gave Jones one hundred dollars, then |
| 12 | turned away.  Jones shot Mr. Souza in |
| 13 | the back of the neck, then fled to |
| 14 | Boatman's vehicle.  Mr. Souza was |
| 15 | discovered by another customer at 1:50 |
| 16 | p.m..  The cash drawer was on the |
| 17 | counter and the safe open.  The customer |
| 18 | called for help and Mr. Souza was taken |
| 19 | to the hospital where he later died from |
| 20 | a single .22 shot in the back of his |
| 21 | neck.  On 5/30/86 an anonymous caller |
| 22 | identified the perpetrators.  On 6/2/86 |
| 23 | a search of Boatman's house revealed the |
| 24 | murder weapon, and Boatman and |
| 25 | Montgomery were arrested.  Jones fled to |
| 26 | Texas where he was arrested on 8/7/86." |
| 27 | And source documents, the probations officer's report |

7

1    and the Superior Court transcript.  Is that basically
2    what happened?
3              INMATE BOATMAN:  Yes, it is.
4              PRESIDING COMMISSIONER VAN COURT:  Quite
5    accurate for the whole thing?
6              INMATE BOATMAN:  Quite accurate.
7              PRESIDING COMMISSIONER VAN COURT:  Okay.  Then
8    it's horrible crime.  And what runs through my mind,
9    is why in the world did he feel like it was necessary
10   to shoot a cooperative -- other than the fact of not
11   having a witness?
12             INMATE BOATMAN:  Yes.
13             PRESIDING COMMISSIONER VAN COURT:  Is that the
14   main reason?
15             INMATE BOATMAN:  That crossed through my mind
16   over the years that I've been doing.  And that's the
17   only conclusion that I could come up with at the time,
18   why he did that.
19             PRESIDING COMMISSIONER VAN COURT:  Well, then
20   also originally when this Mr. Vassel stated that they
21   would be recognized, did you point out the --
22   No, no, that was Jones who said that.
23             INMATE BOATMAN:  Yes.
24             PRESIDING COMMISSIONER VAN COURT:  That they
25   don't have to worry about that.
26             INMATE BOATMAN:  -- to worry about that.
27             PRESIDING COMMISSIONER VAN COURT:  So it sounds

8

1    like he had in mind to execute the clerk early on.

2        INMATE BOATMAN:  Yes.

3        PRESIDING COMMISSIONER VAN COURT:  Okay, then

4    we'll go to your record.  You have no juvenile record.

5        "On 4/30/84 Boatman was arrested by the

6        Fresno County Sheriff's Office for two

7        counts of rape with force and fear.

8        [now]  His court appearance was delayed

9        because the victim was not cooperative."

10   And then later than it turned out that was kind of a

11   marijuana gang deal where everybody took a crack at

12   her and she was a truant and you ended up later on

13   being found guilty of unlawful intercourse with a

14   minor?

15       INMATE BOATMAN:  Yes.

16       PRESIDING COMMISSIONER VAN COURT:  Okay.  Then

17   you also had a grand theft and possession of a weapon.

18   And:

19       "He committed a purse snatch, in

20       possession of a tire iron when arrested.

21       Sentenced [to] 12/19/84 to six months in

22       jail and three years probation with the

23       condition that he not be in possession a

24       weapon."

25   Also you were ordered to pay a $75.00 fine and

26   $126.00 on restitution.  "Boatman was transferred in

27   custody to face the rape charges."  However, I

9

1   already told you how that ended up.  And it said:
2            "On 8/13/85 Boatman's probation was
3            accepted by the authorities in Fresno.
4            There he reported regularly. [and]  On
5            4/23/85 Boatman was arrested by the
6            arrested the Fresno Police Department
7            for petty theft.  On 7/29/85 he was
8            arrested.  He was sentenced to 60 days
9            in jail, 58 days suspended, one year
10           probation."
11   Is all of that information accurate?
12           INMATE BOATMAN:  Yes, I just don't understand
13   the grand theft, can you elaborate on that more?
14   The grand theft --
15           PRESIDING COMMISSIONER VAN COURT:  Okay.  The
16   grand theft, it was 487.2 PC in possession of a weapon
17   1102 PC.
18           INMATE BOATMAN:  That was the purse snatching?
19           PRESIDING COMMISSIONER VAN COURT:  Yeah.
20           INMATE BOATMAN:  Okay, I understand that.
21           PRESIDING COMMISSIONER VAN COURT:  So, yeah,
22   that purse snatching was part of that.
23           INMATE BOATMAN:  Okay.
24           PRESIDING COMMISSIONER VAN COURT:  Okay.  Then
25   you were born in Louisiana, the fourth of six
26   children.  And, okay.  "Boatman's biological father
27   died when he was two years old.  His mother, Ada

10

1    Phillips --"
2                INMATE BOATMAN:  Aida.
3                PRESIDING COMMISSIONER VAN COURT:  Aida?
4                INMATE BOATMAN:  Yeah.
5                PRESIDING COMMISSIONER VAN COURT:  Yeah, Aida.
6                INMATE BOATMAN:  Yeah.
7                PRESIDING COMMISSIONER VAN COURT:  Okay.  "His
8    mother moved the family --"  That was a famous opera.
9                "His father died when he was two years
10               old.  His mother moved the family to
11               Fresno area when he was an infant, where
12               his mother met and married Jim Boatman.
13               Mr. Boatman became the father figure and
14               supported his family throughout a
15               variety of labor intensive jobs ranging
16               from milking cows to drilling oil.  As
17               the children grew his mother took a
18               position as a teacher's aide.  And when
19               Boatman was ten years old his parents
20               divorced.  His father remained in
21               Riverdale and his mother moved to Fresno
22               proper.  At age 14 Boatman chose to live
23               with his father because he got along
24               well with him.  Shortly thereafter his
25               father developed a relationship with a
26               woman that Boatman considered his
27               stepmother.  As a young teenager Boatman

11

1    worked with his father fairly well

2    milking cows and played a variety of

3    sports.  He dropped out of Riverdale

4    High School after completing the

5    eleventh grade.  He did not pursue

6    further educational or vocational

7    training nor did he belong to any clubs

8    or organizations.  After leaving high

9    school Boatman moved to Fresno to live

10   with his mother and a man she had

11   developed a relationship with whom

12   Boatman considered his stepfather.  The

13   relationship between his mother and

14   stepfather added two siblings to the

15   family.  Boatman worked at his

16   stepfather's liquor store as a stock boy

17   and was considering returning to school.

