SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PRISON TERMS

In the matter of the Life    )
Term Parole Consideration    )    CDC Number D-65055
Hearing of:                  )
                             )
CHRISTOPHER BOATMAN          )
_____ )

CALIFORNIA STATE PRISON, SAN QUENTIN

SAN QUENTIN, CALIFORNIA

FEBRUARY 28, 2001

9:10 A.M.

PANEL PRESENT:

LEONARD MUNOZ, Presiding Commissioner
AL ANGELE, Commissioner
SAMUEL MCCORMICK, Deputy Commissioner

OTHERS PRESENT:

CHRISTOPHER BOATMAN, Inmate
TIM O'HARA, Attorney for Inmate

CORRECTIONS/TO THE DECISION HAVE BEEN MADE

_____  No
_____  Yes          See Errata Sheet


Michelle McGuire          Capitol Electronic Reporting


**INMATE COPY**

ii

INDEX

                                                        Page

Proceedings ...................................... 1

Case Factors ..................................... 7

Pre-Commitment Factors ...........................16

Post-Commitment Factors ..........................22

Parole Plans .....................................27

Closing Statements ...............................42

Recess ...........................................48

Decision .........................................49

Adjournment ......................................54

Transcriber Certification ........................55

--oOo--

1

1          P R O C E E D I N G S

2          **ATTORNEY O'HARA:**  Why don't you move that

3     towards you a little bit.  Go ahead and sit on down.

4          **INMATE BOATMAN:**  Okay.

5          **PRESIDING COMMISSIONER MUNOZ:**  Mr. Penner?

6          **DEPUTY COMMISSIONER MCCORMICK:**  You're on tape.

7          **PRESIDING COMMISSIONER MUNOZ:**  Excuse me,

8     Mr. Boatman?

9          **INMATE BOATMAN:**  Yes, Sir.

10          **PRESIDING COMMISSIONER MUNOZ:**  Mr. Penner is the

11     district attorney that's not going to be here this

12     morning.

13          **ATTORNEY O'HARA:**  Okay.

14          **PRESIDING COMMISSIONER MUNOZ:**  Yeah, okay.

15          **INMATE BOATMAN:**  All right.

16          **PRESIDING COMMISSIONER MUNOZ:**  All right, it's

17     ten minutes after 9:00 a.m., and this is a

18     Subsequent Parole Consideration Hearing for Inmate

19     Christopher Boatman, CDC number D-65055.  Today's

20     date is February 28th of 2001, and we are located at

21     San Quentin State Prison.  The inmate was received

22     on September the 3rd, 1987, from the county of

23     Fresno, the offense being murder in the second

24     degree, with use of a firearm, the case number is

25     FRE3510310, count number one, violation of Penal

26     Code Section 187, with 12022(a), that's the use of

27     the firearm.  And the term is 16 years to life, with

2

1    a minimum eligible parole date of January the 31st,

2    1997.  As you know, Mr. Boatman, these hearings are

3    tape-recorded.  For that reason, we all have to

4    ensure that our voices are kept loud enough and

5    clear enough, so the transcriber can make a proper

6    record of this proceeding.

7        INMATE BOATMAN:  Okay.

8        PRESIDING COMMISSIONER MUNOZ:  And so for

9    purposes of voice identification, we're going to go

10   around the room and identify ourselves by giving our

11   names and spelling our last name.  When it comes to

12   your turn, include your CDC number.  I'll begin and

13   go to my left.  My name is Leonard Munoz, M-U-N-O-Z,

14   Commissioner.

15       COMMISSIONER ANGELE:  Al Angele, A-N-G-E-L-E,

16   Commissioner.

17       INMATE BOATMAN:  Boatman, Christopher Boatman,

18   D-number 65055.

19       ATTORNEY O'HARA:  Spell your last name.

20       INMATE BOATMAN:  B-O-A-T-M-A-N.

21       ATTORNEY O'HARA:  Tim O'Hara, O, apostrophe,

22   capital, H-A-R-A, attorney for Mr. Christopher

23   Boatman.

24       DEPUTY COMMISSIONER MCCORMICK:  Samuel E.

25   McCormick, M-C-C-O-R-M-I-C-K, Deputy Commissioner.

26       PRESIDING COMMISSIONER MUNOZ:  Thank you,

27   gentlemen.  And, Mr. Boatman, we also have an

1    officer in the room for security purposes only.  He

2    will not be taking an active role in the hearing

3    itself.  The purpose today's hearing is to once

4    again consider your suitability for parole.  We will

5    consider your crime, and your prior criminal and

6    social history, and your programming and behavior

7    since your commitment.  This Panel has reviewed your

8    Central File and prior transcripts, and you will

9    have the opportunity to correct or clarify that

10   Record.  We will consider your progress since your

11   last hearing, any new psychiatric reports, and any

12   other information that may have a bearing on your

13   suitability for parole.  Any change in parole plans

14   should also be brought to our attention.  Before we

15   recess for deliberations, your attorney and yourself

16   will be given the opportunity to make a statement

17   regarding parole suitability and length of

18   confinement.  After this is done, we will recess,

19   clear the room, and deliberate.  Once we reach a

20   decision, we'll return and announce that decision to

21   you.  The Board of Prison Terms' rules and the law

22   state that a parole shall be denied if your release

23   would pose an unreasonable risk of danger to others.

24   You do have certain procedural rights, and I want to

25   ask your attorney whether those rights have been met

26   to this point.

27          **ATTORNEY O'HARA:**  Yes, Sir, they have.

4

1       PRESIDING COMMISSIONER MUNOZ:  All right.
2    Another right you have, Mr. Boatman, is a right to
3    an impartial Panel.  Now that you see the Panel
4    seated before you, do you have any objection to this
5    composition?
6       INMATE BOATMAN:  No, I don't.
7       PRESIDING COMMISSIONER MUNOZ:  Do you accept
8    this Panel, sir?
9       INMATE BOATMAN:  Yes.
10       PRESIDING COMMISSIONER MUNOZ:  All right, before
11    we get started, I want to refer to your packet.
12    There's a Board of Prison Terms' form 1073 that
13    relates to the Americans with Disabilities Act.
14       INMATE BOATMAN:  Uh-huh.
15       PRESIDING COMMISSIONER MUNOZ:  Apparently, you
16    signed it on December 12th, 2000, and the box that is
17    checked is followed the statement that reads:  "I do
18    not have a disability as defined under the Americans
19    with Disabilities Act."  Is that a true reflection,
20    sir?
21       INMATE BOATMAN:  That's true.
22       PRESIDING COMMISSIONER MUNOZ:  And then you
23    require no accommodations and you're ready to go
24    forward today?
25       INMATE BOATMAN:  Yes, I am.
26       PRESIDING COMMISSIONER MUNOZ:  All right, thank
27    you.  You will receive a copy of our written,

1   tentative decision today.  That decision becomes

2   effective 90 days after review.  Copies of the

3   transcript and that decision will be sent to you,

4   and you have 90 days from the effective date of the

5   decision to appeal if you so desire.  As you know,

6   sir, you're not required to discuss your offense,

7   nor are you required to admit to the offense.  If

8   you choose to discuss the offense, we expect you to

9   be honest and truthful.  If you choose not to

10  discuss those issues, that will not be held against

11  you.  And I also want you to understand that this

12  Panel does accept, as true, the findings of the

13  court.  Do you understand that, sir?

14      **INMATE BOATMAN:**  Yes, I do.

15      **PRESIDING COMMISSIONER MUNOZ:**  Okay, we're here

16  to delve into your suitability.  We can't change

17  your situation even if we wanted to, as far as your

18  -- why you sit here convicted of murder.

19      **INMATE BOATMAN:**  Uh-huh.

20      **PRESIDING COMMISSIONER MUNOZ:**  All right.  And,

21  Mr. McCormick, will any confidential be used today?

22      **DEPUTY COMMISSIONER MCCORMICK:**  No, Sir.

23      **PRESIDING COMMISSIONER MUNOZ:**  All right, at the

24  beginning of the hearing, I gave the document

25  checklist to your attorney, who reviewed it.  Have

26  you had access to all those documents?

27      **ATTORNEY O'HARA:**  Yes, Sir, I have.

6

1    **PRESIDING COMMISSIONER MUNOZ:**  Thank you.  That

2    will be marked exhibit one for the Record.  Do you

3    have any additional documents, Mr. O'Hara?

4    **ATTORNEY O'HARA:**  Nothing further at this point.

5    **PRESIDING COMMISSIONER MUNOZ:**  And are there any

6    other objections you might have, sir?

7    **ATTORNEY O'HARA:**  There is just --

8    **INMATE BOATMAN:**  I don't know who -- I would

9    like to give these letters of support, because --

10   **PRESIDING COMMISSIONER MUNOZ:**  Oh, yeah.

11   **ATTORNEY O'HARA:**  So you can these.  Okay, those

12   are to --

13   **PRESIDING COMMISSIONER MUNOZ:**  Yeah, I'll give

14   those to Mr. Angele.  He'll be handling parole

15   plans.

16   **INMATE BOATMAN:**  Yeah.

17   **PRESIDING COMMISSIONER MUNOZ:**  These are letters

18   of support?

19   **ATTORNEY O'HARA:**  (Inaudible) going together,

20   right?

