SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PRISON TERMS

In the matter of the Life )
Term Parole Consideration )
Hearing of: )
)
CHRISTOPHER BOATMAN )
————————————————————————)

CDC Number D-65055



CALIFORNIA STATE PRISON - SAN QUENTIN

SAN QUENTIN, CALIFORNIA

JULY 30, 2002

2:40 P.M.

PANEL PRESENT:

SHARON LAWIN, Presiding Commissioner
THOMAS WEBB, Deputy Commissioner

OTHERS PRESENT:

CHRISTOPHER BOATMAN, Inmate
ALAN SILVER, Attorney for Inmate

CORRECTIONS TO THE DECISION HAVE BEEN MADE

———— No
———— Yes        See Errata Sheet

Patricia Johnson        Capitol Electronic Reporting

ii

## INDEX

Page

Proceedings ........................................  1

Case Factors .......................................  6

Pre-Commitment Factors ............................ 13

Post-Commitment Factors ........................... 32

Parole Plans ...................................... 21

Closing Statements ................................ 44

Recess ............................................ 48

Decision .......................................... 49

Adjournment ....................................... 55

Transcriber Certification ......................... 56

--oOo--

1

1        P R O C E E D I N G S

2        **PRESIDING COMMISSIONER LAWIN:**  This is a

3   Subsequent Parole Consideration Hearing for

4   Christopher Boatman, CDC number D-65055.  Today is

5   July 30th, 2002.  We're located at San Quentin

6   State Prison, and the time is 2:40 p.m.

7   Mr. Boatman was received in CDC September 3rd,

8   1987 from Fresno County, case number 3510310, for

9   violation of Penal Code Sections 187 and 12022(a),

10  that's murder second with use a firearm, count

11  number one.  Terms of 16 years to life with a

12  minimum eligible parole date of March 31st, 1997.

13  These hearings are tape recorded, as you know.  So

14  for voice identification purposes, we'll go around

15  the room and identify ourselves by stating our

16  first and last name, spelling our last name, and

17  when we come to you, you need to do that plus give

18  us your CDC number.

19        **INMATE BOATMAN:**  Okay.

20        **PRESIDING COMMISSIONER LAWIN:**  I'll begin

21  and go to my right.  Sharon Lawin, L-A-W-I-N,

22  Commissioner.

23        **DEPUTY COMMISSIONER WEBB:**  Thomas Webb, last

24  name spelled W-E-B-B, Deputy Commissioner.

25        **ATTORNEY SILVER:**  Alan Silver, S-I-L-V-E-R,

26  attorney for Mr. Boatman.

27        **INMATE BOATMAN:**  Christopher Boatman,

1    B-O-A-T-M-A-N, D-65055.

2    **PRESIDING COMMISSIONER LAWIN:**  Thank you.

3    That identifies all parties in the room with the

4    exception of two correctional officers who are

5    here for security purposes.  The reason for

6    today's hearing is to again consider your

7    suitability for parole.  In arriving at a

8    decision, we will consider the number and the

9    nature of crimes that brought you to state prison,

10   your prior criminal history, your social history,

11   and your post-conviction factors, which is your

12   behavior since your incarceration.  We'll then go

13   to your progress since last year's hearing,

14   utilizing the counselor's report, psychological

15   report, and any other information that has a

16   bearing on your suitability for parole.

17   **INMATE BOATMAN:**  Okay.

18   **PRESIDING COMMISSIONER LAWIN:**  We have

19   reviewed your Central File and the prior hearing

20   transcripts, and we'll give you and Mr. Silver the

21   opportunity to make corrections and clarifications

22   to the record.

23   **INMATE BOATMAN:**  All right.

24   **PRESIDING COMMISSIONER LAWIN:**  The law and

25   the Board of Prison Terms' rules state that our

26   purpose today is to decide on your suitability for

27   parole.  And in arriving at our decision, we will

1   consider whether or not your release would pose an

2   unreasonable risk of danger to others.  If we

3   conclude your release would pose a danger to

4   others, you will be denied a parole date.  You're

5   not required to discuss the commitment offense

6   with the Panel.  You're not required to admit to

7   the offense.  And if you decide not to speak to us

8   about it, it will not be held against you.

9           **INMATE BOATMAN:**  Okay.

10           **PRESIDING COMMISSIONER LAWIN:**  We do accept

11   as true the court's findings.  We're not here

12   today to retry the case.  The fact that you're

13   convicted of murder is not going to change at the

14   end of today's hearing.  Our purpose is to decide

15   on your suitability for parole only.  On June 14th

16   of 2002, you signed BPT Form 1073.  On that form,

17   you indicated you do not have a disability as

18   defined by the Americans with Disabilities Act.

19   Is that still correct?

20           **INMATE BOATMAN:**  Yes, it is.

21           **PRESIDING COMMISSIONER LAWIN:**  Thank you.

22   Counsel, any comment regarding ADA?

23           **ATTORNEY SILVER:**  No, I think that

24   Mr. Boatman is correct, there are no ADA concerns

25   in his case.

26           **PRESIDING COMMISSIONER LAWIN:**  Thank you.

27   In terms of procedural rights, have your client's

4

1   rights been met thus far to the best of your

2   knowledge?

3          **ATTORNEY SILVER:**  Yes, they have.

4          **PRESIDING COMMISSIONER LAWIN:**  One

5   additional right you have, Mr. Boatman, is to a

6   fair and impartial Panel.  Now that you've seen

7   the Panel members before you, do you have any

8   objection to the Panel?

9          **INMATE BOATMAN:**  No, I don't.

10         **PRESIDING COMMISSIONER LAWIN:**  Counsel, any

11  objection to the Panel?

12         **ATTORNEY SILVER:**  None whatsoever.

13         **PRESIDING COMMISSIONER LAWIN:**  Do you have

14  any preliminary objections?

15         **ATTORNEY SILVER:**  No, I don't.

16         **PRESIDING COMMISSIONER LAWIN:**  Thank you.

17  You'll receive a copy of the tentative written

18  decision today and that decision becomes effective

19  after it's reviewed by the Decision Review Unit of

20  the Board in Sacramento.  After they've issued a

21  final decision, they'll send a copy of it to you,

22  as they have in the past, along with a transcript,

23  a copy of the hearing, and you have 90 days from

24  the date that's sent to you in which to file an

25  appeal if you wish to.

26         **INMATE BOATMAN:**  Okay.

27         **PRESIDING COMMISSIONER LAWIN:**  Okay.  Is

1   there any confidential to be used today?

2       **DEPUTY COMMISSIONER WEBB:**  None,

3   Commissioner.

4       **PRESIDING COMMISSIONER LAWIN:**  Will you be

5   speaking with us today?

6       **INMATE BOATMAN:**  Yes, I will.

7       **PRESIDING COMMISSIONER LAWIN:**  Then if you'd

8   raise your right hand.  Do you solemnly swear or

9   affirm that your testimony at this hearing will be

10  the truth, the whole truth, and nothing but the

11  truth?

12      **INMATE BOATMAN:**  Yes.

13      **PRESIDING COMMISSIONER LAWIN:**  Thank you.  I

14  passed over a documents checklist.  I marked it

15  Exhibit One to make sure we're all working with

16  the same set of documents.  Mr. Silver, did you

17  receive everything on that list?

18      **ATTORNEY SILVER:**  Yes, Commissioner, I have,

19  thank you.

20      **PRESIDING COMMISSIONER LAWIN:**  Thank you.

21  And do you have new items for us to review, new

22  documents?

23      **INMATE BOATMAN:**  Well, I have some support

24  letters if you would like.

25      **PRESIDING COMMISSIONER LAWIN:**  Yeah, we need

26  those.

27      **INMATE BOATMAN:**  Okay.

6

1       **PRESIDING COMMISSIONER LAWIN:**  Thank you.

2   Any chronos or anything else?

3       **INMATE BOATMAN:**  No chronos.

4       **PRESIDING COMMISSIONER LAWIN:**  Okay.  All

5   right.  Counsel, if you have no objection, I'll

6   incorporate by reference the Statement of Facts

7   taken from pages two and three of the probation

8   officer's report.

9       **ATTORNEY SILVER:**  No problem, thank you.

10      **PRESIDING COMMISSIONER LAWIN:**  Thank you.

11  Mr. Boatman, those tell us that you're convicted

12  of the murder of John Sousa.

13      **INMATE BOATMAN:**  Yes.

14      **PRESIDING COMMISSIONER LAWIN:**  S-O-U-S-A.

15  And all of this revolved around a robbery --

16      **INMATE BOATMAN:**  Yes.

17      **PRESIDING COMMISSIONER LAWIN:**  -- is that

18  correct?

19      **INMATE BOATMAN:**  Yes, it is.

20      **PRESIDING COMMISSIONER LAWIN:**  You and your

21  friends decided to rob a store --

22      **INMATE BOATMAN:**  Uh-hmm.

