SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PRISON TERMS

In the matter of the Life )
Term Parole Consideration )     CDC Number D-65055
Hearing of: )
 )
CHRISTOPHER BOATMAN )
_____ )

CALIFORNIA STATE PRISON, SAN QUENTIN

SAN QUENTIN, CALIFORNIA

APRIL 6, 2005

**COPY**

**INMATE**

**PENDING REVIEW AND APPROVAL**

PANEL PRESENT:

STEPHEN LEE, Presiding Commissioner
HERBERT MAY, Deputy Commissioner

OTHERS PRESENT:

CHRISTOPHER BOATMAN, Inmate
JOHN STRINGER, Attorney for Inmate

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____     No          See Review of Hearing
_____     Yes         Transcript Memorandum

Matthew Yates          Capitol Electronic Reporting

ii

INDEX

Page

Proceedings ........................................  1

Case Factors ......................................  7

Pre-Commitment Factors ............................11

Post-Commitment Factors ...........................21

Parole Plans ......................................17

Closing Statements ................................40

Recess ............................................46

Decision ..........................................47

Adjournment .......................................54

Transcriber Certification .........................55

--oOo--

1

1       P R O C E E D I N G S

2           **DEPUTY COMMISSIONER MAY:**  We're on record.

3           **PRESIDING COMMISSIONER LEE:**  This is a

4    Subsequent Parole Consideration for Christopher

5    Boatman, CDC number D-65055.  Date of hearing is

6    April the 6th, year 2005.  Location, San Quentin

7    State Prison.  The life term started on September

8    the 3rd, 1987 from the county of Los Angeles.              '

9    Excuse me, county of Fresno.  The charge is murder,

10   second degree with the use of firearm, which was --

11   Guess it was (inaudible).  Case number FRE351031.

12   Count one, term was 16 years to life.  That was

13   because of the principal armed plus the

14   (inaudible).  Minimum eligibility for parole

15   January 31st, 1997.  This was in violation of Penal

16   Code section 187 slash 12022A.  At this point in

17   time, this hearing will be tape recorded.  For the

18   purposes of voice identification, each of us will

19   be required to state our first name and spell our

20   last name for the record.  When it is your turn,

21   sir, please give us your CDC number.  I will begin.

22   My name is Mr. Lee.  I am the Commissioner.

23          **DEPUTY COMMISSIONER MAY:**  I'm Herbert May,

24   M-A-Y, Deputy Commissioner.

25          **ATTORNEY STRINGER:**  John Stringer, S-T-R-I-

26   N-G-E-R, attorney for Mr. Boatman.

27          **INMATE BOATMAN:**  Christopher Boatman, B-O-A-

1    T-M-A-N, D number 65055.

2        **PRESIDING COMMISSIONER LEE:**  And we have two

3    officers here from Corrections.  Before we begin,

4    we will go through the ADA rights.  Sir, I have a

5    document here.  Document is dated December the

6    17th, year 2004, which you indicated pursuant to

7    1073 that you have no disabilities.  Is that true?

8        **INMATE BOATMAN:**  Yes, it is.

9        **PRESIDING COMMISSIONER LEE:**  All right, you

10   have a document before you.  Would you please read

11   that out loud?

12       **INMATE BOATMAN:**  Okay.

13           "The American With Disabilities Act,

14           ADA, is a law to help people with

15           disabilities.  Disabilities are

16           problems that make it harder for some

17           people to see, hear, breathe, talk,

18           walk, learn, think, work, or take

19           care of themselves than it is for

20           others.  Nobody can be kept out of

21           public places or activities because

22           of a disability.  If you have a

23           disability, you have the right to ask

24           for help to get ready for your BPT

25           hearing, get to the hearing, talk,

26           read forms and papers, and understand

27           the hearing process.  BPT will look

3

1          at what you ask for to make sure that

2          you have a disability that is covered

3          by the ADA and that you have asked

4          for the right kind of help.  If you

5          do not get help, or if you do not

6          think you got the kind of help you

7          need, ask for a BPT 1074 grievance

8          form.  You can also get help to fill

9          it out."

10         **PRESIDING COMMISSIONER LEE:**  Do you

11   understand what you just read, sir?

12         **INMATE BOATMAN:**  Yes, I do.

13         **PRESIDING COMMISSIONER LEE:**  All right.

14   Have you ever had to take psychotropic medication?

15         **INMATE BOATMAN:**  No, I haven't.

16         **PRESIDING COMMISSIONER LEE:**  Do you have any

17   hearing disabilities or seeing disabilities?

18         **INMATE BOATMAN:**  No, I don't.

19         **PRESIDING COMMISSIONER LEE:**  Okay, have you

20   ever been included in Triple CMS or EOP programs?

21         **INMATE BOATMAN:**  No.

22         **PRESIDING COMMISSIONER LEE:**  Have you ever

23   been in special ed class?

24         **INMATE BOATMAN:**  No.

25         **PRESIDING COMMISSIONER LEE:**  Do you know of

26   any disability which would prevent you from

27   participating in today's hearing?

4

1       **INMATE BOATMAN:**  None.

2       **PRESIDING COMMISSIONER LEE:**  All right.

3   This hearing is being conducted pursuant to Penal

4   Code sections 3041 and 3042 and the rules and

5   regulations of the Board of Prison Terms governing

6   consideration hearings for life inmates.  Purpose

7   of today's hearing is to once again consider your

8   suitability for parole.  In doing so, we will

9   consider the nature of the crime that you were

10  committed for, your prior criminal and social

11  history, your behavior and programming since your

12  commitment.  We've had an opportunity to review

13  your Central File, your prior transcripts, and you

14  will have an opportunity to correct or clarify on

15  the record.  We'll consider your progress since

16  your last hearing, your psychological report, and

17  any information that may have bearing on your

18  suitability.  Any change in your parole plans

19  should be brought to our attention.  We will reach

20  a decision today and inform you as to whether or

21  not we find you suitable for parole and the reasons

22  for our decision. If you are found suitable for

23  parole, the length of your confinement will be

24  explained to you.  Before we recess for

25  deliberations, your attorney and you will be given

26  an opportunity to make a final statement.  That

27  statement will be made and then we will recess,

5

1   clear the room, and deliberate.  Once we have

2   completed our deliberations, we will resume the

3   hearing and announce our decision.  California Code

4   of Regulations states that regardless of time

5   served, a life inmate shall be found unsuitable for

6   and denied parole if in the judgment of the Panel,

7   the inmate would pose an unreasonable risk of

8   danger to society if released from prison.  Do you

9   understand the standards that we go by, sir?

10        INMATE BOATMAN:  Yes, I do.

11        PRESIDING COMMISSIONER LEE:  All right.  At

12   this time, you have certain rights.  These rights

13   include the right to timely notice of this hearing,

14   the right to review your Central File, and the

15   right to present relevant documents.  Counsel, to

16   the best of your knowledge, have your client's

17   rights been met?

18        ATTORNEY STRINGER:  They have, Commissioner.

19        PRESIDING COMMISSIONER LEE:  You have an

20   additional right.  That's to be heard by an

21   impartial Panel.  Do you have any objections to the

22   Panel?

23        INMATE BOATMAN:  No, I don't.

24        PRESIDING COMMISSIONER LEE:  Counsel, do you

25   have any further fundamental or preliminary

26   objections?

27        ATTORNEY STRINGER:  Not at this time.

6

1      PRESIDING COMMISSIONER LEE:  You will

2   receive a copy of our written notice today.  That

3   tentative decision becomes effective within 120

4   days.  A copy of the decision and a copy of the

5   transcript will be sent to you.  The Governor, as

6   you know, has the final say, so as such, you have a

7   grievance procedure if in fact you are denied.

8   That grievance procedure is pursuant to

9   administrative decision 04 slash 01.  You're not

10   required to admit the offense or discuss the

11   offense.  However, this Panel will accept as true

12   the findings of the Court.  We are not here to

13   retry your case.  Commissioner, do we have any

14   confidential that we're going to be using today?

15      DEPUTY COMMISSIONER MAY:  We will not be,

16   Mr. Chairman.  Thank you.

17      PRESIDING COMMISSIONER LEE:  I have a

18   checklist of documents that has been handed to your

19   attorney.  It is marked exhibit one.  Counsel, have

20   you had an opportunity to review those files, those

21   documents, and do you have any questions at this

22   time?

