SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS


In the matter of the Life )
Term Parole Consideration )    CDC Number D-65055
Hearing of:               )
                          )
CHRISTOPHER BOATMAN       )
_____)


SAN QUENTIN STATE PRISON

SAN QUENTIN, CALIFORNIA

JUNE 29, 2006

1:51 P.M.

PANEL PRESENT:

Michael Porter, Presiding Commissioner
Chuck Wolk, Deputy Commissioner

OTHERS PRESENT:

Christopher Boatman, Inmate
Candace Christensen, Attorney for Inmate
James Sanderson, Deputy District Attorney
Two Correctional Officers, Unidentified

INMATE
COPY

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____   No      See Review of Hearing
_____   Yes     Transcript Memorandum


Ted Rivera        Vine, McKinnon & Hall

ii

## INDEX

|  | Page |
|---|---|
| Proceedings | 1 |
| Case Factors | 1 |
| Pre-Commitment Factors | 16 |
| Post-Commitment Factors | 22 |
| Parole Plans | 27 |
| Closing Statements | 58 |
| Recess | 63 |
| Decision | 64 |
| Adjournment | 66 |
| Transcriber Certification | 67 |

--oOo--

1

P R O C E E D I N G S

1

2      **PRESIDING COMMISSIONER PORTER:**  Okay, we're on

3      record.  Okay, the time is 1:51.  This is a Subsequent

4      Parole Consideration Hearing for Mr. Christopher Boatman.

5      Back on record.  Okay, we're back on record.  This is a

6      Subsequent Parole Consideration Hearing for

7      Mr. Christopher Boatman, CDC number D as in David, 65055.

8      Today's date is 6/29/06.  We are located at San Quentin

9      State Prison.  The inmate was received on 9/3/87, from

10     Fresno County.  The life term began on 9/3/87.  From a

11     minimum eligible parole date, is 1/31/97.  The

12     controlling offense for which the inmate has been

13     committed is murder.  Second degree, use of firearm.

14     Case number FRE351031-0.  Count One, Penal Code section

15     187 PC 12022A.  The inmate received a term of 16 years to

16     life with a minimum eligible parole date of 1/31/97.

17     This hearing is being tape recorded.  And for the purpose

18     of voice identification, each of us will say our first

19     name, and say and spell our last name.  And when it comes

20     to you, Mr. Boatman, please give us your CDC number after

21     you spell your last name.

22         **INMATE BOATMAN:**  Okay.

23         **PRESIDING COMMISSIONER PORTER:**  All right, we'll

24     start with me and go to my right.  Michael Porter,

25     P-O-R-T-E-R, Commissioner.

26         **DEPUTY COMMISSIONER WOLK:**  Chuck Wolk, W-O-L-K,

27         **DEPUTY DISTRICT ATTORNEY SANDERSON:**  James

1   Sanderson, S-A-N-D-E-R-S-O-N, District Attorneys office

2   Fresno County.

3       **INMATE BOATMAN:**  Christopher Boatman, B-O-A-T-M-A-N,

4   D number 65055.

5       **ATTORNEY CHRISTENSEN:**  Candace Christensen,

6   C-H-R-I-S-T-E-N-S-E-N, attorney for Mr. Boatman.

7       **PRESIDING COMMISSIONER PORTER:**  Okay, and for the

8   record we do have two correction officers present.  And

9   they will not be participating in the hearing.  They are

10  here for security purposes only.  And before we begin,

11  Mr. Boatman, can you please read the ADA statement for

12  me?

13      **INMATE BOATMAN:**  Yes, The Americans With

14  Disabilities act, ADA is a law to help people with

15  disabilities.  Disabilities are problems to make it

16  harder for some people to see, hear, read, talk, walk,

17  learn, think, work or take care of themselves than it is

18  for others.  Nobody can be kept out of public places or

19  activities because of their disability, because of a

20  disability.  If you have a disability, you have the right

21  to ask for help to get ready for your BPT hearing.  Get

22  to the hearing, talk, read forms and papers, and

23  understand the hearing process.  BPT will look at what

24  you ask for, to make sure that you have a disability that

25  is covered by the ADA.  And that you have asked for the

26  right kind of help.  If you do not get help, or if you

27  think -- or -- or if you don't think you got the kind of

1    help you need, ask the BP -- ask for a BPT 1074 Grievance

2    form.  You can also get help to fill it out.

3        **PRESIDING COMMISSIONER PORTER:**  Thank you sir.

4        **INMATE BOATMAN:**  Yes.

5        **PRESIDING COMMISSIONER PORTER:**  The record reflects

6    that you signed a BPT 1073 form on 3/21/06.  Indicating

7    that you do not have a disability as defined under the

8    American's with disabilities act.  Is that true?

9        **INMATE BOATMAN:**  Yes, it is.

10       **PRESIDING COMMISSIONER PORTER:**  Is that information

11   still current?

12       **INMATE BOATMAN:**  Yes, it is.

13       **PRESIDING COMMISSIONER PORTER:**  Okay.  Let's see did

14   you have any problems walking up the steps or anything to

15   get here?

16       **INMATE BOATMAN:**  No problems.

17       **PRESIDING COMMISSIONER PORTER:**  Okay.  Did you see

18   pretty good or do you need glasses or magnifying glasses?

19       **INMATE BOATMAN:**  No, I don't -- I see pretty good,

20   sir.

21       **PRESIDING COMMISSIONER PORTER:**  Okay, do you have

22   any hearing impairments?

23       **INMATE BOATMAN:**  No hearing impairments.

24       **PRESIDING COMMISSIONER PORTER:**  Okay, have you been,

25   ever been included in the triple CMS or EOP programs?

26       **INMATE BOATMAN:**  Triple CMS, no, I haven't.

27       **PRESIDING COMMISSIONER PORTER:**  Okay, and do you

4

1    know what those terms mean?

2        **INMATE BOATMAN:**  Yeah, that's [inaudible] and stuff.

3        **PRESIDING COMMISSIONER PORTER:**  Yes.

4        **INMATE BOATMAN:**  Triple -- no.

5        **PRESIDING COMMISSIONER PORTER:**  Okay, have you ever

6    taken any medication for mental health?

7        **INMATE BOATMAN:**  No, I haven't.

8        **PRESIDING COMMISSIONER PORTER:**  Either on the street

9    or in prison?

10        **INMATE BOATMAN:**  No.

11        **PRESIDING COMMISSIONER PORTER:**  Okay.  And finally,

12    do you suffer from any disability that would prevent you

13    from participating in today's hearing?

14        **ATTORNEY FALLMAN:**  No disabilities.

15        **PRESIDING COMMISSIONER PORTER:**  Okay.  Counsel are

16    there and ADA issues that you believe that need further

17    discussion regarding your clients ability to fully

18    participate in today's hearing?

19        **ATTORNEY CHRISTENSEN:**  No.

20        **PRESIDING COMMISSIONER PORTER:**  Okay.  This hearing

21    is being conducted pursuant to the Penal Code and the

22    rules and regulations of the Board of Parole Hearings

23    governing parole consideration hearings for life inmates.

24    The purpose of today's hearing is to once again consider

25    your suitability for parole.  And then [inaudible] we

26    will consider the number and each of the crimes for which

27    you are committed.  Your prior criminal and social

5

1    history, your behavior in programming since your
2    commitment, and your plans if released. We have had the
3    opportunity to review your Central File and you will be
4    given an opportunity to correct and clarify the record.
5    We will consider your progress since your commitment,
6    your counselor's report and your mental health
7    evaluations.

8        **INMATE BOATMAN:** Yes.

9        **PRESIDING COMMISSIONER PORTER:** We will focus on
10   your progress and any new reports since our last hearing.
11   Any change in parole plans should be brought to our
12   attention. Before we recess for deliberation, the
13   District Attorney's representative, your attorney and you
14   will be given opportunity to make a final statement
15   regarding your parole suitability. Your statements
16   shall be limited to why you feel you are suitable
17   for parole. We will then recess, clear the room and
18   deliberate. Once we have completed our
19   deliberations, we will resume the hearing and
20   announce our decision. The California Code of
21   Regulations states that regardless of time served, a
22   life inmate shall be found unsuitable for and denied
23   parole if in the judgment of the panel, the inmate
24   would pose an unreasonable risk of danger to society
25   if released from prison. You have certain rights,
26   those rights include the right to a timely notice of
27   this hearing. The right to review your Central

6

1   file, and the right to present any relevant

2   documents.  All right, counsel, have the rights of

3   your client been met?

4       **ATTORNEY CHRISTENSEN:**  Yes, they have.

5       **PRESIDING COMMISSIONER PORTER:**  Okay.  You have an

6   additional right to be heard by an impartial panel.  We

7   are your panel.  Do you have any objection to us?

8       **INMATE BOATMAN:**  No, I don't.

9       **PRESIDING COMMISSIONER PORTER:**  Okay.  You will

10  receive a copy of our written tentative decision today.

11  That decision becomes final within a hundred and twenty

12  days.  A copy of the decision and a copy of the

13  transcript will be sent to you.  On May 1st, 2004 the

14  regulations regarding your right to appeal a decision

15  made at this hearing were appealed.  The current policy

16  is entitled Administrative Appeals, correspondence and

17  grievances concerning board of prison term decisions.

18  That means if you object to any decision we -- they made

19  here, you have to go to the court to file an appeal.  You

20  can discuss it with your attorney, or you could review

21  information within the prison law library.  Mr. Boatman,

22  you are not required to admit or discuss your offense.

23  However this panel does accept as true, the findings of

24  the court.  Do you understand that?

25      **INMATE BOATMAN:**  Yes.

26      **PRESIDING COMMISSIONER PORTER:**  Okay.  Deputy

27  Commissioner Wolk, do we have any confidential

7

1    information?

2        **DEPUTY COMMISSIONER WOLK:**  No, sir.

3        **PRESIDING COMMISSIONER PORTER:**  Okay, I have passed

4    a hearing check list marked Exhibit One to your attorney.

5    And to ensure that we are operating off the same set of

6    documents.  Counsel, do we all -- are we all operating on

7    the same set of documents?

8        **ATTORNEY CHRISTENSEN:**  Yes, we are.

9        **PRESIDING COMMISSIONER PORTER:**  Okay.  District

10   Attorney, do we have--

11       **DEPUTY DISTRICT ATTORNEY SANDERSON:**  I reviewed

12   those, so I know.

13       **PRESIDING COMMISSIONER PORTER:**  Okay, excellent. All

14   right, Counsel, do you have any additional documents that

15   need to be submitted?

16       **ATTORNEY CHRISTENSEN:**  Other than what I brought

17   with me when I came [inaudible] no.

18       **PRESIDING COMMISSIONER PORTER:**  Okay, the letters of

19   support.

20       **DEPUTY DISTRICT ATTORNEY SANDERSON:**  [Inaudible]

21   getting those.

22       **ATTORNEY CHRISTENSEN:**  Well it sent in the mail, it

23   would be in the C file, if they are, I apologize.  Those

24   would be duplicates then.

25       **PRESIDING COMMISSIONER PORTER:**  Okay.

26       **ATTORNEY CHRISTENSEN:**  But some of them are recent

27   from June.

1    **PRESIDING COMMISSIONER PORTER:**  All right.  Counsel,

2    are there any preliminary objections?

3    **ATTORNEY CHRISTENSEN:**  No.

4    **PRESIDING COMMISSIONER PORTER:**  Will your client be

5    speaking with the panel today?

6    **ATTORNEY CHRISTENSEN:**  Yes, he will.

7    **PRESIDING COMMISSIONER PORTER:**  Okay, sir, since

8    you'll be speaking with us today, we need to swear you

9    in.

10   **INMATE BOATMAN:**  Okay.

11   **PRESIDING COMMISSIONER PORTER:**  Okay.  Raise your

12   right hand please.  Do you solemnly swear or affirm that

13   the testimony you give at this hearing will be the truth,

14   the whole truth and nothing but the truth?