18   He smoking marijuana and drinking

19   alcohol at the age of 14.  His drug use

20   became problematical in high school and

21   was partially responsible for him

22   dropping out.  While visiting the beach

23   in San Luis Obispo at age 18, he was

24   arrested for purse snatching.  After

25   serving six months in the county jail,

26   he was transferred back to Fresno to

27   face charges of an illegal sex with

12

1     minor, it was subsequently dismissed.

2     His probation was accepted by Fresno

3     County authorities and he reported

4     directly and worked for his stepfather.

5     However, his drug use continued.

6     Boatman reported that when he went to

7     his father's home to visit for a weekend

8     and ended up staying for a month.  He

9     started associating with the

10    codefendants and his drug use just

11    escalated dramatically.  At the time of

12    the instant offense Boatman's addiction

13    to drugs, including cocaine, was out of

14    control.  Throughout the court

15    proceedings Boatman was housed in a jail

16    of an adjacent county because of his

17    testimony and cooperation with the

18    prosecutors.  This codefendant remains

19    listed as an enemy."

20  And source document from 6/1/87 probation officer's

21  report (inaudible).  Is all of that information

22  accurate?

23        INMATE BOATMAN:  Where at -- My parents

24  divorced when I was ten, that's not accurate.

25        PRESIDING COMMISSIONER VAN COURT:  That's not

26  accurate?

27        INMATE BOATMAN:  That's not accurate.

13

1          PRESIDING COMMISSIONER VAN COURT:  Okay.

2          INMATE BOATMAN:  It was somewhere around 14,

3     when I was 14.

4          PRESIDING COMMISSIONER VAN COURT:  When you

5     were about 14 years old?

6          INMATE BOATMAN:  Yes.

7          PRESIDING COMMISSIONER VAN COURT:  Okay.  But

8     the rest of that information is accurate?

9          INMATE BOATMAN:  Yes, pretty much accurate.

10         PRESIDING COMMISSIONER VAN COURT:  Okay, then

11    with that we'll go directly to Commissioner Cassady

12    for your performance since you've been in custody.

13         DEPUTY COMMISSIONER CASSADY:  Okay.

14    Mr. Boatman, you have a present classification score

15    of zero and you have remained disciplinary-free your

16    entire incarceration.  You're to be commended for

17    that.

18         INMATE BOATMAN:  Thank you.

19         DEPUTY COMMISSIONER CASSADY:  Educationally,

20    you've done quite well in that field also.  You

21    apparently completed your GED in 1993.

22         INMATE BOATMAN:  Yes.

23         DEPUTY COMMISSIONER CASSADY:  Okay, I mean

24    there is a lot of talk about you going through GED.  I

25    don't see the certificate in here.

26         INMATE BOATMAN:  Oh, you don't.

27         DEPUTY COMMISSIONER CASSADY:  No.  There is a

14

1    whole lot of Welding certificates and other

2    certificates, but just for your advice it is

3    reflecting numerous times that you took it and finally

4    passed it.  But my advice to you is if you have a copy

5    or if you've sent one home make sure that your

6    counselor gets one in your Central File.

7         INMATE BOATMAN:  I'll do that.  I have a copy.

8         DEPUTY COMMISSIONER CASSADY:  Okay.  It

9    indicates that after you passed your GED that you

10   remained in school so that you could upgrade

11   educationally and raise your grade point level, which

12   you did.

13        INMATE BOATMAN:  Yes.

14        DEPUTY COMMISSIONER CASSADY:  Vocationally,

15   you've been very busy.  You have participated and

16   received numerous certificates that are in the file

17   concerning your welding skills and a certificate in

18   Engine Lathe and your machine shop skills.  So you

19   would be qualified as a Machinist; is that accurate?

20        INMATE BOATMAN:  Yes.

21        DEPUTY COMMISSIONER CASSADY:  Okay, because it

22   indicates that your work reports are very good and

23   that your work supervisor feels that you are -- You

24   could -- I believe it was $15.00 to $20.00 would be

25   the field of how much you could earn an hour with your

26   present skills.

27        INMATE BOATMAN:  How much I could earn at this

15

1   time, yes.

2       **DEPUTY COMMISSIONER CASSADY:**  Okay.  So you're

3   to be commended for those vocational endeavors that

4   you have succeeded.  And now have you worked also and

5   been paid as a Machinist or some kind of Welding in

6   the institution?

7       **INMATE BOATMAN:**  In the institution I am a

8   vocational student so I make approximately a month

9   maybe $30.00.

10      **DEPUTY COMMISSIONER CASSADY:**  Okay.  So you are

11  getting paid as well as getting the certificates as

12  you --  Have you got the certificates in all types of

13  Welding?

14      **INMATE BOATMAN:**  All types.

15      **DEPUTY COMMISSIONER CASSADY:**  All types, okay,

16  so -- Okay, in self-help it indicates you are

17  presently a participant in Narcotics Anonymous; is

18  that accurate?

19      **INMATE BOATMAN:**  Yes, that is.