21   **INMATE BOATMAN:**  Yeah, these are all -- nothing

22   recent, no recent chronos.  These are all something

23   that I've -- something good.

24   **ATTORNEY O'HARA:**  Okay.

25   **PRESIDING COMMISSIONER MUNOZ:**  All right, and

26   then if anything comes up that you want us to know

27   about, you can do just like you did.  You can tell

1  your attorney or you can tell us.  We want to hear
2  everything that's --

3      **INMATE BOATMAN:**  Okay, great.

4      **PRESIDING COMMISSIONER MUNOZ:**  And will your
5  client be speaking with us?

6      **ATTORNEY O'HARA:**  He will.

7      **PRESIDING COMMISSIONER MUNOZ:**  Okay, I need to
8  swear you in, sir, if you'll raise your right hand.
9  Do you solemnly swear or affirm that the testimony
10  you give in this hearing will be the truth, the
11  whole truth, and nothing but the truth?

12      **INMATE BOATMAN:**  I do.

13      **PRESIDING COMMISSIONER MUNOZ:**  Thank you, sir.
14  And if there are no objections, Mr. O'Hara, I want
15  to refer to the Statement of Facts as contained in
16  the current Board Report, the offense summary,
17  that's dated February, 2001.

18      **ATTORNEY O'HARA:**  As long as Mr. Boatman can
19  make clarifications and corrections.

20      **PRESIDING COMMISSIONER MUNOZ:**  Absolutely.  All
21  right, sir, you were involved in this plan to commit
22  a robbery, and during the process of that robbery, a
23  gentleman was killed.

24      **INMATE BOATMAN:**  Yes.

25      **PRESIDING COMMISSIONER MUNOZ:**  A young
26  gentleman, age of 19.  Do you recall his name, sir?
27      **INMATE BOATMAN:**  John Souza (phonetic).

8

1    **PRESIDING COMMISSIONER MUNOZ:**  And how old were
2    you at the time?

3        **INMATE BOATMAN:**  I was maybe 20 years old,
4    approximately about the same age.

5        **PRESIDING COMMISSIONER MUNOZ:**  All right, and
6    there's reference in this report that says you were
7    involved with drugs at the time.  Is that correct?

8        **INMATE BOATMAN:**  Yes, I was using drugs.

9        **PRESIDING COMMISSIONER MUNOZ:**  Was a user.  Were
10   you a heavy user?

11       **INMATE BOATMAN:**  I wasn't really a heavy user.
12   I was using three or four times a day, but any type
13   of usage, I guess, that would be heavy, you know.

14       **PRESIDING COMMISSIONER MUNOZ:**  Yeah, and that
15   was the motivation for you and your crime partners
16   to commit this robbery?

17       **INMATE BOATMAN:**  That was one of the
18   motivations.

19       **PRESIDING COMMISSIONER MUNOZ:**  And you
20   apparently had checked out a couple of stores
21   beforehand.

22       **INMATE BOATMAN:**  Yes.

23       **PRESIDING COMMISSIONER MUNOZ:**  So you had
24   planned on this robbery.

25       **INMATE BOATMAN:**  Yes.

26       **PRESIDING COMMISSIONER MUNOZ:**  Was this the same
27   store?

9

1    INMATE BOATMAN:  We sat around and talked about

2    it.

3    PRESIDING COMMISSIONER MUNOZ:  Who was the

4    leader of your group?

5    INMATE BOATMAN:  Basically, I would say the

6    leader would be Harold Jones, because he's the

7    one --

8    PRESIDING COMMISSIONER MUNOZ:  Mr. Jones?

9    INMATE BOATMAN:  Yes, Mr. Jones.

10   PRESIDING COMMISSIONER MUNOZ:  Is he in prison

11   now?

12   INMATE BOATMAN:  Yes, he is in prison.

13   PRESIDING COMMISSIONER MUNOZ:  And your third

14   crime partner, is he in prison also?

15   INMATE BOATMAN:  No, he turned state evidence

16   and I think he did, like, two years or something

17   like that.

18   PRESIDING COMMISSIONER MUNOZ:  Okay, for a

19   lesser charge?

20   INMATE BOATMAN:  For a lesser charge, yes.

21   PRESIDING COMMISSIONER MUNOZ:  Okay.  And where

22   did the gun come from?

23   INMATE BOATMAN:  My stepmother.

24   PRESIDING COMMISSIONER MUNOZ:  It was your

25   stepmother's gun?

26   INMATE BOATMAN:  Yes.

27   PRESIDING COMMISSIONER MUNOZ:  So you obtained

10

1   the gun?

2       **INMATE BOATMAN:**  Yes, I obtained the gun.

3       **PRESIDING COMMISSIONER MUNOZ:**  Okay, but you

4   didn't -- or did you carry it on the night of the

5   robbery?

6       **INMATE BOATMAN:**  No, I didn't carry it.  What I

7   did is I got the gun.  And Jones said that he needed

8   a gun, because his shotgun was too big, and I

9   elected to go get the gun from my stepmother.  And

10  what I did is I put it in the armrest of my car.

11  And at that time, I didn't touch it until I had

12  initially put it back, wiped the prints off and I

13  put it back.

14      **PRESIDING COMMISSIONER MUNOZ:**  All right, so the

15  three of you drove over to the market.

16      **INMATE BOATMAN:**  Yes.

17      **PRESIDING COMMISSIONER MUNOZ:**  Whose car was it?

18      **INMATE BOATMAN:**  It was my car.

19      **PRESIDING COMMISSIONER MUNOZ:**  It was your car.

20  You were driving?

21      **INMATE BOATMAN:**  Yes, I was driving.

22      **PRESIDING COMMISSIONER MUNOZ:**  Now there's an

23  indication that the original plan was for you to be

24  the driver of your car.

25      **INMATE BOATMAN:**  Yes, it was.

26      **PRESIDING COMMISSIONER MUNOZ:**  The getaway

27  driver, so to speak.

11

1        **INMATE BOATMAN:**  Yes.

2        **PRESIDING COMMISSIONER MUNOZ:**  But eventually

3    you switched roles with the other person.

4        **INMATE BOATMAN:**  Yes, at the last minute, I felt

5    that, in my thinking, that if he goes in and commits

6    it, this crime, I wouldn't get no money, and that's

7    the way I was thinking.  It was crazy, you know.  So

8    at the last minute, as we stopped at the store, I

9    asked Butch, I said, "do you want to drive?"  And he

10   said, "yes, I'll be the driver.  You can be the

11   lookout."  And that was a last second decision on my

12   behalf to go in there.

13       **PRESIDING COMMISSIONER MUNOZ:**  All right, so you

14   entered the store with Mr. Jones?

15       **INMATE BOATMAN:**  Well, yes, I entered -- well,

16   Jones was -- let me clarify some things up.  Jones

17   was a few seconds ahead of me.  And at that time,

18   whenever we was transferring, me and Butch, when I

19   got to the door, he was in the process of already

20   robbing.  So, yes, I was in the store, because, you

21   know, I was in the doorway.

22       **PRESIDING COMMISSIONER MUNOZ:**  All right, so --

23   okay, he was already sticking up the clerk,

24   Mr. Souza.

25       **INMATE BOATMAN:**  Yes.

26       **PRESIDING COMMISSIONER MUNOZ:**  And so what was

27   your position in the store, just stayed by the door?

12

1    **INMATE BOATMAN:**  Yeah, just stayed by the door

2    and just looked for cars or anything that was --

3    **PRESIDING COMMISSIONER MUNOZ:**  People that were

4    coming to the store?

5    **INMATE BOATMAN:**  People that were coming, so I

6    could -- yes.

7    **PRESIDING COMMISSIONER MUNOZ:**  To warn your

8    crime partner?

9    **INMATE BOATMAN:**  Yes.

10   **PRESIDING COMMISSIONER MUNOZ:**  And so the

11   robbery was in the progress.  Then what happened?

12   **INMATE BOATMAN:**  And then I looked in at one

13   time and that -- he was getting the money and I was

14   looking out, and then I heard the shot at that time.

15   **PRESIDING COMMISSIONER MUNOZ:**  You heard the

16   shot?

17   **INMATE BOATMAN:**  I heard the shot.

18   **PRESIDING COMMISSIONER MUNOZ:**  And when I heard

19   it, I ran to the car.

20   **PRESIDING COMMISSIONER MUNOZ:**  All right, you

21   didn't see Mr. Souza get shot?

22   **INMATE BOATMAN:**  No, I didn't see him get shot.

23   **PRESIDING COMMISSIONER MUNOZ:**  And so when did

24   you learn that he had been shot, that he was struck

25   by the bullet?