23      **PRESIDING COMMISSIONER LAWIN:**  -- and

24  Mr. Sousa was the 19-year-old attendant there.

25      **INMATE BOATMAN:**  Yes.

26      **PRESIDING COMMISSIONER LAWIN:**  And your

27  crime partner shot and killed him?

1           **INMATE BOATMAN:**  Yes.

2           **PRESIDING COMMISSIONER LAWIN:**  What was your

3    role in the crime?

4           **INMATE BOATMAN:**  Well, my role was to

5    provide a gun at the time when we were discussing

6    it, and just to be the driver.

7           **PRESIDING COMMISSIONER LAWIN:**  But that's

8    not what happened, is it?

9           **INMATE BOATMAN:**  No, it's not what happened.

10          **PRESIDING COMMISSIONER LAWIN:**  You went into

11   the store as well?

12          **INMATE BOATMAN:**  Yes, I -- what I did is I

13   was thinking that as -- when we went, my plans had

14   changed because what I was thinking is that if he

15   went into the store himself, you know, I wasn't

16   going to get anything. And so --

17          **PRESIDING COMMISSIONER LAWIN:**  You mean as

18   far as --

19          **INMATE BOATMAN:**  -- it changed --

20          **PRESIDING COMMISSIONER LAWIN:**  -- the money

21   from the cash register?

22          **INMATE BOATMAN:**  Yes, the money.  So, what I

23   did is I asked Butch, the other crime partner, if

24   he wanted to drive and then I'll go be the lookout

25   and --

26          **PRESIDING COMMISSIONER LAWIN:**  Meaning the

27   lookout inside?

8

1        **INMATE BOATMAN:** Yes.  Yeah, inside the

2    store, so.

3        **PRESIDING COMMISSIONER LAWIN:** And that's

4    what you did.

5        **INMATE BOATMAN:** And that's what I did.

6        **PRESIDING COMMISSIONER LAWIN:** And this was

7    something that you talked about for several hours,

8    right?

9        **INMATE BOATMAN:** Talked about --

10       **PRESIDING COMMISSIONER LAWIN:** Robbing some

11   place.  Because didn't you originally --

12       **INMATE BOATMAN:** We talked about it --

13       **PRESIDING COMMISSIONER LAWIN:** -- target

14   some place else?

15       **INMATE BOATMAN:** Yes, we had talked about it

16   for probably an hour at his house.

17       **PRESIDING COMMISSIONER LAWIN:** And then

18   there's a discussion of Mr., is it Besel,

19   B-E-S-E-L?

20       **INMATE BOATMAN:** Yes.

21       **PRESIDING COMMISSIONER LAWIN:** You went --

22   You stopped by his house?

23       **INMATE BOATMAN:** Yes, he stopped by his

24   house.  That was somebody that we knew, so we

25   stopped there and --

26       **PRESIDING COMMISSIONER LAWIN:** And you told

27   him what you were going to do?

1   INMATE BOATMAN: Yes, we did.

2   PRESIDING COMMISSIONER LAWIN: You had been

3 freebasing cocaine, the three of you?

4   INMATE BOATMAN: Yes, we'd been smoking

5 crack.

6   PRESIDING COMMISSIONER LAWIN: Was that just

7 prior to the --

8   INMATE BOATMAN: It was --

9   PRESIDING COMMISSIONER LAWIN: -- commitment

10 offense?

11   INMATE BOATMAN: It was a few hours before

12 approximately.

13   PRESIDING COMMISSIONER LAWIN: But you

14 needed more drugs. You wanted more drugs.

15   INMATE BOATMAN: Right. We needed more

16 money to get the drugs.

17   PRESIDING COMMISSIONER LAWIN: And so you

18 decided the way to do that was to rob --

19   INMATE BOATMAN: Well, it was --

20   PRESIDING COMMISSIONER LAWIN: -- a

21 business?

22   INMATE BOATMAN: I'm not trying to say that

23 -- trying to take it off of me because I had

24 played a big role in this, but the discussion had

25 came up after we were smoking that Harold done it

26 before, he had robbed a store, and that it would

27 be easy to do it again. The only thing you had to

1    do was just do this and do that.  And you know --
2        **PRESIDING COMMISSIONER LAWIN:**  That would be
3    Harold Jones?
4        **INMATE BOATMAN:**  Yes, that would be Harold
5    Jones.  And that, you know, I asked him that --
6    You know, I've never been a part of anything like
7    this, and I had asked him that, (indiscernible)
8    doesn't anybody get hurt, you know, and that I'll
9    go along with this.  But I wasn't thinking -- I
10   wasn't thinking right --
11       **PRESIDING COMMISSIONER LAWIN:**  And your --
12       **INMATE BOATMAN:**  -- at that time.
13       **PRESIDING COMMISSIONER LAWIN:**  -- second
14   crime partner was Roland Montgomery?
15       **INMATE BOATMAN:**  Yeah, Butch Montgomery.
16       **PRESIDING COMMISSIONER LAWIN:**  Okay.  So you
17   said you told him you'd go along with it as long
18   as nobody was hurt, and yet you supplied a gun.
19       **INMATE BOATMAN:**  Yes, I did.  I supplied the
20   gun --
21       **PRESIDING COMMISSIONER LAWIN:**  That's quite
22   a contradiction.
23       **INMATE BOATMAN:**  It's not really a
24   contradiction because I thought that nobody was
25   going to get hurt.  And when a person is
26   freebasing, you don't think.  That's one thing you
27   don't do.  So only thing what I was doing, I was

1    reacting to the situation, believing that nobody
2    was going to get hurt. And when you're thinking
3    like that, you know, there's no way that things
4    work out the way that you anticipate them to, and
5    that's how I was doing it at that -- at that time.
6    I wasn't thinking.
7            PRESIDING COMMISSIONER LAWIN: So you were a
8    full participant in this, right?
9            INMATE BOATMAN: Yes, I was.
10           PRESIDING COMMISSIONER LAWIN: Are you
11   responsible for the death of Mr. Sousa?
12           INMATE BOATMAN: I'm very responsible.
13           PRESIDING COMMISSIONER LAWIN: How's that?
14           INMATE BOATMAN: I provided the car, I
15   provided the gun. If I didn't do it, he would
16   still be living today. It's just a senseless act
17   that that shouldn't have happened.
18           PRESIDING COMMISSIONER LAWIN: And how much
19   money did you get out of this crime?
20           INMATE BOATMAN: I didn't get one dime.
21           PRESIDING COMMISSIONER LAWIN: What happened
22   after the shooting?
23           INMATE BOATMAN: What happened after, we
24   went back and I punched a hole in the -- in my
25   tires, acting like my car wasn't running.
26           PRESIDING COMMISSIONER LAWIN: Was that
27   after you dropped off your crime partners?

12

1    **INMATE BOATMAN:** Yes, it was right after.

2    **PRESIDING COMMISSIONER LAWIN:** And then you

3    went home and that's where you disabled the car

4    looking -- so it would look like you hadn't been

5    anywhere?

6    **INMATE BOATMAN:** Yes.

7    **PRESIDING COMMISSIONER LAWIN:** How long

8    before you were arrested?

9    **INMATE BOATMAN:** It was I'm pretty sure

10    three days after.

11    **PRESIDING COMMISSIONER LAWIN:** And Mr. Jones

12    had fled the state?

13    **INMATE BOATMAN:** Yes, he had fled the state.

14    **PRESIDING COMMISSIONER LAWIN:** And was

15    arrested in Texas?

16    **INMATE BOATMAN:** Yes.

17    **PRESIDING COMMISSIONER LAWIN:** And why

18    didn't you turn yourself in?

19    **INMATE BOATMAN:** I was scared. I just sat

20    in my room all that time, you know, and I just

21    felt like, you know, my life had ended. I was

22    hoping that John was going to be okay. I just

23    didn't know what to do. I was just confused.

24    **PRESIDING COMMISSIONER LAWIN:** Did you know

25    Mr. Sousa before this shooting?

26    **INMATE BOATMAN:** No, I didn't know him.

27    **PRESIDING COMMISSIONER LAWIN:** When did you

1  learn that he had died?

2      **INMATE BOATMAN:**  It was a day or two after.

3  It had came on the news and that's when I found

4  out.

5      **PRESIDING COMMISSIONER LAWIN:**  Did you

6  consider turning yourself in?

7      **INMATE BOATMAN:**  I did not at that time, no.

8      **PRESIDING COMMISSIONER LAWIN:**  And how do

9  you feel about what happened?

10     **INMATE BOATMAN:**  I could have saved his

11  life.  I knew that.  And it hurts knowing that the

12  people that I hurt.  Ain't nobody should ever have

13  to go through a loss of a loved one, especially in

14  this type of fashion.  And, you know, I think

15  about it all the time.

16     **PRESIDING COMMISSIONER LAWIN:**  Anything

17  else?

18     **INMATE BOATMAN:**  No, it's just I'm just

19  sorry.