23      ATTORNEY STRINGER:  I do not, Commissioner.

24   With the exception of the confidential material, I

25   have all the documents.

26      PRESIDING COMMISSIONER LEE:  All right, do

27   you have any documents to submit to the Panel at

1   this time?

2       **ATTORNEY STRINGER:**  We have some additional

3   chronos.

4       **PRESIDING COMMISSIONER LEE:**  Those having

5   been handed to Commissioner at this time, we'll

6   swear the inmate.  Sir, raise your right hand.  Do

7   you solemnly swear to tell the truth, the whole

8   truth, and nothing but the truth?

9       **INMATE BOATMAN:**  I do.

10      **PRESIDING COMMISSIONER LEE:**  I'm going to go

11  to the facts of the case this time.  I'm referring

12  to the summary of the offense, page one of seven,

13  dated 2004, September.

14          "Approximately 12 noon on May 29th,

15          1986, inmate Boatman was driving his

16          car with the codefendants Harold

17          Jones and (inaudible) Montgomery.

18          The three of them had been freebasing

19          cocaine and decided that they needed

20          more money to buy drugs.  Boatman

21          (inaudible) a small store in

22          (inaudible), which they decided not

23          to rob because there were too many

24          cars.  At approximately 12:30 P.M.

25          they stopped at the home of Chris

26          Bessel.  They found Mr. Bessel

27          working on his motorcycle.  The four

```
 1        of them were talking when Jones went
 2        into the car to retrieve a .22
 3        caliber handgun which belonged to
 4        Boatman's stepmother.  Jones shot a
 5        can and told Mr. Bessel how they
 6        planned to rob a store in (inaudible)
 7        when instead they decided to rob a 41
 8        Market.  Bessel told them that they
 9        were known and they would be
10        identified and caught.  Jones said
11        that they would not need to worry
12        about that.  The three men left Mr.
13        Bessel's and drove to the 41 Market
14        in Riverdale.  Jones and Boatman
15        entered the store.  Boatman stood by
16        the door and acted as a lookout.
17        Jones confronted the 19 year old
18        (inaudible) Jon Sousa, pointed the
19        gun at him, and ordered him not to
20        move.  Jones then ordered Mr. Sousa
21        to give him money.  Mr. Sousa opened
22        the cash register, gave Jones $1200,
23        and turned away.  Jones shot Mr.
24        Sousa in the back of the head."
25    At this point in time, sir, you were convicted
26    because you were an accessory.  There was no
27    question that apparently you did not do the actual
```

9

1   shooting.  You have been here almost 20 years, not

2   quite.  You were a young man when you went to jail.

3   How do you feel about this crime?

4       **INMATE BOATMAN:**  I feel sorry.  Don't feel

5   good about it at all.

6       **PRESIDING COMMISSIONER LEE:**  Why do you feel

7   sorry?  Why don't you feel good?  You've had a lot

8   of time to think about it.

9       **INMATE BOATMAN:**  I know, and if it wasn't

10  for my actions, getting in the car and my gun and

11  my willingness to do this job, he's still living

12  today.  Weighs heavy in my heart and I wish I could

13  take it back.

14      **PRESIDING COMMISSIONER LEE:**  But you never

15  saw this guy.

16      **INMATE BOATMAN:**  I know, I know, and I did

17  not know he was going to go in there and do that.

18  It was just supposed to be a robbery.  That's it.

19      **PRESIDING COMMISSIONER LEE:**  Yeah, there's

20  the big question, and that has always been the

21  question in regards to these cases, what we call

22  felony murder.  And that is when you know that

23  someone is carrying a weapon, it's one thing to sit

24  there and say, okay, well, they (inaudible).  But

25  when you know that based upon the facts that I just

26  read to you, Mr. Jones practiced with the .22, the

27  .22 was actually real, and then he made that

10

1  cryptic statement, we won't have to worry about

2  identification.  Sir?

3       **INMATE BOATMAN:**  Yes?

4       **PRESIDING COMMISSIONER LEE:**  You indicated

5  to us that you had no -- You thought at the time

6  that you never thought there was going to be a

7  possibility that someone was going to get hurt.

8       **INMATE BOATMAN:**  Exactly.  When he stated

9  that statement, we all had plans.  Every single of

10 us were going to leave town.  I was going to my

11 mom's house, Butch was going somewhere, and he was

12 going somewhere.  When he made that statement, we

13 were just going to hang low, so it didn't strike

14 nothing in my mind that he was going to do that.

15      **PRESIDING COMMISSIONER LEE:**  I have to give

16 you the benefit of the doubt to the extent that you

17 were taking drugs at that time.  And I don't know

18 what the age of the other victims were, but it's

19 obvious that you were not the major mastermind

20 behind this.

21      **INMATE BOATMAN:**  Yes.

22      **PRESIDING COMMISSIONER LEE:**  You could have

23 said something about the gun.  You didn't need to

24 go in there with a loaded gun.  Could have gone

25 there with a unloaded gun.  Could have gone there

26 with no gun, just threatening with a gun.  Never

27 occurred to you at the time to say anything,

1   because you were a full participant in these
2   robberies.

3       **INMATE BOATMAN:**  I was, and I didn't even
4   think nothing at the time.  At that time, my mind
5   was, like, in a stage of self-deception and
6   rationalization, you know.  I thought nobody was
7   going to get hurt and during this, I became very
8   confused and indecisive.  I wanted to say no, let's
9   don't do this, you know.  Let's stop.  But I
10  couldn't, you know.  I was just straight
11  (inaudible), and that's what that does to you.

12      **PRESIDING COMMISSIONER LEE:**  I'm going to go
13  into your social as well as your juvenile record.
14  I'm going to turn to page two.  Basically, the
15  bottom line is that in April 30th -- Let's go to
16  juvenile record.  You have no juvenile record that
17  we know of.  On April 30th, 1984, you were arrested
18  by the Fresno Sheriff's Department for two counts
19  of rape with force and fear.  Apparently the
20  individual did not wish to testify, so you were not
21  convicted of that.  On the other hand, there was a
22  1987 case.  I believe it was a purse snatch.  You
23  were sentenced on December -- Take that back, not
24  1987, 1984 -- to six months in jail, three years
25  probation.  Going to your social history at this
26  point in time.

27      "Mr. Boatman was born in Covington,

12

1                Louisiana on July 25th, 1965, the

2                fourth of six children to Arleta

3                Phillips.  His mother moved the

4                family to Fresno area when he was an

5                infant, where his mother met and

6                married a Jim Boatman.  Mr. Boatman

7                became a father figure and supported

8                his family through a variety of

9                labor-intensive jobs ranging from

10              roping cattle to drilling wells.  As

11              the children grew, his mother took a

12              position as a teacher's aide.  When

13              Boatman was 10 years old, his parents

14              divorced.  His father remained in

15              Riverdale and his mother moved to

16              Fresno."

17     Thought she was already in Fresno.

18              "At the age of 15, Boatman chose to

19              live with his father because he got

20              along well with him.  Shortly

21              thereafter his father developed a

22              relationship with a woman that

23              Boatman considered his stepmother.

24              As a young teenager, Boatman worked

25              with his father drilling wells and

26              roping cows and played a variety of

27              sports.  He dropped out of Riverdale

1           High School after completing the 11th

2           grade.  He did not pursue further

3           education or vocational training, nor

4           did he belong to any clubs or

5           organizations.  After leaving high

6           school, Boatman moved to Fresno to

7           live with his mother and a man she

8           had developed a relationship with.

9           The relationship between the mother

10          and stepfather added two half-

11          siblings to the family.  Boatman

12          worked at the stepfather's liquor

13          store as a stockboy and considered

14          returning to school.  He started

15          smoking marijuana and drinking

16          alcohol at the age of 14.  His drug

17          use became a problem in the high

18          school and was partially responsible

19          for him dropping out.  After visiting

20          the beach in San Luis Obispo at the

21          age of 18, he was arrested for purse

22          snatching.  After serving six months

23          in the county jail, he was

24          transported back to Fresno to face

25          the charge of illicit sex with a

26          minor, which was subsequently

27          dismissed.  His probation was

14

1          accepted by Fresno County

2          authorities.  He remained (inaudible)

3          and worked for the stepfather.