15   **INMATE BOATMAN:**  I dc.

16   **PRESIDING COMMISSIONER PORTER:**  Okay.  Thank you.

17   Let's get started.  For the statement of facts, I'm going

18   to incorporate by reference the June 2006 board report,

19   pages one and two if there are no objections, counselor.

20   **ATTORNEY CHRISTENSEN:**  No objection.

21   **PRESIDING COMMISSIONER PORTER:**  Okay, basically

22   Mr. Boatman, can you tell us what happened on 5/29/86?

23   **INMATE BOATMAN:**  Yes, I can.  That day I moved my

24   [inaudible] Harrold Jones [inaudible] we were smoking

25   crack cocaine.  And it came up that we ran out of the --

26   the drugs.  And Harrold Jones stated that we can get some

27   more.  He says that if you are willing to do this, that

9

1   you can just get the gun and he'd be the driver.  I've

2   done this before, I'll just run in the store and I'll run

3   right back out.  And he stated at that time -- I stated

4   that I'll go along with it, if nobody would get hurt.

5   And I agreed to do this.  I went back to the house and --

6   and I snuck my step mother's gun.  And one of the reasons

7   I done that, 'cause I wasn't thinking.  'Cause I had a

8   shotgun and he said this would be too big to -- to hide.

9       **PRESIDING COMMISSIONER PORTER:**  How old were you at

10  this time?

11      **INMATE BOATMAN:**  I was 20 years old.

12      **PRESIDING COMMISSIONER PORTER:**  Okay.

13      **INMATE BOATMAN:**  When this crime had happened.  Not

14  thinking right at that time -- my thoughts were confused

15  and indecisive.  I deceived myself in believing that

16  nobody was going to get hurt.  And then -- and I didn't

17  think of nobody but myself at the time of the crime I

18  found myself getting more involved.  I -- I became very

19  selfish.  I took more of a leadership role and when we

20  drove to the store -- when I drove to the store my plans

21  changed.  I felt that if I didn't play a bigger part in

22  this crime, that I wasn't going to get anything.  So, I

23  had asked Butch Montgomery if he wanted to drive, and I

24  would be the lookout, and he said yes.  So, that's what I

25  did.  I got immediately out the car, and I was the

26  lookout at that time.  It's really sad that -- the things

27  that I've done -- you know, I hurt so many people.  And

1    this wasn't supposed to happen.  The plans were --

2         **PRESIDING COMMISSIONER PORTER:**  All right, finish

3    telling us -- tell us just what happened.  Okay you are

4    the look -- supposed to be the lookout what happened?

5         **INMATE BOATMAN:**  I was the lookout.  I went to the

6    door.  Trans [phonetic] ran in the store.  I guess, I

7    didn't hear him, but obviously he said hold it up.  And

8    John held his hands up -- and as I was looking in -- and

9    a minute I guess went by as I was looking for traffic,

10   and then I heard the shot.  Immediately hearing the shot,

11   I turned and I seen John fall into -- to the counter and

12   I ran to the car.  And when I was leaving we -- when --

13   when we took off -- I had asked, I didn't know if he had

14   shot him or not at that time.  And I had asked did you

15   shoot him, and he said yes.  There were so many questions

16   that -- and I said why.  He said he was reaching for a

17   gun, I remember.  But I also asked, do you think he's

18   gonna die.  And he said he don't know.  When I got back

19   home, what I did is I parked my car and I flattened the

20   tire.  Out of fear, I wiped off which I thought was the

21   prints when I handled the gun and I put it back.  I went

22   to the house where we tried to get some more drugs and

23   none was available at that time.  From then I stayed at

24   my -- my house and prior after that -- and after hearing

25   on the news that John had died, I became very depressed.

26   I didn't know what to do.  I stayed in my room until I

27   was arrested.  My plans were to leave town.  Everybody

11

1    had plans, and I didn't ask.  I should have asked why.  I
2    should have asked myself the questions of why.  What do
3    you mean by these statements that he made?  But I didn't.
4    Not worried about being caught and identified -- it
5    should have striked a trigger in me to say what do you
6    mean.  But I didn't.  At that time I was powerless.  And
7    the plans were to go, and everybody was going to leave
8    town after the robbery to lay low for a little while
9    after we got the drugs.  And that's what I thought.  But
10   I know I -- I think differently today.  Or I know that if
11   a person is going to commit a crime -- whether it's
12   stealing bubble gum out of a bubble gum machine or
13   something, somebody's going to get hurt.  Whether it's
14   physically or mentally.  These things I didn't take into
15   consideration at that time I was committing this crime.
16       **PRESIDING COMMISSIONER PORTER:**  Okay.  Did you know
17   -- you keep calling him John, did you know him
18   personally?
19       **INMATE BOATMAN:**  No, I did not.
20       **PRESIDING COMMISSIONER PORTER:**  Okay, all right.
21   Keep saying his name John, I thought maybe you knew him
22   personally.
23       **INMATE BOATMAN:**  No, it's -- no I do not know him
24   personally.
25       **PRESIDING COMMISSIONER PORTER:**  Souzza.
26       **INMATE BOATMAN:**  Yes, John Souzza.
27       **PRESIDING COMMISSIONER PORTER:**  Okay, so basically

12

1 you were supposed to be the lookout man and things turned

2 the way that you didn't think they would turn.

3   **INMATE BOATMAN:** Yes.

4   **PRESIDING COMMISSIONER PORTER:** Okay, all right.  I

5 think you covered that pretty good.  Before -- before you

6 did this crime, you look like you had -- let's talk about

7 -- you didn't have a juvenile record.

8   **INMATE BOATMAN:** No.

9   **PRESIDING COMMISSIONER PORTER:** But let's talk about

10 some of the other -- crimes, looks like you had two rapes

11 from -- two forced rapes.  What happened with that?

12   **INMATE BOATMAN:** Them charges were me and a friend

13 picked up these girls that we knew in the school.

14   **PRESIDING COMMISSIONER PORTER:** At what school?

15   **INMATE BOATMAN:** From Riverdale School, high school.

16   **PRESIDING COMMISSIONER PORTER:** Okay.  Hpw old were

17 you at this time?

18   **INMATE BOATMAN:** I was 18 years old at the time.

19   **PRESIDING COMMISSIONER PORTER:** Okay.

20   **INMATE BOATMAN:** She was 14, turning on 15 I'm

21 pretty sure.

22   **PRESIDING COMMISSIONER PORTER:** Uh-huh.

23   **INMATE BOATMAN:** What happened is that we hung out

24 all day.  We had sex.  This is why it's two -- I think it

25 was three -- three charges at that time.  The next day

26 come by, we did the same thing.  It was consensual sex.

27 The third day came around and she got mad at me for

13

1    kissing her friend and they both ran out the house.  And

2    they got caught by a truant officer of the school, and

3    what they did is that they lied.  And I was arrested and

4    after no cooperation from the victims they eventually

5    dropped it to sexual intercourse with a minor.  And then

6    it was dropped on altogether when I came back to facing

7    charges from the -- the grand theft.

8         PRESIDING COMMISSIONER PORTER:  Okay.  14 and 18 are

9    pretty big difference.

10        INMATE BOATMAN:  It is.

11        PRESIDING COMMISSIONER PORTER:  How'd you come

12   across a 14 year old?  I mean what -- what led you to

13   them when you were 18 years old?

14        INMATE BOATMAN:  When I was 18 years old, what I was

15   doing was I was hanging out a lot.  I was working part

16   time, and like when lunch break comes around from the

17   lunch time, I sat around at the school.  Like the parking

18   lots and stuff.  And that's how I came across them and

19   met them.  That's how I came into contact with them.

20        PRESIDING COMMISSIONER PORTER:  Tell us about the

21   grand theft.

22        INMATE BOATMAN:  The grand theft.  I was in San Luis

23   Obispo and -- and in a town that I didn't know anybody.

24   And what I did is I snatched a woman's purse, and I ran

25   and I got caught.  And that day it was stupidity and --

26   and I didn't have to do that.  And --

27        PRESIDING COMMISSIONER PORTER:  Did you have a gun

14

1    with you?

2        **INMATE BOATMAN:**  No.  I didn't have nothing with me

3    at the time I snatched the purse.  I did plead guilty to,

4    um -- with the crowbar.

5        **PRESIDING COMMISSIONER PORTER:**  You had a crowbar?

6        **INMATE BOATMAN:**  No.  I didn't have it, but I plead

7    guilty to it at the time.  While I didn't have that when

8    I snatched the purse, I had it when I went back and ran

9    to my car.  And acted like, when I seen the police, I was

10   going to change my tire.

11       **PRESIDING COMMISSIONER PORTER:**  Okay.

12       **INMATE BOATMAN:**  So --

13       **PRESIDING COMMISSIONER PORTER:**  All right, well what

14   happened after that?  What's the next crime you committed

15   after that?

16       **INMATE BOATMAN:**  The next crime I committed was

17   stealing tapes out of, um -- uh -- a music store

18   something.  Like a, um -- like I said a lot of tapes and

19   videos and things like that.  I ran in the store.  I

20   grabbed a few, and I came out and the buzzer beeped on

21   me.  And that's what I did.  It was in '85 I think.

22       **PRESIDING COMMISSIONER PORTER:**  All right.  So, what

23   -- the time you got for okay -- that was part of your

24   probation but you had a weapon again?

25       **INMATE BOATMAN:**  Yes, it was.

26       **PRESIDING COMMISSIONER PORTER:**  Did you get -- what

27   kind of probation did you get for the rape?

15

1       **INMATE BOATMAN:**  I didn't, uh --

2       **PRESIDING COMMISSIONER PORTER:**  You do six months in
3       jail, or --

4       **INMATE BOATMAN:**  I did six months for the, um -- I
5       did six months for the purse snatch -- the grand theft.
6       What happened after that, when I got in trouble with the
7       rape.  A month went by I think, and I got in trouble
8       again with this grand theft and when I, uh -- did my six
9       months in the county jail, what happened is they
10      transported me back to Fresno County, to stand trial for
11      the rape.  And after that it was dismissed.  So the
12      probation was for the -- for the grand theft.

13      **PRESIDING COMMISSIONER PORTER:**  Okay.  And also
14      during the rape it says that you shared marijuana with
15      her.  How much marijuana did you guys smoke together?

16      **INMATE BOATMAN:**  We smoked like a dime bag in the
17      course of them three days.  So it was a joint here and a
18      joint there.

19      **PRESIDING COMMISSIONER PORTER:**  In two days or three
20      days?

21      **INMATE BOATMAN:**  It was three days.

22      **PRESIDING COMMISSIONER PORTER:**  Three days.

23      **INMATE BOATMAN:**  Yes.

24      **PRESIDING COMMISSIONER PORTER:**  Okay, all right.
25      Let's get to some of your personal factors here.  You
26      were born in Louisiana.

27      **INMATE BOATMAN:**  Yes.

1      **PRESIDING COMMISSIONER PORTER:**  Okay, how long did
2      you live there?
3      **INMATE BOATMAN:**  We lived there, I was three years
4      old and my mother decided to move us to, um -- to Fresno
5      county where she thought -- where she met my dad.  She
6      met my dad, and they thought they could give us a better
7      life.  So, uh -- I was raised in California since then.
8      Since three.
9      **PRESIDING COMMISSIONER PORTER:**  Okay.
10     **INMATE BOATMAN:**  So --
11     **PRESIDING COMMISSIONER PORTER:**  All right.  And you
12     were the third of six children.
13     **INMATE BOATMAN:**  Yes, I am.
14     **PRESIDING COMMISSIONER PORTER:**  What kind of
15     relationship did you have with your brothers --
16     **INMATE BOATMAN:**  My siblings.
17     **PRESIDING COMMISSIONER PORTER:**  -- and sisters?
18     **INMATE BOATMAN:**  Oh we had a wonderful relationship.
19     Our family household --
20     **PRESIDING COMMISSIONER PORTER:**  Did you have older
21     brothers or older sisters?
22     **INMATE BOATMAN:**  Yes, I had an older sister, Arlene.
23     **PRESIDING COMMISSIONER PORTER:**  Okay.
24     **INMATE BOATMAN:**  And I had an older brother, Melvin.
25     **PRESIDING COMMISSIONER PORTER:**  Okay.
26     **INMATE BOATMAN:**  And the relationship with them --
27     **PRESIDING COMMISSIONER PORTER:**  And two other --

17

1     **INMATE BOATMAN:**  Yes, two under me.  There's three
2     under -- there's three under me.