20      **DEPUTY COMMISSIONER CASSADY:**  And how long have

21  you been in that program?

22      **INMATE BOATMAN:**  Since '93.

23      **DEPUTY COMMISSIONER CASSADY:**  Okay.  Does that

24  program practice the 12 Steps, sir?

25      **INMATE BOATMAN:**  Yes, it does practice the 12

26  Steps.

27      **DEPUTY COMMISSIONER CASSADY:**  And do you

16

1    personally practice the 12 Steps?

2        INMATE BOATMAN:  I do.

3        DEPUTY COMMISSIONER CASSADY:  Have you worked

4    each and every one of them?

5        INMATE BOATMAN:  Each and every one of them.

6        DEPUTY COMMISSIONER CASSADY:  Why don't you

7    tell me which one you find most important and why.

8        INMATE BOATMAN:  Most important?  I think the

9    most important is the first Step because it's

10   admitting and if you can't admit the fact then you've

11   got a problem there.  Sc it's the first Step to

12   recovery.  So that is the most important one.

13       DEPUTY COMMISSIONER CASSADY:  Can you tell me

14   what you put in your personal inventory.

15       INMATE BOATMAN:  What -- my personal inventory?

16       DEPUTY COMMISSIONER CASSADY:  Tell me a couple

17   of the good things, a couple of the bad things.

18       INMATE BOATMAN:  I have written about

19   liabilities, bad and good.  And the good things are

20   like sharing, honesty with others.  It's a lot of good

21   things, I just can't think of it at this time.

22       DEPUTY COMMISSIONER CASSADY:  Uh-hmm, I

23   understand.

24       INMATE BOATMAN:  Some of the bad were the

25   guilt, the shame, the remorse, you know, and the

26   anxiety, the resentment.  And that's what --

27       DEPUTY COMMISSIONER CASSADY:  Do you feel that

17

1   over the years you've been able to work through some

2   of those negative things?

3           INMATE BOATMAN:  Oh, yes, definitely.

4           DEPUTY COMMISSIONER CASSADY:  So you feel that

5   if you were to do a personal inventory today that the

6   positives and the negatives would be different?

7           INMATE BOATMAN:  Good question.  They would be

8   different.  I would try to find more positive than I

9   did negative.

10          DEPUTY COMMISSIONER CASSADY:  There you go,

11  okay.  And you think there would be more positive to

12  find today?

13          INMATE BOATMAN:  Yes, there would be more

14  positive.

15          DEPUTY COMMISSIONER CASSADY:  Okay, very good.

16  The Board report that was prepared for today's hearing

17  by your correctional counselor -- Oh, I don't want to

18  forget, you're also in the -- And I always have

19  trouble pronouncing it, Cartargio?

20          INMATE BOATMAN:  Cartargio.

21          DEPUTY COMMISSIONER CASSADY:  Group?

22          INMATE BOATMAN:  Yes.

23          DEPUTY COMMISSIONER CASSADY:  And you've

24  participated in that for how long?

25          INMATE BOATMAN:  Going on four years.

26          DEPUTY COMMISSIONER CASSADY:  Four years?

27          INMATE BOATMAN:  Correct me if I'm wrong.

18

1    DEPUTY COMMISSIONER CASSADY:  And what do you
2    get from that group?
3    INMATE BOATMAN:  Well, it's helping me to
4    understand.  What we do in Cartargio is -- Cartargio
5    is a Greek word and it means to put away what binds
6    you  and whatever is binding you, drugs, sex abuse,
7    anything, illegal activities.  And it helps me to
8    become a more responsible person hearing others
9    people's stories and sharing.  It's a good therapy
10   group.
11   DEPUTY COMMISSIONER CASSADY:  The Board report
12   was prepared by C. Thorntona, T-H-O-R-N-T-O-N-A,
13   Correctional Counselor I.  And the counselor indicates
14   in the Board report under summary that you have
15   programmed overall -- That overall you have programmed
16   positively while incarcerated.  That -- She talks
17   about the things we've talked about, your
18   vocationally, your educationally upgrading, your
19   disciplinary-free behavior.  She does indicates -- Oh,
20   is it a she?  I'm sorry.
21   INMATE BOATMAN:  You're right.
22   DEPUTY COMMISSIONER CASSADY:  -- indicates that
23   you did not pull the trigger, but you do take full
24   responsibility for your involvement that led up to up
25   to the actions that led to the commitment offense.
26   That you do express remorse for the loss of the
27   victim's life.  And that she feels that involvement --

19

1    Considering the involvement in the crime, prior

2    record, prison adjustment, she believes that you would

3    probably pose only a low degree of threat to the

4    public if released at this time.  So that's a

5    relatively optimistic and positive report.

6        INMATE BOATMAN:  Yes.

7        DEPUTY COMMISSIONER CASSADY:  Is there anything

8    that you wanted to add to that report or your

9    programming that maybe we did not discuss?

10       INMATE BOATMAN:  No, that's good.

11       DEPUTY COMMISSIONER CASSADY:  Okay, I am going

12   move to the psychiatric evaluation that was prepared

13   briefly for today's hearing.

14       ATTORNEY LAUCELLA:  The American Welding

15   Society.

16       DEPUTY COMMISSIONER CASSADY:  What did you want

17   to add?

18       INMATE BOATMAN:  Excuse me, I'm sorry.  I did

19   have something about educational.  I have a welding --

20   The American Society that I am a member of.

21       DEPUTY COMMISSIONER CASSADY:  I did see that

22   and I do have that down.  And you want to tell me what

23   that is?  That is in your Central File.