26   **INMATE BOATMAN:**  Well, I had asked, when we was

27   taken away, "Harold, did you shoot him?"  And he

13

1    said, "yes."  And there were many questions going
2    through my mind at that time.  And then I discovered
3    later there when I was, you know, that night,
4    listening to the news, that he had actually been
5    killed.
6        PRESIDING COMMISSIONER MUNOZ:  All right, but as
7    you left the scene, you knew he had been shot?
8        INMATE BOATMAN:  Yes.
9        PRESIDING COMMISSIONER MUNOZ:  Did you think to
10   call an ambulance?
11       INMATE BOATMAN:  I was thinking that, but I was
12   just scared and confused.  And that was my first,
13   initial thought, to go and call and get some help
14   for him, but I didn't.
15       PRESIDING COMMISSIONER MUNOZ:  Okay, and let's
16   see, did your -- did the plan that you three crime
17   partners agreed on, did that include to kill the
18   clerk?
19       INMATE BOATMAN:  No, at the time, I was kind of,
20   like, leery about doing the robbery, because I've
21   never done anything like that before.  And we were
22   sitting around and I made it a point to ask -- I'd
23   asked Harold, I said, "as long as nobody gets hurt,
24   I'll go along and do this."  And I wasn't thinking
25   about the consequences of my actions, but, you know,
26   the plan wasn't to go in there and do that.
27       PRESIDING COMMISSIONER MUNOZ:  All right, who's

1   Mr. Besel, B-E-S-E-L?

2       INMATE BOATMAN:  He's somebody that stayed a 100

3   yards or so from the store.

4       PRESIDING COMMISSIONER MUNOZ:  Okay.

5       INMATE BOATMAN:  It was a house.

6       PRESIDING COMMISSIONER MUNOZ:  Was he charged

7   with any crimes?

8       INMATE BOATMAN:  Not that I know of.

9       PRESIDING COMMISSIONER MUNOZ:  Now there's an

10  indication in this report that he somewhat advised

11  you and the crime partners.

12      INMATE BOATMAN:  Uh-huh.

13      PRESIDING COMMISSIONER MUNOZ:  That it wouldn't

14  be a good idea to rob that 41 Market, because you

15  might be identified and caught.  Did that happen,

16  sir?  Do you recall that?

17      INMATE BOATMAN:  I think I do.  I recall that,

18  Sir.

19      PRESIDING COMMISSIONER MUNOZ:  Okay, and was

20  there -- I'm coming up to the important part, in my

21  mind.

22      INMATE BOATMAN:  Uh-huh.

23      PRESIDING COMMISSIONER MUNOZ:  Your crime

24  partner, Jones, said at that time that they would

25  not need to worry about that.

26      INMATE BOATMAN:  Uh-huh.

27      PRESIDING COMMISSIONER MUNOZ:  What did he mean

15

1   by that?

2        **INMATE BOATMAN:**  I don't know what he meant by
3   that.  But me, personally, I think he had it in his
4   mind to go in there and eliminate any witnesses, and
5   that's what I think he meant at that statement.

6        **PRESIDING COMMISSIONER MUNOZ:**  All right.  But
7   you said you didn't -- you were participating as
8   long as no one was hurt.

9        **INMATE BOATMAN:**  Yes, true.

10       **PRESIDING COMMISSIONER MUNOZ:**  Well, when this
11  statement took place, when this conversation took
12  place, didn't that alarm you?

13       **INMATE BOATMAN:**  No, it didn't.  Not the way I
14  was thinking at that time, it didn't alarm me.

15       **PRESIDING COMMISSIONER MUNOZ:**  All right, how do
16  you feel about this situation, sir, where a young
17  man lost his life?

18       **INMATE BOATMAN:**  I feel very sad about it.  You
19  know, it could have been avoided by me just saying
20  no.

21       **PRESIDING COMMISSIONER MUNOZ:**  How long have you
22  been locked up, sir?

23       **INMATE BOATMAN:**  Approximately 14 years, almost.

24       **PRESIDING COMMISSIONER MUNOZ:**  Fourteen?

25       **INMATE BOATMAN:**  Yes, in this prison.

26       **PRESIDING COMMISSIONER MUNOZ:**  And how have you
27  expressed your sadness or your remorse?

16

1      **INMATE BOATMAN:**  I've written about it and I

2      have --

3      **PRESIDING COMMISSIONER MUNOZ:**  I mean, you know,

4      you're telling me you feel badly about it and you

5      have remorse.

6      **INMATE BOATMAN:**  Yes.

7      **PRESIDING COMMISSIONER MUNOZ:**  Convince me some

8      more.  When you say you've written about it, what do

9      you mean you've written about it?

10     **INMATE BOATMAN:**  I've written about the things

11     that I've done that made this crime possible.  Here

12     it is and I admitted to doing this, I got the gun

13     and it's my car, and, you know, you take any one of

14     them factors away, this crime wouldn't have

15     happened.  And there's no way that anybody should

16     ever have to go through what I put them through.

17     You know, it's hard enough when you lose a loved

18     one, but in this type of fashion, it shouldn't

19     happen.  And, yes, I am to blame for this crime.  I

20     played a major role in that and I realize that.

21     **PRESIDING COMMISSIONER MUNOZ:**  All right, thank

22     you for those comments, and we're going to move from

23     the crime now.  We'll come back to it as the hearing

24     progresses.

25     **INMATE BOATMAN:**  Okay.

26     **PRESIDING COMMISSIONER MUNOZ:**  I want to talk

27     about your past record.  Apparently, you don't have

17

1     a juvenile record.  Is that correct, sir?

2          INMATE BOATMAN:  Yes.

3          PRESIDING COMMISSIONER MUNOZ:  You were never

4     arrested as a juvenile?

5          INMATE BOATMAN:  Never.

6          PRESIDING COMMISSIONER MUNOZ:  Were you ever

7     detained by the police or taken in for questioning

8     or anything like that as a juvenile?

9          INMATE BOATMAN:  As a juvenile.

10         PRESIDING COMMISSIONER MUNOZ:  But you do have

11    several arrests as an adult, however.

12         INMATE BOATMAN:  Uh-huh.

13         PRESIDING COMMISSIONER MUNOZ:  The first one was

14    in 1984, when the Fresno sheriffs took you in for

15    two counts of rape, but that was delayed.  And

16    before that got adjudicated, you had some other run-

17    ins with the law.  On September 21st, 1984, you were

18    arrested by San Luis Obispo police department for

19    grand theft.

20         INMATE BOATMAN:  Yeah.

21         PRESIDING COMMISSIONER MUNOZ:  And possession of

22    a weapon, and that involved a purse-snatch.  What

23    was the weapon?

24         INMATE BOATMAN:  Well, the weapon, let me

25    clarify that.  I'm not trying to make this less

26    dramatic as it is, but the weapon was a crowbar and

27    that was taken out of my car at the time.  I did do

18

1  the crime, but I didn't, you know, present no

2  weapon.  What I did is I ran and snatched a purse

3  and took off running.

4      PRESIDING COMMISSIONER MUNOZ:  So how did the

5  crowbar get involved?

6      INMATE BOATMAN:  I don't know.  I think it was

7  taken out of the car, but I don't -- but they said

8  that I was arrested with this and that's not true.

9      PRESIDING COMMISSIONER MUNOZ:  Were you carrying

10 the crowbar when you snatched the purse?

11     INMATE BOATMAN:  No, I wasn't.

12     PRESIDING COMMISSIONER MUNOZ:  Did you injure

13 the victim of this purse-snatching in any way?

14     INMATE BOATMAN:  Emotionally.

15     PRESIDING COMMISSIONER MUNOZ:  Okay, but not

16 physically?

17     INMATE BOATMAN:  Not physical.

18     PRESIDING COMMISSIONER MUNOZ:  At any rate, you

19 were sentenced to six months in jail, is that right,

20 placed on probation?  Is that right, sir?

21     INMATE BOATMAN:  I think that is, yes.

22     PRESIDING COMMISSIONER MUNOZ:  Did you serve six

23 months in jail?

24     INMATE BOATMAN:  I served six months.

25     PRESIDING COMMISSIONER MUNOZ:  You also had to

26 pay a fine and some restitution.  And then when that

27 sentence was completed, I guess, you had to face the

19

1    rape charges.

2        INMATE BOATMAN:  Yeah.

3        PRESIDING COMMISSIONER MUNOZ:  The couple that I

4    referred to at the beginning.

5        INMATE BOATMAN:  Uh-huh.

6        PRESIDING COMMISSIONER MUNOZ:  And what happened

7    in that case?

8        INMATE BOATMAN:  The case was dismissed.

9        PRESIDING COMMISSIONER MUNOZ:  Totally

10   dismissed?

11       INMATE BOATMAN:  Yeah, it was just totally

12   dismissed.  I think it was three counts.

13       PRESIDING COMMISSIONER MUNOZ:  All right, after

14   that, on April 23rd, '85, you were arrested by Fresno

15   P.D., for petty theft, and you were sentenced to 60

16   days in jail.  Is that right, sir?

17       INMATE BOATMAN:  Yes, it's correct.

18       PRESIDING COMMISSIONER MUNOZ:  Fifty-eight days

19   were suspended, and then you were placed on

20   probation.  Is that the extent of your criminal

21   record, sir?

22       INMATE BOATMAN:  That's the extent of it.

23       PRESIDING COMMISSIONER MUNOZ:  And you were born

24   in Louisiana.  You have -- you were one of six

25   siblings.  Have any of your siblings had difficulty

26   with law enforcement, sir?

27       INMATE BOATMAN:  None of them, except for my

20

1    younger brother.  He's been arrested for using, I

2    think.

3         **PRESIDING COMMISSIONER MUNOZ:**  Has he been to

4    prison?

5         **INMATE BOATMAN:**  No, he's never been to prison.