20     **PRESIDING COMMISSIONER LAWIN:**  Well, it

21  wasn't the first time you had been in trouble.

22  You had been arrested in 1984 by Fresno County

23  Sheriff for two counts of rape --

24     **INMATE BOATMAN:**  Yes.

25     **PRESIDING COMMISSIONER LAWIN:**  -- with force

26  and fear, and the victim ultimately was not

27  cooperative.  And as I understand it from the

14

1    transcripts, you say that it was consensual --

2            **INMATE BOATMAN:** Consensual.

3            **PRESIDING COMMISSIONER LAWIN:** -- consensual

4    sex and that it was something that you'd known for

5    a while.

6            **INMATE BOATMAN:** Yes.

7            **PRESIDING COMMISSIONER LAWIN:** Ultimately,

8    were charges dropped?

9            **INMATE BOATMAN:** Yes, they were dropped.

10   The victim was -- you know, she wasn't cooperative

11   with authorities and that they -- it was false, it

12   didn't happen.

13           **PRESIDING COMMISSIONER LAWIN:** 1984, you

14   were then arrested San Luis Obispo Police

15   Department for grand theft and possession of a

16   weapon.

17           **INMATE BOATMAN:** Yes.

18           **PRESIDING COMMISSIONER LAWIN:** You had

19   committed a purse snatch and you were in

20   possession of a tire iron when arrested?

21           **INMATE BOATMAN:** I was -- Yes.

22           **PRESIDING COMMISSIONER LAWIN:** Received six

23   months in jail, three years probation, and that

24   one of the conditions was that you not be in

25   possession of a weapon. Then you were -- When you

26   were transported in custody to face the rape

27   charges in Fresno County, the counselor's report

15

1    says that was after you served the six months on

2    the purse snatch; is that the way it worked?

3            **INMATE BOATMAN:** Yes, yes.

4            **PRESIDING COMMISSIONER LAWIN:** And then you

5    were released from Fresno County Jail when the

6    charges were reduced to illegal sexual intercourse

7    with a minor and then ultimately dismissed. Then

8    in 1985, you were on probation. Appears you

9    didn't have any problems in probation. Was that

10   from the petty theft, on probation for the petty

11   theft arrest?

12           **INMATE BOATMAN:** No, that wasn't no

13   probation for the petty theft. That was probation

14   for the grand theft.

15           **PRESIDING COMMISSIONER LAWIN:** For the grand

16   theft.

17            **INMATE BOATMAN:** Yes.

18           **PRESIDING COMMISSIONER LAWIN:** Okay.

19   Because you were arrested in '85 in Fresno for

20   petty theft. What happened with that?

21           **INMATE BOATMAN:** It was dropped and did a

22   little community service.

23          **PRESIDING COMMISSIONER LAWIN:** And then,

24   however, it says here you were sentenced to 60

25   days in jail.

26           **INMATE BOATMAN:** Yes.

27          **PRESIDING COMMISSIONER LAWIN:** However, 58

16

1   days were suspended and you got one year

2   probation.

3            **INMATE BOATMAN:**  Yes.

4            **PRESIDING COMMISSIONER LAWIN:**  Okay.  Any

5   other arrests that I didn't mention?

6            **INMATE BOATMAN:**  That's all the arrests.

7            **PRESIDING COMMISSIONER LAWIN:**  Born in

8   Louisiana?

9            **INMATE BOATMAN:**  Yes, I was.

10           **PRESIDING COMMISSIONER LAWIN:**  And looks

11  like there were six children in your family?

12           **INMATE BOATMAN:**  Yes.

13           **PRESIDING COMMISSIONER LAWIN:**  Is it Aieda?

14           **INMATE BOATMAN:**  Aieda.

15           **PRESIDING COMMISSIONER LAWIN:**  Aieda,

16  A-I-E-D-A, Phillips, your mother.  Your father

17  passed away when you were just about two years

18  old?

19           **INMATE BOATMAN:**  That's not true.

20           **PRESIDING COMMISSIONER LAWIN:**  What's the

21  status of your father?

22           **INMATE BOATMAN:**  Well, my biological father,

23  I never knew him, and that a few years ago I found

24  out that he was still living.  And the only father

25  that I've known was Jim Boatman.

26           **PRESIDING COMMISSIONER LAWIN:**  All right.

27  And Jim Boatman, you took his name?

17

1           **INMATE BOATMAN:** Yes, I took his name.

2           **PRESIDING COMMISSIONER LAWIN:** And -- Or

3    they gave you his name because you were very young

4    when he and your mother married apparently?

5           **INMATE BOATMAN:** Yes.

6           **PRESIDING COMMISSIONER LAWIN:** And was he

7    the one that passed away or --

8           **INMATE BOATMAN:** No.

9           **PRESIDING COMMISSIONER LAWIN:** -- what's the

10   issue about the --

11          **INMATE BOATMAN:** It was -- Well, as we was

12   kids, my sister had said that our father had died

13   and --

14          **PRESIDING COMMISSIONER LAWIN:** I see, okay.

15          **INMATE BOATMAN:** -- so that's how the story

16   had --

17          **PRESIDING COMMISSIONER LAWIN:** That's how it

18   evolved?

19          **INMATE BOATMAN:** Yes.

20          **PRESIDING COMMISSIONER LAWIN:** Okay. So

21   Mr. Boatman then was your father. He raised you.

22   And it says that your mother moved to California

23   and then met Mr. Boatman; is that accurate?

24          **INMATE BOATMAN:** No, she had knew him --

25   known him before we moved to California.

26          **PRESIDING COMMISSIONER LAWIN:** He worked a

27   number of jobs including milking cows and drilling

18

1   wells.  Your mother worked as a teacher's aide.

2   And then when you were about 10, your parents

3   divorced?

4       **INMATE BOATMAN:**  No, I was about 14 years

5   old when they divorced.

6       **PRESIDING COMMISSIONER LAWIN:**  Okay.  And

7   you went to live with Mr. Boatman?

8       **INMATE BOATMAN:**  Yes, I chose to live with

9   my dad.

10      **PRESIDING COMMISSIONER LAWIN:**  Says that you

11  worked with your father drilling wells, played

12  sports, went to Riverdale High School.

13      **INMATE BOATMAN:**  Yes.

14      **PRESIDING COMMISSIONER LAWIN:**  And dropped

15  out after the eleventh grade.

16      **INMATE BOATMAN:**  Yes.

17      **PRESIDING COMMISSIONER LAWIN:**  Why did you

18  drop out?

19      **INMATE BOATMAN:**  I started having problems

20  after the divorce.  It kind of hurt me being

21  separated from both parents.  I didn't really care

22  any more.

23      **PRESIDING COMMISSIONER LAWIN:**  Okay.  And

24  then it says that you ultimately moved back in

25  with your mother?

26      **INMATE BOATMAN:**  Yes, I was moving between

27  both of them.  I'd go stay six months with my dad

1   and then I'd go stay about six months with her.
2       **PRESIDING COMMISSIONER LAWIN:**  And you
3   worked in your stepfather's liquor store as a
4   stocker?
5       **INMATE BOATMAN:**  Yes.
6       **PRESIDING COMMISSIONER LAWIN:**  Started
7   smoking marijuana and drinking alcohol about the
8   age of 14?
9       **INMATE BOATMAN:**  Yeah, somewhere around
10  there.
11      **PRESIDING COMMISSIONER LAWIN:**  And then your
12  drug use became a problem in high school according
13  to the counselor's report.
14      **INMATE BOATMAN:**  Uh-hmm.
15      **PRESIDING COMMISSIONER LAWIN:**  Went to -- It
16  says an escalated drug use, but it doesn't say
17  what that included other than the cocaine and
18  marijuana.  Are those the drugs that you were
19  using?
20      **INMATE BOATMAN:**  That was -- That was it.
21      **PRESIDING COMMISSIONER LAWIN:**  So you were
22  just using them more often?
23      **INMATE BOATMAN:**  Well, yes.  I started using
24  crack cocaine -- I started using crack cocaine in
25  '86.  Before it was just marijuana.
26      **PRESIDING COMMISSIONER LAWIN:**  And the
27  commitment offense happened in '86.

1        **INMATE BOATMAN:** Yes.

2        **PRESIDING COMMISSIONER LAWIN:** So you had

3   just started to use it?

4        **INMATE BOATMAN:** Yes, I started to use it,

5   just started to use it in January of '86.

6        **PRESIDING COMMISSIONER LAWIN:** Do you have

7   any children of your own?

8        **INMATE BOATMAN:** No, I don't.

9        **PRESIDING COMMISSIONER LAWIN:** Okay.

10   Anything else about your background that you would

11   like us to know?