4          However, his drug use continued.

5          Boatman reports that he went to his

6          father's house to visit over a

7          weekend and stayed for a month.  He

8          started associating with codefendant

9          and his drug use escalated

10         dramatically.  By the time of the

11         instant offense, Boatman's addiction

12         to drugs, including cocaine, was out

13         of control.  Throughout the court

14         proceedings, Boatman was housed in

15         the jail of an adjacent county.

16         Because of his testimony in

17         cooperation with prosecutors, his

18         codefendant remained listed as an

19         enemy."

20    Sir, based upon what I'm reading, you are no longer

21    associated with Mr. Jones.

22         **INMATE BOATMAN:**  No.

23         **PRESIDING COMMISSIONER LEE:**  What happened

24    to Mr. Montgomery?

25         **INMATE BOATMAN:**  I think he got, like, two

26    years for perjury and he was released after that.

27         **PRESIDING COMMISSIONER LEE:**  I'm a little

1    bit confused.  Mr. Montgomery was doing the robbery

2    with you.

3           **INMATE BOATMAN:**  Yes.

4           **PRESIDING COMMISSIONER LEE:**  So how did he

5    end up doing only two years?

6           **INMATE BOATMAN:**  I don't know.  At the time

7    he made a deal with the prosecution.

8           **PRESIDING COMMISSIONER LEE:**  What happened

9    to Harold Jones?

10          **INMATE BOATMAN:**  He got sentenced to life

11    without.

12          **PRESIDING COMMISSIONER LEE:**  And he's L-

13    WOPP?

14          **INMATE BOATMAN:**  He's what?

15          **PRESIDING COMMISSIONER LEE:**  L-WOPP, Life

16    Without Possibility of Parole?

17          **INMATE BOATMAN:**  Yes, he is.

18          **PRESIDING COMMISSIONER LEE:**  You testified

19    in that case?

20          **INMATE BOATMAN:**  No, I did not.  I just made

21    a statement.  When I pled, I pled to my involvement

22    in the crime itself and my participation.

23          **PRESIDING COMMISSIONER LEE:**  You wouldn't

24    snitch him out.  Why is it that you apparently are

25    on such inscrutable grounds with each other?

26          **INMATE BOATMAN:**  What, me and him?

27          **PRESIDING COMMISSIONER LEE:**  Yes.

16

1              INMATE BOATMAN:  I really didn't know the

2      guy, you know.  I met him one time, that was it,

3      prior to the day I went to the house where

4      Montgomery stayed and that's where he was at again

5      smoking cocaine.  I wanted to do it and I held in

6      adjacent, but I don't know the events, what took

7      place.

8              PRESIDING COMMISSIONER LEE:  Something

9      happened.

10             INMATE BOATMAN:  Yes.

11             PRESIDING COMMISSIONER LEE:  Between you

12     two.

13             INMATE BOATMAN:  Between me and who?

14             PRESIDING COMMISSIONER LEE:  Mr. Jones.

15             INMATE BOATMAN:  Yes.  Well, we don't get

16     along.

17             PRESIDING COMMISSIONER LEE:  Why is it that

18     you don't get along?

19             INMATE BOATMAN:  Well, I just didn't like

20     him.

21             PRESIDING COMMISSIONER LEE:  Is it on your

22     part or his part?

23             INMATE BOATMAN:  It's on my part, because I

24     trusted him.  He told me that nobody was going to

25     get hurt.

26             PRESIDING COMMISSIONER LEE:  Mr. Boatman,

27     you have to understand, I can interpret things in

17

1   many different ways and when you say you don't get

2   along with him, basically, I can infer the positive

3   aspect of what you just said.  You've chosen not to

4   be associated with this person who did a homicide.

5   Or I can assume the other way around, that

6   basically he's mad at you, presumably because you

7   (inaudible) on him.  I don't know, but at this

8   point in time, I have finished the social.  I am

9   now going to go into your parole plans.  If you are

10  released, you have indicated on page seven of your

11  report, September 7th, year 2004, that you plan to

12  live with your mother and stepfather and work with

13  your brother, who live close to each other in

14  Lemoore, California.  You report that your parents

15  are prepared to supply you with clothing,

16  transportation in order to minimize expenses during

17  this transition.  We have received numerous letters

18  regarding this parole, which are in your Central

19  File.  There is a company by the name of Tanner

20  Machine and Manufacturing Company in Fresno,

21  California that there might be a chance you could

22  be hired there if you were released.  We have

23  received the following support letters from San

24  Quentin Correctional Officers J. Robinson, L.

25  Castner, JC Gladstone, and from Recreational Coach

26  Don Zaneby [phonetic], Kairos contact John Kelly.

27  What is Kairos?

18

1      **INMATE BOATMAN:**  Kairos is a three day men's
2   retreat.  They come in and they come in here to
3   share their life experiences with us and they
4   assure us that we're not alone.  They extend us
5   that helping hand when we're released back into the
6   society and then this goes on.  We have a retreat
7   every -- We have it on February and we have it in
8   October, twice a year.

9      **PRESIDING COMMISSIONER LEE:**  At this point
10  in time, I have concluded in regards to the parole
11  plans.  Is there anything you wish to add at this
12  time in regard to your parole plans?

13     **INMATE BOATMAN:**  Yes.  I have some -- As you
14  stated, I want to stay at my mom and dad.  They
15  live in Lemoore, California, and I will be
16  employed, you know, with my brother drilling wells.
17  Doing this type of work will enable me to make
18  enough money to provide for myself as well as my
19  family.  And I also want you to take into
20  consideration that if it didn't work out, as you
21  stated earlier, these jobs that I have right now --
22  You didn't read them all, but I'll just read it
23  real briefly, okay?  A couple of these?

24     **PRESIDING COMMISSIONER LEE:**  At this point
25  in time, submit that to us and I will leave the
26  Commissioner to read them.  And I'm going to go
27  into the next aspect.  That is your 3042 notices.

19

1    3042 notices are notices that are sent out to

2    different agencies that have an interest in your

3    case.  In this particular regard, we did get a

4    response.  On March the 24th, year 2005, we

5    received a response by Blake Gunderson, Senior

6    Deputy District Attorney, lifer unit.  That I will

7    read.

8              "While the inmate has made

9              praiseworthy gains since his

10             commitment to CDC, he was an active

11             and knowing participant in a

12             calculated and cold-blooded murder.

13             While the inmate did not commit the

14             murder, it is reasonable to conclude

15             that he was aware that some violence,

16             if not killing violence, would be

17             used by the codefendant.  He went

18             into the store where the victim was

19             killed without wearing a mask or any

20             means of concealing his identity.  He

21             did not take such precautions.  After

22             hearing a chilling statement by the

23             soon-to-be shooter -- the co-

24             conspirators -- "

25    I mean, conspirators, excuse me.

26             " -- were asked about the certainty

27             about being caught if someone could

20

```
1          see their face.  We're not going to
2          worry about that, was the matter of
3          fact reply from the shooter.  After
4          killing, the inmate concealed the
5          killing -- concealed the killing
6          firearm he had supplied to the
7          shooter.  Further, this robbery
8          murder was accomplished while the
9          inmate was both on felony and
10         disciplinary probation."
```

11    On the other hand, I will indicate to you, I have
12    another letter, and that letter is from one Thomas
13    E. Witt, W-I-T-T.  He is apparently an individual
14    who has met you and is quite impressed with you.
15    He has indicated that he has known you since
16    October of the year 2000, that he believes that you
17    would be a good candidate for release back into
18    society.  There is another letter by an individual
19    by the name of Jack Fefferman from Burlingame.  He
20    also has indicated that (inaudible) volunteer, that
21    he spent much time with you and believes that you
22    would be (inaudible) who should receive a date for
23    parole.  There's an individual by the name of Andre
24    Cornelius Boatman, a relative, who basically
25    indicates that they would support you if in fact
26    you're released.  I have a letter from Big River
27    Drilling, which has indicated that there would be a

1   full time position starting at $25 an hour for you

2   if in fact you are released.  There is yet another

3   letter, and this is from Jonathon Figueroa, who

4   indicates that you would have a full time position

5   with him in Riverdale, California.  Your salary

6   would be $20 per hour (inaudible).  I'm not

7   entirely sure what that is.  There are other family

8   member letters as well.  Not going to go through

9   every one of the letters.  You have quite a few.