3     **PRESIDING COMMISSIONER PORTER:**  How many brothers
4     and sisters under you?

5     **INMATE BOATMAN:**  Under me there's three.  There's
6     two brothers and one sister under me.

7     **PRESIDING COMMISSIONER PORTER:**  Okay.  And back to
8     your relationship with your family, go ahead.

9     **INMATE BOATMAN:**  The relationship with my family was
10    very strong as it is today.  We did everything together.
11    We were taught that family sticks together no matter what
12    and that the, uh -- a bond with them, um -- is something
13    that I'm very grateful for.  To have this -- that the
14    love is still there.

15    **PRESIDING COMMISSIONER PORTER:**  Okay.  How was your
16    relationship with your mom and dad?  Were they both in
17    the home up until when -- or?  [Inaudible] you committed
18    the commitment offense?

19    **INMATE BOATMAN:**  My mom and dad, yes they divorced
20    when I was 14 years old. The separation split us apart.
21    We had to choose what parent, we had to -- you know went
22    to court and who you wanted to stay with.  And, uh -- I
23    chose to stay with my dad all for the first six months.
24    And then I would periodically switch to my mother, and
25    stay with her in Fresno.

26    **PRESIDING COMMISSIONER PORTER:**  And where'd your dad
27    live?

18

1     **INMATE BOATMAN:**  He lived in Riverdale.

2     **PRESIDING COMMISSIONER PORTER:**  Okay.

3     **INMATE BOATMAN:**  My mom lived in Fresno.

4     **PRESIDING COMMISSIONER PORTER:**  Okay.  Why'd you

5     choose to leave from your dad after six months?  Or go

6     back and forth.  Why didn't you just stay with him the

7     whole time?

8     **INMATE BOATMAN:**  I didn't like the -- he uh --

9     **PRESIDING COMMISSIONER PORTER:**  Who were the other

10    kids with you at this point?  Who else went to live with

11    dad?

12    **INMATE BOATMAN:**  My youngest brother Andre.  My

13    younger one and then me.  Andre, he stayed with my dad

14    also.

15    **PRESIDING COMMISSIONER PORTER:**  Okay.

16    **INMATE BOATMAN:**  And everybody else all stayed with

17    my mom.

18    **PRESIDING COMMISSIONER PORTER:**  Okay.

19    **INMATE BOATMAN:**  And I chose between the both of

20    them because I wanted to, uh -- stay with both of them.

21    **PRESIDING COMMISSIONER PORTER:**  Right.

22    **INMATE BOATMAN:**  And --

23    **PRESIDING COMMISSIONER PORTER:**  So, you wanted a

24    relationship with both.  All right, so what happened with

25    -- it looks like you started getting in trouble as you

26    became a teenager.  What happened?

27    **INMATE BOATMAN:**  Yes, I did.  It just didn't work

19

1    out the way I planned.  I started hanging out a lot more
2    on the streets.  I started running into people that were
3    using drugs and doing -- just hanging out all day.

4        **PRESIDING COMMISSIONER PORTER:**  What'd your dad say
5    to you?  Or were you with your mom when you were hanging
6    out?

7        **INMATE BOATMAN:**  I was -- I was with my dad.  But I
8    kept it from him -- hidden.

9        **PRESIDING COMMISSIONER PORTER:**  Uh-huh.

10       **INMATE BOATMAN:**  I had -- I told -- I was working
11   also.  I was working [inaudible].  So he never knew, at
12   least I think he didn't, when I was going out.  Because
13   he had a job himself and he was working and staying busy.
14   So when he'd come home he was tired.  He'd go to sleep.
15   You know.  And I'd sneak out the house.

16       **PRESIDING COMMISSIONER PORTER:**  Uh-huh.

17       **INMATE BOATMAN:**  And, just hang on the streets.

18       **PRESIDING COMMISSIONER PORTER:**  Okay.

19       **INMATE BOATMAN:**  But when the six months came, I was
20   missing my mom.  Although she visited every now and then
21   to drop the kids off for -- my brothers and sisters for
22   the weekend -- the littler ones.  And what I'd do is I,
23   uh -- I'd move.  I'd say, dad I'll be back.

24       **PRESIDING COMMISSIONER PORTER:**  Uh-huh.

25       **INMATE BOATMAN:**  I'll be back in a few months.  I
26   got to go spend time with mom.  And I did that, uh --
27   until, uh -- I committed this crime.

20

1     **PRESIDING COMMISSIONER PORTER:**  You lived with your
2     dad until you committed the crime?

3     **INMATE BOATMAN:**  Yes, it was like I moved back with
4     him like -- I just had got there like six or seven months
5     before I did what I did.

6     **PRESIDING COMMISSIONER PORTER:**  Okay.  When did you
7     see -- when did you start using drugs?  Tell us how that
8     escalated, with the crack cocaine.

9     **INMATE BOATMAN:**  Okay.  I started first just buying
10    a little marijuana.  Drinking a little bit every now and
11    then, and hanging on the streets.  This guy owed me some
12    money.  I sold him like a quarter of a bag of marijuana.

13    **PRESIDING COMMISSIONER PORTER:**  Uh-huh.

14    **INMATE BOATMAN:**  He owed me like twenty five bucks -
15    - twenty bucks.  Something like that, and I wanted my
16    money so I can buy some cocaine.

17    **PRESIDING COMMISSIONER PORTER:**  Uh-huh.

18    **INMATE BOATMAN:**  So he says I have some crack.  And
19    I said crack -- I said what is crack?  And he says if you
20    -- if you come over to my house I'll show you.  If you
21    want your money in crack, I'll give it to you in crack.
22    So we went over to his house, and he put a little bit in
23    the pipe.  And then -- and then I hit it.  And what
24    happened is that I remember me almost passing out holding
25    my hit in.  And I told him what is this stuff, and he
26    said it's crack cocaine.  And I said I can't hardly see.
27    'Cause my vision was impaired.  And I told him, I want my

21

1    money in that stuff right there.  That's some good stuff.

2    And it's -- and it's crazy.  Anybody that uses a drug or

3    anything -- thinks about using a drug -- especially when

4    it makes a person go almost blind, will say no.  I

5    wouldn't want none of this stuff.  But no me, that is

6    what I want.  And that's where I started.

7        PRESIDING COMMISSIONER PORTER:  How old were you at

8    the time?

9        INMATE BOATMAN:  I was 20 years old.  I started

10    using crack cocaine in January of '86.

11       PRESIDING COMMISSIONER PORTER:  Okay.  And before

12    then how -- how much were you drinking?

13       INMATE BOATMAN:  It wasn't a lot.  It was occasion,

14    and the, uh -- like on the weekend or something.  Friends

15    got together and I'd drink maybe a six pack or something.

16    Or a beer here and there.  But my main choice was for

17    marijuana.  And when I got introduced to crack it was the

18    crack.

19       PRESIDING COMMISSIONER PORTER:  How much marijuana

20    did you smoke?

21       INMATE BOATMAN:  I smoked -- myself, I would go

22    through a quarter of weed a month myself.  But if I was

23    sharing, it would go a lot quicker.  But me -- but me

24    personally, I'd smoke a joint when I woke up.  And I'd

25    smoke a joint in afternoons.  And possibly when I went --

26    before I went to bed.

27       PRESIDING COMMISSIONER PORTER:  Okay.

22

1    **INMATE BOATMAN:**  So --.

2    **PRESIDING COMMISSIONER PORTER:**  All right.  We

3    better go to Deputy Commissioner Wolk and go into summary

4    your post conviction factors.

5    **INMATE BOATMAN:**  Yes.  Can I -- can I say a little

6    bit about my criminal history, or --

7    **PRESIDING COMMISSIONER PORTER:**  We'll -- we'll --

8    we'll get back to that.

9    **INMATE BOATMAN:**  Oh.

10   **DEPUTY COMMISSIONER WOLK:**  Okay.  We're going to

11   talk about your programming since you came to prison, and

12   I'm going to start out with your vocational programming.

13   And I see that you worked as a housing [inaudible], a

14   Boxing Trainer and [inaudible].

15   **INMATE BOATMAN:**  Yes.

16   **DEPUTY COMMISSIONER WOLK:**  [Inaudible] and you have

17   your Voc Welding certificate of completion?

18   **INMATE BOATMAN:**  Yes.

19   **DEPUTY COMMISSIONER WOLK:**  And your Voc Machine

20   Shop?

21   **INMATE BOATMAN:**  Yes.

22   **DEPUTY COMMISSIONER WOLK:**  And you're currently

23   working in Voc Plumbing.

24   **INMATE BOATMAN:**  Yes.

25   **DEPUTY COMMISSIONER WOLK:**  How much longer do you

26   have before you get that certificate?

27   **INMATE BOATMAN:**  I have two more tests to take.

23

1   Which will take approximately five months to complete.

2   I'm almost done.  And, uh --

3        **DEPUTY COMMISSIONER WOLK:**  I was going through the

4   file and I see numerous laudatory chronos as well as

5   letters commending you for your job.  All the -- your

6   supervisors and staff have written out commending you for

7   the good job that you've done.  As far as your therapy

8   and self help, I know that you've been active in

9   Narcotics Anonymous since 1994.  You're still active. You

10  took a seminar called An Alternative to Violence in '94.

11  Then you took the Advanced Alternative to Violence in

12  2000.  You took part in the San Quentin walk-a-thon in

13  1995.  You also are a member of Kairos or were a member

14  or Kairos from 2000 until 2004.  You took Centering

15  Prayer in 2001, and you've been involved in a

16  spirituality class since 2003.  And you're still involved

17  in it.  You've received laudatory chronos, about 15 of

18  them for your participation in various therapy and self

19  help endeavors.  You also took the Responsibility

20  Rehabilitation and Restoration Ecumenical [inaudible]

21  table in 2005.  And from Violence to Homeless in June of

22  2005.  You have certificates in it says, Core Curriculum,

23  what is that?

24       **INMATE BOATMAN:**  Core Curriculum is the new

25  curriculum that was just implemented for our vocational

26  Plumbing.  And that they also have, I don't know if you

27  have the certificates there, sir.  I should have gave

1   them to you.  But it's --

2        **DEPUTY COMMISSIONER WOLK:**  What [inaudible].

3        **INMATE BOATMAN:**  It's the [inaudible].

4        **DEPUTY COMMISSIONER WOLK:**  It's okay, I don't need

5   it.

6        **INMATE BOATMAN:**  All right.

7        **DEPUTY COMMISSIONER WOLK:**  You also took the

8   [inaudible] Cutting Tools, these are all machine tool

9   technology programs.  The Engine Wave, the Katargio

10  (phonetic) you participated in that in 1996.  Making a

11  Change in '95.  Um, you have numerous certificates of

12  completion regarding your well being in your machine

13  shop.  And you have your [inaudible] for Machinist?

14       **INMATE BOATMAN:**  Yes, I completed that.  I'm now a

15  Journeyman.

16       **DEPUTY COMMISSIONER WOLK:**  That's like thousands of

17  dollars a week.

18       **INMATE BOATMAN:**  Yeah, it's like eight thousand

19  dollars, I think of training.