24       INMATE BOATMAN:  It's -- AWS is -- What it does

25   give is it gives me the newest products and stuff like

26   that.  It's part of my training.  I was advised that

27   it would be good for me to join the membership and

20

1    be --

2             DEPUTY COMMISSIONER CASSADY:  And it is

3    documented here in the Central File that you have,

4    indeed.  There is a July 1, 1997 from the American

5    Welding Society indicating that you are a member.

6             INMATE BOATMAN:  Yes, and it's a good

7    organization.

8             DEPUTY COMMISSIONER CASSADY:  So they send you

9    magazines how often?

10            INMATE BOATMAN:  Yes, they send me magazines

11   every month, monthly issues.

12            DEPUTY COMMISSIONER CASSADY:  It keeps you up

13   to date what is happening out there with the welding

14   trade?

15            INMATE BOATMAN:  Yes, it is.

16            DEPUTY COMMISSIONER CASSADY:  Okay.  And I am

17   going to assume you read those magazines you've

18   educationally upgraded so well.

19            INMATE BOATMAN:  Oh, yes, I read them.  Yes.

20            DEPUTY COMMISSIONER CASSADY:  Okay.  The

21   psychiatric report that was prepared for today's

22   hearing by Temkova, T-E-M-K-O-V-A, Ph.D., Clinical

23   Psychologist, is very brief.  And indicates that -- Is

24   that he?

25            INMATE BOATMAN:  That's a she.

26            DEPUTY COMMISSIONER CASSADY:  That's a she

27   also.  She indicates that, basically in the last

21

1   paragraph, that you continue to program well and
2   remain psychiatrically stable and the decision of
3   whether or not you parole should be based other than
4   psychiatric factors.  She does refer back to a
5   previous report dated 3/19/96 which she also
6   interviewed and evaluated you, and basically feels
7   that nothing has changed since that previous
8   evaluation which has a little more -- has a little
9   more meat to it.  And she indicates that talking about
10  the offense and the victim and the victim's family, it
11  was clearly painful for you and you became
12  increasingly more sad and tearful, that you took full
13  responsibility for the crime.  At one point you became
14  overwhelmed by your tears and sadness.  That you do
15  possess adequate judgment and insight and presented
16  evidence of being able to take responsibility for your
17  behavior.  Under the Axis diagnosis, she has got Axis
18  I Cocaine Dependence in institutional remission, and
19  Axis II there is no diagnosis, Axis III none, Axis IV
20  incarceration, and your GAF of 65 which is probably I
21  would guess -- Well, she still has a GAF score of 65
22  in the present one.  At any rate, indicates your
23  violence potential appears to have decreased and you
24  can currently as lower than that of the average of
25  San Quentin inmate.  And I will note for the record
26  that was back in '96.  And she doesn't indicate that
27  you have done anything that would change her opinion

22

1   on your violence potential rating.  Is there any
2   comment that you would like to make about the
3   psychiatric evaluation?
4        INMATE BOATMAN:  Well, I really don't agree
5   with it.  I think that a person as he grows, he does
6   change.  And I seen the doctor for only maybe
7   15 minutes and I asked the doctor that day was the
8   report favorable last time and the doctor said yes.  I
9   don't know if --
10       DEPUTY COMMISSIONER CASSADY:  You don't
11  perceive the last one as favorable?
12       INMATE BOATMAN:  No, I don't.
13       DEPUTY COMMISSIONER CASSADY:  Well, part of the
14  last one do you not perceive as favorable?
15       INMATE BOATMAN:  Well, the last one stated
16  that --
17       ATTORNEY LAUCELLA:  I think the concern was
18  just how brief it was.
19       DEPUTY COMMISSIONER CASSADY:  You mean the one
20  prepared for today's hearing?
21       ATTORNEY LAUCELLA:  Yes.
22       INMATE BOATMAN:  Yes.
23       DEPUTY COMMISSIONER CASSADY:  Well, yes, it is
24  brief, I'll grant you that.  But she refers back to
25  the previous one which is also brief but not as brief.
26       INMATE BOATMAN:  Yeah.  I just personally
27  didn't think it was favorable.

23

1        **DEPUTY COMMISSIONER CASSADY:**  Well, I'm just
2   wondering -- I perceived it as favorable.
3        **INMATE BOATMAN:**  Oh, okay.
4        **DEPUTY COMMISSIONER CASSADY:**  So I am not sure
5   what you're not perceiving as favorable.
6        **INMATE BOATMAN:**  Well, as the decision was --
7   The last time I was here at the hearing, one of the
8   reasons I was denied is because the psychiatric
9   evaluation was --
10       **DEPUTY COMMISSIONER CASSADY:**  Was not totally
11  supportive?
12       **INMATE BOATMAN:**  Was not totally supportive.
13       **DEPUTY COMMISSIONER CASSADY:**  Well, that's
14  different than unfavorable.
15       **INMATE BOATMAN:**  Okay.
16       **DEPUTY COMMISSIONER CASSADY:**  Okay?
17       **INMATE BOATMAN:**  All right, thanks.
18       **DEPUTY COMMISSIONER CASSADY:**  In other words,
19  not -- She doesn't indicate in either of the reports
20  that she thinks that she is supporting of parole.  So
21  I mean there are things about it that she feels that
22  you can do.  She makes recommendations.
23       **INMATE BOATMAN:**  Yes.
24       **DEPUTY COMMISSIONER CASSADY:**  But unsupportive
25  in my opinion is different than not totally -- or not
26  favorable is different than not totally supportive.
27       **INMATE BOATMAN:**  Okay, all right.