6         **PRESIDING COMMISSIONER MUNOZ:**  All right, your

7    father passed away when you were a youngster.  Is

8    that right?

9         **INMATE BOATMAN:**  No, that's -- I just recently

10   found out that he was still living.

11        **PRESIDING COMMISSIONER MUNOZ:**  Oh, okay, so the

12   information in this report that says, "Boatman's

13   biological father passed when he was two years old,"

14   that's not true?

15        **INMATE BOATMAN:**  That's not true.

16        **PRESIDING COMMISSIONER MUNOZ:**  He's alive?

17        **INMATE BOATMAN:**  Yes.

18        **PRESIDING COMMISSIONER MUNOZ:**  You just haven't

19   -- you've never had any contact with him?

20        **INMATE BOATMAN:**  Nc, I haven't never had any

21   contact.

22        **PRESIDING COMMISSIONER MUNOZ:**  Okay, and you

23   were apparently raised by your mother and then a man

24   she married.

25        **INMATE BOATMAN:**  Yes.

26        **PRESIDING COMMISSIONER MUNOZ:**  Who is your

27   stepfather.  But how did you get along with him?

21

1      **INMATE BOATMAN:**  That's my dad.

2      **PRESIDING COMMISSIONER MUNOZ:**  That's my dad?

3      **INMATE BOATMAN:**  Yes.  I got along with him

4    well.  That's the only dad I've known, and he's

5    still doing good right now today.  I talk to him on

6    the phone all the time.

7      **PRESIDING COMMISSIONER MUNOZ:**  All right, now

8    they -- your mother and your dad eventually

9    divorced.  Is that right?

10     **INMATE BOATMAN:**  Yes.

11     **PRESIDING COMMISSIONER MUNOZ:**  Okay.  Well, it

12   sounds like you had a pretty good upbringing, but

13   you got involved with drugs and that seems to be the

14   cause of your problems.

15     **INMATE BOATMAN:**  Yeah.

16     **PRESIDING COMMISSIONER MUNOZ:**  So you were --

17   you committed this robbery -- the motivation for

18   this robbery was to obtain money for drugs.  Is that

19   right?

20     **INMATE BOATMAN:**  Yes.

21     **PRESIDING COMMISSIONER MUNOZ:**  How much money

22   were you spending on drugs per day?

23     **INMATE BOATMAN:**  Maybe 60 dollars.

24     **PRESIDING COMMISSIONER MUNOZ:**  And what drug are

25   we talking about specifically?

26     **INMATE BOATMAN:**  It was crack cocaine.

27     **PRESIDING COMMISSIONER MUNOZ:**  Okay, did you use

22

1   any other drugs?

2       INMATE BOATMAN:  No.  Prior to that, I have used

3   marijuana.

4       PRESIDING COMMISSIONER MUNOZ:  Okay, but your

5   big problem was crack cocaine?

6       INMATE BOATMAN:  Yes, it was crack.

7       PRESIDING COMMISSIONER MUNOZ:  All right, and

8   you dropped out of high school in the 11th grade.

9   What was your reason for dropping out of high

10  school?

11      INMATE BOATMAN:  I didn't get along too much.  I

12  kind of butted heads with a teacher and he was kind

13  of strict, and that was one of the reasons.

14      PRESIDING COMMISSIONER MUNOZ:  Were you using

15  marijuana in high school?

16      INMATE BOATMAN:  Yeah, I was using marijuana.

17  And it indicates here that your use of marijuana was

18  partially responsible for your dropping out of high

19  school.  Is that right, sir?

20      INMATE BOATMAN:  Yes.

21      PRESIDING COMMISSIONER MUNOZ:  All right, if

22  you'll focus your attention on Mr. McCormick, to my

23  right, he'll discuss post-conviction factors with

24  you.

25      DEPUTY COMMISSIONER MCCORMICK:  Okay, the

26  emphasis will be on the period since your last

27  hearing of June 30th of '98.  You're at Medium A

23

1   level, with zero points.  You got your GED in 1993,

2   obviously while you were incarcerated.

3       INMATE BOATMAN:  Yeah.

4       DEPUTY COMMISSIONER MCCORMICK:  You're in the

5   apprenticeship program for welding, machinery

6   welding?

7       INMATE BOATMAN:  Yes.

8       DEPUTY COMMISSIONER MCCORMICK:  I noticed a

9   number of certificates in there.  And you're a

10  member of the American Welder's Society?

11      INMATE BOATMAN:  Yes, I was a member.

12      DEPUTY COMMISSIONER MCCORMICK:  You were a

13  member?

14      INMATE BOATMAN:  Yeah.

15      DEPUTY COMMISSIONER MCCORMICK:  Okay.  There's

16  no record of any 115's since you've been

17  incarcerated.

18      INMATE BOATMAN:  Yeah.

19      DEPUTY COMMISSIONER MCCORMICK:  And there's only

20  been two 128-A's, and one in '99, for missing count,

21  and one in '93, and that's it.

22      INMATE BOATMAN:  Yeah.

23      DEPUTY COMMISSIONER MCCORMICK:  I noted there's

24  13 laudatory chronos, nine of them since your last

25  hearing, most of them relating to your participation

26  in NA.

27      INMATE BOATMAN:  Yes.

24

1      **DEPUTY COMMISSIONER MCCORMICK:**  You've been in

2    NA for some time now, and you've also -- since the

3    last hearing, were involved in the advanced

4    Alternatives to Violence and KAIROS.  And over the

5    years, since your coming into the institution,

6    there's been the advanced, there was the original

7    Alternatives to Violence, the San Quentin walk-a-

8    thon, Catargeo.  You got a diploma for a home-study

9    course, the use of cutting tools.

10     **INMATE BOATMAN:**  Yes.

11     **DEPUTY COMMISSIONER MCCORMICK:**  Okay, and that

12    was February of last year.

13     **INMATE BOATMAN:**  Yes.

14     **DEPUTY COMMISSIONER MCCORMICK:**  Okay.  Looking

15    at the psych report, the psych report was based on

16    an interview of about three hours, as well as a

17    review of the C-File and medical file, and it's --

18    the report is dated September 28th of 2000.  The

19    report indicates a review of your file shows no

20    history of psychological treatment or impairment.

21    There are no psych meds, no evidence of mental

22    impairment.  You had a prior psychiatric diagnosis

23    of Axis I, poly-substance dependence in

24    institutional remission, cocaine dependence in

25    institutional remission, Axis II, adult antisocial

26    behavior.  The assessment of -- the clinical

27    assessment includes the statement that you're

1    cognitive functioning was well developed, conceptual

2    thinking, reasoning, awareness, and ability to

3    comprehend were adequate for the formation of good

4    judgment.  There is no evidence of psychosis or

5    organic brain damage.  There is no serious

6    psychological impairment or suicidal ideation.  The

7    present clinical diagnoses, Axis I, no diagnosis;

8    Axis II, no diagnosis; Axis III, none reported; Axis

9    IV, incarceration.  Quite often we get a GAF score,

10   but I don't see any listed there.  You've never

11   received any psych treatment while you've been here.

12   Prognosis for you, according to the doctor, is

13   favorable.  Assessment of dangerousness, within the

14   controlled setting, in other words, within the

15   prison --

16        **INMATE BOATMAN:**  The institution.

17        **DEPUTY COMMISSIONER MCCORMICK:**  -- you're viewed

18   as a programming, conforming inmate; behavior has

19   been described as well above-average; that younger

20   inmates respect you and go to you for advise; you

21   have been a role model for good behavior; widely

22   respected among staff.  If released to the outside

23   community, potential for danger in the community if

24   released appears to be minimal.  I'm quoting:  "He

25   had no history of violence prior to the instant

26   offense.  He has had no difficulty relating to

27   others and conforming to institutional demands in a

1  very stressful institutional setting.  He is focused
2  and knows himself and his needs," end quote.  It
3  goes on to say that there are no risk factors or
4  precursors to violence.  And the clinical
5  observation or recommendation, final paragraph
6  states:  "Yet, this man is not a criminal.  I
7  believe that it is very unlikely that Mr. Boatman
8  would behave violently if released, that his
9  violence potential is actually less than that of an
10 average person.  There is no psychological reason to
11 deny him immediate parole.  The decision to grant
12 parole should be based on other than psychological
13 factors."  And that's signed by Dr. Buchan,
14 B-U-C-H-A-N, Ph.D.  Is there anything that you'd
15 like to say, sir, relative to the psych evaluation?
16      INMATE BOATMAN:  Well, I think it's pretty
17 positive, in that, you know, I've changed so much
18 from being in this institution.  It's going to
19 either do two things for you:  It's going to make
20 you worse or change, you know.  I'm on a positive
21 note.
22      DEPUTY COMMISSIONER MCCORMICK:  Okay.  Of the
23 other things that I talked about, the things you've
24 been doing since you've been incarcerated, is there
25 anything that I left out that you want to put on the
26 Record?
27      INMATE BOATMAN:  Yeah, there's one thing that I

1    would like to get on the Record, and that is that

2    I've finished my contract agreement with the JAC,

3    and I was awarded a certificate of a journeyman

4    welder and a machinist now.  I completed over eight

5    thousand hours in the course.