12        **INMATE BOATMAN:** Well, my background is --

13   it's not -- it's not -- I'm not proud of it.  You

14   know, the way I was raised with loving parents and

15   stuff like that, that's just not me.  And that all

16   the things that I've done in my life, it's just

17   really -- it's really sad to put people through

18   that.  And that I'm not going to make any excuses

19   or anything like that because I knew, you know,

20   what I was doing was wrong.  And that my criminal

21   history, it's not -- it started -- it started at a

22   late age.  It started when I was 18 years old.

23   Yes, I was using when I was like 14, but it didn't

24   start until that time.  And I was a troubled young

25   man at that time and --

26        **PRESIDING COMMISSIONER LAWIN:** And you were

27   21 at the time of the commitment offense?

21

1      INMATE BOATMAN:  I was 20 years old at --

2      PRESIDING COMMISSIONER LAWIN:  Twenty.

3      INMATE BOATMAN:  -- the time.

4      PRESIDING COMMISSIONER LAWIN:  What were you

5  doing to support yourself then?

6      INMATE BOATMAN:  I was working.  I was

7  drilling wells and I was doing some farm.  But

8  before the commitment, just before that recently

9  like I had quit.  I quit working doing the cows

10  and stuff and I'd just go with my dad every now

11  and then to drill the wells.  So, my jobs, I just

12  let it go.

13      PRESIDING COMMISSIONER LAWIN:  Let's move on

14  to your --

15      INMATE BOATMAN:  That's --

16      PRESIDING COMMISSIONER LAWIN:  I'm sorry?

17      INMATE BOATMAN:  No, that's okay.

18      PRESIDING COMMISSIONER LAWIN:  Let's move on

19  to your future plans.  The counselor's report says

20  you plan to live with your sister, Brandy --

21      INMATE BOATMAN:  Yes.

22      PRESIDING COMMISSIONER LAWIN:  -- and her

23  husband, Dale Johnson --

24      INMATE BOATMAN:  Uh-hmm.

25      PRESIDING COMMISSIONER LAWIN:  -- in Fresno.

26      INMATE BOATMAN:  Yes.

27      PRESIDING COMMISSIONER LAWIN:  And that you

22

1   have submitted resumes to various businesses and

2   have received some positive responses. You wish

3   to use your skills as a machinist and a welder on

4   the outside. Is that --

5         **INMATE BOATMAN:** Yes.

6         **PRESIDING COMMISSIONER LAWIN:** -- basically

7   what you want to do?

8         **INMATE BOATMAN:** Yes, that's basically what

9   I want to do, but first what I'd like to do is to

10  help my brother out at the house because he's

11  taken the business on himself. And you have a

12  letter there from him.

13        **PRESIDING COMMISSIONER LAWIN:** Okay, well,

14  I'll go through these now.

15        **INMATE BOATMAN:** Okay.

16        **PRESIDING COMMISSIONER LAWIN:** The first one

17  is from Arlene Boatman, your sister.

18        **INMATE BOATMAN:** Yes.

19        **PRESIDING COMMISSIONER LAWIN:** She writes a

20  support letter. Says that every year the family

21  writes and hope and wait. They believe it's time

22  for you to be released. You've matured into a

23  loving, caring, and responsible individual. She

24  says it's not just in what you say, but it's in

25  your actions. You've paid your debt to society

26  and definitely deserve a second chance. And you

27  go by the name of Burt?

1      **INMATE BOATMAN:**  Yes.

2      **PRESIDING COMMISSIONER LAWIN:**  It says that

3    you could live with her until permanent

4    accommodations are available.  Housing,

5    transportation, and clothing are -- will be

6    provided by the family.  That they've all shared

7    in any -- they will all share in all financial

8    needs that you have.  Apparently they have been

9    doing that all along and will continue to do so

10   upon your release.  Brandy Johnson, your youngest

11   sister, writes a support letter.  She pleads for

12   your release.  Says that once you're released

13   you'll be a useful, law-abiding citizen.  You've

14   paid a heavy toll for your past, you've expressed

15   your regrets, and you deserve the chance to put

16   all of the preparation you've done into positive

17   action.

18           "He has a place of residence by

19           staying with me, and I will provide

20           him with transportation and clothing.

21           He will also have job options and

22           education avenues in his -- at his

23           immediate disposal.  He has a family

24           with strong will and consolidated

25           means for him to achieve all of his

26           goals."

27   Next is a letter from Sail Boatman, S-A-I-L, Sail

24

1   River Boatman, and it's your youngest brother?

2           **INMATE BOATMAN:**  Yes.

3           **PRESIDING COMMISSIONER LAWIN:**  It says that

4   he's kept in contact with you throughout the years

5   through letters and telephone calls.  You've

6   adopted a positive attitude and over time have

7   shown a great deal of remorse.  Believes that

8   you've reflected upon yourself long enough.

9   You've proved yourself to be a changed man for the

10  better and should be given a second chance.

11  Writes:

12          "I am one hundred percent positive

13          that when he is released he will not

14          only be a law-abiding citizen, but a

15          blessing to our community.  I am

16          going to be his NA sponsor and I'm

17          also in a position of giving him

18          employment because I own a well

19          drilling business.  We will do all

20          things necessary to provide for, care

21          for, counsel, and ensure the ultimate

22          success of my brother's life after

23          his release from prison," he writes.

24  Next is a letter from Ontre Cornelius Boatman, and

25  that's O-N-T-R-E.  This is another brother?

26          **INMATE BOATMAN:**  Yes, that's my brother.

27          **PRESIDING COMMISSIONER LAWIN:**  And writes a

1    letter of support.  Says there's lot of support.

2    He's retired from the Air Force where he served

3    for 10 years until he suffered a service-connected

4    disability which affected his vision.  He's now

5    considered legally blind.  He's been employed by

6    the Department of Defense since 1995.  He's a full

7    time post-graduate student, married.  His wife's a

8    high school teacher.  Father of two girls.  Tell

9    us this because he wants us to have a sense of who

10   he is and to ensure -- to assure us that he will

11   provide you with positive influences.  Talks about

12   your positive attitude also, and that you will be

13   a success on parole he says.  Frightens him to

14   think of your being incarcerated further and not

15   given the opportunity to reveal what you have to

16   offer to humanity.  Says that his -- he and his

17   wife, Danielle, have shown strong and

18   unconditional support to you and will continue to

19   do so.  They've both been involved in the

20   mentoring process of many young adults so they

21   have knowledge of that process and are going to

22   put that experience to use helping you.  Shirley

23   Rowe, R-O-W-E, your aunt, has written a support

24   letter.  It says that the crime was horrible.  She

25   doesn't take any seriousness away from the

26   offense.  Realizes the profound effect it's had on

27   family and friends and feels, however, that by

1    becoming a productive citizen you will have the
2    opportunity to give back. She's willing to assist
3    you in obtaining housing and transportation and to
4    become gainfully employed. And then your mother
5    and -- Is this your stepmother and father?
6            **INMATE BOATMAN:** No, that's my real mother.
7            **PRESIDING COMMISSIONER LAWIN:** This is your
8    mother.
9            **INMATE BOATMAN:** Yes. And to me it's like
10   Jim Boatman --
11           **PRESIDING COMMISSIONER LAWIN:** Uh-hmm.
12           **INMATE BOATMAN:** -- I consider him my real
13   dad, so --
14           **PRESIDING COMMISSIONER LAWIN:** Okay.
15           **INMATE BOATMAN:** -- (inaudible).
16           **PRESIDING COMMISSIONER LAWIN:** I just
17   thought that your mother and he were divorced.
18           **INMATE BOATMAN:** No. They're together right
19   now. They were divorced and they got back
20   together I think it's been eight years ago.
21           **PRESIDING COMMISSIONER LAWIN:** Okay, thank
22   you.
23           **INMATE BOATMAN:** Eight or nine years ago.
24   Okay.
25           **PRESIDING COMMISSIONER LAWIN:** That's brings
26   up sort of the background.
27           **INMATE BOATMAN:** Okay.

1      **PRESIDING COMMISSIONER LAWIN:** Okay. Then

2    they write a support letter. They now live in

3    Lemoore. Say that you're a model inmate. You've

4    accomplished a lot. The family is very proud of

5    you. They wait your return to them where you'll

6    have love of family, continued support, employment

7    aspects of financial success. And they believe

8    you have the strength and character to fulfill

9    your duty and responsibility to be a self-

10   sufficient, law-abiding person. That you are

11   prepared, the family is prepared, and that you

12   have a bedroom at their home, the family business

13   as well drillers, nieces and nephews, parents,

14   aunts, uncles, cousins, brothers, and sisters who

15   are all out there waiting for your return so that

16   they can all support you. Paul Auren, A-U-R-E-N,

17   instructor, has written a letter. Talks about

18   your work in the machine tool technology program

19   in 1994. That you went on to be indentured as an

20   apprentice machinist in '95. Completed your seven

21   thousand hour apprenticeship program in 2000.