10  I'm taking note of those, and they're family

11  members.  There is a letter from welding

12  instructor, apparently enjoys your work.

13  (Inaudible) numerous letters.  The other letters

14  are in fact doubles.  At this point in time, we're

15  going to turn the matter over to Deputy

16  Commissioner.  Deputy Commissioner will discuss

17  with you your psychological reports, as well as

18  your activities while incarcerated.

19        **DEPUTY COMMISSIONER MAY:**  Thank you, Mr.

20  Chairman.  Mr. Boatman is commended for not having

21  any 115s since being incarcerated.  I do see two

22  128s, the last being back in 1999.  I guess that

23  was -- You weren't around for count or something?

24        **INMATE BOATMAN:**  Yeah, I was sleeping.

25        **DEPUTY COMMISSIONER MAY:**  Late?  Okay.

26  You're commended for not having 115s.  You're

27  currently vocational machine shop?

22

1       **INMATE BOATMAN:**  No, I'm in the plumbing

2   shop at this time.

3       **DEPUTY COMMISSIONER MAY:**  The plumbing shop?

4       **INMATE BOATMAN:**  Yes, I work in -- I work in

5   both.

6       **DEPUTY COMMISSIONER MAY:**  Okay.  Now, I

7   noticed in reviewing prior reports that you had

8   been in welding.  Had you completed that, though?

9       **INMATE BOATMAN:**  Yes, I have.

10      **DEPUTY COMMISSIONER MAY:**  You completed

11  welding?

12      **INMATE BOATMAN:**  In '94.  I signed the

13  contract agreement with the JC in '95.

14      **DEPUTY COMMISSIONER MAY:**  You completed it

15  back in 1994?

16      **INMATE BOATMAN:**  '94, I completed it.

17      **DEPUTY COMMISSIONER MAY:**  What other

18  vocations have you completed?

19      **INMATE BOATMAN:**  I became a journeyman

20  welder and machinist in 2001.

21      **DEPUTY COMMISSIONER MAY:**  Journeyman welder?

22      **INMATE BOATMAN:**  Yes, and machinist.

23      **DEPUTY COMMISSIONER MAY:**  Machinist.

24      **INMATE BOATMAN:**  Yeah.

25      **DEPUTY COMMISSIONER MAY:**  And that was the

26  year 2000?

27      **INMATE BOATMAN:**  That was in -- Yes, that

1    was in 2000 I graduated.

2         **DEPUTY COMMISSIONER MAY:**  Okay.  Is there

3    anything else?

4         **INMATE BOATMAN:**  June 2000, yes.

5         **DEPUTY COMMISSIONER MAY:**  Any other

6    vocations?

7         **INMATE BOATMAN:**  No vocations.

8         **DEPUTY COMMISSIONER MAY:**  Okay, then I'm

9    going to go over the different other group

10   activities that you've been involved in, okay?

11        **INMATE BOATMAN:**  Okay.

12        **DEPUTY COMMISSIONER MAY:**  Shows that you've

13   continued to be in Narcotic Anonymous, as evidenced

14   in a number of chronos, and I'll go over the

15   chronos with you, and if you feel I've omitted any

16   -- That's September the 30th, 2004.  It shows that

17   you're in the -- actively involved in your

18   spiritual class by Catholic chapel, July 1st, 2004.

19   You're a member of -- Shows that you continued to

20   be in NA AA June the 21st, 2004.  Continued

21   spirituality class.  That's April the 1st, 2004.

22   And Kairos men's retreat that you already indicated

23   earlier, that you performed many duties in that

24   group, and that is February the 16th, 2004.  A

25   number of chronos for your participation in

26   Narcotic Anonymous and your continued involvement

27   in the spirituality class December 2003 and Kairos

24

1   men's retreat, also for October the 13th, 2003.

2   Narcotic Anonymous for October 2003 and

3   spirituality class showing that you were very

4   active with the Catholic chapel.  There's recent

5   chronos for your being in Impact 16 week workshop

6   on addiction with 100 percent attendance.  You were

7   congratulated for having -- And this was from --

8   This shows four chronos from October the 18th,

9   January the 3rd, 2005, and February the 14th, 2005,

10  and March the 21st, 2005 for your attendance for

11  Impact.  Is there anything else?

12          **INMATE BOATMAN:**  Yeah, there's, like, AVP,

13  Alternative Violence Project.

14          **DEPUTY COMMISSIONER MAY:**  When was that?

15          **INMATE BOATMAN:**  AVP, I took that in '94,

16  11/94.  You're just going back to the --

17          **DEPUTY COMMISSIONER MAY:**  From the last

18  hearing.

19          **INMATE BOATMAN:**  Okay, that's okay.

20          **DEPUTY COMMISSIONER MAY:**  Anything else from

21  your last hearing?

22          **INMATE BOATMAN:**  No, there isn't.

23          **PRESIDING COMMISSIONER LEE:**  Well, is there

24  anything that you'd like to say just for the record

25  of some other groups that you have been in prior

26  that you felt had an impact on you while you've

27  been in the institution?

25

1    **INMATE BOATMAN:**  Yes, every single one had

2   an impact.

3    **DEPUTY COMMISSIONER MAY:**  What are some of

4   the other self-help groups that you've been in?

5    **INMATE BOATMAN:**  Alternatives to Violence

6   Project, as I stated, was designed to help with the

7   problems of violence.

8    **DEPUTY COMMISSIONER MAY:**  That was 1994?

9    **INMATE BOATMAN:**  Yeah, that was '94 and it

10  was 2000, April 2000.  And also, there was another

11  one.  That's Catargio.  That was -- It's like a

12  Greek word for (inaudible).

13   **DEPUTY COMMISSIONER MAY:**  I've heard of

14  that.

15   **INMATE BOATMAN:**  Okay, and that was in '96.

16  And personal responsibility course called Making a

17  Change.

18   **DEPUTY COMMISSIONER MAY:**  What year?

19   **INMATE BOATMAN:**  That was in '95.  That was

20  also, like, designed to help reduce recidivism rate

21  at San Quentin State Prison.

22   **DEPUTY COMMISSIONER MAY:**  That cover it?

23   **INMATE BOATMAN:**  Yeah, that pretty much

24  covers it.

25   **DEPUTY COMMISSIONER MAY:**  There anything

26  else that you want to include in your -- some of

27  the things that you've been doing or some of the

26

1    programs you've been in or some of the vocations?
2    That cover it?
3              **INMATE BOATMAN:** That covers everything that
4    I've been in.
5              **DEPUTY COMMISSIONER MAY:** All right, then
6    we'll go right to your psychiatric report by Dr.
7    Elizabeth Wantuch, W-A-N-T-U-C-H. And this is
8    dated January the 14th, 2005. Axis I, no
9    diagnosis. Axis II, no diagnosis. Axis III, none.
10   Axis IV, incarceration. And the GAF, Axis V, is
11   81. The doctor concluded,
12              "A number of factors were considered
13              in assessing Mr. Boatman's current
14              level of dangerousness. Factors are
15              favorable for the inmate are, first,
16              that he did not actually commit the
17              murder himself. Second, he does not
18              have a history of violent criminal
19              behavior. He has a minimal criminal
20              history and no juvenile record.
21              Third, he has not received any 115s
22              in his 18 years of incarceration.
23              Fourth, he does not have a history of
24              serious mental health problems.
25              While he does have a history of
26              substance abuse, it appears that he
27              has been clean and sober for the past