20       **DEPUTY COMMISSIONER WOLK:**  You got your [inaudible]

21  card?

22       **INMATE BOATMAN:**  Yeah, I wanted to show you.  There's

23  a lot of this stuff in -- that's the [inaudible].

24       **DEPUTY COMMISSIONER WOLK:**  Wow, so you'd be readily

25  employable.

26       **INMATE BOATMAN:**  Sure, I have the --

27       **DEPUTY COMMISSIONER WOLK:**  Thank you.  You wanna see

25

1    that?

2        **PRESIDING COMMISSIONER PORTER:**  Yeah.  That's very

3    good Mr. Boatman.

4        **INMATE BOATMAN:**  Thank you.

5        **DEPUTY COMMISSIONER WOLK:**  You have what I would

6    consider to be a fairly minimal disciplinary history. You

7    have no 115s throughout your incarceration.  You have a

8    128A for not standing for count in April of '99.  And a

9    being in possession of a contraband earring in 1993.  And

10   that's all.  That's the extent of your disciplinary

11   history.  I have a psychology, or psychological

12   evaluation counsel, dated January 4th, of '05.  Is there

13   anything later than that?

14       **ATTORNEY CHRISTENSEN:**  No, that's what I have.

15       **DEPUTY COMMISSIONER WOLK:**  Okay.  This was conducted

16   by Dr. Elizabeth Wontuck (phonetic), doctor of

17   psychology, clinical psychologist. It's about a three,

18   two and a half page assessment.  Under AXIS I of the DSM,

19   you have no diagnosis.  Under AXIS II, no diagnosis.  As

20   she goes into what she -- what they call the assessment

21   of dangerousness, she says a number of factors were

22   considered in assessing Mr. Boatman's current level of

23   dangerousness.  Factors that are favorable for the inmate

24   are, first, he did not actually commit the murder

25   himself.  Second, he does not have a history of violent

26   criminal behavior.  He has a minimal criminal history and

27   no juvenile record.  And third, he has not received any

26

1    115 -- any 115s in approximately 19 years of

2    incarceration.  Fourth, he does not have a history of

3    serious mental health problems.  But then she goes on to

4    state while he does have a history of substance abuse, it

5    appears that he has been clean and sober for the past 18

6    years.  And he has participated in NA as well as other

7    self help programs to date, as we covered.  In addition,

8    he appears to have a strong support.  To have strong

9    support from a stable family and friends.  Other factors

10   in his favor are that he has earned his GED, and has

11   worked at a variety of jobs since his incarceration with

12   laudatory performance evaluations.  This examiner does

13   not believe that there are any factors that are

14   unfavorable at this point in time.  Mr. Boatman was

15   convicted twice for theft prior to the incident offense.

16   Served six months in jail.  Mr. Boatman states he feels

17   he has matured.  He feels he has come to trust people and

18   indicated this is because he now chooses his friends

19   carefully.  He chooses people who are positive and

20   successful.  In this examiner's professional opinion, it

21   is Miss -- this examiner's professional opinion that

22   Mr. Boatman would pose a low risk if he were to be

23   released to the community at this time.  And that's

24   pretty much all, what her report says or --  Now, this

25   concludes what I'm going to cover today.  And so, I will

26   give you the opportunity, if I've left anything out you

27   can go ahead and add it now.

27

1      **INMATE BOATMAN:**  Not that I know of, you left
2   anything out.

3      **DEPUTY COMMISSIONER WOLK:**  Okay.  Then I'll turn it
4   back over to Mr. Porter.

5      **PRESIDING COMMISSIONER PORTER:**  Okay.  Thank you,
6   sir, we're going to start with your future plans
7   Mr. Boatman.  Where do you plan on living after you get
8   paroled?

9      **INMATE BOATMAN:**  I plan on staying with my older
10  sister, Arlene in Fresno California.  I will be working
11  as a Well Driller.  I have a couple job offers that are -
12  - that I have in there.  But one is for West Harmon.

13     **PRESIDING COMMISSIONER PORTER:**  Uh-huh.

14     **INMATE BOATMAN:**  He's offered to employ me with 25
15  dollars an hour.  And there's also one for Jonathan
16  Figueroa, with Mount Whitney Collision and Classic Cars.
17  Would you -- I would like to also if it's okay with -- I
18  have to talk to both of them if it's okay if I work part
19  time in his shop.  That's doing a lot of welding and just
20  -- I just restorate -- restoring and that's right up my
21  alley.  And I would like to -- like to do that for part
22  time.  And there's also, um -- uh -- Zach Tanny, from
23  Machine Shop in here, in Fresno, California.  Who has
24  written a letter that they, uh -- it's also another job
25  option that I have.  And also from, uh -- [inaudible].
26  He said that he would give me some -- if he couldn't hire
27  me at that -- at this time, he'd give me some positive

28

```
 1    leads for other machine shops in the immediate area.  And
 2    I also -- I had the support of my family, and all the
 3    financial leads and resources. My brother also has
 4    written a letter there.  We also have another -- a family
 5    owned business.  It's [inaudible] that we deliver.  He's
 6    graduated -- his MBA and that, uh -- his website is there
 7    on his letter.  And he wants me to deliver these
 8    throughout the county of Fresno and stuff like that.  So,
 9    um -- what I, um -- I also like to, uh -- uh -- attend,
10    um -- this 90 meetings in 90 days with my [inaudible]
11    representative, but also my sponsor.  That we all made
12    that a personal commitment with him to attend these, uh -
13    - these meetings which I think is very important to this
14    for -- for my transition back into the community.
15    Considering I'm an ex -- I'll always be a recovering
16    addict.  And when these things work out, I -- I switched
17    my parole plans from my parents.  Because they have
18    separated again.  They are the best of friends right now.
19    But for differences, they thought it would be best to
20    split apart.  So this way that I could support both of
21    them -- I felt I didn't want to -- I wanted to stay with
22    my dad and I want to stay with my mom again.  But I love
23    them both, um -- and I know this is -- this is hurting
24    them a lot for me being in this situation.  So, I'll be
25    able to be there for both of them if I stay with my
26    sister.  In the city -- it gives me a lot of job avenues
27    in the city too.  And that's one of the reasons why I
```

29

1    switched my parole plans to stay with her.

2        **PRESIDING COMMISSIONER PORTER:**  Will you be pretty

3    close to an AA and NA?

4        **INMATE BOATMAN:**  Oh, yes.  Without a doubt.  My

5    sponsor had made the schedule and I will be very close to

6    AA and NA, the meetings.  So that's something that I'm

7    really looking forward to.

8        **PRESIDING COMMISSIONER PORTER:**  Okay.

9        **INMATE BOATMAN:**  Spending time with --

10       **PRESIDING COMMISSIONER PORTER:**  All right.  Well you

11   know crack is still out there.

12       **INMATE BOATMAN:**  Yeah, it's --

13       **PRESIDING COMMISSIONER PORTER:** So, it -- you're

14   walking down the street and you run into your old buddies

15   -- somebody offers you crack.  What are you going to do?

16       **INMATE BOATMAN:**  I'm going to call the police.

17   Crack, I'm not going to do no crack.  'Cause one of the

18   things that I realized in my recovery that even if I were

19   to say, make a drug transaction -- right with no -- with

20   no, uh -- uh -- um -- how would you say, with no

21   repercussions, right.  Would I do that?  No, I wouldn't.

22   Because I know that if I'm going to make a transaction,

23   it's my -- I might as well be using the drugs.  And the

24   thing is -- is that you know -- I know -- there's crack

25   in here too.  And I know that they, uh -- if I were to do

26   it, I'd go back to the same place where I left off.  And

27   I don't want to go back there.  So, that's what

30

1   definitely what I would do.

2       **PRESIDING COMMISSIONER PORTER:**  Okay.  I found some

3   of your letters of employment.

4       **INMATE BOATMAN:**  Oh, okay.

5       **PRESIDING COMMISSIONER PORTER:**  It's looking pretty

6   solid. This Zach Tanny, who's that?

7       **INMATE BOATMAN:**  That's the machine shop in Fresno.

8   I've been writing him resumes and sending them.  I

9   haven't met him but he's willing to offer me this

10  interview.  And I'm sure that once he sees what I know

11  that I will be getting paid some good money.  'Cause I'll

12  be able to, uh -- I think help his business prosper.  You

13  know with -- with the skills that I've learned -- that

14  I've learned in the machine shop. So --

15      **PRESIDING COMMISSIONER PORTER:**  Yeah, he's -- that -

16  -

17      **INMATE BOATMAN:**  He's also --

18      **PRESIDING COMMISSIONER PORTER:**  He employs 45 to 50

19  people.  That's pretty good.

20      **INMATE BOATMAN:**  Yeah.  And he's also said -- in the

21  bottom there that he even has some ex -- he has -- he has

22  ex -- seven -- was it seven people that he employed from

23  a prison system?

24      **PRESIDING COMMISSIONER PORTER:**  Uh-huh.

25      **INMATE BOATMAN:**  And I'm happy with the results.

26  So, that's a positive factor, yeah.

27      **PRESIDING COMMISSIONER PORTER:**  Okay, he's a

1  [inaudible] individual he didn't give a --

2  **INMATE BOATMAN:**  Okay.

3  **PRESIDING COMMISSIONER PORTER:**  -- give a number.

4  But he said he'll be very happy to see you.  And he's

5  looking forward to hiring you.  And we got a letter from

6  Jonathan Figueroa, who's that?

7  **INMATE BOATMAN:**  That's a -- that's a family friend.

8  Jonathan Figueroa, and he has a business in which is --

9  which is getting pretty big right now. It just started

10  like a few years ago.

11  **PRESIDING COMMISSIONER PORTER:**  Uh-huh.

12  **INMATE BOATMAN:**  And that they -- he's willing to, -

13  - give me that employment.

14  **PRESIDING COMMISSIONER PORTER:**  He said he'll start

15  you at 20 dollars an hour.

16  **INMATE BOATMAN:**  Yeah.

17  **PRESIDING COMMISSIONER PORTER:**  And it's commission

18  based and will be paid on a weekly basis. Okay, that's a

19  good offer.

20  **INMATE BOATMAN:**  Yes.

21  **PRESIDING COMMISSIONER PORTER:**  Got another one from

22  West Harmon, who is that?

23  **INMATE BOATMAN:**  West Harmon is a well drilling

24  business that my family is, uh -- well drillers are like,

25  um -- what they do is if my -- my family or my brother

26  couldn't get to a well, what happens is that well

27  drillers call well drillers.  Okay, so they kind of --

32

1   they kind of in the same group.  And that -- they, um --
2   he is also willing to give me that employment knowing my
3   family.
4       PRESIDING COMMISSIONER PORTER:  Okay, very good.
5   Turn the tape over next.
6   [Thereupon, tape was turned over.]
7       PRESIDING COMMISSIONER PORTER:  Okay -- okay we're
8   back on record.  We were talking about the [inaudible]
9   drilling.
10      INMATE BOATMAN:  Yeah.
11      PRESIDING COMMISSIONER PORTER:  And you say your
12  starting salary would -- would be 25 dollars an hour.
13  Okay, that is a good offer.  And that Robert Army, who is
14  that?
15      INMATE BOATMAN:   I don't know.  That's a guy that
16  I've sent resumes and cover letters to.  Also in Fresno,
17  California.
18      PRESIDING COMMISSIONER PORTER:  Okay.
19      INMATE BOATMAN:  And so --
20      PRESIDING COMMISSIONER PORTER:  He said that we're
21  not currently looking for a machinist, however things
22  could change.  So he said keep on contacting, in case a
23  position opens.  And we're going to get into some of your
24  letters.
25      DEPUTY COMMISSIONER WOLK:  How many letters is it?
26      INMATE BOATMAN:  It's only like 20, 21, I think.
27  Right now it's like --

33

1    **PRESIDING COMMISSIONER PORTER:**  Yeah, this is more
2    than 21.