24

1         **ATTORNEY LAUCELLA:**  She does conclude at the
2    bottom whether that decision whether or not to parole
3    would be based on other than the psychiatric factors,
4    so that is her way saying she is not opposed.  That's
5    how I interpret it.
6         **INMATE BOATMAN:**  Okay, yeah.
7         **DEPUTY COMMISSIONER CASSADY:**  Okay, is there
8    anything that you -- We'll note that for the record.
9    Is there anything else you would like to say about the
10   psychiatric evaluation?
11        **INMATE BOATMAN:**  No, there isn't.
12        **DEPUTY COMMISSIONER CASSADY:**  Okay, I'll return
13   back to the Chair, Commissioner Van Court.
14        **PRESIDING COMMISSIONER VAN COURT:**  Okay.  Thank
15   you, Commissioner Cassady.  Now we'll go to
16   Commissioner Gillis for your parole plans.
17        **COMMISSIONER GILLIS:**  Thank you.  What have you
18   done to prepare yourself for parole?
19        **INMATE BOATMAN:**  I have the education and the
20   background that I've been doing and also the therapy
21   and the self-help.
22        **COMMISSIONER GILLIS:**  Okay.  What about your
23   substance abuse?
24        **INMATE BOATMAN:**  Yes, that is the self-help and
25   the therapy I've been --
26        **COMMISSIONER GILLIS:**  And specifically what
27   would you do about that if you were released?

25

1          INMATE BOATMAN:  If I were released I would get

2     immediately into some programs.  It's my one to

3     fourteen day parole plan would be, you know, parole

4     officer and stuff like and seeing what groups I would

5     get into and which ones would fit my leisure time and

6     which ones wouldn't.

7          COMMISSIONER GILLIS:  Okay.  You have

8     Louisianan and Texas?

9          INMATE BOATMAN:  Yes, I do.  Louisiana, Texas.

10         COMMISSIONER GILLIS:  Is that where your father

11    is in Texas?

12         INMATE BOATMAN:  No, my father is in

13    California.

14         COMMISSIONER GILLIS:  In California?

15         INMATE BOATMAN:  Yes.

16         COMMISSIONER GILLIS:  Who is in Texas?

17         INMATE BOATMAN:  My brother.

18         COMMISSIONER GILLIS:  All right.  And we do

19    have a letter from him.  As a matter of fact, a lot of

20    supportive letters from your family.  It seems like a

21    family who thinks a lot of you.

22         INMATE BOATMAN:  Yeah.  And I was wanting a

23    little just in case if future hearing do exist.  If it

24    would be good for me to keep bringing my letters in

25    here or would it be best to give them to Sacramento

26    because I know anybody can write letters or whatever

27    you have and sign names to them and --

26

1      COMMISSIONER GILLIS:  Well, you can have it
2  done either way.

3      INMATE BOATMAN:  Okay.

4      COMMISSIONER GILLIS:  You can have them sent to
5  you and then give them to your counselor so that they
6  will be in your file or you can have them sent to
7  Sacramento.  It's probably the best to have them sent
8  to you because there is a delay.

9      INMATE BOATMAN:  It's much easier, too.

10     COMMISSIONER GILLIS:  Well, there is a delay in
11 getting them from Sacramento to here.  Brothers,
12 sisters, your mother, they all indicate that they
13 would support your release.  Your mother says that she
14 will provide you with a home, transportation, clothes.

15     INMATE BOATMAN:  Yeah, that's my mother.

16     COMMISSIONER GILLIS:  Well, mothers are kind of
17 like that, you know.

18     INMATE BOATMAN:  You know how mothers are.

19     COMMISSIONER GILLIS:  Yeah.  And then your two
20 sisters -- No, your one sister and then your
21 sister-in-law?

22     INMATE BOATMAN:  Yeah.

23     COMMISSIONER GILLIS:  Okay.  And your brother,
24 who is in Texas, indicates that he would even purchase
25 you a home if you were released.

26     INMATE BOATMAN:  That's what he is working on.

27     COMMISSIONER GILLIS:  Okay.  All right, so they

27

1  are sticking kind of close even after the big

2  screw-up (inaudible).

3      INMATE BOATMAN:  Yes.  Well, we always had a

4  bond as we was growing up.  We always hung together,

5  you know.  We always -- When one was wrong, you know.

6  we stuck together and you know --

7      COMMISSIONER GILLIS:  Okay.  There are a couple

8  of job offers here, too.  One indicates that he would

9  give you -- that you could get a job interview.  The

10  other one says that he would offer you a job.  That's

11  the one from Tanny Machine and Manufacturing?

12      INMATE BOATMAN:  Yes.

13      COMMISSIONER GILLIS:  He said that he would

14  have a position for you.

15      INMATE BOATMAN:  Yes, I was surprised.  I went

16  through the directory and found them addresses.

17      COMMISSIONER GILLIS:  Okay.  And you would live

18  with your mother?

19      INMATE BOATMAN:  Yes, I would.

20      COMMISSIONER GILLIS:  Okay, that's not the

21  county of commitment.

22      INMATE BOATMAN:  That is the county of

23  commitment.  Lemoore is -- Fresno is a pretty big

24  county and Lemoore is the county.

25      COMMISSIONER GILLIS:  -- is in the county,

26  okay.

27      INMATE BOATMAN:  Yes.

28

1    COMMISSIONER GILLIS:  All right, so you're okay
2    there.  Do you have any money saved?
3        INMATE BOATMAN:  Me personally, I don't have
4    none saved.
5        COMMISSIONER GILLIS:  But you do get money from
6    your family?
7        INMATE BOATMAN:  Yes, I do.
8        COMMISSIONER GILLIS:  Do you have any children?
9        INMATE BOATMAN:  No children.
10       COMMISSIONER GILLIS:  Okay.  Never been
11   married?
12       INMATE BOATMAN:  Never been married.
13       COMMISSIONER GILLIS:  Okay.  Is there anything
14   else about your parole plans.  And let me tell you
15   also that on these letters that you should get new
16   letters each time.
17       INMATE BOATMAN:  New letters?
18       COMMISSIONER GILLIS:  Yeah.
19       INMATE BOATMAN:  What do you mean?
20       COMMISSIONER GILLIS:  You ought to have them
21   send you another letter each time, supporting your
22   release, like from your mother and your brothers and
23   sisters.
24       INMATE BOATMAN:  Oh, just keep -- Yes, okay.
25       COMMISSIONER GILLIS:  In case you don't -- If
26   you don't get a parole date today you need to --
27       INMATE BOATMAN:  -- to keep -- Yes.