6        **DEPUTY COMMISSIONER MCCORMICK:**  And you've

7    handed -- for the tape, you've handed it to me.

8    It's a certificate from the State of California,

9    Department of Industrial Relations, California

10   Apprenticeship Council, certification of completion

11   of apprenticeship, machinist/welder, and it's dated

12   June 30th, 2000.  Okay, anything else, sir?

13       **INMATE BOATMAN:**  Thank you.  No, that was it.

14       **DEPUTY COMMISSIONER MCCORMICK:**  Okay.

15       **INMATE BOATMAN:**  That's it.

16       **DEPUTY COMMISSIONER MCCORMICK:**  Back to the

17   Chair.

18       **PRESIDING COMMISSIONER MUNOZ:**  All right, thank

19   you.  Mr. Angele will discuss your parole plans with

20   you.

21       **INMATE BOATMAN:**  Okay.

22       **COMMISSIONER ANGELE:**  Mr. Boatman, where do you

23   plan to live, what do you plan to do for a living,

24   when you get released?

25       **INMATE BOATMAN:**  What do I plan to do for a

26   living?

27       **COMMISSIONER ANGELE:**  Where do you plan to live

28

1   and what are you going to do?

2       **INMATE BOATMAN:**  Oh, I'm going to live with my

3   mother and my father in Lemoore, California.  It's

4   Fresno County.

5       **COMMISSIONER ANGELE:**  Is that Aieda?

6       **INMATE BOATMAN:**  Aieda, yeah, A-I-E-D-A, Aieda.

7       **COMMISSIONER ANGELE:**  Okay.  That's in Lemoore?

8       **INMATE BOATMAN:**  That's in Lemoore.

9       **COMMISSIONER ANGELE:**  Fresno County or Kings

10  County?

11      **INMATE BOATMAN:**  That's Fresno County, yes.

12      **COMMISSIONER ANGELE:**  How about a job, what do

13  you plan to do?

14      **INMATE BOATMAN:**  Well, I'd like to work as a

15  machinist and/or welder, and I do have a couple of

16  letters there that are willing to hire me at this

17  present time.  I don't know if you read them or not.

18      **COMMISSIONER ANGELE:**  Yeah, in fact, we'll go

19  over those now.

20      **INMATE BOATMAN:**  Okay.

21      **COMMISSIONER ANGELE:**  Yeah, a number of letters.

22  The first letter, actually, I'll read is from your

23  mother.  Now is this -- is Jim your stepdad?

24      **INMATE BOATMAN:**  Jim is my stepdad.

25      **COMMISSIONER ANGELE:**  But you consider him your

26  father.

27      **INMATE BOATMAN:**  But in actuality, I consider

29

1   him my father.

2        COMMISSIONER ANGELE:  Oh, okay.

3        INMATE BOATMAN:  Because of that's the only

4   person I've known in my life.

5        COMMISSIONER ANGELE:  Okay, I'll refer to him as

6   your father then.

7        INMATE BOATMAN:  Okay.

8        COMMISSIONER ANGELE:  The first one from your

9   mom and dad, and I have to assume, I can't read, but

10  your last name is still Boatman.

11       INMATE BOATMAN:  Yes.

12       COMMISSIONER ANGELE:  Okay, and this is Aieda,

13  that's A-I-E-D-A, and Jim.  They talk about the time

14  you've spent in prison here, what you've been able

15  to accomplish, and the support you have if you're

16  released, not only from them, but within the

17  community.  There's offers of employment and

18  support.  They talk about you successfully

19  completing school, and they ask that we give you a

20  chance to -- a second chance.  They talk about they

21  are willing to provide you a suitable home,

22  transportation, clothing, and all the necessities

23  you will need upon release.  So now you've got a

24  place to live.

25       INMATE BOATMAN:  Yeah.

26       COMMISSIONER ANGELE:  Then there's a letter from

27  your --

30

1       **INMATE BOATMAN:** Sister.

2       **COMMISSIONER ANGELE:** -- sister, Arleen, it's

3    A-R-L-E-E-N.

4       **INMATE BOATMAN:** Yes.

5       **COMMISSIONER ANGELE:** Okay, it's a letter of

6    support. It talks about the time you've been away

7    and what you've learned. It talks about you being

8    remorseful, and you've obviously improved yourself

9    spiritually, emotionally, and vocationally. You

10   recently completed the machinist/welder, as you were

11   just giving us today. So what you've done has

12   prepared you to come home. She wants us to consider

13   your release also. There's another letter here from

14   your sister, Brandy.

15      **INMATE BOATMAN:** Yeah.

16      **COMMISSIONER ANGELE:** Brandy Johnson?

17      **INMATE BOATMAN:** Brandy Johnson, yeah.

18      **COMMISSIONER ANGELE:** J-O-H-N-S-O-N.

19      **INMATE BOATMAN:** Yes.

20      **COMMISSIONER ANGELE:** Okay, it's a letter of

21   support from your sister, Brandy, and she's talking

22   about what you've been able to accomplish while

23   you've been in custody. The skills you've obtained

24   have allowed you to be self-sufficient, apparently

25   to come back and become one of citizen's finest, and

26   we are prepared to help him in this, and all his

27   other -- they say -- indicate your close family, and

1   believes in your exceptional rehabilitation, and

2   obviously would like to see you released also.  The

3   next letter is from your Aunt Shirley.

4         INMATE BOATMAN:  Yeah.

5         COMMISSIONER ANGELE:  Shirley Rone (phonetic),

6   R-O --

7         INMATE BOATMAN:  Shirley Rose.

8         COMMISSIONER ANGELE:  What's the last name?

9         INMATE BOATMAN:  Rose.

10        COMMISSIONER ANGELE:  R-O-S-E?

11        INMATE BOATMAN:  Yeah.

12        COMMISSIONER ANGELE:  Okay.  All right, I can't

13  read it that way, but Shirley Rose.

14        INMATE BOATMAN:  Okay.

15        COMMISSIONER ANGELE:  Anyway, Shirley's in

16  Fresno, and this is regarding me nephew, given the

17  opportunity, he'd be a productive citizen in

18  society.  She talks about how horrible the crime

19  was, but also says she would give -- being released

20  would give you the opportunity to give back to

21  society.  She'd be willing to assist you in

22  obtaining housing, transportation in order for you

23  to become gainfully employed.

24        INMATE BOATMAN:  I'll have the --

25        COMMISSIONER ANGELE:  That was the first one?

26        INMATE BOATMAN:  Yeah, that's just a note.

27        COMMISSIONER ANGELE:  Here's a letter from a

1    Tanney Machine and Manufacturing, that's

2    T-A-N-N-E-Y.  They're located in Fresno.  It says,

3    "As I have received your resume, I can state most

4    assuredly that he would be considered for employment

5    at our company upon his release."  They represent 65

6    to 70 persons, of which 30-plus are in positions

7    that Mr. Boatman could fill.  So it's a job offer in

8    Fresno.  A letter from a Ruter Armey, R-U-T-E-R,

9    A-R-M-E-Y, Incorporated, wrote us a letter regarding

10   your journeyman status as a machinist/welder.  They

11   currently have an opening for a machinist.  It

12   should be filled within the next few days, but plans

13   -- they say they're going to need one more within

14   the next month or so.  They'll be more than happy to

15   interview you, so there's a potential job there.

16   They're located in Fresno also.  The last letter is

17   from a Lindberg Machine, L-I-N-D-B-E-R-G:  "Thanks

18   for your interest.  Your qualifications are suitable

19   for our consideration.  Being a small company and

20   (inaudible), I'd appreciate you trying to come and

21   see me after release."  But at least, it's a

22   potential of a job interview there.  Anything else

23   you want to tell me?

24         **INMATE BOATMAN:**  No, that was it.

25         **COMMISSIONER ANGELE:**  There was another letter

26   that I didn't read actually.  It had to do with --

27         **INMATE BOATMAN:**  Yeah, Steve Silva, he -- or he

33

1    was looking for some employment opportunities, self-

2    businesses and getting into contracts, so he said he

3    just couldn't offer at that time.

4        COMMISSIONER ANGELE:  Well, there's some other

5    contacts.  It shows an effort on your part, at

6    least, in seeking in employment.

7        INMATE BOATMAN:  Yeah.

8        COMMISSIONER ANGELE:  Anything else you want to

9    tell me?  You have a place to live with your mom.

10       INMATE BOATMAN:  Yes, I have a place to live.

11       COMMISSIONER ANGELE:  And is that in your old

12   neighborhood?

13       INMATE BOATMAN:  No, that's, like, a couple

14   miles away from my old neighborhood, when I was

15   raised.

16       COMMISSIONER ANGELE:  What about the victim,

17   where -- did the victim live in Lemoore, do you

18   know?

19       INMATE BOATMAN:  I don't know.  It's somewhere

20   around there, because it was Lanare, so I don't

21   think it was Lemoore.  But I'm assuming, so --

22       ATTORNEY O'HARA:  You're going to be in NA?

23       INMATE BOATMAN:  Yes, yes, I will be attending

24   NA meetings out there, because I've been doing that

25   for quite some time and it's a part of my --

26       COMMISSIONER ANGELE:  Are you working the steps?

27       INMATE BOATMAN:  Yes, I've been working them,

34

1   the steps.