22   Received your certificate as a journeyman

23   machinist in July 2001. And says that this

24   accomplishment is significant because other

25   correctional institutions in California are not

26   certified to graduate a journeyman in the

27   machinist trade. That you have met or exceeded

1   the criteria established by the Department of
2   Corrections, the Bureau of Industrial Standards,
3   and the International Association of Machinists.
4   It will allow you to enter the work force on an
5   equal skill level with most training centers or
6   junior college graduates. You were considered by
7   your welding instructor, Mr. D. Hildreth,
8   H-I-L-D-R-E-T-H, as a person most likely to
9   succeed upon parole. You were transferred into
10  the machine tool technology program when the San
11  Quentin welding program was closed. Then we have
12  a letter from Darrell Hildreth, welding
13  instructor, now retired. Says it's a character
14  reference submitted on your behalf. You were in
15  the voc welding program for two and a half years.
16  You elected to continue your education in metal
17  trades and transferred to voc machine shop. He
18  says during the time he had the opportunity to
19  observe your behavior, attitude and work habits,
20  he's always known you to be -- to have continually
21  displayed an above average interest in training,
22  duties, and activities. You volunteer to assist
23  other instructors with work schedules and took it
24  upon yourself to assist fellow inmates concerning
25  written and manual assignments. He says that your
26  activities are indicative to him of an individual
27  who has a highly attuned sense of the world of

```
1    work and your ability to master your job with all
2    its diversifications as well as your proven
3    initiative and cooperation are in keeping with the
4    requirements of any work situation that you would
5    have to encounter in the outside world.  A letter
6    from Jack Tanney, T-A-N-N-E-Y, of Tanney Machine
7    and Manufacturing in Fresno.  Says he received
8    your resume.  He can state most assuredly that he
9    would be -- you would be considered for employment
10   at their company upon your release.  Tanney
11   Machine presently employs 65 to 70 persons, he
12   says, of which 30 are in positions that
13   Mr. Boatman could fill.  And should you be
14   interested in locating in the Fresno area, he
15   believes there would be a very good chance that
16   you could be hired soon after your release, and
17   they have hired several other individuals upon
18   their release from the prison system and have been
19   very happy with the results.  Letter from John
20   Kelly, executive director emeritus and current
21   consultant to Samaritan House.  Samaritan House
22   shows a central office in San Mateo, client
23   services in San Mateo and Redwood City.  It's a
24   letter of recommendation.  Says that -- Mr. Kelly
25   writes that he's known Mr. Boatman for a little
26   more than two years through his activities at the
27   Catholic chapel.  Talks about your participation
```

1    in Kairos and says he characterizes you as a

2    positive, solid, well-adjusted adult.  Testifies

3    to your clearly regretting the mistakes of your

4    younger days and to having turned your life

5    totally around to become a productive human being.

6            "As a former director and current

7            consultant with Samaritan House," he

8            writes, "the human service agency in

9            San Mateo County, I would be in

10           position to assist him with some of

11           his basic needs upon parole.  I feel

12           very strongly that Christopher

13           Boatman not only would pose no threat

14           to anyone in society, but would

15           actually be a productive member of

16           any community."

17   And I just wanted to make sure.  We had a number

18   of letters in our Board packet, but they're all

19   duplicates of what I've just read.  Any other

20   letters?

21           INMATE BOATMAN:  No, that's it.

22           PRESIDING COMMISSIONER LAWIN:  So you've got

23   several offers of residency.

24           INMATE BOATMAN:  Yes.

25           PRESIDING COMMISSIONER LAWIN:  You've got --

26   If you don't care to work with the family in well

27   drilling, you have a place to go, at least you

31

1    qualify for and if there's -- it sounds like if

2    there's an opening then Tannery or Tanney will

3    hire you as a machinist.

4         **INMATE BOATMAN:** Yes.

5         **PRESIDING COMMISSIONER LAWIN:** Okay.

6    Anything else to tell us about parole plans?

7         **INMATE BOATMAN:** Well, I'd like to stay with

8    my mom and my dad if I can, and I just want to ask

9    that question. And they're out of the county. I

10   always thought it was Fresno County, but they're

11   Kings County and it's like --

12        **PRESIDING COMMISSIONER LAWIN:** Okay.

13        **INMATE BOATMAN:** -- it's right on the

14   borderline and I --

15        **PRESIDING COMMISSIONER LAWIN:** The law

16   changed.

17        **INMATE BOATMAN:** Uh-hmm.

18        **PRESIDING COMMISSIONER LAWIN:** So you are no

19   longer required to go back to the last county of

20   legal residence and you're not required to go to

21   the county of commitment. If this -- The Panel

22   has the authority to send you to whatever county

23   we believe you would be most successful on parole

24   in. So if it's your -- where your family lives,

25   where there's family support and housing, then

26   that's generally where you would be sent.

27        **INMATE BOATMAN:** Oh, okay. So I could stay

32

1   with them.

2          **PRESIDING COMMISSIONER LAWIN:** Uh-hmm.

3          **INMATE BOATMAN:** Good.

4          **PRESIDING COMMISSIONER LAWIN:** We send out

5   3042 notices. They go out to those agencies that

6   have an interest in your case, the court, the

7   District Attorney, the investigating agency, and

8   we received no written responses back from any of

9   those agencies nor do we have anyone here

10  representing them today. And with that, we will

11  move on to post-conviction.

12         **DEPUTY COMMISSIONER WEBB:** Thank you,

13  Commissioner. Your last hearing -- You last

14  appeared before the Board of Prison Terms on the

15  28th of February in the year 2001.

16         **INMATE BOATMAN:** Yes.

17         **DEPUTY COMMISSIONER WEBB:** Okay. Well, on

18  the post-conviction I will cover that period of

19  time from the last hearing to today.

20         **INMATE BOATMAN:** Okay.

21         **DEPUTY COMMISSIONER WEBB:** From 1/13, 2001

22  to 9/2, 2001, you remained at San Quentin, Level

23  II, in general population. I was checking your

24  classification score because it doesn't say

25  anything, but your classification score is zero.

26         **INMATE BOATMAN:** Yes.

27         **DEPUTY COMMISSIONER WEBB:** Okay. And your

33

1    academics, work record, you remained assigned to

2    the vocational machine shop with satisfactory

3    progress reports noted.  Group activities:

4    Narcotics Anonymous 1/18, 2001, 4/18, 2001.  What

5    is Kairos?

6         **INMATE BOATMAN:**  Kairos.

7         **DEPUTY COMMISSIONER WEBB:**  Kairos.

8         **INMATE BOATMAN:**  Yeah, that's a -- Kairos is

9    -- it's a three-day men's retreat.

10        **DEPUTY COMMISSIONER WEBB:**  Okay.  And that

11   was 2/14, 2001.

12        **INMATE BOATMAN:**  Yes.

13        **PRESIDING COMMISSIONER LAWIN:**  And outside

14   people come in to participate in that as well as

15   inmates.

16        **INMATE BOATMAN:**  Yes.

17        **DEPUTY COMMISSIONER WEBB:**  Oh, okay.

18   Psychiatric treatment:  None.  Prison behavior:

19   Excellent.  Remains disciplinary-free   From 9/3,

20   2001 to 4/30, 2002, you remained placed at San

21   Quentin State Prison in the general population

22   with a classification score of zero, custody level

23   Medium A.  UCC on 9/6, 2001, the committee

24   continued his present program.  Academics:  None.

25   Work record:  Remained assigned to the vocational

26   machine shop with satisfactory reports.  Group

27   activities:  None.  Psych treatment:  None.

1    Prison behavior:  Excellent.  Remained

2    disciplinary-free.  Got a question.  What kind of

3    self-help program are you involved in?

4         **INMATE BOATMAN:**  Right now, I'm involved in

5    the NA.

6         **DEPUTY COMMISSIONER WEBB:**  You are?

7         **INMATE BOATMAN:**  I go to that -- Yes, I've

8    been going to that since '93 and I'm still going,

9    so --

10        **DEPUTY COMMISSIONER WEBB:**  Okay.  Do you

11   have any certificates?

12        **INMATE BOATMAN:**  No, they don't give you any

13   certificates, but they give you chronos.

14        **DEPUTY COMMISSIONER WEBB:**  Well, isn't that

15   what I'm -- That's what I mean, chronos.

16        **INMATE BOATMAN:**  Oh, okay.  Do I have any on

17   me right now?

18        **DEPUTY COMMISSIONER WEBB:**  Well, do you have

19   any period?

20        **INMATE BOATMAN:**  Yes, I have a bunch of

21   them.

22        **DEPUTY COMMISSIONER WEBB:**  Oh, okay.

23        **INMATE BOATMAN:**  I have a bunch of them,

24   yeah.  I just didn't bring them in --

25        **DEPUTY COMMISSIONER WEBB:**  Okay.

26        **INMATE BOATMAN:**  -- because --

27        **ATTORNEY SILVER:**  Commissioner, it says

35

1   there's a bunch of laudatory chronos under therapy

2   and self-help activities in the evaluation report.