27

```
 1        18 years and he has participated in
 2        NA as well as other self-help
 3        programs to aid his recovery in
 4        addiction.  He appears to have a
 5        strong support from a stable family
 6        and friends.  Other factors in his
 7        favor are that he earned his GED and
 8        has worked on a variety of jobs since
 9        his incarceration with laudatory
10        performance evaluation.  This
11        examiner does not believe that there
12        are any factors that are unfavorable
13        at this point in time.  Mr. Boatman
14        was convicted twice for theft prior
15        to the instant offense and served six
16        months in jail for the second
17        offense.  The inmate was quite
18        forthcoming about his history and
19        self-reflective about the changes
20        that he feels he has made over the
21        years.  Mr. Boatman states he feels
22        he has matured.  He feels that he has
23        come to trust people and indicated
24        that this is because he now chooses
25        his friends carefully.  He added that
26        he chooses people who are positive
27        and successful.  In turn, he feels
```

```
 1              grateful for the support he has
 2              received.  Mr. Boatman appears eager
 3              to work and to involve himself in the
 4              community.  He appears to understand
 5              the importance of his continued
 6              participation in 12 step program and
 7              wants to give to his community,
 8              particularly those affected by drugs
 9              and crime.  It is this examiner's
10              professional opinion that Mr. Boatman
11              would pose a low risk if he were
12              released into the community at this
13              time."
14     Before I go to the Chair, since you were involved
15     in 12 steps, what's the most important one of the
16     12 steps in your --
17          INMATE BOATMAN:  The most important?  I like
18     really two.  I like 10.
19          DEPUTY COMMISSIONER MAY:  What's 10?
20          INMATE BOATMAN:  Ten is continue to take
21     personal inventory.  When you're wrong, promptly
22     admit it.  I like that step because you're
23     admitting that you have a problem.  You're, like,
24     working the first step.  You're working all the
25     first 10 steps and you're making that decision --
26     You know what I'm saying -- to turn your will and
27     your life over to God as you know Him.  And you're
```

1   making that searching and fearless moral inventory

2   and you're also admitting your liabilities, you

3   know, so, and admitting to God, to yourself

4   (inaudible) human being is actually the nature of

5   your wrong, so that step right there is the most

6   important to me.  What I do is, I go back and,

7   like, the end of the day, I'll go back and lay in

8   my bunk and I'll evaluate how my day was and did I

9   say anything to somebody or did I do anything to

10  somebody that I shouldn't have done.  And I take

11  immediate steps to correct that, because if you

12  don't do that (inaudible).  What that does is, it

13  causes you to back up in a corner that you can't

14  get out of.

15       DEPUTY COMMISSIONER MAY:  Is there another

16  step?

17       INMATE BOATMAN:  And number 12.  I like 12,

18  having had that spiritual awakening as a result of

19  the steps.  You know, you get to give back to the

20  community. You know, you get to give back to people

21  who are hooked on drugs and hopefully, they won't

22  make the same mistakes that you made in life.

23       DEPUTY COMMISSIONER MAY:  What about three?

24       INMATE BOATMAN:  Three, making the decision

25  to turn our will and our life over to the care -- I

26  mentioned that.  That's like -- I think I mentioned

27  that.  Okay, but that step right there --

1      **DEPUTY COMMISSIONER MAY:**  You said 10 and

2      12.

3      **INMATE BOATMAN:**  Ten and 12, but number

4      three is -- Ten is, like -- Step 10 is the most

5      important to me, because that's like working number

6      one through 10, okay.  And number three is making

7      the decision to turn our will and our lives over to

8      the care of God as we understood Him.

9      **DEPUTY COMMISSIONER MAY:**  All right.  I'll

10     return to the Chair.

11     **PRESIDING COMMISSIONER LEE:**  All right.  Mr.

12     Boatman?

13     **INMATE BOATMAN:**  Yes.

14     **PRESIDING COMMISSIONER LEE:**  Your case is

15     difficult.  The reason for this is because you are

16     remorseful for the death of -- what occurred, but

17     there's no question based upon your history, that

18     you were involved with crime.  And based upon the

19     statements in the psychiatric reports, that you

20     were out of control.  You were increasing in the

21     magnitude of criminality.  You were on probation at

22     the time this occurred.  Can you explain to us

23     what's different between the way you are now as

24     opposed to as you were then?

25     **INMATE BOATMAN:**  Yes.  It's a totally

26     different person that you're looking at today.  And

27     at that time, I was going through a lot of

1   confusion in my life, you know, and it's really
2   sad, because I was a good kid and I just needed
3   help at that time.  I thought if I used drugs,
4   which is stupid, it would dampen the depression of
5   the moment, but it just added to my loneliness,
6   which played a major role in me reacting to the
7   crimes that I committed.

8       **PRESIDING COMMISSIONER LEE:**  I have no
9   problems with that.  There's quite a few young
10  people in this world who have sense of loss and a
11  sense of loneliness, a sense of detachment, a sense
12  of not knowing who they are.  But they don't go out
13  and commit crimes.

14      **INMATE BOATMAN:**  That's true.  There's no
15  excuse.

16      **PRESIDING COMMISSIONER LEE:**  What is
17  different?  What is different?  Why are you
18  different?

19      **INMATE BOATMAN:**  I've had a lot of time to
20  reflect and think and what's different about me is
21  that I'm not like that.  That person right there
22  doesn't exist.  You know, that confusion.  I
23  haven't used drugs in over 19 -- almost 19 years.
24  The mistakes that I make today are correctable.  I
25  care about people as well as myself.  I have faith
26  in myself, you know, and I stand up -- The biggest
27  difference is, I stand up for what I believe in.

32

1    PRESIDING COMMISSIONER LEE:  Let me ask you
2    something.

3    INMATE BOATMAN:  Yes.

4    PRESIDING COMMISSIONER LEE:  You say you
5    stand up for what you believe in.  You were set a
6    date at one point in time.  The Governor reversed
7    that.

8    INMATE BOATMAN:  That's true.

9    PRESIDING COMMISSIONER LEE:  How you feel
10   about that?  Bother you?

11   INMATE BOATMAN:  It hurt at first.  The
12   initial impact of him reversing it because he
13   didn't know me, but on the other hand, I felt very
14   grateful to be given that opportunity for him to
15   review my parole, because at that time, too many
16   people weren't getting out or getting granted,
17   found suitable, and that to me -- It's made me a
18   stronger person today, you know, because I could
19   have said, like, you know, forget it, you guys
20   ain't going to let me go.  You know, I could have
21   went on a tear and got me some dope, you know, but
22   I didn't do that, you know, because I still
23   believed that I'd be out there.  And I'm not going
24   to give up like I did before in my life.

25   PRESIDING COMMISSIONER LEE:  Are you talking
26   about before you were arrested?

27   INMATE BOATMAN:  Yes, I gave up.

1      **PRESIDING COMMISSIONER LEE:**  This is an

2    interesting point, because we've had an opportunity

3    to review the Governor's reversal.  And though I

4    don't necessarily agree with all of it, there is

5    one portion that seems to indicate -- Well, let's

6    just -- Let's go over that.  First part, one of the

7    issues was the fact that you actually assisted, not

8    merely as being a lookout, but also as the one who

9    facilitated Mr. Jones having a gun.  But also, the

10   Governor refers to the fact that you helped discard

11   the gun.  How do you respond to that?

12      **INMATE BOATMAN:**  I did do that.  I was

13   scared.  I didn't know what to do at the time, and

14   that I was just hoping that Jon was going to be

15   okay.  It's sad.  That was a lot of confusion in my

16   life, Sir.

17      **PRESIDING COMMISSIONER LEE:**  Did you know

18   that somebody had been shot?

19      **INMATE BOATMAN:**  Yes, I did.

20      **PRESIDING COMMISSIONER LEE:**  Did you see it

21   or did you just hear it?

22      **INMATE BOATMAN:**  I just heard it.  I just

23   heard it and as I looked out the corner of my eye,

24   I seen him falling.

25      **PRESIDING COMMISSIONER LEE:**  And afterwards

26   -- Obviously, this is something that you never

27   expected.  What happened then?

1          INMATE BOATMAN:  I ran.  I ran to the car

2     and we drove away at that time.  I didn't know that

3     he shot him or not and I had asked him, did you

4     shoot him, and he said yes.  You know, and then I

5     asked him, do you think he's going to die and he

6     said he don't know.  And I asked him why.  He

7     stated that he was reaching for a gun at that time.

8          PRESIDING COMMISSIONER LEE:  Governor also

9     mentioned something which really is not that clear.

10    You were arrested for petty theft and something

11    about a grand theft and a possession of a weapon,

12    though I don't remember seeing that exactly.  There

13    was something about this rape of a 14 year old

14    girl.  That was never -- You were never convicted

15    of it.  However, there seems to be different

16    stories, one to the effect that you were sleeping

17    with her because everybody slept with her, and

18    another one that apparently she saw you kissing

19    someone and reacted.  Can you give us some

20    explanation in regards to the only other serious

21    matter that you seem to have had in your life?