3    **INMATE BOATMAN:**  Is it?

4    **PRESIDING COMMISSIONER PORTER:**  Looks like it, feels
5    like it.

6    **INMATE BOATMAN:**  Oh it's -- it's -- some of them are
7    like double.

8    **PRESIDING COMMISSIONER PORTER:**  Well, let's go over
9    some.  Thomas Witt, who is that?

10   **INMATE BOATMAN:**  That's a friend that I've met
11   through this institution, through the Kairos ministry.

12   **PRESIDING COMMISSIONER PORTER:**  Okay, all right.
13   Said, uh -- that he thinks you should be found suitable
14   for parole.  And you're a very cheerful man with a smile
15   on his face and a song his heart. So they're very
16   supportive of you.  And we've got Arlene Boatman, who is
17   that?

18   **INMATE BOATMAN:**  That's my older sister who I would
19   be -- will be staying with.

20   **PRESIDING COMMISSIONER PORTER:**  Okay.

21   **INMATE BOATMAN:**  Given the opportunity.

22   **PRESIDING COMMISSIONER PORTER:**  Okay.  She's very
23   supportive of you. She said that her home is equipped
24   with everything you'll need to translate, to transition
25   and pursue your goals.

26   **INMATE BOATMAN:**  Uh-huh.

27   **PRESIDING COMMISSIONER PORTER:**  She's currently

34

1    working for the IRS, she's been there for 18 years so --
2        **INMATE BOATMAN:**  Yes.
3        **PRESIDING COMMISSIONER PORTER:**  --okay, will be
4    happy to have you live with her.
5        **INMATE BOATMAN:**  Yes, she wrote another one too.
6        **PRESIDING COMMISSIONER PORTER:**  Okay.  This is
7    Ms. Arlene again.  I guess more support and that you're
8    in her prayers.  She's waiting for you.  Let's see, this
9    is from --
10       **INMATE BOATMAN:**  Andre --
11       **PRESIDING COMMISSIONER PORTER:**  Andre Boatman, who
12   is that?
13       **INMATE BOATMAN:**  That's my younger brother under me
14   who lives in San Antonio, Texas.  And the one that has
15   the, a, uh -- the business with the cocoa.  So he's --
16       **PRESIDING COMMISSIONER PORTER:**  Okay.  Well he's in
17   -- he's very supportive of you.
18       **INMATE BOATMAN:**  He's very successful.
19       **PRESIDING COMMISSIONER PORTER:**  He's been trying for
20   you, and he knows you got a lot of job offers.  And he
21   knows you've got several opportunities to -- to get a
22   good business going with yourself.  Landmark and Business
23   Factory, that's his current company.  Okay.
24       **INMATE BOATMAN:**  That's --
25       **PRESIDING COMMISSIONER PORTER:**  Then we have Jim
26   Boatman.
27       **INMATE BOATMAN:**  Yes.

1     **PRESIDING COMMISSIONER PORTER:**  Who is Jim?

2     **INMATE BOATMAN:**  That's my dad.

3     **PRESIDING COMMISSIONER PORTER:**  Okay.  And he's in

4     support of you -- you're his son.  And he says you have

5     not only made him -- you accomplished a lot.  And your

6     father's proud of you and he still -- he still has a

7     bedroom full of clothes for you.

8     **INMATE BOATMAN:**  I know.

9     **PRESIDING COMMISSIONER PORTER:**  He's waiting for

10    you.  And he's looking forward to you getting out.  We

11    have a Brandy Boatman, who is that?

12    **INMATE BOATMAN:**  That's my little sister.

13    **PRESIDING COMMISSIONER PORTER:**  Okay.

14    **INMATE BOATMAN:**  That's the youngest one.

15    **PRESIDING COMMISSIONER PORTER:**  Little sister is,

16    wow -- she's full of excitement waiting for you to get

17    out.  She says it put a heavy toll on her by you being

18    away. And -- but her love is strong and she's got

19    assurance, that you know -- her love is going to stay

20    strong for you. One day, you'll be a tight family again.

21    Christopher and Kimberly Peyton, who is that?

22    **INMATE BOATMAN:**  That's friends that I met through

23    the -- also the um -- the Kairos program.

24    **PRESIDING COMMISSIONER PORTER:**  Okay, all right.

25    **INMATE BOATMAN:**  I have like seven or eight of them

26    letters.

27    **PRESIDING COMMISSIONER PORTER:**  They've known you

36

1    for over three years and him and his family are very

2    supportive of you.  And they're behind you getting --

3    getting out of here.  And we have a letter from Liz Ram.

4        **INMATE BOATMAN:**  She's another one who I met through

5    the Kairos program.

6        **PRESIDING COMMISSIONER PORTER:**  Okay.

7        **INMATE BOATMAN:**  She's a good family friend.

8        **PRESIDING COMMISSIONER PORTER:**  She's a retired

9    professional woman.  And she's known you for six years.

10   And you've always been respectful towards her and she

11   believes you've made a lot of positive strides.  And she

12   sees you almost every Sunday in mass and [inaudible], and

13   a member of the choir.  So, she says you're a good

14   lecturer, she says you are a man full of compassion,

15   loving and understanding.  And there's a Marx (phonetic)

16   help me out with the last name.

17       **INMATE BOATMAN:**  Marx, I couldn't -- I couldn't.

18       **PRESIDING COMMISSIONER PORTER:**  C-A-Z-E-N-A-D-E.

19       **INMATE BOATMAN:**  I don't know, I couldn't pronounce

20   it myself.

21       **PRESIDING COMMISSIONER PORTER:**  Cazenade.

22       **INMATE BOATMAN:**  Yeah, I always get it wrong.  I

23   just call him Brother Marx.

24       **PRESIDING COMMISSIONER PORTER:**  Where do you know

25   him from?

26       **INMATE BOATMAN:**  Well Marx, I met through -- also

27   the, a, uh -- the also the, uh -- the programs that we

1    were -- the a, um -- he used to come to our Spirituality
2    Class.

3        **PRESIDING COMMISSIONER PORTER:** Uh-huh.

4        **INMATE BOATMAN:** Which is a 12 step, like for drug
5    and alcohol rehabilitation program. And I -- that's
6    where I got to know him a lot better. He came through the
7    -- also the Kairos Ministry. And that we have grown to
8    become close friends. He's an ex addict on -- he's been
9    clean and sober for over 30 years.

10       **PRESIDING COMMISSIONER PORTER:** Yeah, since '87.

11       **INMATE BOATMAN:** Yes, since '87 and that they -- I
12   felt that he would be the best friend that I could ever
13   have when I'm -- when I get released.

14       **PRESIDING COMMISSIONER PORTER:** Okay.

15       **INMATE BOATMAN:** Probably 'cause of his background
16   and his understanding of addiction. And that they --
17   he's agreed to be my sponsor.

18       **PRESIDING COMMISSIONER PORTER:** Okay.

19       **INMATE BOATMAN:** So he's taking me -- taking me to
20   the meetings and everything.

21       **PRESIDING COMMISSIONER PORTER:** He said that you've
22   demonstrated that you are committed to your recovery and,
23   uh -- that you've taken all the necessary steps to be
24   successful upon your release. So, he's very supportive.

25       **INMATE BOATMAN:** Yes.

26       **PRESIDING COMMISSIONER PORTER:** And there's another
27   letter from him. We got a letter from Tina Olivero

38

1    (phonetic).

2    **INMATE BOATMAN:**  Yes.

3    **PRESIDING COMMISSIONER PORTER:**  Okay, who is she?

4    **INMATE BOATMAN:**  She's a friend that -- that comes

5    up for [inaudible] from, back down south to visit.  I've

6    known her for like eight years.

7    **PRESIDING COMMISSIONER PORTER:**  Okay.

8    **INMATE BOATMAN:**  The, uh -- a real close friend of

9    the -- my family.  In fact she's like a little sister to

10   me.

11   **PRESIDING COMMISSIONER PORTER:**  Okay.  She says she

12   lovingly calls you Bert.

13   **INMATE BOATMAN:**  Yeah.

14   **PRESIDING COMMISSIONER PORTER:**  And it's easy to

15   love Bert.  'Cause you're so amazingly humble and a

16   compassionate person.  So she's very supportive of you

17   getting out soon.  All right, we got John Kelly, did we

18   go over his?

19   **INMATE BOATMAN:**  No.

20   **PRESIDING COMMISSIONER PORTER:**  Okay.  Who is John?

21   **INMATE BOATMAN:**  John Kelly is -- he's been a

22   volunteer at this prison over, uh -- 13 years.

23   **PRESIDING COMMISSIONER PORTER:**  Okay.

24   **INMATE BOATMAN:**  He does a lot of work in the Kairos

25   program and also the spirituality class he is involved

26   in.  And that, uh -- I've come to known him as an -- and

27   uh -- I feel grateful to have him as one of my friends

1    also.

2        **PRESIDING COMMISSIONER PORTER:** Okay. Well he's --
3    he's in support of you. And he said there's no doubt in
4    his mind that you're on the right track. And you've made
5    up for your mistakes in the past and he's supportive of
6    you. Let's see, Victor Feralla (phonetic).

7        **INMATE BOATMAN:** Feralla.

8        **PRESIDING COMMISSIONER PORTER:** Okay, who is that?
9        **INMATE BOATMAN:** He's another one from Kairos. He's
10   very supportive when I come to -- to [inaudible].

11       **PRESIDING COMMISSIONER PORTER:** All right. So, he
12   says you're -- he's happy and wants you to get out. And
13   he said you were found suitable for parole [inaudible] so
14   he can't figure out why you're still here. Okay, we got
15   Laurie W. Gayle, who is she?

16       **INMATE BOATMAN:** She's a volunteer from the catholic
17   chapel. She does, um -- a lot of the -- she's a part of
18   our -- a band. She sings and worships in there. And a
19   real good friend who's come to -- we've come to share
20   with one another and, um -- just a loving experience.

21       **PRESIDING COMMISSIONER PORTER:** She's been knowing
22   you for about four years and she's spent many hours with
23   you and she says you're a deeply spiritual man with very
24   strong and sheer sense of who he is and has learned with
25   Christ in his life. So she's very supportive of you.
26   And we've got Thomas E. Whit, who is that?

27       **INMATE BOATMAN:** Thomas E. Whit is, [inaudible], I

1  think you read that the first time.

2  **PRESIDING COMMISSIONER PORTER:** Okay, is he someone-

3  -

4  **INMATE BOATMAN:** Yeah, you read that one.

5  **PRESIDING COMMISSIONER PORTER:** Okay, we've got

6  Patricia Putnam.

7  **INMATE BOATMAN:** She's another friend who, uh --

8  from the Kairos ministry that I've come to know over

9  several years. It's a real good friend [inaudible].

10  **PRESIDING COMMISSIONER PORTER:** Okay. She's been

11  knowing you for about six years and she's always

12  supportive of you and she -- she meets with you like

13  regularly and attends the meetings, I think it's twice a

14  month. Sharing with your Kairos.

15  **INMATE BOATMAN:** Yes.

16  **PRESIDING COMMISSIONER PORTER:** We've got Sister

17  Karen Conover.

18  **INMATE BOATMAN:** Yes.

19  **PRESIDING COMMISSIONER PORTER:** Okay. She's

20  supportive of you. She's been knowing you for seven

21  years as a community volunteer with music and with the

22  catholic chapel and everything. She wants you to get

23  out. Brother David Corona.

24  **INMATE BOATMAN:** Yes.

25  **PRESIDING COMMISSIONER PORTER:** Who's he?

26  **INMATE BOATMAN:** He's another from the, the Kairos

27  that I know.

1      **PRESIDING COMMISSIONER PORTER:**  He's -- he's
2    definitely supportive of you and he wants you to get out.
3    You've got a Robert Puente.