29

1       **COMMISSIONER GILLIS:** Okay, I think I told you
2   that the last time.

3       **INMATE BOATMAN:** Yeah, I remember.

4       **COMMISSIONER GILLIS:** Okay. Anything else
5   about your parole plans that you want to tell me
6   about?

7       **INMATE BOATMAN:** No, not about my parole plans.

8       **COMMISSIONER GILLIS:** We don't have any letters
9   from the county of commitment, no letters opposing
10  your release. We sent out notices to the DA and the
11  police department and all those people and we didn't
12  get a response. That's all I have.

13      **PRESIDING COMMISSIONER VAN COURT:** Okay, thank
14  you, Commissioner Gillis. Now at this phase of the
15  hearing, the Commissioners can ask you questions.

16      **INMATE BOATMAN:** Okay.

17      **PRESIDING COMMISSIONER VAN COURT:** So we'll
18  start off with Commissioner Cassady.

19      **DEPUTY COMMISSIONER CASSADY:** I have no
20  questions.

21      **PRESIDING COMMISSIONER VAN COURT:** Commissioner
22  Gillis.

23      **COMMISSIONER GILLIS:** What happened to the
24  other crime partners? I know one was sentenced to
25  life without --

26      **INMATE BOATMAN:** Yeah, and from my
27  understanding that Butch Montgomery, he did maybe a

30

1    couple of years or something for perjury and that was
2    it.
3              COMMISSIONER GILLIS:  Okay.  And what about the
4    other one?  There was a fourth one.
5              INMATE BOATMAN:  No, there was just three.
6    That's me, Butch Montgomery, and Harold Jones.  That
7    was it.
8              COMMISSIONER GILLIS:  All right.  Did you go to
9    trial?
10             INMATE BOATMAN:  No, I didn't go to trial.
11             COMMISSIONER GILLIS:  You pled guilty?
12             INMATE BOATMAN:  I pled guilty.
13             COMMISSIONER GILLIS:  Okay.  Did your crime
14   partner go to trial?
15             INMATE BOATMAN:  Yes.
16             COMMISSIONER GILLIS:  Did you testify against
17   him?
18             INMATE BOATMAN:  No, I did not testify against
19   him.
20             COMMISSIONER GILLIS:  Why not?
21             INMATE BOATMAN:  At the time -- Well, I'll just
22   say that there is a lot of things that happened at
23   that time in the trial and I guess it wasn't --
24             COMMISSIONER GILLIS:  Since you're struggling
25   with that one, let me rephrase it.
26             INMATE BOATMAN:  Okay.
27             COMMISSIONER GILLIS:  Did they ask you to

31

1    testify against your crime partner?

2         INMATE BOATMAN:  Yes, they did.

3         COMMISSIONER GILLIS:  And did you refuse to?

4         INMATE BOATMAN:  No, I didn't.

5         COMMISSIONER GILLIS:  So you agreed to testify?

6         INMATE BOATMAN:  I agreed to testify, but

7    things as they were going along it didn't work out and

8    they didn't need at that time to do it.

9         COMMISSIONER GILLIS:  Okay, so they didn't your

10   testimony is the reason why?

11        INMATE BOATMAN:  Yes, they didn't.

12        COMMISSIONER GILLIS:  But if they called you

13   would you have testified?

14        INMATE BOATMAN:  Yes, I would of.

15        COMMISSIONER GILLIS:  And you provided the gun;

16   did you not?

17        INMATE BOATMAN:  Yes, I provided it.

18        COMMISSIONER GILLIS:  Okay, that's all I have.

19        PRESIDING COMMISSIONER VAN COURT:  Okay, did

20   that Mr. Vassel testify?

21        INMATE BOATMAN:  Not to my knowledge.  I don't

22   know what went on in his trial or whatever.

23        PRESIDING COMMISSIONER VAN COURT:  But he was

24   also tried?

25        INMATE BOATMAN:  Mr. Vassel -- he was --

26        PRESIDING COMMISSIONER VAN COURT:  Yeah, the

27   fellow who was working on the motorcycle and warned

32

1   you that you would be identified?

2           INMATE BOATMAN:  I don't know if he testified

3   or not, but I'm sure that he did.  He made a

4   statement.

5           PRESIDING COMMISSIONER VAN COURT:  You're sure

6   that he did?

7           INMATE BOATMAN:  Yes, I'm pretty sure that

8   he -- He wasn't involved in the crime itself.

9           PRESIDING COMMISSIONER VAN COURT:  No, no, I

10  didn't say -- Except for the fact that you had

11  discussed your plans in front of him and he apparently

12  tried to discourage you saying that you would all be

13  identified.

14          INMATE BOATMAN:  Yes.

15          PRESIDING COMMISSIONER VAN COURT:  But that was

16  talking about a different market, was it?

17          INMATE BOATMAN:  No, that was talking about the

18  market straight down the street.

19          PRESIDING COMMISSIONER VAN COURT:  The same

20  one?

21          INMATE BOATMAN:  Yes, it was.

22          PRESIDING COMMISSIONER VAN COURT:  Okay. I have

23  no other questions.  Now we'll we'll see if

24  Mr. Laucella wants to ask you any questions.

25          ATTORNEY LAUCELLA:  No, I have none.

26          PRESIDING COMMISSIONER VAN COURT:  Okay, then

27  we'll go directly to your closing statement.