2       COMMISSIONER ANGELE:  Okay, what's the most
3   important for you?

4       INMATE BOATMAN:  Right now, it would ten and 12,
5   I think is most important.

6       COMMISSIONER ANGELE:  Why is that?

7       INMATE BOATMAN:  Well, continue to take personal
8   inventory, and you do that -- that step right there
9   is like looking at the first ten steps, you see.
10  And what it -- let me explain to you, but what it
11  means is that you form a habit from looking at
12  ourselves, our actions, attitudes, and relationships
13  on a regular basis.  So what you're doing is you're
14  staying aware of your defects and you're not letting
15  that stuff build.  And it's pleasing from the
16  records of the present, because you're making
17  amends, you're making that personal, fearless
18  inventory, and you're making God a promise.  And
19  what I do, is I sit down at the end of the day in my
20  bunk and I just think, "well, what did I do, did I
21  piss anybody off today or did I say something I
22  shouldn't have said," and I clean that right up.  So
23  that's like the most important to me.

24      COMMISSIONER ANGELE:  Do you practice step
25  eight?

26      INMATE BOATMAN:  Practice step -- yes, I've made
27  a list.

35

1      COMMISSIONER ANGELE:  Who's on top of your list?
2      INMATE BOATMAN:  The first one that was on top
3   of my list was the victim's family.  That was the
4   first one.
5      COMMISSIONER ANGELE:  I have nothing further.
6   Return to the Chair.
7      PRESIDING COMMISSIONER MUNOZ:  All right, thank
8   you, Mr. Angele.  We're going into a question and
9   answer phase, and I had a question I was going to
10   ask you and I should have jotted it down.  I don't
11   remember now, but it may come back to me.  But I'll
12   ask Mr. McCormick whether he has questions of you.
13      DEPUTY COMMISSIONER MCCORMICK:  I don't have a
14   question, but there is something I meant to put on
15   the Record and I didn't, but I just -- for people
16   that might be looking at this down the road.
17   Originally, you had an R-suffix.
18      INMATE BOATMAN:  Yes.
19      DEPUTY COMMISSIONER MCCORMICK:  And it was based
20   on the arrest for the rape that was mentioned when
21   they were covering your criminal history.  But I
22   have a chrono from March 15th of '96, where that was
23   removed.
24      INMATE BOATMAN:  Oh, yeah.
25      DEPUTY COMMISSIONER MCCORMICK:  And it was based
26   on the fact that the counselor got a copy of the
27   police report and it indicated that at least a part

36

1   of the action was consensual and was more

2   appropriately unlawful sex with a minor, as opposed

3   to a rape.  Unlawful sex with a minor does not --

4   even if you had been convicted --

5       INMATE BOATMAN:  For an R-suffix.

6       DEPUTY COMMISSIONER MCCORMICK:  Yeah, and you

7   weren't, so it doesn't qualify for an R-suffix and

8   that's why it was taken off at that point, and I

9   just thought that that should be on the Record.

10      INMATE BOATMAN:  All right, thank you.

11      DEPUTY COMMISSIONER MCCORMICK:  But I have no

12   questions.

13      INMATE BOATMAN:  Thank you.

14      PRESIDING COMMISSIONER MUNOZ:  All right, after

15   the commission of this crime, Mr. Jones fled the

16   area, apparently.  What happened to the gun?

17      INMATE BOATMAN:  I put it back where it was at.

18      PRESIDING COMMISSIONER MUNOZ:  Back at your

19   family's residence?

20      INMATE BOATMAN:  Yes, I thought -- yes.  After

21   the crime had happened and I was so distraught, you

22   know, what was going through my mind is -- okay, I

23   flattened the tires on the car to make it look like

24   it wasn't running, and I thought about hiding it,

25   you know, just destroying the gun and not even

26   putting it back in its place.  But after thinking

27   about this and sitting in my bedroom, you know, I

37

1    didn't even care anymore, you know, it's just how I

2    felt.  I just felt like, you know, that was it, you

3    know, me saying I've been involved in this horrible

4    crime and there's no way that I can do this.  I'm

5    just going to wait and see what happens, and I stood

6    there until the arrest took place.

7         PRESIDING COMMISSIONER MUNOZ:  All right.

8    Mr. Angele, do you have any questions?

9         COMMISSIONER ANGELE:  Yeah, I want to make sure

10   I understood your statements earlier about what you

11   thought was going to happen during the robbery.

12   From what Besel said, one of your crime partners --

13        INMATE BOATMAN:  Yes.

14        COMMISSIONER ANGELE:  Did he wind up being the

15   driver of the car?

16        INMATE BOATMAN:  Did he want to what?

17        COMMISSIONER ANGELE:  Did he wind up being the

18   driver of the car?

19        INMATE BOATMAN:  Who?

20        COMMISSIONER ANGELE:  Besel.

21        INMATE BOATMAN:  No, he was just at his house

22   and he wasn't involved in the crime whatsoever.

23        COMMISSIONER ANGELE:  All right, but you were

24   there when he made the statement about -- there was

25   statements made about the guys at the 41 Market

26   would probably recognize you guys.

27        INMATE BOATMAN:  Yeah.

38

1    **COMMISSIONER ANGELE:**  And the answer then was
2    Jones said you wouldn't need to worry about that.
3        **INMATE BOATMAN:**  Yeah.
4    **COMMISSIONER ANGELE:**  What did you think that
5    meant?
6        **INMATE BOATMAN:**  At that time, I wasn't really
7    thinking about it, but now I know what he meant.
8    Considering that he's saying, "well, we don't have
9    to worry about that," that actually he was going to
10   go in there and execute the clerk, you know, prior
11   to the robbery.
12       **COMMISSIONER ANGELE:**  But you didn't think at
13   that time that's what he meant?
14       **INMATE BOATMAN:**  No, I didn't.
15   **COMMISSIONER ANGELE:**  Okay, no other questions.
16   **PRESIDING COMMISSIONER MUNOZ:**  All right, thank
17   you.  Any questions, Mr. O'Hara?
18       **ATTORNEY O'HARA:**  Yes, Mr. Boatman, how have you
19   changed at this point?  Obviously, you were running
20   with the wrong crowd.  You were just a young man,
21   and you come in here very poised and a good
22   presentation.  What's changed in you?  How have you
23   come to this point?
24       **INMATE BOATMAN:**  Well, you know, I used to think
25   and act like a criminal, and I don't do that no
26   more, and I care about others, as well as myself.
27   And I've remained positive and I try to be the most

39

1  enthusiastic person I know.

2      **ATTORNEY O'HARA:**  So what caused that change in
3  your life?

4      **INMATE BOATMAN:**  Caring about others and not --
5  you know, it's like a -- nobody should ever have to
6  go through what I put him through.  And, you know,
7  I've really always been this way.  And just that's a
8  horrible thing.

9      **ATTORNEY O'HARA:**  So the crime basically woke
10  you up?

11      **INMATE BOATMAN:**  Yes.

12      **ATTORNEY O'HARA:**  I notice you don't have any
13  115's or anything once you've come into prison.

14      **INMATE BOATMAN:**  Well, the crime basically, yes,
15  it did wake me up.  And like I say, I was just
16  sitting in the bedroom all alone and I felt lonely,
17  and at that time, to be involved in something like
18  this, it was something that I didn't want to happen.
19  You know, when you're doing criminal acts, you're
20  thinking of things like, "that's going to go good."
21  You don't think about the negative side of that.

22      **ATTORNEY O'HARA:**  So you --

23      **INMATE BOATMAN:**  What I want to do is make sure
24  that nobody else makes the mistakes that I've done.
25  You know, I've been raised in a loving home.  I
26  mean, I had everything, you know, a person would
27  want as a kid, from motorcycles to go-carts, mini-

40

1    bikes, whatever you could name, I probably had it,
2    and, you know, there's no way that I want to ever
3    disappoint my family again.
4        ATTORNEY O'HARA:  So now your thinking is pro-
5    social, positive?
6        INMATE BOATMAN:  Pcsitive, yes.
7        ATTORNEY O'HARA:  Right?
8        INMATE BOATMAN:  Yes.
9        ATTORNEY O'HARA:  And how long was that program
10   to get certified as a machinist?
11       INMATE BOATMAN:  It's taken approximately eight
12   years to complete, because it wasn't only just -- I
13   signed a contract with the machinist, but it was
14   also welding, so it was really like completing two
15   trades.  I had completed welding before, but I
16   didn't complete the agreement.  It's taken quite
17   some time, and fortunately I've had the supervisors
18   that have tooken their time out of their lives to
19   help me.  You know, without them, I wouldn't even
20   have this.
21       ATTORNEY O'HARA:  And to clear up one quick
22   thing, we've had a little discussion about you were
23   first changed with a rape and then it was reduced to
24   unlawful intercourse.  But the general gist of that,
25   there's so much stigma on sexual crimes.
26       INMATE BOATMAN:  Yes.
27       ATTORNEY O'HARA:  It was consensual?

41

1      **INMATE BOATMAN:**  It was consensual.  It was

2   somebody that I had knew for, you know, quite some

3   time and it was like three counts.  What happened is

4   she got caught ditching in school and she tried to

5   pawn it off on me, like, you know, I did this.  But,

6   yes, it was consensual.