3           **DEPUTY COMMISSIONER WEBB:**   Right.   I will

4   cover that.

5           **ATTORNEY SILVER:**   Speaks a lot about

6   laudatory chronos for many years.

7           **DEPUTY COMMISSIONER WEBB:**   Okay.   And is

8   there anything else you want to say that's not

9   included in the Board report regarding your prison

10  activities?

11          **INMATE BOATMAN:**   Well, I just -- I just got

12  into another trade.

13          **DEPUTY COMMISSIONER WEBB:**   Okay.

14          **INMATE BOATMAN:**   And --

15          **DEPUTY COMMISSIONER WEBB:**   What's the trade?

16          **INMATE BOATMAN:**   Plumbing.

17          **DEPUTY COMMISSIONER WEBB:**   Plumbing.

18          **INMATE BOATMAN:**   Yeah, I'm in plumbing right

19  now.

20          **DEPUTY COMMISSIONER WEBB:**   Are you an

21  apprentice?

22          **INMATE BOATMAN:**   No, not apprentice.   They

23  don't have -- They don't have the apprentice

24  program in the plumbing, but I am -- hopefully

25  I'll be able to get a completion out of that

26  though.

27          **DEPUTY COMMISSIONER WEBB:**   Okay.   A

36

1   certificate?

2       **INMATE BOATMAN:**  Yes, yes.

3       **DEPUTY COMMISSIONER WEBB:**  Okay.  And how
4   long is this program?

5       **INMATE BOATMAN:**  Approximately a year.  It
6   depends because I know a lot already when I
7   entered it, you know, as far as reading blueprints
8   and structural layouts and stuff like that.  So
9   what I -- what I got to do is learn all the codes
10  and the things like that.  And the welding, I got
11  all that.  So it will probably take a year,
12  approximately two for me to complete this here.

13      **DEPUTY COMMISSIONER WEBB:**  Okay.  Is there
14  anything else you wish to tell me?

15      **INMATE BOATMAN:**  That's the only thing
16  that's new into the -- for what I've done is the
17  plumbing right now.

18      **DEPUTY COMMISSIONER WEBB:**  Okay, with that,
19  I'm --

20      **INMATE BOATMAN:**  (Inaudible) --

21      **DEPUTY COMMISSIONER WEBB:**  Okay.  With that,
22  I'm going to move on to the psych report.  There
23  is no current psych report.  The last psych report
24  was 2000 for the 2001 hearing.

25      **INMATE BOATMAN:**  Uh-hmm.

26      **DEPUTY COMMISSIONER WEBB:**  And which
27  basically says you don't have any psychiatric

37

1   problems --

2          **INMATE BOATMAN:** Uh-hmm.

3          **DEPUTY COMMISSIONER WEBB:** -- or psychiatric

4   concerns.  It says -- Under Axis I, it says Poly-

5   Substance Dependence in Institutional Remission,

6   Cocaine Dependence in Institutional Remission, and

7   No Diagnosis.  Axis II:  Adult Social -- Adult

8   Anti-Social Behavior, No Diagnosis.  And

9   basically --

10          **INMATE BOATMAN:** Yes.

11          **DEPUTY COMMISSIONER WEBB:** -- under the

12   clinical assessment under Axis I is B-799.90, No

13   Diagnosis.  Axis II:  E-799.90, No Diagnosis.

14   Axis III:  None Reported.  Axis IV:

15   Incarceration.  And according to the report in the

16   clinical assessment it says, you have good insight

17   into the dynamics of your commitment offense and

18   takes full responsibility for your actions.  "His

19   judgment at present is well above average."  And

20   that's noted in the psych report of 2000.  Did you

21   have an opportunity to discuss this report with

22   the doctor?

23          **INMATE BOATMAN:** Yes, I have.

24          **DEPUTY COMMISSIONER WEBB:** Do you concur

25   with his statements?

26          **INMATE BOATMAN:** Oh, yes.

27          **DEPUTY COMMISSIONER WEBB:** Okay.  With that,

38

```
1    then --
2            INMATE BOATMAN:  Yes, I --
3            DEPUTY COMMISSIONER WEBB:  Go ahead.
4            INMATE BOATMAN:  And that they -- it also
5    states on here that they -- the potential for
6    danger in the community and that it was really
7    minimal --
8            DEPUTY COMMISSIONER WEBB:  Okay.
9            INMATE BOATMAN:  -- and which I thought was
10   really good.  And that -- also that in the
11   clinical observation and comments and
12   recommendations, it stated that:
13            "I believe that Mr. Boatman is very
14            unlikely that he would behave
15            violently if released.  That his
16            violence potential is actually less
17            than that of the average person.
18            Should he be released, he would be a
19            solid citizen, son, brother, and
20            hopefully some day a husband and a
21            father.  There is no psychological
22            reason to deny him immediate parole."
23   Which I also thought was pretty good too for the
24   doctor to write something like that.  So, you
25   know, it's like really almost going out on a limb,
26   you know, for a person and I just --
27            DEPUTY COMMISSIONER WEBB:  Okay.
```

39

1      **INMATE BOATMAN:** -- wanted to let you know
2  that.

3      **DEPUTY COMMISSIONER WEBB:** Okay. I read the
4  whole thing. With that, I'll return to the Chair.
5      **PRESIDING COMMISSIONER LAWIN:** I see you got
6  your GED in '93; is that accurate?

7      **INMATE BOATMAN:** Yes, that is accurate, in
8  March of '93 and a high school diploma in May of
9  '93.

10     **PRESIDING COMMISSIONER LAWIN:** You took at
11 least one home study course. What was that about?
12     **INMATE BOATMAN:** That was (indiscernible).
13 I was getting real close to my contract agreement
14 with the JC, completing that eight thousand hours,
15 and what I wanted to do is get more intuitive into
16 the trade itself, so I learned a lot about the
17 tools that we were using. And that's what it was,
18 it was -- it was a -- it was a six-month course.

19     **PRESIDING COMMISSIONER LAWIN:** Alternatives
20 to Violence and AA and Katargeo I see are all
21 self-help programs --

22     **INMATE BOATMAN:** Yes.

23     **PRESIDING COMMISSIONER LAWIN:** -- you
24 participated in in the past.

25     **INMATE BOATMAN:** Yes, they are.

26     **PRESIDING COMMISSIONER LAWIN:** Were there
27 any others?

1      **INMATE BOATMAN:**  That was -- That was --
2    That was the self-help programs.
3      **PRESIDING COMMISSIONER LAWIN:**  Okay.
4      **INMATE BOATMAN:**  I also attended a Marin
5    AIDS Project in '95.
6      **PRESIDING COMMISSIONER LAWIN:**  Was that a
7    seminar or --
8      **INMATE BOATMAN:**  That was like a seminar,
9    yes.  I don't -- I wouldn't say it was a self-help
10   program, but it's --
11     **PRESIDING COMMISSIONER LAWIN:**  Communicable
12   disease --
13     **INMATE BOATMAN:**  Yes.
14     **PRESIDING COMMISSIONER LAWIN:**  -- prevention
15   sort of thing?  Okay.
16     **INMATE BOATMAN:**  Uh-hmm.
17     **PRESIDING COMMISSIONER LAWIN:**  All right,
18   thank you.
19     **INMATE BOATMAN:**  Okay.
20     **PRESIDING COMMISSIONER LAWIN:**  The
21   commitment offense is -- it's difficult to
22   understand your participation because when you
23   talk to us today, it's as though your
24   participation was minimal --
25     **INMATE BOATMAN:**  Yes.
26     **PRESIDING COMMISSIONER LAWIN:**  -- in that it
27   wasn't your idea and that Mr. Jones at least had

1   some experience in doing these sorts of things.

2        **INMATE BOATMAN:** No, I take full

3   responsibility.

4        **PRESIDING COMMISSIONER LAWIN:** I understand

5   that you do that. But when I listen to you talk,

6   it sounds like you were sort of on the -- you

7   know, you were trying to prevent it, make sure no

8   one got hurt, and yet what seems very

9   contradictory to me is that you --

10        **INMATE BOATMAN:** Yes.

11        **PRESIDING COMMISSIONER LAWIN:** -- supplied

12   the car, you supplied the gun, and you were a

13   lookout.

14        **INMATE BOATMAN:** Yes, it was -- I was.

15        **PRESIDING COMMISSIONER LAWIN:** So it doesn't

16   sound to me like there was minimal involvement in

17   it, and that doesn't add up to someone who was

18   trying to make sure no one got hurt.

19        **INMATE BOATMAN:** But see --

20        **PRESIDING COMMISSIONER LAWIN:** How can you

21   -- Let me finish.

22        **INMATE BOATMAN:** Okay.

23        **PRESIDING COMMISSIONER LAWIN:** How can you

24   make me understand that you were trying to prevent

25   something from happening, like someone getting

26   hurt or murdered?