22         INMATE BOATMAN:  That's my criminal history

23    right there, the two petty thefts that I've been

24    arrested for and the two counts of that rape.

25         PRESIDING COMMISSIONER LEE:  I understand,

26    but you were arrested for that charge.

27         INMATE BOATMAN:  Huh?

1    **PRESIDING COMMISSIONER LEE:**  You were

2    arrested for that charge.

3        **INMATE BOATMAN:**  For what charge?  The rape?

4        **PRESIDING COMMISSIONER LEE:**  The 14 year

5    old.  Yes, the rape.

6        **INMATE BOATMAN:**  Yes, and that was a lie.  I

7    was arrested.  She was ditching school.  We had met

8    them and we went at my house and I was with a

9    couple friends and she brought a friend over.  And

10   what had happened, the sex was consensual.  She

11   took her panties off and went in my bedroom.  And I

12   was wrong at that time.  I shouldn't have did what

13   I did.  And then she got mad.  The second day they

14   came over, we did the same thing and she got mad

15   because I went and kissed her friend and ran out

16   the house, and that's when she had gotten picked

17   up.  She said I raped her.

18       **PRESIDING COMMISSIONER LEE:**  Either way, you

19   were not convicted of that and I'm not going to put

20   the weight the Governor put on it.  I just want to

21   see how you wanted to explain that particular

22   situation.  At this point in time, we come to

23   probably the hardest aspect of this case, and that

24   is that -- How do you accept the fact that Governor

25   argued -- I won't say argued -- Governor made a

26   statement that this should have been a felony

27   murder case, that you should actually have been

36

1    convicted of first degree murder, since the

2    codefendant in this case got life without.   That

3    based upon everything that you said, this was an

4    easy felony murder case.   That you've already

5    gotten your grant of leniency.   That your leniency

6    is the fact that you didn't get 25 years to life.

7    That you've only done, you know, 17 years or

8    whatever it is.   That you haven't even done 25 yet.

9    How do you respond to that?

10         **INMATE BOATMAN:**   Well, if he only knew the

11   circumstances.

12         **PRESIDING COMMISSIONER LEE:**   Well, he knew

13   the circumstances.   He read the entire transcript.

14   He read every one of your letters that you

15   submitted to the Governor's secretary or legal

16   affairs secretary, went through the entire file

17   that I have, everything that you've ever done up

18   until, obviously the last few years.   So how do you

19   respond to the fact that they said you've already

20   gotten your break, the fact that you even get a

21   possibility of parole?

22         **INMATE BOATMAN:**   There's really nothing that

23   I can say about that.   He's entitled to his opinion

24   and that it wasn't my intention to go in there and

25   kill anybody, you know, so.

26         **PRESIDING COMMISSIONER LEE:**   Go ahead.   I'll

27   (inaudible).   I'll wait until you finish.

1          **INMATE BOATMAN:**  Yes, but I don't know about
2     how the felony murder rule applies.  I know that
3     I'm just as guilty and I know that.  And I'm
4     responsible for this death and I understand that.
5          **PRESIDING COMMISSIONER LEE:**  Well, your
6     attorney wasn't very good.  Your attorney should
7     have explained to you the following: The felony
8     murder rule is based upon the inherent
9     dangerousness of the act.  That means that we don't
10    care whether you want to hurt somebody.  The fact
11    that when you involve yourself in robbery and
12    someone dies as a result of that robbery, you
13    should never have gotten involved with it in the
14    first place and therefcre, we're going to hold you
15    liable for a death that has occurred.  So you're
16    conceivably -- If your partner was killed, you
17    could still in certain states be held for the
18    felony murder rule.  That would mean that you could
19    do two things: one, get life without the
20    possibility of parole, or in certain states, like
21    Texas, you might even get the death penalty.  So
22    the thing is, is that the argument from the
23    Governor is that you involved yourself in a
24    robbery.  You should have gotten first degree,
25    which would have been 25 years to life.  You
26    didn't, and that you should not even be complaining
27    at this -- I'm putting words in his mouth right

38

1    now, but the thing is, is that whatever you say

2    about the argument is that, hey, you know what,

3    you're just fortunate to even have the possibility

4    of parole, that someday, yeah, you might get

5    released, but that you've already gotten your

6    leniency.  That this is, you know, that you

7    shouldn't be looking forward to release anytime

8    soon.

9        **INMATE BOATMAN:**  I can understand that, but

10   I pled guilty to avoid that.  I pled guilty because

11   of my involvement.  I understood the consequences

12   of me going to trial and the pain of dragging the

13   family through that, and I knew that.  So that's

14   the only thing I can say, Sir.  I knew that and I

15   pled guilty to avoid that.

16       **PRESIDING COMMISSIONER LEE:**  All right.  I

17   have no further questions.  Do you have any

18   questions, Counsel?

19       **ATTORNEY STRINGER:**  Yes, thank you,

20   Commissioner.  Mr. Boatman, if you were to regain

21   your date and a number of restrictions were placed

22   on you as far as parole goes, would you abide by

23   all those restrictions?

24       **INMATE BOATMAN:**  Yes, I would.

25       **ATTORNEY STRINGER:**  And I just want to make

26   this crystal clear: You pled to second degree

27   murder to avoid putting the family of the victim

1    through a trial.  Is that correct?

2         **INMATE BOATMAN:**  Yes, I did.

3         **ATTORNEY STRINGER:**  Thank you.  Thank you,

4    Commissioner.

5         **PRESIDING COMMISSIONER LEE:**  All right,

6    before we go into statements, I have one last

7    question in regards to what your attorney just

8    asked.  When you pled to 15 to life, you knew at

9    that time that conceivably -- I'm not saying you

10   will, I'm saying conceivably -- you could spend the

11   rest of your life in jail.

12        **INMATE BOATMAN:**  No.

13        **PRESIDING COMMISSIONER LEE:**  Yes, you did,

14   because your attorney made it very clear, 15 to

15   life means exactly that, 15 to life.

16        **INMATE BOATMAN:**  Exactly, if I was messing

17   up in prison.  But he also told me on the other

18   hand, if I program and done everything that the

19   Board have asked, that I could be paroled in 10

20   years and 10 months.  He also stated that to me.

21        **PRESIDING COMMISSIONER LEE:**  He was a lot

22   braver attorney than I ever met in my life, because

23   at that point in time, hardly anybody was getting

24   paroled.  So I don't know whether or not you're

25   telling me a lie or whether or not your attorney

26   was very fluid with his opinions, but at that point

27   in time -- Okay, you knew the possibility that you

40

1   could spend the rest of your life in jail.  You

2   still can spend the rest of your life in jail.

3         INMATE BOATMAN:  Exactly.  I agree.

4         PRESIDING COMMISSIONER LEE:  What would

5   happen -- Let me ask you: How would you feel if we

6   gave you a denial for five years?  What would you

7   do?

8         INMATE BOATMAN:  It'd be very disappointing.

9         PRESIDING COMMISSIONER LEE:  Didn't ask you

10  that.  I said, what would you do?  Didn't ask you

11  how you'd feel.

12        INMATE BOATMAN:  I would continue to move

13  forward and I would stay strong, because I'm not

14  going to give up, you know.  That's not who I am.

15        PRESIDING COMMISSIONER LEE:  You're sure?

16        INMATE BOATMAN:  I'm positive.

17        PRESIDING COMMISSIONER LEE:  You're not

18  (inaudible) like this?

19        INMATE BOATMAN:  No, I'm 100 percent

20  positive.