4      **INMATE BOATMAN:**  Yes, he's a -- he's a -- Robert
5    Puente has been a volunteer here at the prison for -- I
6    can't recall.  It's like ten years or so.  And that they,
7    uh -- he used to teach this course at the, uh -- Personal
8    Responsibility Course, Making a Change.  And he does a lot
9    of, um -- um educational as far as writing and helping us
10   [inaudible] GED's and things like that, and better in the
11   trade.  So --

12     **PRESIDING COMMISSIONER PORTER:**  He said that he's
13   known you for six years and you've made -- you've made
14   great strides and he believes that you've shown remorse
15   for what you've done and -- and [inaudible].  He says you
16   understand the suffering that you've caused for others,
17   and he believes that you whole heartedly have changed and
18   just want to -- just go further and do good things. So
19   he's supportive of you.  We've got a Laura Bowman, okay
20   who's she?

21     **INMATE BOATMAN:**  She's an academic teacher here who
22   works for the prison and she, what she did is she
23   resubmitted the letter that she wrote to Governor
24   Schwarzenegger earlier, so --

25     **PRESIDING COMMISSIONER PORTER:**  Okay.  So by all
26   accounts, you've always been a good person.  You know,
27   you got strayed away a little bit in your youth, but

1    however you've been transformed in prison.  And you've
2    been maintaining a very good prison record and she's a
3    hundred percent behind you.  We have D.D. Lavi PhD.
4        **INMATE BOATMAN:**  Oh, that's Denevey (phonetic),
5    that's Dawn Denevey.
6        **PRESIDING COMMISSIONER PORTER:**  Okay.
7        **INMATE BOATMAN:**  He's the coach that works in this
8    institution and that they, uh -- I've been a part of the
9    tennis team over a few years.  [Inaudible] what I do, is
10   I take a lot of the volunteers up and I give them tours
11   around the institution.  All that kind of and they visit
12   us and play with us and that they, uh -- it's been
13   something that I really enjoy.
14       **PRESIDING COMMISSIONER PORTER:**  Okay, yeah.  He's a
15   -- I guess with the tennis team.
16       **INMATE BOATMAN:**  Yeah, with the tennis team.
17       **PRESIDING COMMISSIONER PORTER:**  Yeah.  He's feeling
18   like you're definitely worthy and he's definitely
19   supportive of you and he wants you to get out.  And we
20   have one from --
21       **INMATE BOATMAN:**  Ayita (phonetic).
22       **PRESIDING COMMISSIONER PORTER:**  Ayita, okay who is
23   she?
24       **INMATE BOATMAN:**  Ayita DeLatega (phonetic) she's
25   been with the [inaudible] corrections back in '94-5, I
26   met her and we're -- she was doing things with my old
27   supervisor, Paul Earn, and she has become the -- our

43

1    college for Death Row now that she does and that I have

2    come to know her and work with her on a lot of projects.

3    And that they, uh -- I thought it was one of the reasons

4    why a lot of the letters are from the Kairos and the

5    people that, um -- that are within this prison is because

6    I thought it would be better for you to get a better

7    understanding of who I was.  'Cause you know family's

8    pretty much going to you know, -- uh --

9        **PRESIDING COMMISSIONER PORTER:**  Right, okay --

10       **INMATE BOATMAN:**  Okay so --

11       **PRESIDING COMMISSIONER PORTER:**  -- so she's observed

12   your professional work habits and you've always acted in

13   a respectful way, work hard and has always been diligent

14   about completing your assignments.  Okay, I think we've

15   got all the letters covered, and do we have any letters

16   of opposition?

17       **DEPUTY COMMISSIONER WOLK:**  No, sir, we do not.

18       **PRESIDING COMMISSIONER PORTER:**  Okay, but we have

19   our District Attorney here and, sir, we're going to open

20   the panel up for you to ask questions of the, Mr. Boatman

21   here.

22       **DEPUTY DISTRICT ATTORNEY SANDERSON:**  You've done a

23   pretty good job according to background, Commissioner, so

24   I just have a few questions.  The purse snatching on

25   September 21st, of '84.  [Inaudible].

26       **INMATE BOATMAN:**  Yes -- yes I did.

27       **DEPUTY DISTRICT ATTORNEY SANDERSON:**  And then you

44

1    were, you jogged by this young woman and turned around

2    and came up behind her and grabbed her purse.

3    **INMATE BOATMAN:** I came right be--, behind her, yes.

4    **DEPUTY DISTRICT ATTORNEY SANDERSON:** Why did you

5    pick her out?

6    **INMATE BOATMAN:** She was around -- there was nobody

7    around -- and I thought that was an easy time.

8    **DEPUTY DISTRICT ATTORNEY SANDERSON:** Why did you do

9    a purse snatch to begin with?

10    **INMATE BOATMAN:** Why. There isn't a valid excuse

11    that I can give you of why I done it. I know at that

12    time in my life I was dealing with a lot of issues. My

13    heart was empty and full of anxiety. I thought that you

14    know -- it was crazy. But if I used drugs it would

15    dampen the depression at the moment that was adding to me

16    to [inaudible] to doing this thing. And it's sad because

17    I was a good kid and at that time I just needed a little

18    help.

19    **DEPUTY DISTRICT ATTORNEY SANDERSON:** Did you do the

20    purse snatch because you needed money?

21    **INMATE BOATMAN:** No, I didn't need no money. It was

22    stupidity. If I needed money, the only thing I had to do

23    was just call my parents or something.

24    **DEPUTY DISTRICT ATTORNEY SANDERSON:** So, you didn't

25    need the money --

26    **INMATE BOATMAN:** No.

27    **DEPUTY DISTRICT ATTORNEY SANDERSON:** -- or a mean

45

1    spirit in this, or, or what?

2       **INMATE BOATMAN:** You can say it was mean spirited.
3    I was smoking marijuana at that time. And I felt if I
4    could get a little money I can buy me some more. But
5    that's still not excusing. I'm not going to make an
6    excuse for that.

7       **DEPUTY DISTRICT ATTORNEY SANDERSON:** Okay. So, I'm
8    confused. I thought you said you didn't do it because of
9    the money.

10      **INMATE BOATMAN:** No, I didn't but -- not for the
11   money, for the drugs. This is what I stole it for.

12      **DEPUTY DISTRICT ATTORNEY SANDERSON:** How were you
13   buying your drugs before that time?

14      **INMATE BOATMAN:** I had, um -- I had some money in my
15   wallet. And when I -- when I, um -- did the crime, um --
16   I felt like I can buy more -- more drugs. So --

17      **DEPUTY DISTRICT ATTORNEY SANDERSON:** Now, let me go
18   back to [inaudible], um -- you didn't need the money when
19   you did the purse snatch. I think that's what you said.

20      **INMATE BOATMAN:** Yes.

21      **DEPUTY DISTRICT ATTORNEY SANDERSON:** Okay. And I
22   think you said that you could get money from -- from your
23   folks.

24      **INMATE BOATMAN:** Uh-huh.

25      **DEPUTY DISTRICT ATTORNEY SANDERSON:** And had you
26   gotten money from your folks before so you could get
27   marijuana?

46

1          **INMATE BOATMAN:**  Yes, I did.  Before I took the trip

2     up there, I had just got money from them.

3          **DEPUTY DISTRICT ATTORNEY SANDERSON:**  So why did you

4     have to -- why did you feel you had to do the purse

5     snatching?

6          **INMATE BOATMAN:**  That's a good question.  And -- and

7     because I didn't -- and, uh -- I wasn't thinking at that

8     time when I did it.  I thought since I was in a town,

9     it'd be easy target.  You know, and that day, uh -- I

10    just wasn't thinking of nobody.  I didn't even care.

11         **DEPUTY DISTRICT ATTORNEY SANDERSON:**  What about your

12    friend that you were with, [inaudible]?

13         **INMATE BOATMAN:**  Yes.

14         **DEPUTY DISTRICT ATTORNEY SANDERSON:**  Did you plan on

15    doing it with him?

16         **INMATE BOATMAN:**  Yes.

17         **DEPUTY DISTRICT ATTORNEY SANDERSON:**  Were you

18    looking for an easy target [inaudible]?

19         **INMATE BOATMAN:**  Yes.

20         **DEPUTY DISTRICT ATTORNEY SANDERSON:**  Both of you

21    were together.

22         **INMATE BOATMAN:**  Yes.

23         **DEPUTY DISTRICT ATTORNEY SANDERSON:**  And why were

24    you carrying a crowbar?

25         **INMATE BOATMAN:**  I wasn't carrying the crowbar.  Um

26    -- at the time I was arrested, um -- I didn't have the

27    crowbar.  Um -- I did plead to that, and, um -- so all I

1   did was snatch the purse and run.

2      **DEPUTY DISTRICT ATTORNEY SANDERSON:**  Why did you

3   plead to carrying a crowbar?

4      **INMATE BOATMAN:**  'Cause I gotta get out of jail.

5   When I told them, they told me that I would just do six

6   months.  And it was close to doing throughout that time.

7      **DEPUTY DISTRICT ATTORNEY SANDERSON:**  All right, in

8   looking at this document, it's a probation report

9   [inaudible] on page five it references the purse

10  snatching in [inaudible].

11      **INMATE BOATMAN:**  Okay.

12      **PRESIDING COMMISSIONER PORTER:**  The last line, it

13  says it was also determined that at the time the offense

14  occurred Boatman was carrying a pry iron.

15      **INMATE BOATMAN:**  Uh-huh.

16      **DEPUTY DISTRICT ATTORNEY SANDERSON:**  Do you know how

17  they arrived at that?

18      **INMATE BOATMAN:**  I do not know, but I wasn't.  All I

19  can say -- I was not carrying no crowbar.  I did go to my

20  car and act like I was going to change the tire when the

21  police had arrived out there.  But my assumption is that

22  it was taken from my trunk.  'Cause they popped the trunk

23  open, and I remembered the officer stating I got it --

24  here it is.

25      **DEPUTY DISTRICT ATTORNEY SANDERSON:**  Julie had said

26  something about you having a [inaudible].

27      **INMATE BOATMAN:**  Who?

48

1     **DEPUTY DISTRICT ATTORNEY SANDERSON:** Julie

2     [inaudible].

3     **INMATE BOATMAN:** I don't know who --

4     **DEPUTY DISTRICT ATTORNEY SANDERSON:** She was one on

5     the -- it's not important.

6     **INMATE BOATMAN:** Okay, it's a possibility that she

7     said that but--

8     **DEPUTY DISTRICT ATTORNEY SANDERSON:** All right.

9     **INMATE BOATMAN:** Or witnesses or whatever you have -

10    - but -- but I didn't have one, again, sir.

11    **DEPUTY DISTRICT ATTORNEY SANDERSON:** So you just

12    pleaded to it to get out.

13    **INMATE BOATMAN:** Yes, I did.

14    **DEPUTY DISTRICT ATTORNEY SANDERSON:** [Inaudible] few

15    months later, so you did the petty theft. What was that

16    about?

17    **INMATE BOATMAN:** Stealing some cassette tapes.

18    **DEPUTY DISTRICT ATTORNEY SANDERSON:** And the reason

19    you stole that, on that occasion was?

20    **INMATE BOATMAN:** Um -- no excuse again sir. Um -- I

21    stole it 'cause I thought I can get away with it. And I

22    had the money to buy -- buy the tapes in my pocket.

23    **DEPUTY DISTRICT ATTORNEY SANDERSON:** So, it wasn't

24    the money?

25    **INMATE BOATMAN:** Wasn't for money.

26    **DEPUTY DISTRICT ATTORNEY SANDERSON:** Wasn't for

27    drugs?

49

1    **INMATE BOATMAN:** No it was not. It was my criminal

2    behavior. In a way I thought, that's what it was. I

3    thought like a criminal would think. And acted

4    [inaudible].