33

1        ATTORNEY LAUCELLA:  Thank you.  Christopher is
2    a fairly unusual case in that he had a couple minor
3    priors with stealing cassette tapes from the Warehouse
4    Store and he took a purse when he was a teenager, but
5    generally speaking he had a fairly uneventful past.
6    The crime itself he has taken full responsibility for
7    and we didn't go over it at length today, but
8    basically his involvement was he drove there and he
9    was the lookout.  I don't think it was ever in his
10   mind to have anything violent go on.  And even though
11   it did occur and he was not the shooter, per se, he
12   has taken full responsibility for the life that was
13   taken.  And I think that went on even from -- As you
14   found out today, he was willing to testify which has
15   not left him in great favor with some of the others
16   involved.  So I think it does go to his character that
17   for the most part he has been quite up front with all
18   of his involvement.  Additionally, he has not had even
19   one 115 through his entire incarceration.  He has been
20   doing great things, in particular with his welding
21   success.  Not only is he certified but he is a part of
22   the American Welding Society.  He is very employable.
23   He has been very industrious, put out resumes, put out
24   job requests, and has received, quite remarkably, job
25   offers just from the letters gone out.  So he is very,
26   very marketable.  I think you can be very confident
27   that if he were to get a date that he would be

34

1    employable quite easily.  In addition, he has a very
2    good Board report listing him as a low degree of
3    threat.  His psych report is a bit thin, but it does
4    keep referring back to parole plans -- or parole
5    suitability can be based on other than psychological
6    factors.  Again, he has been very consistently
7    involved in NA and Cartargio.  And he knows the steps
8    in and out and he really does live them and work them
9    and I think they will always be a very important part
10   of his life.  So although it is quite unusual at
11   11 years in prison to really be seriously considering
12   a date, I think Christopher has deserved some serious
13   consideration of whether or not he is suitable.  He
14   has a great network of family and friends.  He has a
15   job waiting for him.  And I think when you weigh in
16   balance his culpability in this crime with all the
17   positive things he is doing, I think he is deserved
18   the opportunity to be found suitable.  Thank you.
19             PRESIDING COMMISSIONER VAN COURT:  Okay.  Thank
20   you, Mr. Laucella.  Now would you like to make a brief
21   statement relative to your suitability for parole,
22   Mr. Boatman, or are you satisfied with what your
23   attorney has said?
24             INMATE BOATMAN:  Yes, I am satisfied and I
25   would like to make a statement.
26             PRESIDING COMMISSIONER VAN COURT:  Certainly,
27   go right ahead.

35

1          **INMATE BOATMAN:** Okay. I want to clear up a

2    few things and one is when I agreed to do this crime

3    there was no way that I knew he was going to do that.

4    If I did, I wouldn't have done this crime. My

5    intentions were to go in there and get that money with

6    anybody getting hurt. Okay. And I want you all to

7    know that I do take full responsibility for it. You

8    know, I know if I didn't agree to do this a person

9    would still be living today. And there is no way that

10   I can ever commit a crime such as this or any other

11   type of crime. I know society isn't going to accept

12   it and I am not going to accept it. And I have a lot

13   of things going for me. And I know it is going to be

14   difficult at times, but I think it will be much easier

15   for me, given the support and the friends out there.

16   I feel good about being released. I have trained

17   myself very well and I think it is time to give back

18   to society what I have taken away. And I hope you all

19   will give me that opportunity and thank you.

20         **PRESIDING COMMISSIONER VAN COURT:** Okay. Thank

21   you. We will now take a recess. The time is 10:30.

22   We'll call you back in just a little while.

23         **INMATE BOATMAN:** All right.

24         **DEPUTY COMMISSIONER CASSADY:** Thank you.

25                    R E C E S S

26                      --o0o--

27

36

1       CALIFORNIA BOARD OF PRISON TERMS

2                D E C I S I O N

3          PRESIDING COMMISSIONER VAN COURT:  Okay, are we

4    on the air?

5          COMMISSIONER GILLIS:  Yes.

6          PRESIDING COMMISSIONER VAN COURT:  Okay,

7    everyone has returned to the hearing room that was

8    here during the hearing.  And, Mr. Boatman, the Panel

9    reviewed all information received from the public and

10   the relied on the following circumstances in

11   concluding that the prisoner is not suitable for

12   parole and would pose an unreasonable risk of danger

13   to society and a threat to public safety if released

14   from prison.  The offense was carried out in an

15   especially cruel and callous manner.  The offense was

16   carried out in a manner which exhibits a callous

17   disregard for the life and suffering of another.  The

18   murder of the victim did not deter the victim and

19   crime partners from later committing a second armed

20   robbery, the same case number but it was dismissed.

21          INMATE BOATMAN:  The second --

22          PRESIDING COMMISSIONER VAN COURT:  Is that

23   correct?

24          INMATE BOATMAN:  No, it's not.  That was the

25   same -- That was the same crime.  The only thing it

26   was -- It was a robbery and then it was robbery

27   CHRISTOPHER BOATMAN  D-65055  DECISION PAGE 1  6/30/98

37

1    and (inaudible).

2        **PRESIDING COMMISSIONER VAN COURT:**  Oh, I see,

3    the robbery part was -- The 211 charge was dismissed.

4        **INMATE BOATMAN:**  Yes, the 211 was dropped.

5        **PRESIDING COMMISSIONER VAN COURT:**  Okay.

6        **INMATE BOATMAN:**  Yes.