7      **ATTORNEY O'HARA:**  Very good.  Are you ready for

8   parole?

9      **INMATE BOATMAN:**  Yes, I am.

10      **ATTORNEY O'HARA:**  You can make on the street?

11      **INMATE BOATMAN:**  Without a doubt.

12      **ATTORNEY O'HARA:**  Very good.  Thank you, sir, I

13   appreciate it.

14      **PRESIDING COMMISSIONER MUNOZ:**  All right, one

15   more question, it was mentioned earlier, you've

16   never had a 115, sir?

17      **INMATE BOATMAN:**  No, I've never had a 115.

18      **PRESIDING COMMISSIONER MUNOZ:**  Never had 115,

19   all right.  It must be a misprint.  There was

20   something in your initial parole consideration

21   hearing where he -- and I don't know whether it was

22   a typo or what, but one of the Commissioners, the

23   Presiding Commissioner, Mr. Baker, made a statement

24   on page 38.  He advised you that during the next two

25   years, to remain disciplinary-free.  That's the most

26   important you can do.  And the way it's written, it

27   says it can -- or it says it took one 115 to wipe

42

1 out all your good programming.

2     **INMATE BOATMAN:** He probably meant -- yeah, it

3 was -- it probably will take.

4     **PRESIDING COMMISSIONER MUNOZ:** You can -- that

5 all it would take is one 115.

6     **INMATE BOATMAN:** Yeah.

7     **PRESIDING COMMISSIONER MUNOZ:** Yeah, okay, so

8 it's just not written or didn't come out right, and

9 I just wanted to delve into that.

10     **INMATE BOATMAN:** Okay.

11     **PRESIDING COMMISSIONER MUNOZ:** You've never had

12 a 115, okay. You can go into closing, sir.

13     **ATTORNEY O'HARA:** Thank you, Sir. Mr. Boatman

14 is asking for a finding of suitability, as he does

15 not pose an unreasonable risk. As a young man,

16 Mr. Boatman obviously made some poor choices. He

17 had everything provided to lead a positive

18 lifestyle, but whether it was friends that took him

19 along the wrong course, it's obvious and he got into

20 the drugs, and you started seeing the purse

21 snatches, petty thefts, things like that. The

22 unlawful sex is an anomaly in his background, but it

23 appears that he had some property crimes and so

24 forth, feeding the need. And as he got more and

25 more into the drugs, he got to the larger crimes,

26 and then all of a sudden, he's involved with

27 basically a strong-armed robbery and this robbery

43

1    went very, very poorly.  It was not Mr. Boatman who
2    fired the fatal shot.  He was at the door as a
3    lookout.  He's indicated that -- there was a lot of
4    indications that should have sunk into his mind at
5    the time that there could be a murder, and he set up
6    a lot of the factors, brought the gun, drove the
7    vehicle, heard the statements by his crime partners.
8    But in his thinking at the time was that this will
9    all go right, it will all go well, it will work out,
10   and, of course, it did not.  But Mr. Boatman did not
11   -- he stood at the door.  He was the lookout.  He
12   was not the actual shooter, which in some ways
13   mitigates his part.  But the other side of it, it
14   probably would not have happened if he hadn't taken
15   the steps that he took, and he understands that,
16   certainly understands it.  But it can't be said that
17   Mr. Boatman had an unsocial or unpositive social
18   history.  He was from a good family and was doing as
19   well as he could on the streets.  Once incarcerated,
20   he's done extremely well, and it's clear that he had
21   a wake-up call that snapped him out of the course he
22   was taking.  He comes into prison, he's had no
23   115's.  He's had only two 128's in over 14 years of
24   incarceration.  That is exemplary and that bodes
25   very well for him upon release.  Obviously he knows
26   what it is to follow rules, and the fact that he can
27   do that in a structured setting, such as prison,

44

1    bodes very well for him.  He should be able to
2    maintain that upon the streets.  He's been involved
3    with NA, is very well versed with the steps and a
4    clear understanding of how they relate to his
5    situation, and he plans on continuing with NA upon
6    his release.  That is the most important thing here.
7    Mr. Boatman would not have gone down his path if he
8    did not get -- become involved with drugs.  He's
9    taken other courses such as Alternatives to
10   Violence, Catargeo, and so forth, to help him better
11   deal with the stresses that he will find upon
12   release.  He's obtained his GED, and therefore
13   upgraded himself educationally.  He's certified as a
14   machinist/welder.  He has the certificate as a
15   journeyman machinist/welder from the Joint
16   Apprentice Council.  He's a past member of the
17   American Welding Society.  He's got numerous
18   laudatory chronos in his abilities in work, very,
19   very marketable skills.  And from the support
20   letters, there's clearly a demand for someone of his
21   background and ability out there in the streets.
22   Psychiatrically, he has a very positive --
23   (End of Tape 1, Side A-Beginning of Tape 1, Side B)
24        DEPUTY COMMISSIONER MCCORMICK:  Okay, we're back
25   on tape.
26        ATTORNEY O'HARA:  Thank you.  And that
27   psychiatric report further goes on to say that his

1   danger in the community is quite minimal.  That's
2   what we're looking for here today.  Is he an
3   unreasonable risk to society?  Well, the trained
4   clinician, who interviewed him in his very extensive
5   report, indicates that at this point, no, his
6   violence potential is quite minimal.  He will reside
7   with his parents in Lemoore, California, which is,
8   it's my understanding, in Fresno County, and work as
9   a machinist or welder.  He has those skills.  He has
10  the job offers from -- actually, he has
11  possibilities of interviews and so forth from Tanney
12  Machinery or a Tanney Machine, Ruter Armey,
13  Lindberg, various other groups.  It's clear that
14  Mr. Boatman has done his work to prepare himself for
15  his release, in sending out his resume and so forth,
16  and the response indicates that there is a great
17  deal of need for man of his abilities on the
18  streets.  Mr. Boatman has been rehabilitated.  He
19  has awoken after the crime, and has avoided any type
20  of criminality or breaking of the rules.  He's been
21  incarcerated over 14 years, and has been effectively
22  punished for his crime.  His rehabilitation is done.
23  His punishment is what is required by the matrix.
24  He's asking that you find him suitable today, set
25  his release date in the near future.  Thank you.
26       PRESIDING COMMISSIONER MUNOZ:  Thank you for
27  your comments, Mr. O'Hara.  Mr. Boatman, this is

46

1    your opportunity to make a statement regarding your
2    parole suitability, unless you're satisfied with the
3    comments made on your behalf by your attorney.
4         **INMATE BOATMAN:** I'd like to make a brief
5    statement first.
6         **PRESIDING COMMISSIONER MUNOZ:** Go ahead, sir.
7         **INMATE BOATMAN:** Thank you for that.  And that
8    the crime itself is that -- you know, I think about
9    this all the time and it's something I wish I could
10   change.  And my intentions were to go in there and
11   get that money without nobody getting hurt.  And I
12   just want to share a few things with you also, just
13   to reiterate on a couple things.  KAIROS is, like, a
14   three day men's retreat, and that has been a program
15   that's been one of the most positive ones I've ever
16   been in, in that I've learned so much about myself,
17   being involved in this.  There's no -- I like this
18   certificate, because what this is, it's something
19   that, you know, what I like to say, I got a high
20   price on my butt and employers are looking for me.
21   I'm not really looking for the employers, so to
22   speak.  I know a person needs support, and what I
23   want you to look at is a picture.  This is an
24   extension to my family.  Them are people are in the
25   community that are willing to support me when I do
26   get out.  Also, I thought I had a positive
27   psychological evaluation and also a Board Report

47

1    from the counselor.

2        PRESIDING COMMISSIONER MUNOZ:  What's the name

3    of this group?

4        INMATE BOATMAN:  This is KAIROS.

5        PRESIDING COMMISSIONER MUNOZ:  This is KAIROS?

6        INMATE BOATMAN:  Them are KAIROS.  Them are just

7    a small handful of people --

8        PRESIDING COMMISSIONER MUNOZ:  Right.

9        INMATE BOATMAN:  -- that are willing to support

10   me when I get out and help me.

11       PRESIDING COMMISSIONER MUNOZ:  These are people

12   you've had direct contact with?

13       INMATE BOATMAN:  Yes, direct contact with.

14       PRESIDING COMMISSIONER MUNOZ:  I see.

15       INMATE BOATMAN:  And I also have the financial

16   needs and resources, the housing, the employment,

17   but most important is that support.  There's no way

18   -- you know, I'd like to end this with a quote by

19   Winston Churchill.  He stated that:  "What is the

20   use of living if not be to strive for noble causes

21   and make this muddled world a better place for those

22   who are living in it after we are gone."  And I

23   think about that.  There's only two things you can

24   do with your life:  It's either giving or it's

25   taking.  And let me tell you, I've taken enough from

26   people, and that's not who I am and I don't like

27   that.  Now when you give, it seems like you just get

48

1   so much more in return, and that's the road I'm on

2   today.  And there's no way that I'll ever commit

3   another criminal act.  You have my word on that.