27        **INMATE BOATMAN:** I didn't do anything to

42

1    prevent that.  What I will say is that my thoughts
2    were confused and they were -- they were -- they
3    were clashing.  I knew right from wrong.  You
4    know, I knew that this was wrong and I just didn't
5    -- I just didn't step up and say no, I don't want
6    to be a part of this.  I kick myself in the butt
7    for that, for not doing that.  That's something I
8    think about all the time, and I realize that and
9    it's not good.  I know that and I'm sorry for
10   that.

11        **ATTORNEY SILVER:**  If I might say something
12   as --

13        **INMATE BOATMAN:**  Yes.

14        **ATTORNEY SILVER:**  -- far as that.  I think
15   what he was trying to express was that he was --
16   there was a lot of peer pressure.  There was this
17   group of guys that they were sort of doing things
18   together.  Drugs was a part of it.  That was one
19   of the things they were going to do together.  So
20   he provided certain things that he thought would
21   be able to allow them to maybe commit a robbery,
22   but he did not expect it to turn into a murder.
23   And I think that's really true.

24        **INMATE BOATMAN:**  Yes.

25        **ATTORNEY SILVER:**  He did not expect that.
26   He didn't -- He didn't take the necessary
27   precautions to make sure that it didn't happen,

1    because once you have a gun anything can happen.

2    But as he said, he was -- he was on drugs. And he

3    did whatever he could in the sense to be a part of

4    the group, but in some sense try to convey this is

5    not a good thing to kill. And I guess that -- I

6    mean, that was not a part of what he had in mind

7    and somebody else had a different, you know, idea

8    of what this crime was supposed to be.

9    **PRESIDING COMMISSIONER LAWIN:** Well, then

10   moving from there, what's different today about

11   you that would keep you from giving into that sort

12   of peer pressure?

13   **INMATE BOATMAN:** Well, I just had a birthday

14   last week. I'm not 20 years old anymore; I'm 37.

15   I don't think like a -- I think as a mature and

16   responsible individual and I care about others.

17   There's no way that I would do anything like that.

18   And right, I'm willing to step into harm's way in

19   order to protect anybody in this room and that's

20   just who I am. And it seems like when you give,

21   you receive so much more in return and that's the

22   road I'm on today.

23   **PRESIDING COMMISSIONER LAWIN:** Thank you.

24   Commissioner, questions?

25   **DEPUTY COMMISSIONER WEBB:** No questions.

26   **PRESIDING COMMISSIONER LAWIN:** Mr. Silver,

27   any questions of your client?

1      **ATTORNEY SILVER:** Anything else you'd like
2    to offer the Board regarding these issues, any
3    other issues you want to talk about?
4         **INMATE BOATMAN:** That --
5         **PRESIDING COMMISSIONER LAWIN:** And you will
6    have a chance for a closing statement.
7         **INMATE BOATMAN:** Okay, that's -- Okay,
8    that's it.
9         **PRESIDING COMMISSIONER LAWIN:** Then you can
10   go to your closing statement, please.
11        **ATTORNEY SILVER:** Okay, thank you. I guess,
12   you know, obviously the reason we're here is to
13   determine whether he's suitable for parole, and I
14   think the evidence supports Mr. Boatman's
15   suitability. The evaluation report indicates that
16   he has continued to program in a positive manner.
17   He's remained disciplinary-free, attends Narcotics
18   Anonymous. They say he's very sociable, gets
19   along with his peers and fellow workers very well.
20   And as Commissioner Webb pointed out, his
21   psychological reports indicate that he would be a
22   low degree of threat to the public if released.
23   Again, he has remained disciplinary-free
24   throughout his incarceration. That shows his
25   commitment to his new way of living and his new
26   attitude. His future plans are very realistic.
27   They -- He has plenty of job offers and he has a

45

1    great place to live with his family. We could go
2    through all the self-help activities that he's
3    participated in, but just to answer the
4    Commissioner's question, on Narcotics Anonymous it
5    shows that he's been involved since 1994.  He's
6    taken courses on Advanced Alternatives to
7    Violence.  He has numerous laudatory chronos
8    starting in 1990.  He has a certificate for a
9    machinist welder, and which is no small task, and
10   he's started a new trade.  So he's clearly on the
11   right path.  Talking about some of the issues that
12   -- factors -- criteria that tend to show
13   suitability, his juvenile record, he had no
14   juvenile record.  He had a very stable social
15   history in terms of his family.  There's all the
16   support that he has from his family now, that's
17   the kind of support he had then.  Again, while
18   he's in prison, he's enhanced his ability to
19   function within the law upon his release through
20   participation in all those programs that we've
21   talked about, his journeyman machinist activities,
22   his GED, several other things.  All his self-help
23   therapy has gone towards making him better --
24   understand why he did what he did and I think he
25   truly does that -- understand that.  All his work
26   reports are excellent.  I think when we talk about
27   the notion of stress as a part of the criteria, I

46

1    think there was peer pressure and stress in that

2    way at that time and he wasn't able to overcome

3    it, but there was some stress asserted as to why

4    he committed the crime that he did.  His criminal

5    history I think is reasonably minimal.  He was on

6    probation for grand theft when this occurred, but

7    overall his criminal history is fairly minimal.

8    He was young.  As he said, he was only 20 when he

9    committed the crime.  He's 37 now.

10            **INMATE BOATMAN:**  Yes.

11        **ATTORNEY SILVER:**  He's matured considerably.

12    And I think it states in here he's been a model

13    prisoner and a lot of younger prisoners come to

14    you for advice and to figure out how to do things

15    here; is that correct?

16            **INMATE BOATMAN:**  Yes, it is.

17        **ATTORNEY SILVER:**  Okay.  So, he's maintained

18    a very positive institutional behavior.  He has

19    shown significant signs of remorse.  We can go

20    back all the way from the time that this crime

21    happened how sorry he was for what happened.  I

22    think he's done an excellent job trying to

23    reconstruct his life.  And I think now that there

24    is no evidence to support the fact that he's not

25    suitable and would request that you find him

26    suitable.  Thank you very much.

27        **PRESIDING COMMISSIONER LAWIN:**  Thank you.

47

1   This is your opportunity to tell us why you're

2   suitable for parole.

3       INMATE BOATMAN:  Well, I think I'm suitable

4   for parole.  I have a loving family.  I have jobs.

5   I have a -- everything that a person needs to have

6   to have a successful parole, and I know that

7   there's no way that I'll ever do another criminal

8   act.  I'm just not saying that to get no date or

9   anything like that, but I know who I am and if you

10  could see or just live within my body just for a

11  minute or two you could see it's sincere that I do

12  have.  I care about people and I want to give

13  back.  You know, I feel that I could make a good

14  contribution.  I do it in here.  And I would

15  appreciate that if you'd give me another chance to

16  do it in society.  And that they -- I have a lot

17  -- I have a lot of friends and support.  So I feel

18  that I am suitable for parole seeing that.  And I

19  don't -- I can't -- what I done is a horrible

20  thing and to me if I was to do like another 100

21  years it still wouldn't be enough time and I

22  realize that.  But I feel I'm ready because I have

23  a good heart and just a loving-family, so.

24      PRESIDING COMMISSIONER LAWIN:  That's it?

25      INMATE BOATMAN:  Yeah.

26      PRESIDING COMMISSIONER LAWIN:  Okay.  Thank

27  you for your comments.  We appreciate them.  We'll

48

1    take a recess now and we'll call you back when we

2    have a decision.

3              INMATE BOATMAN:  Can I -- Can I -- Can I ask

4    you one more thing?

5              PRESIDING COMMISSIONER LAWIN:  Yes.

6              INMATE BOATMAN:  Is that if you don't find

7    me suitable today, can you please tell me what I

8    need to do so I can, you know, get back out to go

9    home.  I'd appreciate that too.

10             PRESIDING COMMISSIONER LAWIN:  We certainly

11   will.

12             INMATE BOATMAN:  Okay.

13             PRESIDING COMMISSIONER LAWIN:  Thank you.

14             INMATE BOATMAN:  All right, thank you.

15             ATTORNEY SILVER:  Thank you.

16                       R E C E S S

17                        --oOo--

18

19

20

21

22

23

24

25

26

27

1       **CALIFORNIA BOARD OF PRISON TERMS**

2       **D E C I S I O N**

3       **DEPUTY COMMISSIONER WEBB:**  We're on.

4       **PRESIDING COMMISSIONER LAWIN:**  Thank you.

5       We're back on record in the hearing for

6       Christopher Boatman and all parties have returned

7       to the room.  The Panel has reviewed all

8       information received from the public and relied on

9       the following circumstances in concluding that the

10      prisoner is suitable for parole and would not pose

11      an unreasonable risk of danger to society or a

12      threat to public safety if released from prison.