21        PRESIDING COMMISSIONER LEE:  I accept that.

22  Now we'll go to statements.  Counsel.

23        ATTORNEY STRINGER:  I don't think there's

24  any question, and I don't think Mr. Boatman would

25  disagree with us, that this was just an entirely

26  senseless crime.  Mr. Sousa's -- Jon Sousa, the

27  victim in this crime's only -- He was only 19 and

41

1   his only crime in life was that he went to work
2   that particular day and lost his life.  And I can
3   understand the Board's reluctance in this case.
4   And I can understand that the Board has to really
5   look at the psychological reports and really look
6   at the Board reports, because in a sense it does
7   strain credulity to presuppose that when someone
8   comes up to you and you get a gun and you're going
9   in to rob a place and they say, don't worry about
10  it, they're obviously saying there aren't going to
11  be any witnesses.  So I think the answer to that
12  is, you almost have to look at Mr. Boatman's
13  personality at that time.  And I think from the
14  demeanor he presents to you here and what he's said
15  to you, I think it's fair to say that he was a
16  follower, a real follower, at that time, because
17  he's told you even after this occurred, he didn't
18  have the ability to be able to tell Mr. Jones no.
19  He just kept on participating in this horrific
20  event.  I think what the Board has to weigh is --
21  They weighed it once, of course, and gave him a
22  date, but what the Board has to weigh again is, has
23  Mr. Boatman changed within the institutions to the
24  point that now he would not be a follower and if
25  these events, these horrible events, were presented
26  to him again, that he would have the intestinal
27  fortitude, personality and emotional makeup to say

1    no.  And for that, again, you have to go to the

2    experts and the experts seem to say that he has

3    gained such insight and personality and emotional

4    development that he is now, and was when he got his

5    date, an excellent candidate for parole and a

6    person that would be a very productive citizen in

7    society.  And this assessment goes back as far as

8    September 29th of 2000, when Dr. Buchan in that

9    report indicates that -- This is on page 10 of that

10   report -- quote.

11          "Although he did not actually do the

12          murder, he torments himself for

13          participating in a crime that became

14          murder and for making this murder

15          possible by supplying the car and the

16          gun.  This is as it should be.  Yet

17          this man is not a criminal.  I

18          believe that it is very unlikely that

19          Mr. Boatman would behave violently if

20          released, that his violence potential

21          is actually less than that of an

22          average person.  Should he be

23          released, he will be a solid citizen,

24          son, brother, and hopefully someday a

25          husband and father.  There is no

26          psychological reason to deny him

27          immediate parole.  The decision to

```
 1          grant him parole should be based on
 2          other than psychological factors."
 3   In September of '04, Dr. Cornberg reviewed my
 4   client and indicates in the last three sentences on
 5   page 11, thus it is recommended that factors in
 6   this case other than psychopathology, i.e., moral,
 7   legal, ethical, medical, or other criteria be
 8   considered in determining his eligibility for
 9   parole.  That seems to echo what Dr. Buchan
10   indicated in the year 2000.  That opinion, Dr.
11   Buchan's opinion, has also been verified by Dr.
12   Elizabeth Wantuch, who is a clinical psychologist,
13   in her report of 1/14/05, as has already been put
14   in the record.  It indicates, in this examiner's
15   professional opinion, Mr. Boatman would pose a low
16   risk if he were to be released into the community
17   at this time.  And Dr. Wantuch does go through the
18   various psychological factors that she is basing
19   this opinion on.  Counselor Tate of San Quentin
20   reviewed Mr. Boatman for possibility of parole in a
21   Board report dated July of '03.  Counselor states,
22   quote, based on his prior history, psychological
23   reports, and prison adjustment, it is this writer's
24   belief that Boatman would pose a low degree of
25   threat to the public if released from prison at
26   this time.  So here are four individuals, all of
27   them professionals, indicating that my client is a
```

44

1    low risk for dangerousness if released to the

2    community.  I'm sure this is one of the factors

3    that the first reviewing Panel took into

4    consideration.  I think it's remarkable -- It

5    always is -- when someone comes to the Board and

6    has no 115s.  In these institutions, that's a feat

7    in itself.  I don't think there's any question at

8    all that Mr. Boatman has been effective and will be

9    affected for the rest of his life for the taking of

10   this young man's opportunity to marry, have

11   children, do whatever he might have done.

12   Certainly that will go with Mr. Boatman all of his

13   life.  But I would ask that the Board reaffirm his

14   date, give him the opportunity to counsel with

15   young people, to show young people what this kind

16   of senseless act can do, not only the person that

17   does it, but an entire community and family.  He

18   has very viable parole plans.  He has a place to

19   stay.  He has a place to work.  Since the Governor

20   took his date, he has not been idle.  He comes to

21   the Board even a better candidate for parole than

22   he was when the granting Panel gave him that date.

23   So I would submit there is no evidence that would

24   deny him reaffirmation of his date, and I would ask

25   that the Board reaffirm Mr. Boatman's date of

26   parole.  Thank you.

27        **PRESIDING COMMISSIONER LEE:**  Mr. Boatman,

1    this is the opportunity to add to any remarks made

2    by anybody pursuant to your suitability for parole.

3        INMATE BOATMAN:    Just want you to know that

4    I've made a lot of bad mistakes in my life, and

5    this crime is the worst.    You know, there hasn't

6    been a day that's passed when I haven't thought

7    about it.    It weren't for my actions, Jon would be

8    still living today, and I am responsible for his

9    death.    I'm sorry for the pain that I've brought

10   into all of your life.    I didn't realize that there

11   isn't anything in the world that I could ever

12   accomplish that would make up for what I've done,

13   but I'm trying my best, you know, just to educate

14   myself and rehabilitate myself.    And my drugs and

15   the criminal history, that is over.    I closed that

16   chapter of my life, and I want you to know that,

17   and I've turned my life around, like, 360 degrees,

18   you know.

19       PRESIDING COMMISSIONER LEE:    That goes back

20   to where you started.

21       INMATE BOATMAN:    Well, 180.    I'm not the

22   person that committed this crime anymore.    Grown

23   and matured to a loving and caring person and I

24   have a wonderful family (inaudible) that I would

25   never be (inaudible).    I'm going to be okay.    And I

26   just have a good heart, you know, and I just ask

27   you, please give me a second chance to give back to

46

1    the community that I took so much from.  You know,

2    I'm prepared.  Thank you.

3            PRESIDING COMMISSIONER LEE:  We'll go to

4    recess.  It is 5:20.

5                        R E C E S S

6                         --o0o--

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

47

1        CALIFORNIA BOARD OF PRISON TERMS

2              D E C I S I O N

3        DEPUTY COMMISSIONER MAY:  We're on record.

4        PRESIDING COMMISSIONER LEE:  All right.  In

5     the Subsequent Parole Consideration of Christopher

6     Boatman.  The Panel has had a great difficulty in

7     making this determination.  The reason being is

8     that there are factors in mitigation in regards to

9     Mr. Boatman's offense: first of all, that he was

10    young, he was taking drugs, that he was not the

11    shooter.  The aspects that negate that, however,

12    are the fact that he was clearly out of control at

13    the time.  He was already on probation.  He was

14    apparently involved in a lifestyle which led him to

15    voluntarily be a part of this robbery to the extent

16    that he actually furnished the firearm, which led

17    to the death of a young man that had no reason to

18    die whatsoever.  But again, I am bound by the law

19    and the law is that this is a sentence of 16 years

20    to life.  Because it's 16 years to life, the

21    anticipated plea bargain would be that the Board of

22    Prison Terms would determine whether or not this

23    man is a threat to society.  And I'd like to make

24    my statements up front, just in case you decide to

25    change your mind and try to tell me that I'm wrong,

26    then I can change my mind.  I cannot conceive of a

27    CHRISTOPHER BOATMAN  D-65055 DECISION PAGE 1 4/6/05

1   situation where a person did not know the
2   ramifications of either what he was going to do or
3   what he pled to.  And when you indicate to me that
4   you didn't know someone was going to get hurt or
5   possibly get hurt or that if you pled guilty, you
6   thought you were only going to do 10 years, that's
7   naïveté to the highest degree.  But I can't hold
8   that against you, because unfortunately, I mean, if
9   everybody was brilliant, they wouldn't be in this
10  institution.  And I'm hoping that if you are true
11  to what you've indicated in regards to your faith,
12  then you've matured enough to know that wisdom
13  comes from experience and that the experience that
14  you've had from sitting in jail for close to 19
15  years has taught you something.  So the Panel
16  reviewed all information received from the Public
17  and relied upon the following circumstances in
18  concluding that the prisoner is suitable for parole
19  and would not pose an unreasonable risk of danger
20  to society or a threat to the public safety if
21  released from prison.  Number one, the inmate has
22  no juvenile record of assaulting others.  Number
23  two, he has a stable social history, as exhibited
24  by the reasonably stable relationship with others.
25  I'm going to tell you, sir, that very unlikely that
26  I'm ever going to have a situation that occurs as
27  CHRISTOPHER BOATMAN  D-65055 DECISION PAGE 2 4/6/05