5    **DEPUTY DISTRICT ATTORNEY SANDERSON:** Now murder

6    itself, back in May of '86, what was the reason you

7    committed that theft? [Inaudible].

8    **INMATE BOATMAN:** The theft.

9    **DEPUTY DISTRICT ATTORNEY SANDERSON:** Yeah, basically

10   the robbery -- the theft.

11   **INMATE BOATMAN:** Yes.

12   **DEPUTY DISTRICT ATTORNEY SANDERSON:** Because

13   somebody ended up getting killed.

14   **INMATE BOATMAN:** Yes.

15   **DEPUTY DISTRICT ATTORNEY SANDERSON:** Yeah. Why did

16   you commit that?

17   **INMATE BOATMAN:** Um -- the main reason was for the

18   drugs. It's what I was searching for. It's an

19   addiction. Uh -- that's why I agreed to do this -- is

20   for myself, being selfish.

21   **DEPUTY DISTRICT ATTORNEY SANDERSON:** You were

22   convicted in September of '84, in the purse snatching.

23   **INMATE BOATMAN:** No I was -- I was smoking then but

24   I wasn't addicted --

25   **DEPUTY DISTRICT ATTORNEY SANDERSON:** You weren't

26   addicted in --

27   **INMATE BOATMAN:** Well let me clarify that up. Okay,

50

1   'cause I was addicted.  Because I was using everyday.  I
2   was smoking marijuana everyday.  Okay, so -- so I just
3   want to clarify that.

4       **DEPUTY DISTRICT ATTORNEY SANDERSON:**  Okay, so you
5   commit the -- the purse snatch in September of '84,
6   because you're addicted.

7       **INMATE BOATMAN:**  Yes, I was addicted.

8       **DEPUTY DISTRICT ATTORNEY SANDERSON:**  And that would
9   be the same for petty theft in '85?

10      **INMATE BOATMAN:**  Yes, it would be the same for the
11  petty theft in '85.  Not making decisions of my addiction
12  but -- but, uh -- the reaction of -- of thinking that I
13  can get away in -- in doing in a criminal state of mind.
14  You know 'cause -- 'cause that there wasn't for no drugs
15  or nothing.  That there was simply for, um -- for my
16  personal use.  To listen to me some free cassette tapes
17  out of the store.

18      **DEPUTY DISTRICT ATTORNEY SANDERSON:**  Now going back
19  to the robbery and murder.  Right now you've been using
20  crack cocaine, is that right?

21      **INMATE BOATMAN:**  Yes, it is.

22      **DEPUTY DISTRICT ATTORNEY SANDERSON:**  And you've run
23  out.  Is that right?

24      **INMATE BOATMAN:**  Yes.

25      **DEPUTY DISTRICT ATTORNEY SANDERSON:**  Now besides
26  doing crack cocaine, were you working at that time?

27      **INMATE BOATMAN:**  Uh -- I just recently had quit a

1  job a couple months prior to, um -- a couple months prior

2  to, um -- being addicted to that.  So I was working as a

3  [inaudible] in a -- in my step father's liquor store --

4  [inaudible] step -- step father's liquor store.

5      **DEPUTY DISTRICT ATTORNEY SANDERSON:**  Were you still

6  getting money from your folks?

7      **INMATE BOATMAN:**  Yes, but they were getting tired of

8  it.  Continuing to give me money and wondering what would

9  it -- what -- what it's for.

10     **DEPUTY DISTRICT ATTORNEY SANDERSON:**  Okay.  Maybe

11 part of the reason you did the robbery wasn't only

12 because you were addicted to the drugs, it was because

13 maybe a harder a lifestyle for you.

14     **INMATE BOATMAN:**  It was.  A part of it was a

15 lifestyle.  Yes, I agree with you.

16     **DEPUTY DISTRICT ATTORNEY SANDERSON:**  Now this

17 person, he was the shooter.  The guy that actually shot

18 the victim -- you did not know him personally.

19     **INMATE BOATMAN:**  No, I'd met him though.

20     **DEPUTY DISTRICT ATTORNEY SANDERSON:**  Oh.

21     **INMATE BOATMAN:**  One prior time.  And I knew the

22 house that I went to, uh -- that they smoked crack.  And,

23 uh -- when I went over, I jumped a couple fences and he

24 was there.

25     **DEPUTY DISTRICT ATTORNEY SANDERSON:**  How long had

26 you been up, [inaudible] that night?

27     **INMATE BOATMAN:**  After that -- after --

1      **DEPUTY DISTRICT ATTORNEY SANDERSON:**   Before it

2   happened.

3      **INMATE BOATMAN:**   Before it happened?

4      **DEPUTY DISTRICT ATTORNEY SANDERSON:**   Yeah.

5      **INMATE BOATMAN:**   Um -- a couple hours.

6      **DEPUTY DISTRICT ATTORNEY SANDERSON:**   Well was it

7   easy to trust this guy?

8      **INMATE BOATMAN:**   Um -- I knew he was kind of -- you

9   know, a little wild.  A little crazy but, um -- there was

10   no reason to trust him and -- but -- but I did.

11      **DEPUTY DISTRICT ATTORNEY SANDERSON:**   You decided to

12   believe that he wouldn't hurt anybody?

13      **INMATE BOATMAN:**   I did.

14      **DEPUTY DISTRICT ATTORNEY SANDERSON:**   [Inaudible]

15   being able to -- somebody else's thoughts and -- think it

16   was he that made the comment that there wasn't going to

17   be any witnesses.  Do you recall that?

18      **INMATE BOATMAN:**   I recall that.

19      **DEPUTY DISTRICT ATTORNEY SANDERSON:**   Said that after

20   you got the gun?

21      **INMATE BOATMAN:**   No -- yes, it was after the gun was

22   in the car at that time.

23      **DEPUTY DISTRICT ATTORNEY SANDERSON:**   How long did

24   you plan on doing this robbery?  How long did it take you

25   to -- were you able to get the people [inaudible]?

26      **INMATE BOATMAN:**   Um -- soon after smoking it took

27   approximately -- I'm making an assumption now 'cause I

1   really don't know.

2        **DEPUTY DISTRICT ATTORNEY SANDERSON:**   Okay.

3        **INMATE BOATMAN:**   But, um -- it wasn't about maybe an

4   hour or so afterwards.  After we went out -- after we had

5   used the crack.

6        **DEPUTY DISTRICT ATTORNEY SANDERSON:**   Okay, you

7   already left your house or you're -- I'm just asking

8   about the firearm.

9        **INMATE BOATMAN:**   Yes, I did.

10       **DEPUTY DISTRICT ATTORNEY SANDERSON:**   Okay, and you

11   came back with the firearm?

12       **INMATE BOATMAN:**   Yes.

13       **DEPUTY DISTRICT ATTORNEY SANDERSON:**   And

14   [inaudible].

15       **INMATE BOATMAN:**   Yes.

16       **DEPUTY DISTRICT ATTORNEY SANDERSON:**   And where did

17   you go from there?

18       **INMATE BOATMAN:**   We went to the first store which

19   was in [inaudible], but he say, but, uh -- James said

20   that he had robbed this particular store before and that

21   store was too many people.  Too many customers.  'Cause

22   he was going to run in the back, and then, um -- so we

23   decided to go and, uh -- to another.  And the same thing,

24   this one had too many customers.  So the plan had changed

25   from that point.

26       **DEPUTY DISTRICT ATTORNEY SANDERSON:**   When did you

27   take on this, uh -- what you called this leadership role?

1   More of a leadership role.

2       **INMATE BOATMAN:**  I took that, uh -- I'd say right
3   after I got in the car and I drove to where John was
4   working.  I took --

5       **DEPUTY DISTRICT ATTORNEY SANDERSON:**  [Inaudible].

6       **INMATE BOATMAN:**  After I picked up the gun, when I
7   decided I was going to go and be a part of this and I got
8   the gun and I drove my car, that's when I, uh -- I took
9   that leadership position.  And it escalated.  As we
10  continued I, uh -- it's like we had [inaudible].  That's
11  when I told -- when I asked Butch if he wanted to be the
12  driver.

13      **DEPUTY DISTRICT ATTORNEY SANDERSON:**  Okay, I think
14  that's all I have.

15      **PRESIDING COMMISSIONER PORTER:**  Thank you, sir.
16  Counsel, do you have any questions of your client?

17      **ATTORNEY CHRISTENSEN:**  A couple yeah.  Just one
18  thing, when you were talking about the rape with the 14
19  year old, you said that it was consensual.  Do you
20  understand that you can not -- that a 14 year old can not
21  consent to sex?

22      **INMATE BOATMAN:**  I do -- I do understand now.  At
23  that time, I did not understand that it was what I --
24  what mine was it was consensual.  But I didn't do
25  anything you know.

26      **ATTORNEY CHRISTENSEN:**  At the time.

27      **INMATE BOATMAN:**  At the time -- at the past it was.

55

1   But now I understand that. That no minor can consent to
2   sex [inaudible] adult.

3       **ATTORNEY CHRISTENSEN:** Okay. All right. Well, at
4   the time this crime occurred you were already on
5   probation. So obviously you were not successful on
6   probation. So what can you tell this board to convince
7   them that you would be successful on parole?

8       **INMATE BOATMAN:** Uh -- I'd be successful on parole
9   because of how much I've matured. I care about people
10  today as well as myself. I have faith in myself. The
11  things that I choose are different today than the things
12  I choose then. Everybody that I choose in my life today
13  are successful. They are clean, they are sober and I
14  thought at that time they were my friends. But they were
15  associates. So it's just like I choose my friends like
16  anybody would choose their groceries out of the store you
17  know. The fruits, if a fruit is all spoiled or rotten
18  you're not going to throw it in your bag. You know, and
19  that there. And to me it's like if you choose somebody
20  · in your life to hang around with, an associate that is
21  successful, most likely you're going to be successful.
22  If you choose somebody that's using drugs, I don't care
23  how strong you are, eventually you're going to start
24  using drugs.

25      **ATTORNEY CHRISTENSEN:** Are you the only one in your
26  family with any type of criminal history?

27      **INMATE BOATMAN:** Yes, I'm the only one with any type

1    of criminal history. Although my brother is, um -- my
2    younger brother Sal, is, uh -- he's had a drug problem
3    with crystal meth. Uh -- and, but criminal, I'm the only
4    one that I know of in this family.

5        **ATTORNEY CHRISTENSEN:** Okay. And then finally I
6    would just like you to address this. Governor
7    Schwarzenegger in his decision dated 8/24/05 says
8    quote:

9            "Although he claims to have remorse and
10           accept responsibility for Mr. Souzza's
11           murder, Mr. Boatman has maintained
12           throughout his incarceration and as recently
13           as during his 2005 parole hearing that he
14           did not know anyone would get hurt during
15           the robbery. Despite the crime partners
16           remarks before hand that there would be no
17           concern about being identified by witnesses.
18           This to me is some evidence that Mr. Boatman
19           may not fully grasp the consequences of his
20           actions or the magnitude of his role in this
21           murder."

22   End quote. Could you address that concern for us?

23       **INMATE BOATMAN:** Yes, it's really unfortunate that I
24   know that they -- if he was to know me I think that
25   opinion would be different. And it's -- it's my fault.
26   I kind of take the responsibility for that because I did
27   not clarify this up when Commissioner Lee had asked me to

1    clarify this statement up.  That's -- my pride got in the
2    way a little bit of that.  And the past and the present.
3    I know that now today.  As I stated earlier that the
4    person -- it doesn't matter what type of crime that you
5    commit in your life, I know that today -- that somebody's
6    going to be affected.  They're going to get hurt.  Okay,
7    then it is true, I was very naïve.  I didn't know the
8    difference -- I didn't care.  But today, through this
9    learning, and through the programs that I've been a part
10   of, and through the changes and the transformation that I
11   made in myself -- in my heart.  That they -- that was me
12   then -- but it's not me today.  I think totally
13   different. I don't think -- and as I stated earlier -- as
14   a criminal we think and act.  And that day of -- and I
15   can see where he drew up this conclusion.  Where yes, I
16   should have asked a question.  I should have said what do
17   you mean by that.  By that state -- what do you mean that
18   I didn't?  And my intentions were to go commit this
19   robbery and to get this money without nobody getting hurt
20   at that time.  And I believed that.