7        **PRESIDING COMMISSIONER VAN COURT:**  Okay,

8    because I knew -- I noticed that it was the same case

9    number.  These conclusions are drawn from the

10   Statement of Facts where the prisoner and crime

11   partner had been free-basing cocaine and decided they

12   needed more money for drugs.  They decided to stick-up

13   a small market for cash.  The crime partner, Jones,

14   took the weapon and the prisoner entered the store and

15   remained as a lookout.  The cashier gave the crime

16   partner, Jones, the money and cash, then turned away

17   and was shot in the back if the neck resulting in his

18   death.  The murder weapon was found at the prisoner's

19   house.  The prisoner had an escalating pattern of

20   criminal conduct and violence, an unstable social

21   history -- an unstable social history and prior

22   criminality which included as an adult -- No juvenile

23   record but as an adult a rape with force.  It appeared

24   the victim was uncooperative and eventually it was

25   reduced to unlawful sex with a minor.  He had a grand

26   theft which was a purse snatch and possession of a

27   CHRISTOPHER BOATMAN  D-65055  DECISION PAGE 2  6/30/98

38

1   weapon.  He got a six months jail term and fines.  The
2   victim of the rape was an uncooperative witness and
3   was a 14 year old truant.  On 4/23/85 he had a petty
4   theft.  On 7/29/85 he was sentenced to 60 days in jail
5   and 58 days was suspended and got one year probation.
6   The prisoner has misconduct while incarcerated.  He
7   has one CDC 128(a), a minor violation.  The
8   psychological/psychiatric report dated in 6/98,
9   authored by J. Temkova, I thought was a favorable
10  report.  And shows that her recommendation was because
11  of cocaine and addiction -- is to remain actively
12  involved in NA and/or like program upon release.
13  Nevertheless, the prisoner should be commended for
14  being disciplinary-free and completing Welding.  And
15  now also putting in time at the Machine Shop and which
16  could be a very good -- compatible to go along with
17  the welding skills.  However, these positive aspects
18  of his behavior does not outweigh the factors of
19  unsuitability.  The prisoner is denied parole for a
20  period of two years.  The Hearing Panel finds it is
21  not reasonable to expect that parole would be granted
22  at a hearing during the following two years.  And the
23  specific reasons for this finding are as follows:  The
24  prisoner and crime partners committed the offense in
25  an especially cruel and callous manner.  Specifically,
26  the prisoner provided the gun and the car for the
27  CHRISTOPHER BOATMAN  D-65055  DECISION PAGE 3  6/30/98

39

1    robbery.   The crime partner, Jones, was the gun -- was
2    the shooter and the prisoner was the lookout.   And as
3    a result of this robbery and homicide, a longer period
4    of observation and evaluation is required before the
5    Board should set a parole date.   The prisoner has not
6    completed necessary programming which is essential.
7    It would be very advantageous for him to complete the
8    Machine Shop training.   And also you should -- And I'm
9    sure you plan to remain active in NA and continue on
10   with that therapy.   And take advantage of any therapy
11   that becomes available because it will help build a
12   stronger wall between you and narcotic use.   And also
13   we recommend that you remain disciplinary-free and
14   upgrade vocationally and educationally at every
15   opportunity and also participate in self-help and
16   therapy programming as they become available.   And of
17   course the most important thing is that NA.   Stay in
18   that and live by those 12 Steps.   Okay, that completes
19   the hearing.   Here is a copy of the decision.   And I
20   personally feel like you are doing quite well.   The
21   completion of the Machine Shop will definitely put you
22   in good stead.   Anything to say, Commissioner Cassady?
23       DEPUTY COMMISSIONER CASSADY:   Just I dissented
24   for a one year, sir.   I think that you're doing very
25   well and that you need to continue in the path that
26   you're that going.   It is two year by majority, but I
27   CHRISTOPHER BOATMAN   D-65055   DECISION PAGE 4   6/30/98

40

1    dissented for one year and it reflects on your

2    tentative decision.

3            INMATE BOATMAN:  Right, thank you.

4            PRESIDING COMMISSIONER VAN COURT:  And

5    Commissioner Gillis.

6            COMMISSIONER GILLIS:  No, I would agree that

7    you are doing well, and we did have a long discussion

8    about whether or not it ought to be a two year or a

9    one year denial and I opted for the two year.  You

10   see, you've got a long way to go.

11           INMATE BOATMAN:  I understand.

12           COMMISSIONER GILLIS:  It's not that you're not

13   doing well.  You just have got a long way to go.

14           INMATE BOATMAN:  I see.

15           COMMISSIONER GILLIS:  So I would say keep it

16   up.  You're doing okay.

17           INMATE BOATMAN:  All right.

18           COMMISSIONER GILLIS:  Good luck to you.

19           INMATE BOATMAN:  Thank you.

20           PRESIDING COMMISSIONER VAN COURT:  Good luck.

21   That ends the hearing.  The time now is ten minutes

22   before eleven.

23           INMATE BOATMAN:  All right, you guys take care.

24           DEPUTY COMMISSIONER CASSADY:  Good luck.

25           INMATE BOATMAN:  I appreciate it.

26           COMMISSIONER GILLIS:  And keep up that family

27   CHRISTOPHER BOATMAN  D-65055  DECISION PAGE 5  6/30/98

41

1    tie.

2                          --o0o--

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    PAROLE DENIED TWO YEARS
                                  JUL 3 1 1998
26    EFFECTIVE DATE OF THIS DECISION_____

27    CHRISTOPHER BOATMAN  D-65055  DECISION PAGE 6   6/30/98

42

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, LINDA ROSE, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages number 1 through 41, and which recording was duly recorded at CALIFORNIA STATE PRISON, SAN QUENTIN at SAN QUENTIN, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING OF CHRISTOPHER BOATMAN, CDC Number D-65055, on June 30, 1998, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated July 18, 1998, at Sacramento, California.


_Linda Rose_
Linda Rose
Transcriber
**CAPITOL ELECTRONIC REPORTING**