4   It's not who I am, you know.  And it's like a

5   contradicting statement in a way, but prison hasn't

6   really changed me, you know, I've always been this

7   way, but I never did apply myself, and I feel good

8   about this.  And also I'd like to say that if you're

9   not sure of how you want to vote today, you can, you

10  know, call supervisors up or staff that know me, and

11  you get a better perspective on how I am as an

12  individual and how I carry myself in prison.  With

13  that, I'll just say thank you.

14      **PRESIDING COMMISSIONER MUNOZ:**  All right, well,

15  thank you for your comments.  Thank you for being

16  here.  We're going to recess for deliberations.

17  It's 10:00 a.m.

18                    R E C E S S

19                    --o0o--

20

21

22

23

24

25

26

27

49

1        CALIFORNIA BOARD OF PRISON TERMS

2                 D E C I S I O N

3        **DEPUTY COMMISSIONER MCCORMICK:**  Okay, we're back

4     on tape.

5        **PRESIDING COMMISSIONER MUNOZ:**  It's now 17

6     minutes after 10:00 a.m.  And, Mr. Boatman, in a

7     unanimous decision, this Panel has decided on a one-

8     year denial in your petition for a parole

9     suitability.  This Panel reviewed all the

10    information received from the public and relied on

11    the following circumstances in concluding that

12    you're not suitable for parole, and you would pose

13    an unreasonable risk of danger to society if

14    released from prison at this time.  Many factors

15    were considered.  First and foremost was the

16    commitment offense itself.  This offense was carried

17    out in a cruel manner, a manner which demonstrates a

18    callous disregard for human suffering.  The motive

19    for this crime was somewhat inexplicable, in that

20    the money had already been obtained when the victim

21    was shot.  These conclusions are drawn from the

22    Statement of Facts, wherein the prisoner and his

23    crime partner planned to commit a robbery to obtain

24    money to buy drugs.  Several stores were considered,

25    and the decision was made to rob the 41 Market.  The

26    crime partners armed themselves initially with a

27    CHRISTOPHER BOATMAN D-65055 DECISION PAGE 1 2/28/01

1   shotgun and a handgun.  It was decided not use the
2   shotgun, it was too big, and crime partner, Jones,
3   utilized the handgun provided by Inmate Boatman to
4   commit the robbery.  Also, this inmate used his
5   vehicle to carry out the robbery.  His initial
6   assignment was to act as the getaway driver.  At the
7   last minute, he changed that and became the lookout
8   in the store.  After a short delay, while parking
9   the vehicle and getting out of the vehicle, the
10  inmate followed the crime partner, Jones, into the
11  market.  And by the time he entered the market, the
12  robbery was in progress, and shortly after that, the
13  inmate heard one shot.  The crime partner, Jones,
14  had shot the clerk, who had not offered any
15  resistance and had turned over the money.  The crime
16  partners fled the scene without rendering aid to the
17  victim of this crime, a 19-year old youth.  As a
18  result of the inmate's actions, a human being was
19  killed.  In regards to Mr. Boatman's previous
20  record, at the time of the commitment offense, he
21  was enmeshed in an escalating pattern of criminal
22  conduct, and also he was in the midst of a strong
23  addiction to crack cocaine.  He had not profited
24  from society's previous attempts to correct his
25  criminality.  Such attempts include adult probation
26  and county jail time.  His institutional behavior,
27  CHRISTOPHER BOATMAN D-65055 DECISION PAGE 2 2/28/01

1  the inmate has done well. He has received no 115's
2  and only two 128-A's. The psychiatric report is
3  good, and his parole plans are in order. And there
4  is no representation here from the district
5  attorney's office from the county of Fresno, and
6  also we received no correspondence from the police
7  department or the D.A., opposing parole
8  consideration. This Panel makes the following
9  findings:  That this prisoner needs to continue on
10 the path he's on, to continue with self-help
11 programming, in order to face, discuss, understand,
12 and cope with stress in a nondestructive manner.
13 The prisoner's gains, the way he's comported himself
14 during his incarceration, are appreciated by this
15 Panel. As I said earlier, hopefully he'll remain on
16 this path. He should be commended for a number
17 things that he's accomplished during his
18 incarceration:  He received his GED while
19 incarcerated. He also has at least 13 laudatory
20 chronos, most of which relate to his participation
21 in Narcotics Anonymous. He's also taken part in
22 various self-help programs such as the Alternatives
23 to Violence, the personal responsibility course, the
24 walk-a-thon, Catargeo. Is that how you pronounce
25 that?
26      **INMATE BOATMAN:** Catargeo, yes.
27 CHRISTOPHER BOATMAN D-65055 DECISION PAGE 3 2/28/01

52

1    **PRESIDING COMMISSIONER MUNOZ:**  Okay, and he's

2    also completed some home-study correspondence

3    courses, I believe.  He's completed his vocation in

4    welding and as a machinist.  He's completed that

5    course and he's -- you're an apprentice now, right,

6    you're a certified apprentice now, sir?

7    **INMATE BOATMAN:**  Yes, I'm a journeyman now.

8    **PRESIDING COMMISSIONER MUNOZ:**  Journeyman now?

9    **INMATE BOATMAN:**  I've completed the contract,

10   but, yes.

11   **PRESIDING COMMISSIONER MUNOZ:**  Okay.

12   **INMATE BOATMAN:**  I've completed it.

13   **PRESIDING COMMISSIONER MUNOZ:**  You have achieved

14   journeyman status in your welding and machinist

15   vocational training, and you're to be commended for

16   all of that.  However, these positive aspects of

17   your behavior do not outweigh the factors of

18   unsuitability.  This Panel recommends that you

19   remain disciplinary-free; and that you, if

20   available, continue your participation in any and

21   all self-help and therapy programming that becomes

22   available.  In particular, as you stated during your

23   presentation, you're doing real well in your NA

24   participation.  You're doing well, period.

25   **INMATE BOATMAN:**  I appreciate that.

26   **PRESIDING COMMISSIONER MUNOZ:**  You made a good

27   CHRISTOPHER BOATMAN D-65055 DECISION PAGE 4 2/28/01

53

1   presentation and your attorney made a good

2   presentation on your behalf.  You're very, very

3   close.  I can't promise you you'll get one the next

4   time you come before the Panel.

5       INMATE BOATMAN:  Uh-huh.

6       PRESIDING COMMISSIONER MUNOZ:  But I'm very

7   impressed with what you've done with yourself so

8   far.  And, Mr. McCormick?

9       DEPUTY COMMISSIONER MCCORMICK:  I just want to

10  go along with what Mr. Munoz said.  You made a very

11  good presentation and you're headed in the right

12  direction.  And I know that it can be disappointing

13  to not get a date.  Don't let that disappointment

14  affect you.

15      INMATE BOATMAN:  I won't.

16      DEPUTY COMMISSIONER MCCORMICK:  You know,

17  because you're headed in the right direction.

18      INMATE BOATMAN:  Okay.

19      DEPUTY COMMISSIONER MCCORMICK:  If I weren't

20  retiring I'd be saying I look forward to seeing you

21  again next year.  But anyway, just hang in there.

22      INMATE BOATMAN:  Okay, I will.

23      DEPUTY COMMISSIONER MCCORMICK:  Okay?

24      INMATE BOATMAN:  I appreciate that.  You know, I

25  won't give up, there's no way.  I've come too far

26  now, you know.

27  CHRISTOPHER BOATMAN D-65055 DECISION PAGE 5 2/28/01

1    **PRESIDING COMMISSIONER MUNOZ:**  Yeah, and I do

2    want to share one more thing, and you can tell your

3    family I said this.

4        **INMATE BOATMAN:**  Uh-huh.

5        **PRESIDING COMMISSIONER MUNOZ:**  Your family

6    should be proud of the way you've conducted

7    yourself.

8        **INMATE BOATMAN:**  Oh, yes, they are.  They see

9    the change.  I appreciate that, Mr. Munoz.

10       **PRESIDING COMMISSIONER MUNOZ:**  Okay.

11       **INMATE BOATMAN:**  You guys take care and --

12       **PRESIDING COMMISSIONER MUNOZ:**  All right, sir.

13       **INMATE BOATMAN:**  All right, I'll see you next

14   year.

15       **PRESIDING COMMISSIONER MUNOZ:**  Good luck to you.

16       **INMATE BOATMAN:**  Okay.

17       **PRESIDING COMMISSIONER MUNOZ:**  And thank you.

18       **DEPUTY COMMISSIONER MCCORMICK:**  Hang in there.

19       **INMATE BOATMAN:**  Okay, I will.

20       **PRESIDING COMMISSIONER MUNOZ:**  It's 25 minutes

21   after 10:00 a.m.  That concludes the hearing for

22   Inmate Boatman.

23                          --o0o--

24

25   PAROLE DENIED ONE YEAR

26   EFFECTIVE DATE OF THIS DECISION_____MAR 2 7 2001_____

27   CHRISTOPHER BOATMAN D-65055 DECISION PAGE 6 2/28/01

55

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, MICHELLE MCGUIRE, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 54, and which recording was duly recorded at CALIFORNIA STATE PRISON, SAN QUENTIN, at SAN QUENTIN, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of CHRISTOPHER BOATMAN, CDC No. D-65055, on FEBRUARY 28, 2001, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated March 14, 2001, at Sacramento County, California.

Michelle McGuire
Transcriber
**CAPITOL ELECTRONIC REPORTING**