13      The prisoner has no juvenile record of assaulting

14      others.  While imprisoned, he has enhanced his

15      ability to function within the law upon release

16      through participation in educational programs.  He

17      has acquired his GED.  Through vocational

18      programs, he has spent over seven thousand hours

19      working toward his machinist certification.  He

20      has spent time in welding, and he also is now

21      enrolled in a plumbing program.  Through, excuse

22      me, self-help programs such as NA, which he's been

23      involved in for the past nine years.  Has taken

24      home study courses to enhance his vocational

25      abilities.  He participated in Alternatives to

26      Violence, Kairos, Alcoholics Anonymous, Katargeo,

27      CHRISTOPHER BOATMAN  D-65055  DECISION PAGE 1  7/30/02

1   and various other self-help programs such as
2   walkathons. He has realistic parole plans which
3   include job offers and family support, and has
4   maintained close family ties while in prison via
5   letters and visits. He has maintained positive
6   institutional behavior which indicates significant
7   improvement in self-control. Mr. Boatman has
8   received no 115s since his incarceration, and he
9   has received three 128(a) counseling chronos. He
10  also shows signs of remorse. He has indicated he
11  understands the nature and magnitude of the crime
12  and has taken steps toward good citizenship, and
13  he accepts responsibility for his criminal
14  behavior. The psychiatric report dated September
15  28th, 2000 by Dr. S. Buchan, B-U-C-H-A-N, supports
16  parole. In that report, the doctor says -- makes
17  a number of positive comments, but does indicate
18  that the inmate has good insight into the dynamics
19  of his commitment offense, takes full
20  responsibility for his actions, and that his
21  judgment is well above average. Goes on to state
22  that the inmate's potential for danger in the
23  community appears to be quite minimal. He has no
24  history of violence prior to the commitment
25  offense. And says this man is not a criminal and
26  that it's very unlikely he would behave violently
27  CHRISTOPHER BOATMAN  D-65055  DECISION PAGE 2  7/30/02

1    if released.  The prior report was done --

2    Actually, two previous reports were done by Dr. J.

3    Temkova, T-E-M-K-O-V-A, psychologist, and in the

4    March 1998 report he refers us back to his 1996

5    report, stating the decision of whether or not he

6    is paroled should be based on other than

7    psychiatric factors.  In the 1996 report, he talks

8    about the inmate's judgment and insight.  He says

9    it's adequate and he presented evidence of being

10   able to take full responsibility for his behavior

11   and openly acknowledged his problems with cocaine

12   abuse.  The base life offense of which the

13   prisoner has been convicted is murder second,

14   Penal Code Section 187.  The offense occurred on

15   May 29th, 1986.  The term is derived from the

16   matrix located in the CCR Title 15 at Section

17   2403(c), second degree murder, offense committed

18   on or after November 8th, 1978.  The Panel finds

19   that Category III-C is appropriate in that the

20   victim, John Sousa, suffered severe trauma, having

21   died from the gunshot wound during the course of a

22   robbery, and there was no prior relationship.  The

23   inmate indicates he did not know Mr. Sousa who was

24   employed at the store that was robbed.  The Panel

25   assesses 240 months and notes -- this is the base

26   offense and notes that this is the middle term.

27   CHRISTOPHER BOATMAN  D-65055  DECISION PAGE 3  7/30/02

1   There are no factors that we determined in

2   aggravation nor mitigation.  There was an

3   additional charge, an armed allegation, that's

4   Code Section 12022(a), and the same Fresno County

5   case number, 3510310, count number one, and the

6   Panel assesses six months for that armed

7   allegation, bringing the total to 246 months.

8   There is post-conviction credit awarded from

9   September 3rd, 1987 to today's date, July 30th,

10  2002, of 59 months in that Mr. Boatman has no

11  115s, therefore he received full post-conviction

12  credits bringing the total period of confinement

13  to 187 months.  Mr. Boatman, the Panel sets the

14  final -- these conditions of parole -- special

15  conditions of parole:  First of all, you're not to

16  use alcoholic beverages.  You're to submit to

17  anti-narcotic testing, submit to THC testing, and

18  attend parole outpatient clinic for evaluation and

19  they will determine whether or not you need to

20  continue to participate in parole outpatient

21  clinic.  This is only the first step.

22          INMATE BOATMAN:  Yes.

23          PRESIDING COMMISSIONER LAWIN:  The paperwork

24  says that you're not to be released until the

25  Governor has reviewed -- exercised his review

26  authority.  That's because it goes from here to

27  CHRISTOPHER BOATMAN  D-65055  DECISION PAGE 4  7/30/02

```
 1   Decision Review at the Board of Prison Terms and
 2   they'll make sure that we did our job.  And then
 3   it will generally go to the Governor from there.
 4   The Governor then decides what decision he wants
 5   to make.  He can reverse our decision.  He can
 6   send our -- your case to the full Board for all
 7   nine of us to vote on.  So there are a number of
 8   options that he has --
 9            INMATE BOATMAN:  Okay.
10            PRESIDING COMMISSIONER LAWIN:  -- and I have
11   no clue as to where -- which way he'll go with it.
12            INMATE BOATMAN:  Okay.
13            PRESIDING COMMISSIONER LAWIN:  We believe we
14   have presented him with the best case by filling
15   in all of the blanks and we have -- we hope that
16   we have provided adequate information to the
17   reader of this transcript to reach the same
18   conclusion that we did, that we do not believe
19   that you would be a threat to society.
20            INMATE BOATMAN:  Thank you.
21            PRESIDING COMMISSIONER LAWIN:  Okay.
22            INMATE BOATMAN:  I don't know what else to
23   say.
24            PRESIDING COMMISSIONER LAWIN:  And the Panel
25   also agrees that your highest chance of success
26   would be with your family; therefore, the Panel
27   CHRISTOPHER BOATMAN  D-65055  DECISION PAGE 5  7/30/02
```

54

1    believes that you should be paroled to Kings

2    County.

3            **INMATE BOATMAN:**  Okay.

4            **PRESIDING COMMISSIONER LAWIN:**  Commissioner?

5            **ATTORNEY SILVER:**  Thank you.

6            **DEPUTY COMMISSIONER WEBB:**  Nothing else.

7    You did a good job.

8            **INMATE BOATMAN:**  Thank you, Mr. Webb.

9            **PRESIDING COMMISSIONER LAWIN:**  If there are

10   any additional letters of support, job offers,

11   anything that you were expecting but maybe didn't

12   get in on time, they need to go directly to Board

13   of Prison Terms now --

14           **INMATE BOATMAN:**  Okay.

15           **PRESIDING COMMISSIONER LAWIN:**  -- because

16   this case -- your case will go up to the

17   Sacramento office for work on it.  So anything

18   else from now on needs to go directly to the

19   Board.

20           **INMATE BOATMAN:**  Okay.

21           **PRESIDING COMMISSIONER LAWIN:**  All right.

22           **INMATE BOATMAN:**  All right.

23           **PRESIDING COMMISSIONER LAWIN:**  I wish you

24   good luck.

25           **INMATE BOATMAN:**  Thank you.

26           **PRESIDING COMMISSIONER LAWIN:**  And I would

27   **CHRISTOPHER BOATMAN  D-65055  DECISION PAGE 6  7/30/02**

55

1    cautious with the information about your date.

2           INMATE BOATMAN:  Okay.  All right.

3           PRESIDING COMMISSIONER LAWIN:  Okay.

4           INMATE BOATMAN:  Thank you guys.

5           PRESIDING COMMISSIONER LAWIN:  That

6    concludes the hearing.  It's 4:10.

7           ATTORNEY SILVER:  Thank you.

8                    --o0o--

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24                                    PENDING REVIEW

                                   AND APPROVAL

25    PAROLE GRANTED

26    EFFECTIVE DATE OF THIS DECISION_____

27    CHRISTOPHER BOATMAN  D-65055  DECISION PAGE 7  7/30/02

55

1   cautious with the information about your date.

2          INMATE BOATMAN:  Okay.  All right.

3          PRESIDING COMMISSIONER LAWIN:  Okay.

4          INMATE BOATMAN:  Thank you guys.

5          PRESIDING COMMISSIONER LAWIN:  That

6   concludes the hearing.  It's 4:10.

7          ATTORNEY SILVER:  Thank you.

8                       --o0o--

9

10

11

12

13

14

15

16

17                    .

18

19

20

21

22

23

24

25   PAROLE GRANTED

26   EFFECTIVE DATE OF THIS DECISION  NOV 2 6 2002

27   CHRISTOPHER BOATMAN  D-65055  DECISION PAGE 7  7/30/02

56

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, PATRICIA M. JOHNSON, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 55, and which recording was duly recorded at CALIFORNIA STATE PRISON - SAN QUENTIN, at SAN QUENTIN, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of CHRISTOPHER BOATMAN, CDC No. D-65055, on JULY 30, 2002, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated August 12, 2002, at Sacramento County, California.

Patricia M. Johnson
Transcriber
**CAPITOL ELECTRONIC REPORTING**