1    today occurred.  And one of the big reasons that
2    I've noticed is that both situations that I was
3    involved in today had very stable relationships and
4    you're very fortunate that you have a family that's
5    willing to support you.  While in prison, he has
6    enhanced his ability to function within the law
7    through educational programs, self-help programs,
8    vocational programs, and his job assignments.  I am
9    not taking into account significant stress in your
10   life.  The reason why I'm not taking that into
11   account is because I don't believe your stress is
12   any greater than anybody else's stress.  However, I
13   will take into account that you did not -- you lack
14   a significant criminal history of a violent nature.
15   You did in fact do some things that you were placed
16   on probation for.  That whole sexual thing, I just
17   let it go because that was something that
18   (inaudible), though Governor obviously was
19   concerned about it, the previous Governor.  I'm
20   going to tell you right now, there's a distinct
21   possibility that everything that Commissioner, as
22   well as myself, is saying is going to be reversed.
23   I'm going to tell you, this is a very serious
24   crime.  You have realistic plans, which include job
25   offers as well as family support, to live with your
26   family, as well as continue to go back to digging
27   **CHRISTOPHER BOATMAN  D-65055 DECISION PAGE 3 4/6/05**

50

1   wells, I guess.  You've maintained close family

2   ties while in prison.  You've maintained positive

3   institutional behavior, which indicates significant

4   improvement in self-control.  You show signs of

5   remorse.  You have indicated that you understand

6   the nature and the magnitude of the offense and

7   accepted responsibility for the criminal behavior

8   and desire to change toward good citizenship.  I

9   will commend you in this one area.  Not once did

10  you point the finger at the codefendant, saying he

11  did the shooting.  What you said for the record was

12  that you didn't know he was going to do that.  I

13  think if you had shifted the blame, maybe the

14  decision might have been different.  Psychological

15  factors.  As of January 2005, Dr. Wantuch indicated

16  that you were a low risk, that in her impression,

17  the report, that you are favorable for a grant of

18  parole.  In regards to the September 7th, year 2004

19  authored by Cornberg, that report also was

20  favorable.  In regards to the base term, base life

21  offense which the prisoner has been convicted of is

22  murder in the second degree, pursuant to Penal Code

23  section 187.  Date of the offense was May 29th,

24  1986.  Term is derived from the matrix located at

25  CCR Title XV at 2403-C, second degree murder.  The

26  Panel finds that category 3-C is appropriate in

27  **CHRISTOPHER BOATMAN  D-65055 DECISION PAGE 4 4/6/05**

1   that you had no relationships with the victim and
2   death was not immediate.  The Panel assesses 240
3   months as the base term and notes this is the
4   midterm.  There are no aggravating or mitigating
5   circumstances to change from the midterm --
6   sufficiently change from the midterm.  This point
7   in time, we're not going to aggravate this offense.
8   Parole is granted.  This decision is -- If this
9   decision is final, you will get a date of parole.
10   We'll send a copy of this decision.  However, the
11   decision is subject to the Governor's exercising
12   his review authority.  In case number 3510310, in
13   regards to count one, murder in the second degree,
14   you are getting 240 months.  You will receive also
15   six months pursuant to the weapons charge.  Total
16   term, 246 months.  Time credit from September 3,
17   1987 to today's date, April 6th, year 2005, is 71
18   months, giving you a total of 175 months.  You are
19   beyond that period of time.  I will now inform you
20   in regards to what the procedure will be.  At this
21   time, once documentation has been reviewed, what
22   will happen is that the investigative unit of the
23   BPT will investigate all documentation.  They will
24   basically check to see whether or not your job
25   references, as well as your home references, are
26   valid.  I would strongly suggest that you pray that
27   CHRISTOPHER BOATMAN   D-65055 DECISION PAGE 5 4/6/05

1   nothing falls through, because that is a simple

2   reversal and it's my understanding that if anything

3   is faulty --

4       **INMATE BOATMAN:**  No, it's not.

5       **PRESIDING COMMISSIONER LEE:**   -- that that is

6   an automatic reversal.  At that point in time, it

7   goes to the Governor, at which time the Governor

8   will decide whether to allow this grant or reverse

9   the grant.  He can also send it (inaudible) back to

10  the Commission, at which time the set of

11  Commissioners will make a decision as to whether or

12  not Deputy Commissioner and I made a mistake.  Mr.

13  Boatman, I'm going to tell you that I feel that I'm

14  taking a chance with you.  I believe that even

15  though you have done everything conceivable that

16  the institution can give, that I conceivably, well,

17  could have denied you based upon the offense.  I

18  felt that your handing your gun over was beyond

19  (inaudible) in regards to felony murder.  But

20  again, having 115s seems to be more -- not having

21  115s impressed us.  I think also the remarks by the

22  psychiatrist, who oftentimes we disagree with,

23  seemed to be consistent.  The other thing that I

24  will congratulate you in, sir, or commend you, is

25  that oftentimes we have people come in here and

26  attempt to tell us that they are Christians or they

27  CHRISTOPHER BOATMAN   D-65055 DECISION PAGE 6 4/6/05

53

1    are Buddhists or they are American Indian

2    spiritualists and they changed their lives in this

3    or that nature.  You did not attempt to persuade us

4    in such a fashion.  Obviously, your faith is that

5    strong and will keep you out of trouble.  So having

6    said that, Commissioner?

7         **DEPUTY COMMISSIONER MAY:**  Yeah, I wanted to

8    -- I want to add something, since we mentioned

9    about the psychiatric report.  Another psychiatric

10   report that I think should be on record for your

11   favor, we should also include the one by --

12   September the 29th, 2000 by Dr. Buchan, B-U-C-H-A-

13   N.  Dr. Buchan concluded,

14        "This man is not a criminal.  I

15        believe that it is very unlikely that

16        Mr. Boatman would behave violently if

17        released, that his violence potential

18        is actually less than that of an

19        average person.  Should he be

20        released, he will be a solid citizen,

21        son, brother, and hopefully someday a

22        husband and father.  There is no

23        psychological reason to deny him

24        immediate parole.  This decision to

25        grant him parole should be based on

26        other than psychological factors."

27   CHRISTOPHER BOATMAN  D-65055 DECISION PAGE 7 4/6/05

54

1   With that, I'll conclude.  Good luck to you.

2         INMATE BOATMAN:  Thank you.

3         PRESIDING COMMISSIONER LEE:   It is 6:00 P.M.

4   This hearing is (inaudible).

5         INMATE BOATMAN:  Thank you, Commissioner Lee

6   and Commissioner May.  I won't disappoint you.  You

7   have my word on that.

8                       --oOo--

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23  PAROLE GRANTED                    AUG 0 4 2005

24  THIS DECISION WILL BE FINAL ON:  _____

25  YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

26  DATE, THE DECISION IS MODIFIED.

27  CHRISTOPHER BOATMAN  D-65055 DECISION PAGE 8 4/6/05

54

1   With that, I'll conclude.  Good luck to you.

2          INMATE BOATMAN:  Thank you.

3          PRESIDING COMMISSIONER LEE:  It is 6:00 P.M.

4   This hearing is (inaudible).

5          INMATE BOATMAN:  Thank you, Commissioner Lee

6   and Commissioner May.  I won't disappoint you.  You

7   have my word on that.

8                      --oOo--

9

10

11

12

13

14

15

16

17

18

19

20

21

22                                  PENDING REVIEW
23   PAROLE GRANTED                 AND APPROVAL

24   THIS DECISION WILL BE FINAL ON: _____

25   YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

26   DATE, THE DECISION IS MODIFIED.

27   CHRISTOPHER BOATMAN  D-65055 DECISION PAGE 8 4/6/05

55

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, MATTHEW YATES, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 54, and which recording was duly recorded at CALIFORNIA STATE PRISON, SAN QUENTIN at SAN QUENTIN, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of CHRISTOPHER BOATMAN, CDC No. D-65055, on APRIL 6, 2005 and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated April 27, 2005 at El Dorado County, California.

_____
Matthew Yates
Transcriber
**CAPITOL ELECTRONIC REPORTING**