21        **ATTORNEY CHRISTENSEN:**  Were there bullets in the
22   gun?

23        **INMATE BOATMAN:**  There were bullets already in the
24   gun, yes.  Yes, they were and so -- and I didn't think
25   about it.  I was powerless at that time.  But I -- but I
26   lived with that and it hurts.  Knowing that, what I know
27   today I wish I would have known then.  If I could have

1   stayed two steps ahead -- I would have stopped it.

2       **ATTORNEY CHRISTENSEN:**  Do you ever find yourself --

3   today Mr. Boatman, wanting to do things that are not

4   right just to get away with it?

5       **INMATE BOATMAN:**  What do you mean -- can you?

6       **ATTORNEY CHRISTENSEN:**  Well you said that back then

7   you would sometimes commit a crime to -- you would steal

8   for drugs.  But sometimes not drugs.  Sometimes just to

9   get away with tit.

10      **INMATE BOATMAN:**  Yes, it was the adrenaline I guess.

11  It's like that first hit when you take -- you always

12  chase that first hit.  It's the adrenaline of let me see

13  if I can get away with this.  You know.  And, uh --

14      **ATTORNEY CHRISTENSEN:**  And today?

15      **INMATE BOATMAN:**  And today it's -- it's totally

16  different.  The adrenaline to me is the adrenaline to

17  make a difference.  To -- to give back.  To stop the pain

18  that the people go through.  The victim -- there are so

19  many victims that are left behind.  And that's not right.

20  Today I think as a mature and responsible person.  I'm

21  not 20 years old anymore.  I'm almost 41 years old.  Next

22  month I'll be 41.  Might be kind of young to some that

23  say that.  But I feel as though I'm going on 60 years

24  old.

25      **ATTORNEY CHRISTENSEN:**  [Inaudible].  No further

26  questions.

27      **PRESIDING COMMISSIONER PORTER:**  Thank you counsel.

1    Okay, we'll go back to the District Attorney for closing
2    statements.

3    **DEPUTY DISTRICT ATTORNEY SANDERSON:**  I'll be real
4    brief. I'm going to continue on, Governor
5    Schwarzenegger's comments.  His release review and
6    counsel reference.  Leaving off where she -- or picking
7    up where she left off.  Regardless of Mr. Boatman's
8    claimed belief as to what would happen -- it was he who
9    brought along the gun.  He was active, willing and a
10   major participant in a planned armed robbery that
11   resulted in the shooting death of Mr. Souzza.
12   Mr. Boatman's actions therefore exceed [inaudible]
13   necessary to sustain a conviction for second degree
14   murder.  [Inaudible] however for which he was convicted
15   [inaudible].  This factor alone is enough for me to
16   conclude at this time Mr. Boatman's release from prison
17   would pose [inaudible] for public safety risk.
18   [Inaudible] the manner of which Mr. Souzza was murdered
19   was [inaudible] and senseless.  Mr. Souzza fully
20   cooperated with the assailants and then was shot in the
21   [inaudible].  I tend to agree with the governor.  I don't
22   think anything really changed from the last hearing.
23   There are a couple things that came out at this hearing
24   that I didn't see in the papers from the courts and the C
25   file.  One of which was the time which the inmate took a
26   leadership role, and decided to take a leadership role in
27   the -- in the robbery.  And that was when he was by

1    himself and he picked up the gun before he [inaudible]
2    co-conspirators.  It was he who decided to take this
3    leadership role when he was picking up a loaded hand gun.
4    [Inaudible] this basically an execution of the gentleman
5    that was behind the counter [inaudible] conspiratorially
6    involved with the others who did these -- the robbery.
7    Also, based on some of the statements that came out
8    today, with respect to the prior criminal record
9    including the nature and the thought process that went
10   into the [inaudible] in September of 1984, his
11   willingness to do crime, he was not addicted to crack
12   cocaine at that time.  Little petty theft -- shows the --
13   a willingness or a -- [inaudible].  At this point in
14   time, I didn't see any subject able change in
15   circumstances, and still think that he is an unreasonable
16   risk [inaudible] society.

17        **PRESIDING COMMISSIONER PORTER:**  Thank you very much,
18   sir.  All right, Counselor, do you have a closing
19   statement?

20        **ATTORNEY CHRISTENSEN:**  I do.  Mr. Boatman is not an
21   unreasonable risk at this time.  Two prior panels have
22   found him suitable for parole.  He's just as suitable
23   today, if not more so in that he's continued with classes
24   and programming.  He is very candid in thought today.  In
25   his presentation he certainly did not minimize his
26   [inaudible].  But frankly opposite.  He takes full
27   responsibility and he has deep remorse for the victim.

1    And he has shown that -- that he has done here in prison
2    -- that he wishes to better his life and he has turned
3    himself to god by all of his positive programming.  Which
4    is [inaudible] and will utilize what he has learned in
5    the outside in order to be a productive law abiding
6    member of society.  Everything's in place for him to have
7    a successful parole.  He's got a loving family, wonderful
8    friends.  He has a residence.  He has a multiple job
9    offers.  He's picked up great skills here in prison.
10   Extremely marketable skills.  He would be able to have a
11   pipe hanging job if he were to be out there.  And he
12   would attend AA out on the streets.  That's one thing
13   that he realizes. He needs to have as a life long
14   commitment.  And he is a very good candidate, once again
15   for consideration for parole.  So, I hope the board goes
16   to find his [inaudible] this time.  [Inaudible], thank
17   you.

18        **PRESIDING COMMISSIONER PORTER:**  Thank you very much,
19   Counselor.  Mr. Boatman would you like to make a closing
20   statement?

21        **INMATE BOATMAN:**  Yes, I would.

22        **PRESIDING COMMISSIONER PORTER:**  Okay.

23        **INMATE BOATMAN:**  Thank you, Mr. Chrsistensen.  John
24   lost his life because of what I've done.  And knowing
25   that I could have stopped it -- it hurts a lot.  I didn't
26   do anything to prevent it.  I did everything to make it
27   happen.  I gave the gun, I drove my car.  And he was

62

1    killed because of what I've done. It hurts me, because
2    the victims. It's senseless, and they didn't do anything
3    do deserve that. I -- I wish I could change it. I wish
4    I can go back and prevent this tragedy from happening but
5    I can't. I didn't want this to happen, but it did. It
6    wasn't my intentions to commit a murder. And, uh -- what
7    I do is I just ask for forgiveness. And I'm sorry for
8    what I done. You have seen a lot of things that I
9    achieved since my incarceration. The certificates and
10   the positive laudatory chronos. Completed vocational
11   trades. With numerous self-help and therapy programs
12   I've taken in. Favorable psychological evaluations and
13   counselor reports. And many other factors supporting my
14   release. Staying disciplinary free. But it will never
15   clean the slate -- or bring John back. Even if I was to
16   serve another 20 years in this institution -- it still
17   wouldn't be enough time for John's life. All I can say
18   is that I agree with the District Attorney, that yes,
19   it's crazy. But I disagree with you, sir, on the fact
20   that I'm not that person anymore. I've been trying to do
21   my best and what I do. All I can say is that I'm a good
22   person with a good heart, and I'm trying my best to good
23   for others in my family. And most important, is that I
24   seek forgiveness for my taking of John's life and the
25   pain I have caused to his family. I just thank you.
26       **PRESIDING COMMISSIONER PORTER:** Okay. Thank you
27   very much, sir. We appreciate your comments. We will

63

1    now recess for deliberations.

2                          R E C E S S

3                            --o0o--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

64

1      **CALIFORNIA BOARD OF PAROLE HEARINGS**

2                **D E C I S I O N**

3      **PRESIDING COMMISSIONER PORTER:**  Okay.  We're back on

4      record.  Okay, the time is 3:37, and basically in the

5      matter regarding Christopher Boatman, CDC number D as in

6      David, 65055, we've reached a decision.  And the board

7      reviewed all information received from the public  and

8      relied on the following circumstances.  In concluding

9      that the person is not suitable for parole and would pose

10     an unreasonable risk of danger to society or a threat to

11     public safety if released from prison.  The crime was

12     very cruel.  The crime was done or planned without

13     feeling bad about hurting others.  The inmate did not

14     care people suffered.  The reason for the crime was small

15     compared to the hurt it caused.  The inmate has sexually

16     assaulted [inaudible] very much.  In a separate decision,

17     the hearing panel finds that it is not reasonable to

18     expect that parole would be granted at a hearing in the

19     following two years.  The specific reason for the

20     findings are, that this was carried out in an especially

21     cruel and callous moment.  The offense was carried out in

22     a dispassionate and [inaudible] manner. Such as an

23     execution style murder.  The offense was carried out in a

24     manner which demonstrates an exceptionally callous

25     disregard for human suffering.  The motive for the crime

26     was inexplicable in the relationship to the offense.  I

27     C. BOATMAN      D-65055        DECISION PAGE 1    6/29/06

65

1    mean this was a crime where he had given you the money.
2    You had went and got the gun, put bullets in it, and
3    drove down there.  So you knew that somebody had a good -
4    - somebody's going to get killed.  Especially when the
5    guy made the statement, there will be no witnesses.  When
6    someone asked you -- hey, who's going to -- what about
7    witnesses -- I'm going to take care of that.  And so this
8    man, even though he cooperated, he still lost his life.
9    You have no record of violence or assaultive behavior.
10   And it became an escalating pattern of criminal conduct.
11   Basically, you failed to profit from society's previous
12   attempt to correct your criminal, criminality.  Such as,
13   you were on probation at the time this -- this crime
14   occurred.  On probation.  A young lady had been raped
15   prior to that.  Somebody else had -- had had their purse
16   snatched prior to that.  And then at some point this --
17   it was just going to far.  It's like you were a one man
18   crime spree.  And, but don't let them take away from the
19   fact that you know -- you've been programming well.  And
20   you've been doing a lot of things that are very, very
21   commendable.  And you just keep going because you're on
22   the right track.  Do you have any comments Deputy
23   Commissioner?
24        **DEPUTY COMMISSIONER WOLK:**  Not at this time.
25        **PRESIDING COMMISSIONER PORTER:**  Okay.  That
26   concludes this hearing, the time is 3:41.  I wish you the
27   C. BOATMAN        D-65055        DECISION PAGE 2    6/29/06

66

1   best of luck, sir.

2        **INMATE BOATMAN:**   Thank you.

3        **PRESIDING COMMISSIONER PORTER:**   Good luck.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23   **PAROLE DENIED TWO YEARS**

                                          OCT 2 7 2006
24   **THIS DECISION WILL BE FINAL ON:**_____

25   **YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT**

26   **DATE, THE DECISION IS MODIFIED.**

27   **C. BOATMAN**   **D-65055**   **DECISION PAGE 3**   6/29/06

67

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, TED RIVERA, a duly designated transcriber, VINE, MCKINNON & HALL, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total two in number and cover a total of pages numbered 1 - 67, and which recording was duly recorded at SAN QUENTIN STATE PRISON, at SAN QUENTIN, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of CHRISTOPHER BOATMAN, CDC No. D-65055, on JUNE 29, 2006, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-mentioned matter and have no interest in the outcome of the hearing.

Dated OCTOBER 1, 2006, at Sacramento County, California.

_T. Rivera_

_____
TED RIVERA
Transcriber
**VINE, MCKINNON & HALL**